**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * |
| | * |
| | * |
| **v.** | *   **Criminal No. ELH-16-0009** |
| | * |
| **MOHAMED ELSHINAWY** | * |
| | * |

\*\*\*\*\*\*\*

## GOVERNMENT'S CONSOLIDATED PRETRIAL MOTIONS RESPONSE

The United States of America, by and through its counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Christine Manuelian and Kenneth S. Clark, Assistant United States Attorneys for said District, responds as follows to the defendant's pretrial motions to dismiss the indictment and sever counts of the indictment for trial.

## I.   Summary of the Case

### A.   Facts

On June 25, 2015, the FBI became aware of an ISIL facilitator in Egypt ("Egyptian ISIL operative") who was attempting to send money to the defendant. Western Union transactional records confirmed delivery of a $1,000 wire transfer to the defendant on June 28, 2015, originating from a location in Egypt with the Egyptian ISIL operative identified as the sender. On that same date, FBI surveillance agents observed the defendant pick up the wire transfer from a convenience store near his home, after which he was followed to a local bank branch. Bank records confirmed that at that time, the defendant deposited $800 of the cash from the wire transfer into his bank account and then transferred $200 from that deposit into a joint account held with the woman with whom he resides.

On June 30, 2015, the defendant was stopped in his vehicle and briefly questioned by Baltimore County police officers. Shortly thereafter, the defendant was observed by law enforcement agents visiting a Walmart store in the nearby vicinity, where, according to Walmart records, he purchased two pay-as-you-go cell phones and two phone cards.

On July 17, 2015, the defendant consented to a non-custodial interview by FBI agents. During the interview, which was not recorded, the defendant was questioned about the $1,000 Western Union transfer and provided a number of false statements. He initially stated that the money had come from his mother who resides in Egypt, then surmised that his identity may have been stolen online, and then claimed that the money had been sent to purchase an iPhone for a friend. Upon being advised that making a false statement to law enforcement officers was a criminal offense for which he could face imprisonment, the defendant revealed that he had been communicating with a childhood friend (referred to herein and in the indictment as Coconspirator #1) who had been arrested in Egypt on terrorism-related offenses and who had subsequently fled to Syria following his release from custody.

The defendant advised the interviewing agents that a few months prior to the date of the interview, Coconspirator #1 had introduced him, through social media, to an unnamed ISIL operative. The defendant had agreed to this contact because he thought he could obtain some money from ISIL. Thereafter, the defendant began communicating with the ISIL operative through encrypted social messaging applications.

The defendant provided the interviewing agents with the phone number he used to contact the ISIL operative and indicated that he had only received a total of $4,000 in two payments from this individual. He stated that the first payment of $3,000 (minus transaction fees) was sent via PayPal, and the second payment was the Egyptian wire transfer of $1,000

received on June 28, 2015. The defendant showed the agents a PayPal receipt on his laptop computer reflecting the $3,000 transaction originating from a foreign company (referred to herein and in the indictment as "Overseas Company"). He stated that he had been instructed by the ISIL operative to use the monies he received for "operational purposes," which he understood to mean causing destruction or conducting a terrorist attack in the United States. The defendant stated that the ISIL operative did not provide specific guidance as to what weapons to buy or how to conduct an attack, but the Draw Mohammed Contest in Texas was given as an example.[1] The defendant claimed that even though he knew the money he had been sent was to fund a terrorist attack, he never intended to conduct such an attack. Rather, he claimed, he saw an opportunity to make money and take it from "thieves," and felt that the FBI should reward him for what he had done. He also indicated that he had been instructed to stop whatever activities he was doing in connection with executing an attack if he ever determined he was under surveillance by law enforcement.

The defendant consented to a second non-custodial interview with FBI agents on July 20, 2015, which was recorded. During this interview, the defendant claimed that he was simply trying to scam some money from ISIL members and that he had received no other funds from ISIL other than the $4,000 previously discussed, which he stated he had used to buy furniture and pay bills. He touted his success at having taken ISIL's money, felt that his efforts should be applauded, and thought he should be offered a job to work with the FBI to identify ISIL's money network. Towards the end of the interview, the defendant stated that he had just remembered having received another $1,200 from the ISIL operative through PayPal. He indicated that the

---

[1] On May 3, 2015, two individuals attempted to attack and kill attendees at an art contest in Garland, Texas, depicting drawings of the Prophet Mohammed. The individuals were immediately killed by law enforcement officers as they sought to launch their attack.

guidance he received from the ISIL operative, as was the case with the other monies, was to use this additional money to do something destructive that ISIL could claim.

During this second interview, the defendant explained that in order to receive the additional $1,200, he registered for an account with an online store that provided drop shipping services, and then chose printers to pretend to sell over ebay for his ISIL contacts to pretend to buy. He also stated that he provided an email address to the ISIL operative to complete the money transfer via PayPal. Records obtained from the online store identified by the defendant during this interview reflect no activity related to the purchase of printers as represented by the defendant. In fact, the items observed in the online store accounts relate to weapons components and electronic communication equipment being viewed or tagged for possible purchase.

A review of PayPal records subsequently confirmed that the defendant had concealed from the FBI at least $3,500 of the $7,700 in ISIL-related funds he received from the Overseas Company, via two PayPal accounts, between March and June 2015. The identified PayPal payments (exclusive of processing fees) were received as follows: $1,500 on March 23; $1,000 on April 16; $1,000 on May 1; $3,000 on May 14; and $1,200 on June 7. This last payment, which occurred in concert with the defendant's creation of one of his accounts on the online store, was sent through a PayPal account subscribed to the woman with whom the defendant resides and refers to as his "wife," though they are not legally married. The other payments from the Overseas Company went through a PayPal account in the name of business previously established by the defendant called "TheCheapMart." With the addition of the $1,000 Egyptian wire transfer, the defendant received a total of at least $8,700 from individuals the defendant had identified in his interviews as being associated with ISIL.

A review of bank and business records indicate that the defendant spent the monies he received from ISIL operatives as follows: at least $1350 of the monies were used to purchase communication devices such as phones, calling cards, a laptop computer, a hotspot for internet access, and a virtual private network;[2] at least $3000 of the monies were converted into cash by the defendant through ATM withdrawals that are neither traceable nor accountable; and a portion of the remaining funds appear to have been used for personal expenses, again, not all of which can be traced or identified.

PayPal and email records establish that during the period from March to June 2015, when the defendant was receiving ISIL-related funds, he not only reengaged his PayPal business account, which had been dormant since May 2014, but he was also activating numerous email and cell phone accounts, in many instances utilizing pseudonyms in an attempt to conceal his identity. The PayPal records indicate a number of log-ins from IP addresses resolving to proxy servers (which are typically used to conceal the true location of the user), and more significantly, IP addresses resolving to locations in Turkey, which occurred close in time to the May 17 money transfer and the money transfer on June 7. Similar activity was observed in records for the defendant's accounts with the online store. There was no transactional activity in those accounts between in or about 2012 and June 2, 2015. Activity was then observed for the period from June 2-7, 2015, with one of the accounts being accessed on June 5 and 6, 2015, from an IP address resolving to a location in France.

During his July 17 interview with FBI agents, the defendant claimed that he had destroyed one of his cell phones. He indicated that he had told the ISIL operative that he had

---

[2] An internet "hot spot" is a virtual machine that offers its user accessibility to the internet from any location, including the ability to anonymously access private internet-based communication platforms. A virtual private network, or VPN, provides its users the ability to communicate securely over the internet through an encrypted virtual connection.

done this because of his belief that he was under observation and had to get "out" of the game. The defendant stated that he thought this explanation to the ISIL operative would be a good excuse that would not be questioned and would disassociate his old phone number with the encrypted messaging applications over which he had been communicating with ISIL members. However, the defendant confirmed that he transferred the phone number for the ISIL operative into his new phone along with all of his other contacts.

Also during the July 17 interview, the defendant consented to a search of his Dell and HP laptop computers (which were subsequently returned to him by the FBI on July 20, 2015). A forensic analysis revealed that the hard drive of the HP laptop had been damaged. More significantly, the HP laptop was utilizing a thumb drive containing a particular type of operating system that does not allow for the storage of information on the computer and resets it each time it is rebooted. Accordingly, no retrievable information or evidence was found on the HP laptop computer by FBI forensic analysts.

A forensic analysis of the Dell laptop revealed several pictures documenting significant damage to the Italian Consulate in Cairo, Egypt, which was bombed on July 11, 2015. The analysis also revealed that the laptop had been used to access another email account, identified through records to be registered by the defendant under a pseudonym, and that the account had been accessed on July 11, 2015 – the same day as the consulate bombing. During the July 17 interview, the defendant was shown photographs by the interviewing agents of the consulate attack. The defendant denied having ever seen any photos of the attack. Forensic analysis of the defendant's Dell laptop also revealed that the computer had been used to access multiple email accounts subscribed to the defendant (as established by certain registration information

provided), in some instances utilizing pseudonyms or other identifiers in an apparent attempt to conceal his true identity.

Subscriber records indicate that the defendant last accessed one of the email accounts he established (under a pseudonym) on July 2, 2015, approximately three months after its creation on April 6, 2015. The records associate the account to the defendant through another email account and a cell phone identified through records as being used by the defendant. According to the subscriber records for this email account, it was logged into approximately 85 times, which was almost every single day during the period from April 6 through July 2, 2015, when the defendant was receiving funds from ISIL. A criminal search warrant executed on this account provided no substantive information that would explain what activities were taking place in the account following the log-ins, which could include accessing other Google services or temporarily storing information subsequently deleted from the account. In addition to obtaining and using multiple phones and email accounts, the defendant also utilized a particular type of router that is commonly known to protect the anonymity of the location from which the routed communications are originating as it streams the data through cooperating proxy servers.

Through the execution of various criminal search warrants, the government was able to obtain records from certain social media accounts used by the defendant, Coconspirator #1, and the defendant's brother who resides in Saudi Arabia. The records for the defendant's social media account revealed that he had deleted numerous chats between himself and Coconspirator #1. The records from Coconspirator #1's social media account revealed that he and the defendant had engaged in numerous conversations dating back to February 2015, the substance of which reflected the defendant's allegiance, and that of Coconspirator #1, to ISIL's cause. (A number of these chats are excerpted in the Count One of the indictment.) The IP addresses

associated with logins for the defendant's social media account during his chats with Coconspirator #1 originated in Maryland, while the login IP addresses for Coconspirator #1 in connection with these chats resolved to either proxy servers located in Europe and Africa, fixed locations in Turkey near the Iraq/Syria border, or locations inside of Iraq. The public profile from October 2015 for Coconspirator #1's social media account contained several images of ISIL-related propaganda. In addition, a number of Coconspirator #1's conversations with other individuals over his social media account involved ISIL-related operational discussions (some of which are also excerpted in Count One of the indictment).

The records from Coconspirator #1's social media account also indicate that he had made numerous attempts in mid-July and August to contact the defendant; however, the defendant never responded. At that point, the defendant had been interviewed by the FBI. Records from the defendant's social media account reveal that at a point in time after having met with FBI agents, the defendant blocked Coconspirator #1 from accessing his (the defendant's) social media account, in addition to deleting their chats, apparently in an attempt to conceal his own activities with ISIL members.

The defendant's social media records also indicate that he had joined numerous related social media networks that reflected radical beliefs or support for ISIL, or involved information relating to ISIL activities and electronic hacking. One of the individuals listed as a "friend" on the defendant's account had photos and other ISIL-propaganda included on his public social media profile. On July 18, 2015, the day after the defendant was first interviewed by Baltimore FBI agents, he "removed" this individual as a "friend" on his social media account. During execution of a criminal search warrant at the defendant's residence on October 9, 2015, the name of this individual was displayed on the defendant's phone as an account that the defendant was

"following" as of that day, thereby demonstrating that the relationship between the two men continued. A subsequent criminal search warrant executed on the social media account of this individual revealed multiple photos of ISIL soldiers, the black ISIL flag, tanks and guns, news coverage of "Jihadi John" (the individual seen in numerous ISIL beheading videos), and a map of ISIL-held or proposed ISIL territories.

During execution of the search warrant at the defendant's residence on October 9, it was discovered that the defendant had a mobile hot spot. A receipt for the purchase of the hot spot, also found during the search, indicated that it was purchased by the defendant on February 21, 2015, from a local Walmart. This date is within a few days of the defendant's social media chat with Coconspirator #1 during which the defendant pledged his allegiance to ISIL (referenced in paragraph 10 of Count One of the indictment).

A review of records from the social media account used by the defendant's brother revealed multiple chats in which the defendant sought to recruit his brother to join ISIL, and confirmed his allegiance to ISIL and his desire to live among the Islamic State and die as a martyr. During a series of social media chats in August 2015, the defendant told his brother to warn Coconspirator #1 that the defendant could no longer communicate with him (Coconspirator #1) because he (the defendant) had been revealed and uncovered (an obvious reference to the defendant's contact with the FBI). The defendant directed his brother to delete all communications with, or about, Coconspirator #1. (A number of the chats between the defendant and his brother are excerpted in Count One of the indictment.)

During the execution of a search warrant at the defendant's residence on the day of his arrest, December 11, 2015, a handwritten note was found that contained the name and contact information of an employee of the Overseas Company associated with its wire transfers to the

defendant. The note also included wire transfer information for an attempted transfer of monies to the defendant by that employee through MoneyGram. The transfer was unsuccessful, but was subsequently completed by another member of the Overseas Company through a transfer of funds into the PayPal account of the defendant's "wife" on June 7, 2015.

Finally, agents executing the search at the defendant's residence on December 11, 2015, found a large box in the residence containing months of newspaper articles and clippings reporting on ISIL and its ongoing activities, including recent bombings, as well as articles concerning FBI terrorism investigations.

### B. Elements of the Charged Offenses

Counts One and Two of the indictment charge the defendant with providing, and attempting to provide, material support to ISIL, a designated foreign terrorist organization, and conspiracy to do same, in violation of 18 U.S.C. § 2339B. In order to satisfy its burden of proof as to these counts, the government must prove that: 1) the defendant knowingly provided material support or resources to a foreign terrorist organization, in this case ISIL; 2) that the defendant knew that ISIL was a designated terrorist organization, or that it had engaged or was engaging in terrorist activity or terrorism; and 3) that one of the jurisdictional requirements set forth in the statute was satisfied. 18 U.S.C. § 2339B(a)(1). The jurisdictional requirement is met by establishing one of the following: the defendant is a national of the United States; after the conduct occurred, an offender was brought back to, or found in, the United States; the offense occurred in whole or part in the United States; the offense occurred in or affected interstate or foreign commerce; or an offender aided or abetted, or conspired with, any person over whom jurisdiction exists for the offense. 18 U.S.C. § 2339B(d).

In order to satisfy its burden of proof as to Count Three of the indictment, which charges the defendant with unlawful financing of terrorism in violation of 18 U.S.C. § 2339C(a), the government must prove that: 1) the defendant willfully collected funds; 2) that he had the knowledge that the funds were to be used, in full or in part, to carry out an act intended to cause death or serious bodily injury to a civilian, and whose purpose, by its nature or context, was to intimidate a population; and 3) that he committed the offense while in the United States and satisfied one of the statutory jurisdictional requirements. 18 U.S.C. § 2339C(a). In this case, the jurisdictional requirement would be met by establishing one of the following: the defendant was a national of the United States; a perpetrator was found outside of the United States; or the offense was directed toward or resulted in the carrying out of a predicate act within the United States, and either the offense or predicate act was conducted in, or the results thereof affected, interstate or foreign commerce. 18 U.S.C. § 2339C(b).

Finally, as to Count Four of the indictment, which charges the defendant with making material false statements in violation of 18 U.S.C. 1001, the government must prove that 1) on or about the date specified, the defendant made statements or representations, 2) that were material, 3) that were false, fictitious, or fraudulent, 4) that were made knowingly and willfully, and 5) that were made in a matter within the jurisdiction of the government of the United States – in this case, an investigation being conducted by the FBI, an agency within the executive branch of the government. 18 U.S.C. § 1001(a)(2); Sand & Siffert, *Modern Federal Jury Instructions*, § 36-9.

## II.    Motion to Sever Counts of the Indictment

The defendant moves to sever Count Four of the indictment, alleging that joinder of the false statement charge with the remaining counts of the indictment was improper and that, even if proper, Count Four should be severed because it would unfairly prejudice him at trial.

Because his false statements to law enforcement were about the very conduct that is the subject of the terrorism charges in Counts One through Three, the joinder was proper under both the rules and case law, and the defendant fails to demonstrate the prejudice required to sever them.

Joinder – and the severance of properly-joined counts – are governed by Federal Rules of Criminal Procedure 8 and 14, respectively.  Rule 8(a) provides:

> The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged--whether felonies or misdemeanors or both--are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed.R.Crim.P. 8(a).  "To promote judicial efficiency [this rule] 'permits very broad joinder' of 'related counts in the same trial.'"  *United States v. Blair*, 661 F.3d 755, 768 (4th Cir. 2011) (quoting *United States v. Cardwell*, 433 F.3d 378, 385 (4th Cir. 2005)).  Moreover, "'the prospect of duplicating witness testimony, impaneling additional jurors, and wasting limited judicial resources suggests that related offenses should be tried in a single proceeding.'"  *Id.* at 768-69 (quoting *United States v. Hawkins*, 589 F.3d 694, 700 (4th Cir. 2009), opinion amended and superseded, 776 F.3d 200 (4th Cir. 2015)).  The Fourth Circuit has explained that, "[i]n determining whether two offenses are connected with or constitute parts of a common scheme or plan for purposes of Rule 8(a), we have read the rule 'flexibly' to require simply a 'logical relationship' between offenses charged in the indictment."  *Id.* at 769 (quoting *Cardwell*, 433 F.3d at 385).

Federal Rule of Criminal Procedure 14 provides:

> If the joinder of offenses … in an indictment … appears to prejudice a defendant or the government, the court may order separate trials of counts … or provide any other relief that justice requires.

Fed.R.Crim.P. 14(a). To sever properly-joined counts, "the defendant 'must establish that actual prejudice would result from a joint trial, and not merely that a separate trial would offer a better chance of acquittal.'" *Blair*, 661 F.3d at 770 (quoting *United States v. Reavis*, 48 F.3d 763, 767 (4th Cir. 1995)). Specifically, that requires a showing of "'a serious risk that a joint trial would … prevent the jury from making a reliable judgment about guilt or innocence.'" *Id.* (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

The Fourth Circuit has consistently upheld the joinder and joint trial of counts involving the cover up or concealment of the joined substantive or conspiracy counts. *See*, *e.g.*, *Blair*, 661 F.3d at 769 ("We conclude that 'a tax count is properly joined to other counts of an indictment if the other crimes generated the income on which the defendant evaded payment.'") (quoting *United States v. Oakley*, 853 F.2d 551, 554 (7th Cir. 1988)); *United States v. Snyder*, 365 Fed.Appx. 508, 509–10 (4th Cir. 2010) (holding that obstruction of justice count (Count Nineteen) "was part of the same transaction" as the wire fraud count).

In *United States v. Carmichael*, a case before the Fourth Circuit, the defendants had been convicted of "conspiracy to buy votes and substantive counts of vote buying in the primary election, as well as obstruction of justice in connection with the grand jury investigation of the election." 685 F.2d 903, 905 (4th Cir. 1982). Both defendants challenged the denial of their motions to sever the obstruction counts from the substantive counts. *Id.* at 909-10. The Fourth Circuit found that the obstruction was a part of the same "series of acts or transactions" as the other counts because they "related to actions by [the defendants] to conceal the actions for which they were charged under conspiracy and substantive counts." *Id.* at 910. As a result, joinder was proper and there was no potential prejudice that would have justified severance. *Id.*

Similarly, in *United States v. Jamar*, the Fourth Circuit affirmed the defendant's convictions on perjury, unlawfully possessing a stolen check, and uttering the same check with intent to defraud. 561 F.2d 1103, 1105 (4th Cir. 1977). The perjury count arose from the defendant's preliminary hearing on the other two counts, in which she falsely claimed that her fingerprints would have gotten on the forged check a year after the offenses were committed. *Id.* at 1106. The court found that joinder was proper because "all three counts relate to, and are logically and intimately connected together with, the theft and cashing of the treasury check." *Id.* (internal quotations and citations omitted).

The *Jamar* court also found no potential prejudice that would have supported severing the counts. *Id.* at 1107-08. Specifically, the court noted that "if the evidence of all the joined crimes would be mutually admissible for legitimate purposes in separate trials for each offense (assuming no joinder), the possibilities of prejudice from the fact of joinder no longer present themselves so forcefully." *Id.* at 1106-07. Because the lion's share of the evidence of the substantive counts would have been admissible at a separate perjury trial to show "motive and intent to lie…and perhaps materiality of the false statement," the court found a strong reason to join the counts to "avoid[] two trials entailing much of the same proof when one would suffice." *Id.* at 1107.

Similar to the situation in *Carmichael* and *Jamar*, here the defendant is charged with making false statements to FBI agents about his involvement in the charged conspiracy and substantive offenses. The defendant suggests, without support, that the false statements bear no relation to underlying counts because they came after the conduct being investigated by the FBI. As an initial matter, this is not correct – his interviews (in July 2015) occurred while the conspiracy was on-going (through December 2015) and sought to derail the investigation into his

on-going activities. But, even had the false statements come later, the cover-up of a crime (e.g., obstruction, perjury, false statements) often comes after the underlying crime is complete, as was the case in both *Carmichael* and *Jamar*. Indeed, the Fourth Circuit has made clear that lying about the substantive conduct is part of the same "series of acts or transactions" as the other counts because it "relate[s] to actions by [the defendant] to conceal the actions for which [he was] charged under conspiracy and substantive counts." *See Carmichael*, 685 F.2d at 910. As a result, joinder of such counts is proper.

In addition, these properly-joined counts should not be severed. The defendant makes no effort to meet his high burden to demonstrate the prejudice required to sever properly-joined counts. This is not surprising. Much of the evidence at issue would be mutually admissible at both trials were they charged separately. The fact that he made false statements about his involvement with ISIS is directly relevant to the charges related to material support of terrorism and terrorist financing. Moreover, the underlying conduct in which he was involved would be admissible to explain the false statements. Specifically, they show "motive and intent to lie … and perhaps materiality of the false statement as well," so there is good reason to "avoid[] two trials entailing much of the same proof when one would suffice." *Jamar*, 561 F.2d at 1107. Thus, there can be no prejudice because much of the evidence would be admissible even at separate trials. Moreover, any potential for prejudice could easily be addressed by a jury instruction.[3] *See*, *e.g.*, *Blair*, 661 F.3d at 770 (finding no prejudice where court issued a limiting instruction); *United States v. Ketter*, 456 Fed.Appx. 293 (4th Cir. 2011) (same).

---

[3] A standard jury instruction used by this court provides:

> Each count charges the defendant with a different crime. You must consider each count separately and return a separate verdict of guilty or not guilty for each. Whether you find the defendant guilty or not guilty as to one offense should not affect your verdict as to any other offense charged.

Thus, the counts in this case were properly joined and the defendant cannot demonstrate any prejudice to justify severance. His motion should be denied.

## III. Motion to Dismiss the Indictment

### A. Counts One and Two – Alleged Due Process and Free Speech Violations

The defendant seeks to dismiss Counts One and Two of the indictment on the grounds that the material support statute – 18 U.S.C. § 2339B – as applied to the defendant, is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment and infringes on the defendant's freedom of speech in violation of the First Amendment. Unfortunately for the defendant, these very claims have been rejected by the Supreme Court and other federal courts under facts similar to those charged in this case.

#### 1. Void for Vagueness Claim

In order for a conviction to comport with due process, the statute under which it was obtained must "provide a person of ordinary intelligence fair notice of what is prohibited" and must not be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The Supreme Court has repeatedly held that a determination of vagueness must be considered "as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Holder v. Humanitarian Law Project ("HLP")*, 561 U.S. 1, 18-19 (2010) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). Though the Court has stated in the past that a more stringent vagueness test should apply when a statute interferes with free speech or association, *see Hoffman Estates*, 455 U.S. at 499, the Court made clear in *HLP*

---

Sand & Siffert, *Modern Federal Jury Instructions*, § 3.01.

that the rule set forth in *Hoffman Estates* "makes no exception for conduct in the form of speech." 561 U.S. at 20. "Thus, even to the extent a heightened vagueness standard applies, a plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim under the Due Process Clause of the Fifth Amendment for lack of notice. And he certainly cannot do so based on the speech of others." *Id.*

In this case, the defendant is charged in Counts One and Two with conspiring to provide, providing, and attempting to provide, material support or resources to ISIL in the form of personnel, services (including means and methods of communication), and financial services. The definition of "material support or resources" is found in 18 U.S.C. § 2339A(b). *See* 18 U.S.C. § 2339B(g)(4) ("the term 'material support or resources' has the same meaning given that term in section 2339A"). The term is defined as the provision of

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b). Prosecution under 18 U.S.C. § 2339B for the provision of personnel is limited as follows:

> No person may be prosecuted under this section in connection with the term "personnel" unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization. Individuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control.

18 U.S.C. § 2339B(h).

As the Supreme Court noted in *HLP*, § 2339B(h) not only "makes clear that 'personnel' does not cover *independent* advocacy[,]" 561 U.S. at 23 (emphasis in original), it also informs interpretation of the other referenced forms of material support, including the term "service," as types of "concerted activity." 561 U.S. at 23-24.

> The statue prohibits providing a service "*to* a foreign terrorist organization." The use of the word "to" indicates a connection between the service and the foreign group. We think a person of ordinary intelligence would understand that independently advocating for a cause is different from providing a service to a group that is advocating for that cause.
>
> Moreover, if independent activity in support of a terrorist group could be characterized as a "service," the statute's specific exclusion of independent activity in the definition of "personnel" would not make sense. Congress would not have prohibited under "service" what is specifically exempted from prohibition under "personnel." The other types of material support listed in the statute, including "lodging," "weapons," "explosives," and "transportation," are not forms of support that could be provided independently of a foreign terrorist organization. We interpret "service" along the same lines…. Thus, … a person of ordinary intelligence would understand the term "service" to cover advocacy performed in coordination with, or at the direction of, a foreign terrorist organization.

*Id.* at 24 (emphasis in original).

In support of his vagueness claim, the defendant relies on *Johnson v. United States*, ___ U.S. ___, 135 S.Ct. 2551 (2015), in which the Supreme Court upheld a vagueness challenge to the residual clause of the Armed Career Criminal Act ("ACCA"). In *Johnson*, the Court faulted "the indeterminacy of the wide-ranging inquiry required by the residual clause" finding that it denied fair notice to defendants and invited arbitrary enforcement by judges. *Id.* at 2557. The defendant fails to explain how the "interdeminacy" flaw in the ACCA's residual clause is in any way present in § 2339B. Indeed, the Supreme Court held otherwise in *HLP*, specifically noting that application of the statutory terms contained in § 2339B does not require the type of

"untethered, subjective judgments" that had compelled it to strike down statutes tying criminal culpability to vague concepts such as "annoying" or "indecent" conduct. 561 U.S. at 20-21.

The defendant's reliance on *United States v. Sattar*, 272 F.Supp.2d 348 (S.D.N.Y. 2003), for guidance on the meaning of "personnel" under § 2339B is also misplaced given the subsequent amendment to § 2339B in 2004 clarifying the term "personnel" to allow prosecution of those who have "knowingly provided, attempted to provide, or conspired to provide a [FTO] with 1 or more individuals (who may be or include [oneself]) to work under that terrorist organization's direction or control ….." *See* HLP, 561 U.S. at 12-13. *Compare United States v. Lindh*, 212 F.Supp.2d 541, 574 (E.D.Va. 2002) (in pre-amendment case reaching conclusion opposite to *Sattar* and holding that term "personnel" not unconstitutionally vague, but rather, "aimed at denying the provision of human resources to proscribed terrorist organizations, and not at the mere independent advocacy of an organization's interests or agenda").

The case of *United States v. Farhane*, 634 F.3d 127 (2nd Cir. 2011), is analogous in a number of ways to the case at hand. Defendant Farhane, a licensed physician also known as Rafael Sabir, and his co-defendant Tarik Shah, met on a number of occasions with an undercover FBI agent posing as an al Qaeda recruiter. During those meetings, Shah offered to travel abroad to provide terrorist training to al Qaeda combatants and Sabir offered to meet with the mujahideen overseas and provide medical assistance to any wounded fighters. Both Sabir and Shah subsequently pledged their allegiance to al Qaeda, swore obedience to the leaders of al Qaeda, and promised to serve as soldiers of Islam and protect their fellow brothers on the path of jihad. *Id.* at 132-33. Both defendants were subsequently charged with conspiring to provide, and providing and attempting to provide, material support to al Qaeda in the form of personnel, training, and expert advice and assistance, in violation of § 2339B. Shah subsequently plead

guilty to the charged conspiracy; Sabir was convicted after trial of both the conspiracy and the substantive charge.  *Id.* at 132-34.

On appeal of his conviction, Sabir raised, among other things, an as-applied due process challenge to § 2339B, alleging that the terms "training," "personnel," and "expert advice and assistance" were "inherently vague to provide the notice and direction required by due process." *Id.* at 140.  The Second Circuit flat out rejected the defendant's claim, holding that 1) "[s]uch a general complaint" was foreclosed by the Supreme Court's opinion in *HLP*, and 2) Sabir's more specific factual challenges were "equally meritless."  *Id.*  With regard to the term "personnel," the court relied squarely on § 2339B(h) to undercut the defendant's claim:

> The provision of personnel is prohibited by § 2339B only when an individual knowingly provides, attempts to provide or conspires to provide a foreign terrorist organization with one or more individuals, including himself, "to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct [its] operation."  18 U.S.C. § 2339B(h). … Sabir's offer to serve as an on-call doctor for the organization, standing ready to treat wounded *mujahideen* in Saudi Arabia, falls squarely within the core of this prohibition, defeating any suggestion either that he lacked notice that his conduct was unlawful or that the statute was enforced arbitrarily with respect to him. … In offering his support for al Qaeda, Sabir did not simply honor his Hippocratic oath. He swore a further oath of allegiance to al Qaeda, making clear that his treatment of wounded *mujahideen* would be provided not as an independent physician but as "one of the soldiers of Islam," duty bound to obey al Qaeda's leaders, … and to protect his fellow "brothers on the path of *Jihad*" and "on the path of al Qaeda." No reasonable person with a common understanding of al Qaeda's murderous objectives could doubt that such material support fell squarely within the prohibitions of § 2339B.

*Id.* at 140-41.

As set forth in the indictment in this case, the defendant's "pledge of allegiance" to ISIL's cause on February 17, 2015, was conveyed to an admitted ISIL operative – Coconspirator #1 (*see* Indictment, Doc. 19, ¶ 36), was made in the context of the defendant describing himself as a soldier for ISIL, and was made in conjunction with the defendant stating his commitment to

committing violent jihad on behalf of ISIL. Most importantly, the defendant requested that his pledge and associated statements be conveyed to ISIL's leadership – thereby reflecting his commitment to action and intent to further ISIL's cause – while at the same time referencing plans to commit a future terrorist attack (which the defendant acknowledged would be a crime in the United States) and accepting direction from Coconspirator #1 to avoid detection by keeping those plans secret. (Indictment, Doc. 19, ¶ 10.) The defendant then subsequently accepted approximately $8,700 (through arrangements he admitted to the FBI were put in motion by Coconspirator #1), to be used (as directed by ISIL operatives per the defendant's admission) to commit a terrorist attack in the United States.

The defendant's conversation with Coconspirator #1 on February 17, 2015, in and of itself, satisfies the requirement of § 2339B(h) that the provision of personnel be knowingly provided (or attempted to be provided, or conspired to be provided) to work under that terrorist organization's direction or control. However, this conversation is not the government's only evidence of the defendant's intent and actions to provide personnel to ISIL. He sought to recruit his brother, who resides in Saudi Arabia, to join ISIL as a fighter, and engaged his assistance to pass messages to Coconspirator #1 and conceal communications with Coconspirator #1 in order to evade law enforcement detection, consistent with direction from Coconspirator #1 that the defendant acted on by concealing their communications and his own attack plans. *See United States v Goba*, 220 F.Supp.2d 182, 194 (W.D.N.Y. 2002) (finding that term "personnel" in pre-amendment version of § 2339B was not vague, since "one can be found to have 'provided material support or resources to a foreign terrorist organization' by offering one's services to said organization and allowing one's self to be indoctrinated and trained as a 'resource' in that organization's beliefs and activities").

The factual assertions and specifics in the indictment reflect a defendant engaged not in "mere membership" in an organization, but rather, in active conduct at the direction of, and in coordination with his ISIL coconspirators. *See United States v. Marzook*, 383 F.Supp.2d 1056, 1065-66 and n.9 (N.D. Ill. 2005) (incorporating analysis of *Lindh, supra,* that the "plain meaning" of the term "personnel" in pre-amendment version of § 2339B encompasses an "employment-like relationship" that takes it outside "mere independent advocacy" on behalf of the FTO's interests or agenda, as subsequently illuminated by addition of § 2339B(h)).

The defendant's complaints about the alleged vagueness of the terms "services (including means and methods of communication)" and "financial services" as-applied in this case are equally unavailing. The manner and means by which the defendant and his coconspirators are alleged to have acted is specifically detailed in the indictment by way of a listing of the methods used by them to effectuate the conspiracy, including identifying the specific forms of covert communications utilized (social media, electronic mail and messaging accounts and applications, electronic communication devices, and "pay as you go" cellular phones), and the specific types of financial accounts and services used by the defendant and his coconspirators to transfer monies into the United States for a terrorist attack (bank accounts, online financial accounts, prepaid credit/debit cards, online e-commerce accounts, and a business account of an overseas company). (Indictment, Doc. 19, ¶¶ 5 and 6). These details are incorporated by reference in Counts Two and Three, as are the specific examples in Count One of certain acts taken by the defendant to communicate with at least one of his ISIL "handlers" (Coconspirator #1), and allow use of his online financial account to facilitate the receipt of funds in connection with the conspiracy to finance a future terrorist attack.

In *United States v. Hammoud*, the court rejected a vagueness challenge to § 2339B and upheld a charge of providing material support in the form of currency, noting that the term "material support" is not vague given that it "is specifically defined as a number of enumerated actions." 381 F.3d 316, 330 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated in part*, 405 F.3d 1034 (4th Cir. 2005). In this case, the defendant's claim of vagueness falls short of establishing a failure of fair notice of the charges against him and arbitrary enforcement of the statutes under which he has been charged.

## 2. First Amendment Claim

The lack of merit to the defendant's vagueness claim becomes even more clear when addressing his assertion that § 2339B, as applied in this case, violates his First Amendment right to freedom of speech. The defendant never fully explains how the statute impermissibly restricts that freedom, especially in light of the fact that several components of § 2339B operate to avoid such an infringement.

First, "[t]he material-support statute is, on its face, a preventive measure – it criminalizes not terrorist attacks themselves, but aid that makes the attacks more likely to occur." *HLP*, 561 U.S. at 35. As previously noted, § 2339B provides that "[i]ndividuals who act entirely independently of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control." 18 U.S.C. § 2339B(h). Second, the statute states that "[n]othing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the Constitution of the United States." 18 U.S.C. § 2339B(i). Third, the definition of the term "material support or resources" includes specific examples of the types of service that would constitute material support (e.g., personnel, currency or monetary instruments, financial services,

communications equipment, facilities, etc.), some of which are alleged to have been provided by the defendant in this case, as well as things more closely related to speech (*e.g.*, training, expert advice or assistance). 18 U.S.C. § 2339A(b), 18 U.S.C. § 2339B(g)(4).

It was upon considering a First Amendment challenge to these very provisions (specifically, providing training and legal expertise to FTOs and engaging in political advocacy on their behalf) that the Supreme Court held in *HLP* that Congress, having narrowly circumscribed the effect of § 2339B, could criminalize speech that provides material support to designated terrorist organizations:

> Congress has not … sought to suppress ideas or opinions in the form of "pure political speech." Rather, Congress has prohibited "material support," which most often does not take the form of speech at all. And when it does, the statute is carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations.

561 U.S. at 26. Recognizing "the considered judgment of Congress and the Executive that providing material support to a designated foreign terrorist organization – even seemingly benign support – bolsters the terrorist activities of that organization," *id.* at 36, the Court concluded that § 2339B's prohibitions were appropriately tailored to the government's interest in preventing terrorism so as not to abridge the freedom of speech guaranteed by the First Amendment. *Id*. at 36-39.

The defendant argues that the provision of personnel – be it in providing oneself to the terrorist organization through a pledge of allegiance or other actions, or attempting to recruit others – is protected speech. There is nothing in the Supreme Court's opinion in *HLP* that supports his assertion.

First and foremost, the defendant is not charged, as he claims, with violating § 2339B based solely on his pledge of allegiance to, or expressions of support for, ISIL. Those actions

and statements evidence his intent to become an ISIL fighter and his knowledge that ISIL engages in terrorism. They are properly part of the government's proof as to the defendant's engagement in a conspiracy to commit violations of § 2339B as set forth in Count One of the indictment, and his actual substantive commission, or attempted commission, of a violation of § 2339B as set forth in Count Two. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (there is no prohibition on "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent").

The defendant's pledge of allegiance, however, was more than just an expression of support during a conversation over social media. As previously noted with respect to his vagueness challenge, the defendant's conversations with Coconspirator #1 and his brother are indicative not of an individual simply advocating for a cause, but, like the defendant in *Farhane*, committing himself as an ISIL soldier to engage in violent jihad overseas side-by-side with the Islamic State. At the same time, the defendant was also committing himself to proceed with a terrorist attack in the United States, encouraging his brother to join ISIL's ranks, and undertaking tasks, and engaging in various methods and means (as set forth in Count One) to facilitate covert communication and receive monies from his coconspirators to fund a terrorist attack. Most significantly, the defendant was executing his provision of support to ISIL while taking direction from, and coordinating with, an admitted ISIL operative (Coconspirator #1) and others. *See United States v. Taleb-Jedi*, 566 F.Supp.2d 157, 180-83 (E.D.N.Y. 2008) (rejecting as-applied vagueness challenge where defendant's participation as "personnel" is "more akin to an employment relationship;" such conduct is "more than advocacy protected by the First Amendment").

In fully addressing the defendant's First Amendment arguments, it bears stating that § 2339B also does not violate the freedom of religious association guaranteed by the First Amendment. Though the defendant does not explicitly reference freedom of association in his motion, to the extent his arguments allege such a violation, the courts have found no basis for such a claim.

Freedom of association encompasses two forms: (1) the right "to maintain certain intimate human relationships;" and (2) "the right to associate for the purpose of engaging in those activities protected by the First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984). In *HLP*, the Supreme Court expressly held that § 2339B does not prohibit individuals from becoming members of designated terrorist organization or impose any sanction on them for doing so. "The statute does not penalize mere association with a foreign terrorist organization[;] … '[it] does not prohibit being a member of one of the designated [FTOs] or vigorously promoting and supporting the political goals of the group.… What [§ 2339B] prohibits is the act of giving material support.'" 561 U.S. at 39-40 (quoting *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1133 (9th Cir. 2000)).

The Fourth Circuit and other federal courts agree. *See, e.g., Hammoud*, 381 F.3d at 328-29 ("§ 2339B does not prohibit mere association; it prohibits the *conduct* of providing material support to a designated FTO"); *People's Mojahedin Organization of Iran v. Department of State*, 327 F.3d 1238, 1244 (D.C. Cir. 2003) (rejecting organization's claims that § 2339B violated its First Amendment rights of freedom of speech and association); *United States v. Warsame*, 537 F.Supp.2d 1005, 1013-15 (D. Minn. 2008) (rejecting defendant's argument that § 2339B violated his right of association because the statute does not require a showing of specific intent to

commit the underlying terrorist activity); *United States v. Assi*, 414 F.Supp.2d 707, 712-716 (E.D. Mich. 2006) (same); *Taleb-Jedi*, 566 F.Supp.2d at 173-77 (same).

Contrary to the defendant's assertions, the charges in the indictment do not offend the defendant's First Amendment freedoms of speech and association, as they clearly involve the defendant's *conduct* – be it actual, attempted, or as part of the charged conspiracy – to provide material support to ISIL.

### B.      Counts One through Four – Claim of Lack of Specificity

The defendant moves, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii), to dismiss the indictment for lack of specificity, claiming that it does not sufficiently identify or allege facts that support each of the four counts charged.  Assertions of this kind cannot support dismissal of an indictment, which must be considered on its face with the allegations taken in the light most favorable to the government.

The Fourth Circuit has repeatedly held that "courts lack authority to review the sufficiency of evidence supporting an indictment, even when a mistake was mistakenly made." *United States v. Wills*, 346 F.3d 476, 488 (4th Cir. 2003) (citing *United States v. Mills*, 995 F.2d 480, 487 (4th Cir.1983) and *Costello v. United States*, 350 U.S. 359, 363–64 (1956) ("permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence … would run counter to the whole history of the grand jury institution")). "Furthermore, '[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charges on the merits.'"  346 F.3d at 488-89 (quoting *Mills*, 995 F.2d at 487)).

An indictment must be "a plain, concise and definite written statement of the essential facts constituting the offense charge."   Fed.R.Crim.P.  7(c)(1).   An indictment is deemed

sufficient if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). "When the words of a statute are used to describe the offense generally, they 'must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged.'" *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (quoting *Hamling*, 418 U.S. at 117-18)).

As to each of the charged offenses in this case, the indictment tracks the required elements of the referenced statutes and provides particularity as to time and place of commission. With respect to the charge of conspiracy contained in Count One, the indictment: references coconspirators with whom the defendant conspired, specifically identifying an admitted ISIL member (Coconspirator #1); it details the manner and means by which the defendant and his coconspirators sought to further the goals of the conspiracy; and, it identifies certain of the acts taken to effect the object of the conspiracy. *See Wong Tai v. United States*, 273 U.S. 77, 81 (1927) (noting long-held axiom that "certainty, to a common intent, sufficient to identify the offense which the defendants conspired to commit, is all that is necessary" in charging a conspiracy) (internal quotation marks and citation omitted)).

As previously noted with regard to the defendant's vagueness challenge, the manner and means by which the defendant and his coconspirators acted is specifically detailed in the indictment by way of a listing of the methods used by them to effectuate the conspiracy, including identifying the specific forms of covert communications utilized (social media, electronic mail and messaging accounts and applications, electronic communication devices, and

"pay as you go" cellular phones), and the specific types of financial accounts and services used by the defendant and his coconspirators to transfer monies into the United States for a terrorist attack (bank accounts, online financial accounts, prepaid credit/debit cards, online e-commerce accounts, and a business account of an overseas company).

That same level of specificity is included in the substantive charges in Counts Two through Four, as they incorporate, by reference, all of the details set forth in Count One (save the charging language in paragraph 4). These details include identification of certain acts undertaken by the defendant, such as 1) the attempted recruitment of his brother, 2) agreeing to direction provided by Coconspirator #1 to conceal plans for a potential terrorist attack, 3) taking direction from Coconspirator #1 to obtain an unattributable phone number to facilitate covert communication with ISIL operatives, 4) obtaining a phone to facilitate communication with his coconspirators and through means designed to conceal his identity, 5) offering himself as a committed mujahideen to go overseas to fight with ISIL overseas, 6) consulting with Coconspirator #1 with regard to how to obtain or make an explosive device shortly after their discussion regarding the defendant taking time to pursue an attack against his targets, 7) collecting monies from his coconspirators on specific dates and in specific amounts to be used to commit a terrorist attack in support of ISIL (and admitting same to his brother – *see* Indictment, Doc. 19, ¶ 20), and 8) making certain specific false statements to the FBI designed to minimize his involvement with ISIL and misdirect the criminal investigation of his activities.

It is inconceivable how all of these details in the indictment deny the defendant "the ability to 'plead an acquittal or conviction,'" Def. Mem. to Mtn. to Dismiss, Doc. 51-1, at 14, and the defendant offers no explanation other than to complain about the sufficiency of the evidence. For example, the defendant complains that Counts One and Two do not identify any

facts indicating he providing funding to ISIL. The indictment does not claim that he did. It does, however, state that the defendant and his coconspirators utilized various financial accounts and services to transfer monies into the United States from overseas to be used to conduct a terrorist attack," and provides specific examples of the types of financial services used that form the "financial services" prong of the material support charges. (*See* Indictment, Doc. 19, ¶ 6).

The defendant also complains that the indictment fails to allege the means and methods of communication provided by the defendant and his coconspirators. Yet the indictment specifically explains that the defendant and his coconspirators used surreptitious methods to evade law enforcement detection and the means used by them to accomplish that concealment (*see* Indictment, Doc. 19, ¶ 5), and provides one example of the defendant's purchase of a cell phone, under a false name, for communications with Coconspirator #1, an admitted ISIL operative (*see* Indictment, Doc. 19, ¶¶ 12, 14-15).

Finally, with respect to Counts One and Two, the defendant complains that there are no facts supporting how he acted at the direction of ISIL to plan a terrorist attack, or how he formulated his pledge of allegiance to ISIL. These are evidentiary matters that go beyond the "facts and circumstances" necessary "to inform the accused of the specific offence … with which he is charged." *Hamling*, 418 U.S. at 117-18.

With regard to Count Three, the defendant complains that the indictment does not identify facts establishing that he received ISIL funds with the intent to carry out a terrorist act, or that the funds were actually used for that purpose. Neither of these assertions are elements of the charged offense. Section 2339C(a) identifies two types of prohibitions against the financing of terrorism. The first is to provide or collect funds with the intention that they be used, in full or in part, to carry out a terrorist act. The second is that with which the defendant is charged – to

provide OR (as in the defendant's case) **to collect funds with the knowledge that such funds were to be used, in full or in part, to carry out a terrorist act.** 18 U.S.C. § 2339C(a).

The defendant is not charged in Count Three with providing funds to ISIL, only receiving funds from ISIL for use in carrying out a terrorist attack.[4] Section 2339C specifically states that "it shall not be necessary that the funds [collected] were actually used to carry out a predicate act" in order to constitute a violation of 2339C(a). 18 U.S.C. § 2339C(a)(3). More importantly, "§ 2339C does not require a showing of specific intent that the defendant acted to further the organization's terrorist activities .… Mere knowledge that the funds provided and collected would be used to carry out the predicate act is enough." *Wultz v. Islamic Republic of Iran*, 755 F.Supp.2d 1, 47 (D.D.C. 2010) (internal citation omitted). *Accord Weiss v. National Westminster Bank, PLC*, 453 F.Supp.2d 609, 629-30 (E.D.N.Y. 2006) (noting that §2339C, on its face, requires only knowledge that collected funds are to be used for terrorist purposes; it is not necessary to show that the defendant had the intent to receive the funds for terrorist purposes).

Finally, with regard to Count Four, the defendant complains that the indictment is ambiguous regarding the specifics of the universe of false statements made by the defendant and lacks essential details regarding the monies he received from ISIL. It is difficult to make sense of these assertions because they stand in complete contradiction to what is stated in the indictment. First, the indictment sets forth the dates and amounts of each of the payments received by the defendant into his online account (for a total of approximately $8,700), identifies the primary sender as an overseas company used by the coconspirators to further the goals of the conspiracy to support ISIL (*see* Indictment, Doc. 19, ¶ 6), and specifies that the monies were to be used to conduct a terrorist attack on ISIL's behalf.

---

[4] The term "collects" as used in § 2339C(a) "includes raising and receiving." 18 U.S.C. § 2339C(e)(4).

Second, in addition to the two specific examples of false statements made by the defendant as set forth in Count One and incorporated by reference in Count Four (*see* Indictment, Doc. 19, ¶¶ 29 and 31), Count Four also provides additional specificity regarding the nature of the defendant's false statements by identifying them as statements that "minimized, mischaracterized, and concealed the full extent of [the defendant's] criminal conduct with ISIL, including the true nature and extent of his association with, and relationship to ISIL, the amount of monies he received from ISIL, and the support he provided to ISIL." (Indictment, Doc. 19, at 11). And by incorporating by reference the details of the conspiracy set forth in Count One, the indictment makes clear the materiality of the false statements made by the defendant to the FBI during the course of their investigation. These factors, combined with the tracking of the statutory elements of the charge, "fairly inform[] [the] defendant of the charge against which he must defend." *Hamling*, 418 U.S. 117.

"A district court may dismiss an indictment under Rule 12 'where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial.'" *United States v. Engle*, 676 F.3d 305, 415 (4th Cir. 2012) (quoting *United States v. Snipes,* 611 F.3d 855, 866 (11th Cir.2010)). *See also United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992) ("There is no summary judgment procedure in criminal cases. Nor do the rules provide for a pre-trial determination of sufficiency of the evidence."). As the Fourth Circuit noted in *United States v. Matzkin*, 14 F.3d 1014 (4th Cir 1994),

> [T]he sufficiency of an indictment should be determined by practical, as distinguished from purely technical, considerations. Does it, under all of the circumstances of the case, tell the defendant all that he needs to show for his defense, and does it so specify that with which he is charged that he will be in no danger of being a second time put in jeopardy? If so, it should be held good.

*Id.* at 1019 (quoting *United States v. Cobb*, 905 F.2d 784, 790 (4th Cir.1990)).

The type of recitation of evidentiary details sought by the defendant is not what Rule 7(c) and the Constitution require. What is required is fair notice of the charges (which the defendant appears to agree the indictment has provided), and enough information to "enable[] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. The indictment more than meets those requirements.

## IV. Conclusion

WHEREFORE, for the reasons stated herein, the government respectfully requests that the defendant's motions to sever Count Four of the indictment and to dismiss the indictment on various grounds be denied in their entirety.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____/s/_____

Christine Manuelian
Kenneth S. Clark
Assistant United States Attorneys
36 S. Charles Street, 4th Floor
Baltimore, MD 21201
410-209-4800

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 3, 2016, the foregoing Government's Consolidated Pretrial Motions Response was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all counsel of record for the defendant.

_____/s/_____

Christine Manuelian
Assistant United States Attorney