

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | |
|---|---|---|
| *Christine Manuelian*<br>*Assistant United States Attorney*<br>*Christine.Manuelian@usdoj.gov* | *Suite 400*<br>*36 S. Charles Street*<br>*Baltimore, MD 21201-3119* | *DIRECT: 410-209-4852*<br>*MAIN: 410-209-4800*<br>*FAX: 410-962-0293* |

August 10, 2017



Joshua Treem, Esquire
Stuart O. Simms, Esquire
Brown Goldstein & Levy, LLP
120 East Baltimore Street, Suite 1700
Baltimore, MD  21202

> Re:  *United States v. Mohamed Elshinawy*
>       Criminal No. ELH-16-0009

Dear Mr. Treem and Mr. Simms:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been reached between the Defendant and the United States Attorney's Office for the District of Maryland ("this Office").  The terms of the agreement are as follows:

### Offenses of Conviction

The Defendant will plead guilty to the Indictment pending against him in which he is charged with: conspiracy to provide, providing, and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1) (Counts 1 and 2); terrorist financing, in violation of 18 U.S.C. § 2339C(a) (Count 3); and making material false statements and representations, in violation of 18 U.S.C. § 1001 (Count 4). The Defendant admits that he is, in fact, guilty of these offenses and will so advise the Court.

### Elements of the Offenses

The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

### Count One

(1)  the Defendant knowingly and intentionally conspired with others to provide material support or resources to a foreign terrorist organization, namely, ISIS; and,
(2)  the Defendant did so knowing that ISIS is a designated terrorist organization and that it had engaged, or was engaging, in terrorist activity or terrorism; and,

1

(3) one of the jurisdictional requirements was met, in this case that the Defendant is a national of the United States.

Count Two

(1) the Defendant knowingly provided, or attempted to provide, material support or resources to a foreign terrorist organization, namely, ISIS;

(2) the Defendant did so knowing that ISIS is a designated terrorist organization and that it had engaged, or was engaging, in terrorist activity or terrorism; and,

(3) one of the jurisdictional requirements was met, in this case that the Defendant is a national of the United States.

Count Three

(1) the Defendant willfully collected funds, directly or indirectly, with the knowledge that such funds were to be used, in full or in part, to carry out a terrorist attack; namely, an act intended to cause death or serious bodily injury to a civilian, and,

(2) one of the jurisdictional requirements was met, in this case that the offense occurred in whole or in part within the United States and a perpetrator was found outside the United States, or the offense was directed toward the carrying out of a predicate act committed within the United States that affected interstate or foreign commerce.

Count Four

(1) the Defendant knowingly and willfully made statements or representations that were false, fictitious, or fraudulent;

(2) the statements or representations were material; and,

(3) the statements or representations pertained to a matter within the jurisdiction of the executive branch of the United States government, namely, a terrorism investigation being conducted by the Federal Bureau of Investigation.

Penalties

The maximum sentence provided by statute for the offenses to which the Defendant is pleading guilty are as follows: (1) as to Counts One, Two and Three, a maximum term of imprisonment for each count of twenty (20) years, and for each count a life term of supervised release (pursuant to 18 U.S.C. 3583(j)), and a $250,000 fine; (2) as to Count 4, a term of imprisonment of eight (8) years, a three year term of supervised release, and a $250,000 fine.

In addition, the Defendant must pay $400 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may

also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

(1)     If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

(2)     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

(3)     If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

(4)     The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

(5)     If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

and the Court's decisions.

(6)     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

(7)     If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

(8)     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt.

The parties stipulate and agree that the applicable sentencing guideline for the offenses in Counts One, Two and Three to which the Defendant is pleading guilty is U.S.S.G. § 2M5.3, which provides for a base offense level of 26, to which 2 levels are added to account for the offense involving funds or other support or resources that were received by the defendant with knowledge, intent or reason to believe they were to be used to commit, or assist in commission of, a violent act. The resulting offense level for each count is 28.

The parties disagree as to the application of U.S.S.G. § 3A1.4 to the calculation of the total offense level for Counts One, Two and Three, which requires a twelve (12) level enhancement to

4

the total offense level when the offense involved, or was intended to promote, a federal crime of terrorism. As a result, the total offense level for these counts would be level 40. Section 3A1.4 also would raise the Defendant's criminal history category to Category VI. The government believes this enhancement is required, by the very terms of the guideline, and thus, reserves its right to argue for its application in this case. The Defendant reserves his right to argue against application of the enhancement.

The parties stipulate and agree that the applicable sentencing guideline for the offense in Count Four to which the Defendant is pleading guilty is U.S.S.G. § 2J1.2, which provides for a base offense level of 14. The government believes that a 12 level enhancement is appropriate, pursuant to either § 3A1.4 or § 2J1.2(b)(C), since the offense relates to terrorism. The Defendant reserves his right to argue against the 12 level enhancement under either guideline provision. The parties stipulate and agree, however, that should the Court apply the sentencing enhancement set forth in § 3A1.4, the 12 level enhancement under § 2J1.2(b)(C) does not apply, as set forth in § 2J1.2 App. Note 2(B).

The parties stipulate and agree that the total offense level for all four counts may be affected by the grouping rules as set forth U.S.S.G. § 3D1.1 through § 3D1.5.

This Office does not oppose a reduction in the Defendant's sentence consistent with the parameters set forth in U.S.S.G. § 3E1.1 to account for the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. However, the parties stipulate and agree that should the Court apply the sentencing enhancement set forth in U.S.S.G. § 3A1.4, the resulting guidelines sentence, even with a reduction for acceptance of responsibility, would exceed the statutory maximum sentence provided for the offenses to which the Defendant is pleading guilty under Counts One, Two and Three. As a result, the statutory maximum sentence of twenty (20) years for each count would become the advisory guidelines sentence for those counts, pursuant to U.S.S.G. § 5C1.1.

This Office may oppose *any* credit for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income. The Defendant also understands that application of the sentencing enhancement pursuant to U.S.S.G. § 3A1.4 could also alter his criminal history category.

This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential

departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

The Defendant reserves his right to bring to the Court's attention for consideration in sentencing the factors contained in 18 U.S.C. § 3553(a), and will notify the Court, the United States Probation Officer and government counsel at least ten days in advance of sentencing of the factors or other issues he intends to raise.

### Obligations of the United States Attorney's Office

At the time of sentencing, this Office will recommend an appropriate sentence, taking into account the advisory guidelines sentence and the factors set forth in 18 U.S.C. § 3553(a), such as the need to protect the public from further crimes of the Defendant, provide adequate deterrence to criminal conduct, and provide a just punishment that promotes respect for the law and addresses the nature, circumstances and seriousness of the offense.

This Office reserves its right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Waiver of Appeal

In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

(1)     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal his conviction.

(2)     The Defendant and this Office each reserve their right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose, and the calculation of, any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

(3)     Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

(4)     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

6

## Obstruction or Other Violations of Law

The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises,

7

undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,
Stephen M. Schenning
Acting United States Attorney

By: _____
Christine Manuelian

_____
Kenneth Clark
Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it.  I am completely satisfied with the representation of my attorney.

_____8/14/17_____
Date

_____
Mohamed Elshinawy
Defendant

We are Mr. Elshinawy's attorneys.  We have carefully reviewed every part of this agreement, including the Sealed Supplement with him.  He advises us that he understands and accepts its terms.  To our knowledge, his decision to enter into this agreement is an informed and voluntary one.

_____8/14/17_____
Date

_____
Joshua Treem, Esquire

_____
Stuart O. Simms, Esquire
Counsel for the Defendant

8

**ATTACHMENT A - STIPULATED STATEMENT OF FACTS**
**United States v. Elshinawy, Criminal No. ELH-16-0009**

FILED U.S. DISTRICT COURT DISTRICT OF MARYLAND 2017 AUG 15

*The parties agree that if this matter had proceeded to trial, the government would have proven the following facts beyond a reasonable doubt. The parties also agree that the following facts do not encompass all facts that would have been proven had this matter proceeded to trial.*

In October 2004, the United States Secretary of State designated al-Qa'ida in Iraq (AQI), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under Section 1(b) of Executive Order 13224. This designation was subsequently amended by the Secretary of State in May 2014, and again in September 2015, to add various aliases for the organization, including, among others, Islamic State of Iraq and the Levant, Islamic State of Iraq and al-Sham, Daesh, Islamic State, ISIL and ISIS (which is how the FTO is referenced herein). At all times material to the charged conspiracy, ISIS remained, and continues to remain, a designated FTO.

During the time frame of the Indictment, Mohamed ELSHINAWY, a United States national of Egyptian descent, resided in Maryland, where he conspired with others to knowingly provide material support and resources to ISIS, and provided and attempted to provide such support and resources to ISIS, knowing that ISIS was a designated FTO that had engaged, and was engaging, in terrorist activity and terrorism. The material support and resources consisted of personnel (including ELSHINAWY), services (including means and methods of communication), and financial services.

ELSHINAWY maintained an ongoing relationship with his childhood friend (Individual #1), who was a self-described member of ISIS residing in ISIS-controlled territories. During discussions with Individual #1 over social media in September and October 2014, ELSHINAWY expressed his support for an Islamic caliphate, his belief in the legitimacy of ISIS and the words expressed by its self-proclaimed leader, Abu Bakr al-Baghdadi, his hope that ISIS would be victorious and its enemies defeated, and his readiness to travel to Syria, through Turkey, to live in the Islamic State with his religious wife (a woman with whom he resided in Maryland). Individual #1 offered to provide monies and other assistance to ELSHINAWY to facilitate his travel.

On February 17, 2015, during a social media discussion with Individual #1, ELSHINAWY pledged his allegiance to ISIS, described himself as its soldier, committed himself to committing violent jihad, and asked that Individual #1 convey his message of loyalty to ISIS leadership. On direction of Individual #1, ELSHINAWY agreed not to discuss his own plans for a potential terrorist attack, acknowledging that such an attack would be a crime in the United States. In subsequent social media discussions with Individual #1 during the period from March through June 2015, ELSHINAWY discussed his preparedness for jihad, his efforts at undertaking extreme security measures to protect himself and his ISIS-related activities while taking the time to deal with his many targets, and expressed his indebtedness to Individual #1 for showing him the way to martyrdom, reiterating his commitment to ISIS and its cause. ELSHINAWY also sought guidance from Individual #1 on how to obtain or make some sort of explosive device and a silencer.

During this same period of time, ELSHINAWY began receiving quantities of cash from a foreign company based in Wales, United Kingdom, and Dhaka, Bangladesh (the UK Company),

to be used to fund a terrorist attack in the United States. The primary business of this company (which was made up of a number of related entities) consisted of the provision of IT-related products and services. The owner of the UK Company (Individual #2) was a national of Bangladesh, who left his residence in the UK in July 2014 to travel to Syria, through Turkey, to join ISIS and assist in its development of weaponized drone technology. In so doing, he relied on his close relative who was a Director of the UK Company (Individual #3), and an employee of the UK Company based in the UK (Individual #4), to utilize financial and business accounts associated with the UK Company to send monies to ELSHINAWY, and to purchase drone technology and related components from companies in the United States, Canada, and Europe for subsequent shipment to Individual #2 and other associates in Turkey and Syria for the benefit of ISIS. These transactions began in or about October 2014, and continued throughout the course of the charged conspiracy. By utilizing the UK Company's name and business accounts, members of the conspiracy were able to conceal the true nature of their ISIS-related transactions. Individual #2 was subsequently killed on December 10, 2015, while fighting with ISIS in ISIS-controlled territory.

ELSHINAWY ultimately received a total sum of approximately $8,700.00 from members of the conspiracy during the period from March through June 2015 to be used to conduct a terrorist attack in the United States. The bulk of the monies were received through transfers from an online financial account associated with the UK Company, in some instances emanating from Bangladesh where Individual #3 was located, into ELSHINAWY's online financial account in the name of TheCheapMart, LLC, a business name he had previously registered in Maryland. One of the money transfers was received into an online financial account associated with ELSHINAWY's religious wife. The transfer was falsely disguised to appear as purchase of printers rather than a cash transfer. The last money transfer was sent to ELSHINAWY via wire from a location in Egypt in the name of another member of the conspiracy.

The initial money transfer to ELSHINAWY from the UK Company in March 2015 was first attempted to be sent through a wire transfer service by Individual #4, acting at the direction of Individual #3. In order to accomplish the transfer without raising suspicion, Individual #4 withdrew funds from his personal bank account and the UK Company's bank account, which he then wired to ELSHINAWY in the United States. On March 18, 2015, ELSHINAWY attempted to pick up the wired funds in Maryland, but was unsuccessful, as the funds had been placed on temporary hold by the wire transfer service upon initial entry into the service's account in the United States. ELSHINAWY subsequently relayed information to members of the conspiracy that they needed to contact the wire transfer service to straighten things out. Shortly thereafter, Individual #3 took care of transferring the funds to ELSHINAWY through a transfer from the UK Company's online financial account to ELSHINAWY's CheapMart account.

During the time frame of the charged conspiracy, ELSHINAWY and other members of the conspiracy engaged in various activities to facilitate their efforts on behalf of ISIS and its cause. ELSHINAWY used various monikers to register business and social media accounts, such as "mojoeusa," "Mo Jo," "Black Eyes," and others, in order to conceal his identity. He then used those accounts, while in Maryland, to communicate with other members of the conspiracy and facilitate its objectives. In addition to the use of social media, ELSHINAWY and members of the conspiracy utilized various other forms and methods of communication, in some instances registering devices and accounts under alias names and/or fake addresses, in order to conceal from law enforcement their criminal association, the substance of their communications, and their

2

criminal activities. ELSHINAWY himself created and/or used various of these forms and methods to surreptitiously communicate with members of the conspiracy in order to facilitate the transfer of monies to him from ISIS operatives, to conceal his communications and activities with those operatives, and to provide those operatives with the ability to use and access communication accounts at will.

Throughout the course of the charged conspiracy, ELSHINAWY attempted to recruit his brother, who resides in Saudi Arabia, to join ISIS. In multiple discussions over social media, ELSHINAWY sought to convince his brother of the religious legitimacy of ISIS. He also told his brother how he had received a lot of money from ISIS and would be receiving more in the future. ELSHINAWY told his brother about how he had pledged his allegiance to ISIS, how he desired to live in the Islamic State, how he intended to remain in the United States for the time being because he had certain plans of his own to undertake in connection with his ISIS-related activities, and how he was taking steps to conceal those activities to avoid law enforcement detection. He also stated that his project and desire was to wage violent jihad and die as a martyr. On multiple occasions, ELSHINAWY directed his brother to take steps to conceal their communications regarding ISIS.

Finally, during interviews by agents of the Federal Bureau of Investigation in July 2015, ELSHINAWY attempted to continue his efforts at avoiding detection of the full extent of his criminal conduct with, and on behalf of, ISIS. Though ELSHINAWY admitted his knowledge that ISIS was a designated foreign terrorist organization, he provided false information regarding the total amount of monies he had received from ISIS operatives to conduct a terrorist attack in the United States, and falsely claimed his intent was to defraud ISIS of funds. Throughout his interviews, ELSHINAWY concealed and mischaracterized the true nature and extent of his association with, and relationship to, ISIS operatives and the support he had provided to ISIS. Soon after his meetings with the FBI, ELSHINAWY took steps to block and erase his communications over social media with Individual #1, and exhorted his brother to do the same with his own social media account. ELSHINAWY also directed his brother to warn Individual #1 that he (ELSHINAWY) had been "revealed and uncovered."

**SO STIPULATED:**

_____
Mohamed Elshinawy
Defendant

_____
Joshua Treem, Esquire

_____
Stuart O. Simms, Esquire
Counsel for Defendant

3