## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>   v.<br><br>MOHAMED ELSHINAWY<br><br>       Defendant. | Criminal No. ELH-16-0009 |

## DEFENDANT MOHAMED ELSHINAWY'S SENTENCING MEMORANDUM

Joshua R. Treem (#00037)
Stuart O. Simms (#27090)
Chelsea J. Crawford (#19155)
Brown, Goldstein & Levy, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Tel:  410-962-1030
Fax:  410-385-0869
jtreem@browngold.com
sos@browngold.com
ccrawford@browngold.com

*Attorneys for Mohamed Elshinawy*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES.................................................................................................iii

LIST AND DESCRIPTION OF EXHIBITS..........................................................................v

I.    INTRODUCTION ....................................................................................................1

II.    PROCEDURAL HISTORY.......................................................................................2

III.    FACTUAL BACKGROUND ....................................................................................3

IV.    ARGUMENT ...........................................................................................................15

      A.  In Order to Maintain Uniformity in Sentencing, the Guidelines Establish that the Punishment Imposed Must Be Connected to the Offender's Real Conduct.......15

      B.  The Guidelines Range for Mr. Elshinawy's Terrorism-Related Convictions in Counts One Through Three of the Indictment Is 63-78 Months....................16

          i.  Mr. Elshinawy's maximum base offense level pursuant to U.S.S.G. § 2M5.3 is level 28.............................................................................16

          ii.  No chapter three adjustments are appropriate as to any count of conviction.............................................................................17

              1.  Application of the terrorism enhancement of U.S.S.G. § 3A1.4 is neither required nor appropriate in this case.............................17

              2.  There are no facts which merit a two-level adjustment for obstruction of justice.............................................................23

      C.  The Guidelines Range for Count Four Is 63-78 Months............................26

      D.  Mr. Elshinawy Has No Criminal History and Any Guidelines Sentence Should Reflect The Absence of This History..................................................26

      E.  No Public Welfare Departure or Any Other Upward Departure Is Appropriate in This Case.........................................................................27

      F.  Consideration of the Section 3553(a) Factors Weighs In Favor of a Guideline Sentence............................................................................27

          i.  Mr. Elshinawy's life in the United States was riddled with poverty, professional failures, and strained relationships.............................28

ii.     Mr. Elshinawy's association with ISIS was brief, and he severed all ties with ISIS before the government first questioned him…………………..30

iii.    Mr. Elshinawy's role in the broader conspiracy is minimal and attenuated……………………………………………………………...31

iv.     The average term of imprisonment imposed by sentencing courts for defendants convicted of providing material assistance is significantly below 20 years, the statutory maximum…………………………………33

G.  The Court Should Impose a Term of Supervised Release of No More Than 3 Years For Each Count, to Run Concurrently, and the Court Should Not Impose Any Fines……………………………………………………………………...34

CONCLUSION.................................................................................................................35

CERTIFICATE OF SERVICE .........................................................................................36

# TABLE OF AUTHORITIES

**Cases**

*United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005); ................................................. 17

*United States v. Assi*, 586 F. Supp. 2d 841 .......................................................................... 19, 21

*United States v. Booker* .................................................................................................... 15, 17

*United States v. Chandia*, 675 F.3d 329 (4th Cir. 2012). ...................................................... 18, 19

*United States v. Hassan*, 742 F.3d 104 (4th Cir. 2015), .......................................................... 19, 20

*United States v. Mohamed*, 757 F.3d 757 (8th Cir. 2014) ...................................................... 19, 21

*United States v. Stafford*, 782 F.3d 786 (6th Cir. 2015) ................................................................ 21

*United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009), ........................................................... 22

*United States v. Stewart*, 686 F.3d 156, 163 (2d Cir. 2012). ......................................................... 17

*United States v. Wright*, 747 F.3d 399 (6th Cir. 2014). .......................................................... 19, 20

**Statutes and Sentencing Guidelines**

18 U.S.C. § 2339A .................................................................................................................. 22, 33

18 U.S.C. § 2339B ........................................................................................................ 2, 18, 23, 33

18 U.S.C. § 2339C .......................................................................................................... 2, 18, 23

18 U.S.C. § 1001(a). ...................................................................................................................... 26

18 U.S.C. § 2332b(g)(5) ........................................................................................................ 17, 18, 22

18 U.S.C. § 3553(a) ........................................................................................................ 16, 27, 28, 34

18 U.S.C. § 3559(a) ....................................................................................................................... 34

18 U.S.C. § 3583(j). ....................................................................................................................... 34

18 U.S.C. § 3624(e). ...................................................................................................................... 34

18 U.S.C. § 371 ............................................................................................................................. 22

U.S.C. 3583(b)(2) .......................................................................................................................... 34

U.S.S.G. § 2M5.3 ........................................................................................................................... 16

U.S.S.G. § 1B1.3(a) ....................................................................................................................... 22

U.S.S.G § 3A1.4 ................................................................................................................. 17, 23, 27

U.S.S.G § 3C1.1. .................................................................................................................... 17, 24

U.S.S.G § 3C1.1 Note 3 ................................................................................................................. 24

U.S.S.G. § 5K2.14 .......................................................................................................................... 27

U.S.S.G. § 1B1.1. .................................................................................................................... 15, 17

U.S.S.G. § 2J1.2. ........................................................................................................................... 26

U.S.S.G. § 5D1.2(a)(2) ................................................................................................................... 34

U.S.S.G. § 5K2.14 .......................................................................................................................... 27

U.S.S.G. § 6A1.3(a) ....................................................................................................................... 19

Antiterrorism and Effective Death Penalty Act ("AEDPA"), ....................................................... 18

Sentencing Reform Act of 1984 ..................................................................................................... 15

## LIST AND DESCRIPTION OF EXHIBITS

Defense Exhibit 1          Defense Chronology of Events

Defense Exhibit 2          Facebook Conversations with Tamer Elkhodary

Defense Exhibit 3          Ibacs Organizational Chart

Defense Exhibit 4          Expert Report of Marc Sageman, Ph.D.

Defense Exhibit 5          Facebook Conversations with Ahmed Elshinawy

Defense Exhibit 6          Transcript and Video Interview with Ahmed Elshinawy

Defense Exhibit 7          Mohamed Elshinawy's Employment and Debt Records

Defense Exhibit 8          Affidavit of Mona Elshinawy

Defense Exhibit 9          Index of FBI 302s

Defense Exhibit 10         FBI 302 of July 17, 2017 Interview

Defense Exhibit 11         Excerpts of Transcripts of Mohamed Elshinawy's FBI Interviews

Defense Exhibit 12         Transcript and Video Interview with Dr. Elshinawy and Dr. Abdelaty

Defense Exhibit 13          Affidavit of Douglas Miller

Defense Exhibit 14         Affidavit and Financial Analysis of Jules Dorner

Defense Exhibit 15         Analysis of Government's Chronology of Conspiracy Sequence of Events

Defense Exhibit 16         Analysis          of          Material          Assistance          Cases

## I.    INTRODUCTION

On July 17, 2015, Mohamed Elshinawy confessed to his role in the terrorism-related offenses for which he is facing sentencing before this Court.

On that day, FBI Special Agents knocked on the front door of the home that Mr. Elshinawy shared with his wife, Rachel Rowe.  The FBI had been surveilling Mr. Elshinawy for at least three weeks and knew that he had received money from foreign sources connected to the Islamic State of Iraq and the Levant (hereinafter "ISIS").  When Mr. Elshinawy answered the door, he had a choice to make: he could reveal to the Special Agents his role in accepting money to conduct a now-abandoned terrorist attack, or he could refuse to say anything and decline to cooperate with the FBI's investigation.  Mr. Elshinawy chose the former and met with the Special Agents no fewer than four separate times for hours over the next ten days to explain, among other things, how he received the money, from whom it was sent, the purpose for which it was sent, and how he spent it.  In addition, Mr. Elshinawy consented to a search of his laptop computers.  Mr. Elshinawy also agreed to stay in touch with his ISIS-related contacts for the benefit of the government's ongoing investigation.

Now, more than two years later, the government's investigation has unwound a spool of co-conspirators stretching from Egypt to Bangladesh to the United Kingdom.  The conspiracy centered on a company based in the United Kingdom and Bangladesh, which assisted ISIS in purchasing and obtaining drone technology and other related components for use in the battlefield.  This company also sent Mr. Elshinawy funds on behalf of ISIS.  Mr. Elshinawy neither knew of, nor was connected to, the U.K. company's efforts to purchase drones and other technology.  The government, however, seeks to have this Court punish Mr. Elshinawy, who

1

received the funds, as it would punish the co-conspirators who worked directly with and for ISIS and the U.K. company.

This Court must sentence Mr. Elshinawy commensurate with his specific role in the alleged conspiracy, not on the actions of his co-conspirators, which dwarf his own conduct. To that end, the defense urges the Court to impose concurrent sentences for Mr. Elshinawy's convictions in Counts One through Four of the Indictment and sentence Mr. Elshinawy to a period of incarceration between 63 and 78 months, which reflects the guidelines range applicable to the most serious offense of conviction, without application of the terrorism enhancement of Section 3A1.4, or any other upward adjustments or departures. The defense also urges the Court to impose a three-year term of supervised release.

## II.   PROCEDURAL HISTORY

On August 15, 2017, Mr. Elshinawy entered a plea of guilty to all counts in a four-count Indictment, including: conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B ("Count One"); knowingly providing and attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B ("Count Two"); terrorism financing, in violation of 18 U.S.C. § 2339C ("Count Three"); and knowingly and willfully making material false statements to agents of the FBI, in violation of 18 U.S.C. § 1001 ("Count Four"). As part of his plea, Mr. Elshinawy stipulated to a statement of facts, which laid out—in broad terms—the facts relating to the elements of the charged offenses. Mr. Elshinawy accepted responsibility for: (1) pledging allegiance to ISIS, (2) accepting money to fund a terrorist attack in the United States, (3) utilizing various social media and other accounts to communicate with the co-conspirators, (4) attempting (and failing) to recruit his brother, and (5) lying to the FBI.

The defense acknowledges that Mr. Elshinawy has pleaded guilty to all counts in the Indictment and has agreed to the Statement of Facts.  The purpose of this Memorandum is to provide context to those facts for the purpose of sentencing.

## III.   FACTUAL BACKGROUND OF THE OFFENSES

The facts described below are summarized in Defense Exhibit 1, which provides a timeline of the events and activities pertinent to this case.  The chronology begins in 2007, the year that Mr. Elshinawy first moved to the United States as an adult, and ends in 2016 with the return of the Indictment in this case.

### A.   In 2014, Mr. Elshinawy's Childhood Acquaintance Befriended Him on Facebook and Planted the Seed to Join ISIS.

In early 2014, an acquaintance from Mr. Elshinawy's childhood in Egypt, Tamer Elkhodary, began reaching out to Mr. Elshinawy on Facebook.  *See* Facebook Conversations with Tamer Elkhodary, attached as Def. Ex. 2.[1]  Tamer grew up in the same neighborhood as Mr. Elshinawy, but the two had lost contact after Tamer was imprisoned in Egypt.  Mr. Elshinawy told Tamer that he was living in the United States.  In the fall of 2014, Mr. Elshinawy and Tamer began talking about ISIS and its ideology.  Mr. Elshinawy asked whether Tamer was living in Raqqa, Syria with the State, to which Tamer replied "Yes."  *Id.*  Mr. Elshinawy asked Tamer whether ISIS was a legitimate group and Tamer responded by explaining ISIS's goal of fighting infidels.  *Id.*  Mr. Elshinawy was curious about life in ISIS territory and expressed a desire to live in an Islamic Caliphate with Rachel.  *Id.*  Tamer encouraged Mr. Elshinawy to travel to Syria, stating that Mr. Elshinawy should "Ask for Allah's advice and come. There are some great guys

---

[1] Mr. Elshinawy's Facebook conversations with Tamer Elkhodary total nearly 300 pages. The defense has only included records pertaining to the quotations described in this Memorandum. *See* Def. Ex. 2.  For reference, a more complete set of Facebook records are attached to the expert report of Marc Sageman, Ph.D., which is included with this Memorandum as Defense Exhibit 4.

in here from where you are."  Tamer then asked Mr. Elshinawy, "Would you like me to have them call you[?]"  Mr. Elshinawy declined.  *Id.*

Tamer twice offered Mr. Elshinawy money and assistance with travel to Syria, but Mr. Elshinawy did not follow up.  Tamer told Mr. Elshinawy to "Just come to Turkey and Allah willing, I will arrange everything for you."  *Id.*  Mr. Elshinawy and Tamer communicated again several months later, in February 2015.  Mr. Elshinawy asked Tamer about housing and employment in Syria, and expressed an eagerness to live in Syria because ISIS governed according to Sharia law.  Convinced that his life in Syria would be a vast improvement over his life in the United States, Mr. Elshinawy told Tamer that he had pledged allegiance to ISIS and asked Tamer to convey his pledge to the Amir.

In March 2015, Tamer asked Mr. Elshinawy whether he had Telegram, an encrypted messaging application, which does not retain records of users' communications.  *Id.*  Mr. Elshinawy was unfamiliar with Telegram, but agreed to download and activate the application. *Id.*  As reflected in the records from Facebook, after activating the application, Mr. Elshinawy shared his phone number with Tamer, who then connected Mr. Elshinway to an unidentified individual in Syria.  *Id.*  Tamer urged Mr. Elshinawy to keep their communications secret and asked that Mr. Elshinawy not speak with anyone about their conversations.  *Id.*  Mr. Elshinawy began using one of his phones to talk with one or more individuals on Telegram, but there are no records of these conversations.

In late March 2015, Mr. Elshinawy began receiving money from ISIS to fund some kind of operation in the United States, the nature of which is unknown.  Mr. Elshinawy did not discuss the details of any operation with Tamer, but during his Facebook conversations at the time, he vaguely referenced "a dream project" and asked whether "making a small thing with a silencer"

4

was "difficult or easy."  Mr. Elshinawy stated that he was planning to "completely dedicate [his] time for that matter" before traveling to Syria. He described the matter as "the most important thing in his life." *Id.*

On April 25, 2015, Tamer asked Mr. Elshinawy whether he had a phone number that he could use to activate WhatsApp, a messaging application.  *See* Def. Ex. 2.  Mr. Elshinawy provided the phone number to one of his phones and, shortly thereafter, a message was exchanged via WhatsApp, the substance of which is unknown.  *Id.*  Tamer and Mr. Elshinawy continued to exchange greetings in April, May, and June, but by mid-July, Mr. Elshinawy had ceased communicating with Tamer altogether.  On July 14, 2015—three days before the FBI knocked on his door—Mr. Elshinawy sent a final message to Tamer, in which he asked how Tamer was doing.  *Id.*  After he received no response, Mr. Elshinawy stated that he hoped Tamer was well.  *Id.*  On July 18, Tamer reached out to Mr. Elshinawy and asked his whereabouts.  *Id.*  Mr. Elshinawy never responded and ignored Tamer's subsequent attempts to communicate on July 19, 23, 25, and August 3.  *Id.*  Facebook records pertaining to Mr. Elshinawy's and Tamer's accounts demonstrate that Mr. Elshinawy "blocked" Tamer at some point and later deleted the records of his conversations with Tamer.[2]

### B.  In the Spring of 2015, Mr. Elshinawy Began Receiving Funds from a Company Connected to ISIS For the Purpose of Conducting a Terrorist Attack in the United States.

For approximately three months from March 23, 2015 to June 28, 2015, Mr. Elshinawy received a total of $8,700 from ISIS, the bulk of which he spent on purchasing a computer,

---

[2] The government contends that Mr. Elshinawy blocked Tamer and removed all history of their conversations on July 18, 2015—one day after the first FBI interview, but the defense has been unable to independently verify that date through a review of the Facebook records.  As noted above, the only known relevant Facebook event that occurred on July 18, 2015 was a message from Tamer to Mr. Elshinawy, to which Mr. Elshinawy never responded.

couch, cell phones, marijuana, household items, and other expenses.  Mr. Elshinawy received a total of six cash transfers from ISIS.  Each transfer of funds, with the exception of the final Western Union transaction, came from Ibacstel Limited ("Ibacs"), a company based in Wales, United Kingdom and Dhaka, Bangladesh.  The owner of Ibacs, Siful Sujan, was ISIS's chief hacker and director of social media.  He was killed by military forces in a drone strike on December 10, 2015.  Ataul Haque, Siful Sujan's brother, is co-owner of Ibacs.  Abdul Samad is Ibacs' director.  *See* Ibacs Organizational Chart, attached as Def. Ex. 3.

Records provided by the government during discovery reflect that Ibacs has been engaged in the provision of IT-related products and services since at least 2006, and has operated as several different entities from 2006 to 2015.  Ibacs had also been engaged in the purchasing and facilitation of purchases of drone technology and other related components on behalf of ISIS for use in the battlefield.

Ibacs sent Mr. Elshinawy the first transfer of funds, totaling $1,500, via PayPal on March 23, 2015. Approximately one week after receiving the first transfer, Mr. Elshinawy purchased a HP laptop and pre-paid cell phones from Walmart, totaling $574.48.  On April 16, 2017, Mr. Elshinawy received a second PayPal transfer from Ibacs in the amount of $1,000.  On May 1, Mr. Elshinawy received another $1,000 transfer.  Two weeks later, on May 14, Ibacs transferred $3,000 to Mr. Elshinawy.  On May 18th, Mr. Elshinawy purchased two prepaid cell phones from Walmart, and the next day, purchased a new couch for his apartment.

On June 2, 2015, Mr. Elshinawy communicated on Surespot, an encrypted messaging application, with an individual using the moniker "Robert199."  Five days later, on June 7, Mr. Elshinawy received a payment in his wife's PayPal account in the amount of $1,200 through a false drop shipping transaction, in which he offered two printers for sale.  Ibacs paid Mr.

Elshinawy the cost of the printers, but no printers were ever shipped.  On June 22, Mr. Elshinawy communicated with a separate individual on Surespot, and six days later, on June 28, he received from this individual what proved to be the last cash transfer in the amount of $1,000.

### C. By Early Summer 2015, Mr. Elshinawy Had Abandoned Plans for Any Attack and Disentangled Himself from ISIS.

As reported by Dr. Sageman and corroborated by the discovery provided by the government, in the end of June 2015, Mr. Elshinawy began to distance himself from ISIS's reach.[3]  *See* Expert Report of Marc Sageman, Ph.D., attached as Def. Ex. 4.  The last communication Mr. Elshinawy had with any ISIS-related individual on Surespot was June 22, 2015.  On June 28, 2015, Mr. Elshinawy received his last payment from ISIS, and by July 15, 2015, Mr. Elshinawy had ceased communicating with Tamer. Mr. Elshinawy cut off all contact with ISIS days before his first FBI interview, and, also before the first FBI interview, he destroyed a cell phone that he had been using to communicate with ISIS in an effort to break ISIS's lines of communication.

Mr. Elshinawy's brother, Ahmed Elshinawy, was critical to Mr. Elshinawy's decision to abandon any plan for a terrorist attack.  Mr. Elshinawy's brother is a scholar of Islamic studies and challenged Mr. Elshinawy's ideas about ISIS and its ideology.  As Dr. Sageman described in his report, and as reflected in the Facebook discussion between the brothers, Ahmed was skeptical of ISIS and its views.  *See* Def. Ex. 4.  In response to his brother's efforts to persuade Ahmed of the correctness of ISIS's cause, Ahmed tried to educate Mr. Elshinawy about the inconsistency of ISIS's views with the Quran and the Sunna.  Ahmed also encouraged Mr. Elshinawy to read books to learn more about Islam.  As reflected in Ahmed's recorded interview,

---

[3] Marc Sageman, Ph.D. is the defense's expert in terrorism and forensic psychiatry. He has researched and testified on issues dealing with terrorism, political violence, and forensic psychiatry.  He has also been qualified as an expert in terrorism in numerous cases.

*see* Def. Ex. 6, and in the Facebook records, Ahmed tried to correct Mr. Elshinawy's misunderstanding about life in Syria. He described hearing first-hand from Syrians about their experiences living in ISIS territory with no money or valuable possessions.  Ahmed explained that ISIS was "Neither the same picture you had in mind nor what they tried to convey to you." *See* Facebook Conversations with Ahmed Elshinawy, attached as Def. Ex. 5.

On June 28, 2015, Ahmed and Mr. Elshinawy engaged in a lengthy discussion on Facebook regarding ISIS.  *See* Def. Exs. 2 and 4.  Ahmed told Mr. Elshinawy that ISIS was causing discord through its fight against other Muslims. Mr. Elshinawy explained that he was not planning to perform jihad with ISIS, but that he just wanted to live amongst the group.  Ahmed informed Mr. Elshinawy that performing jihad required the permission of one's parents, and he shared with Mr. Elshinawy the story of a famed follower of the Prophet Mohammed, Uwais al-Qarani.  Ahmed relayed to Mr. Elshinawy that, just as Uwais did not travel to see the Prophet because he was caring for his mother, Mr. Elshinawy should not travel to the Islamic State out of kindness to their mother.  Mr. Elshinawy was moved by Uwais, and on July 8, nine days before the FBI knocked on his door, he wrote to Ahmed that he was "convinced" of the story, and, as a result, decided not to travel to Syria. *See* Def. Ex. 2.

Shortly after receiving the last installment of cash from ISIS, Mr. Elshinawy had also depleted most, if not all, of the money that he had received since March.  His various bank accounts were critically low, or in the negative, and his bills were in arrears.  In June and July 2015, Mr. Elshinawy owed $682.69 to Comcast and $1,944.53 to BGE.  *See* Mohamed Elshinawy's Employment and Debt Records, attached as Def. Ex. 7.  Mr. Elshinawy was also relying on friends and family for loans.  *Id.* at 5–14.  He kept a running list of his debts and debtors, which included no fewer than three people at a time and debts totaling hundreds of

8

dollars. *Id.* Mr. Elshinawy's mother transferred $1,000 to him via Western Union on June 25, $620 of which he deposited in his checking account and later used to pay court costs in the District Court of Maryland for Harford County for motor vehicle offenses. Rather than seek ISIS out for more cash in his time of need, Mr. Elshinawy resumed work delivering newspapers and employment at 7-Eleven. *See* Def. Ex. 1. Mr. Elshinawy also received money from his sister Mona, but nothing more from ISIS. *See* Affidavit of Mona Elshinawy, attached as Def. Ex. 8; *see also* Def. Ex. 1.

### D.  Mr. Elshinawy Confessed to the Government His Role in Accepting Money From ISIS and Cooperated With The Government's Investigation.

Based on the evidence made available to the defense, the government's investigation of Mr. Elshinawy appears to have started in earnest in late-June 2015. On June 24, 2015, the FBI began conducting 24-hour physical surveillance of Mr. Elshinawy's movements.[4] The government also surveilled Mr. Elshinawy from helicopters and aerial drones. In addition to surveillance, the government began issuing grand jury subpoenas and other requests to various entities to obtain all of Mr. Elshinawy's records. Between June 24 and July 1, the government requested records from the MVA and NCIC databases, Yahoo, Verizon Wireless, Tracfone, TMobile, Verizon Online, Google, Microsoft, Comcast, Sprint, Metro PCS, Western Union, Surespot, and the Howard County Police Department. During this period, the government also obtained surveillance photos and videos from M&T Bank and Walmart, and FBI investigators met with members of Walmart's Asset Protection team. *See* Index of FBI 302s, attached as Def. Ex. 9.

Records provided by the government during discovery demonstrate that the government also utilized state law enforcement to monitor Mr. Elshinawy's activities. From June 2015

---

[4] This surveillance continued until Mr. Elshinawy's arrest on December 11, 2015.

through Mr. Elshinawy's arrest in December, he was stopped by state law enforcement authorities at least three times. On June 30, at the request of an FBI agent, Baltimore County police conducted a traffic stop of Mr. Elshinawy for suspicious activity. The FBI agent requested assistance stopping Mr. Elshinawy in reference to the federal investigation, but provided the Baltimore County police officer with no further details regarding the investigation.  Mr. Elshinawy is reported to have consented to a search of his person and vehicle, but no evidence was recovered.

On July 13, 2015, the FBI observed Mr. Elshinawy remove trash from his home to a nearby dumpster.  FBI agents searched Mr. Elshinawy's trash and recovered two empty cell phone boxes, handwritten notes, cigarette casings, and a zip lock bag with trace residue of a green leafy substance believed to be marijuana.  On July 17, 2015, FBI special agents knocked on Mr. Elshinawy's door for an interview and search.

According to the FBI 302 of the interview, Mr. Elshinawy shared much of his life history. He first told the agents about his family, his travel back and forth to Egypt, his educational history, and his financial situation.  *See* FBI 302 of July 17, 2015 Interview, attached as Def. Ex. 10.   Mr. Elshinawy also shared private details of his marriage to Rachel, including their breakups and Rachel's bipolar disorder.  *Id.*  The FBI agents asked Mr. Elshinawy about his political views of Egypt's leadership and his opinion of the bombing at the Italian Consulate, which had occurred a few days prior to the FBI's visit.  *Id.*

The agents also asked Mr. Elshinawy about the number of phones he had been using and the particular applications he used to communicate with others.  *Id.*  The agents then asked about Mr. Elshinawy's history of receiving money transfers via Western Union.  Mr. Elshinawy explained that his mother sent him money on several occasions through her assistant, who

transferred the funds to Mr. Elshinawy on his mother's behalf.  *Id.*  At that point, the agents confronted Mr. Elshinawy with a Western Union receipt from an individual other than his mother's assistant.  Mr. Elshinawy misrepresented the nature of this transaction by explaining to the FBI agents that he received the money from a childhood friend in Egypt who asked Mr. Elshinawy to purchase an iPhone 6 and ship it to him in Egypt.  *Id.*  After being advised by the agents that lying is a federal offense, Mr. Elshinawy revealed his association with Tamer and ISIS.

Mr. Elshinawy also volunteered and explained the following:

(1) He communicated via Facebook with Tamer who claimed to have fled to Syria to live with ISIS;

(2) Tamer put Mr. Elshinawy in touch with an ISIS member, with whom Mr. Elshinawy communicated via SureSpot and Telegram;

(3) An unidentified ISIS member sent Mr. Elshinawy $4,000 through a company called Ibacs, Ltd;

(4) The money Mr. Elshinawy received was to be used to conduct a terrorist attack in the United States, and the Draw Mohamed Context in Texas was given as an option;

(5) Mr. Elshinawy took the money to scam ISIS and used it to purchase a couch and pay his bills;

(6) Mr. Elshinawy destroyed one of his phones with a hammer in order to terminate all communications with ISIS; and

(7) The date he last communicated with Tamer.

In addition to this information, Mr. Elshinawy showed the agents receipts of the PayPal and Ebay transactions with Ibacs, and provided the website and telephone number to Ibacs.  *Id.*

11

Mr. Elshinawy also provided the agents with the phone number of the ISIS member with whom he had been communicating.  *Id.*  Finally, Mr. Elshinawy consented to a search of his two laptops—a Dell and HP—both of which he voluntarily allowed the agents to take without requiring them to obtain a warrant.  On the following day, Mr. Elshinawy sent a text message to an agent with the password to the Dell laptop.  Two days later, Mr. Elshinawy met with several different FBI agents in an unmarked FBI van for a second interview, which lasted approximately 2 hours.  During this interview, Mr. Elshinawy provided the government with more information about his association with ISIS and relationship with Tamer.  Mr. Elshinawy explained that the individual, with whom he had communicated on Telegram, did not provide him with a specific target, but suggested Texas and only directed him to "do something destructive."  *See* Excerpts of Transcripts of Mohamed Elshinawy's FBI Interviews, attached as Def. Ex. 11, at 4.  Mr. Elshinawy described ISIS as desperate for American recruits, and explained that his receipt of the money was not contingent on him completing an attack.  *Id.*

Mr. Elshinawy also told the agents that ISIS's financial network was global.  He stated that ISIS had "people all over the world to send money 'cause they [sic] asking me where you want the money to come from?  Turkey?  China . . . England?  Any country, point in the map, there is people to send you the money."  *Id.* at 7.  Mr. Elshinawy went into greater detail about how he spent the money he received from ISIS.  He told the agents that he purchased a couch, computer, made repairs to his car, and just "enjoyed the money."  *Id.* at 12.  Mr. Elshinawy also revealed—on his own accord—that he received an additional $1,200 payment from ISIS through a false drop shipping transaction, in which he received money under the guise of a legitimate sale of printers.  When asked what he did with the money, Mr. Elshinawy stated that he "waste[s]

money like really quick."  *See id* at 17; *see also* Def. Exs. 8 and Transcript and Video Interview with Dr. Elshinawy and Dr. Abdelaty, attached as Def. Ex. 12.

At several points during the interview, the FBI agents encouraged Mr. Elshinawy stay in touch with his ISIS contacts and to behave as an agent.  *See* Def. Ex. 11.  Mr. Elshinawy informed the agents that Tamer continued to reach out to him on Facebook, but that he had not responded.  One agent told Mr. Elshinawy to continue speaking with Tamer, so as not to lose the connection, and later asked whether Mr. Elshinawy could reestablish his social media account on one of his phones to maintain contact with an ISIS member.  One agent said that Mr. Elshinawy, "should feel like you're one of us."  *Id.* at 19.  Later in the interview, another agent remarked that maybe they would "promote [Mr. Elshinawy] today."  *Id.* at 21.  Before the interview concluded, Mr. Elshinawy agreed to take a polygraph, which was to be scheduled at a later date.  However, one agent proceeded to ask Mr. Elshinawy a series of "yes" or "no" questions regarding Mr. Elshinawy's plans to support or conduct a terrorist attack.

On July 22, 2015, Mr. Elshinawy met with FBI agents for a third interview, which took place at a Starbucks and lasted more than 3 hours.  Few details regarding the government's investigation were discussed, given that the meeting occurred in a public place.  Mr. Elshinawy did, however, express apprehension about the government's investigation and his lack of privacy.  Mr. Elshinawy was unsure about whether he should retain a lawyer and wanted to know whether the government intended to pursue him criminally.

> "I wanna know like my legal situation. I wanna know and I'm like if we are in trouble 'cause if I'm in trouble then I should go ahead and try to get myself out of trouble…, get a lawyer on my case and stuff like this but then we will be in separate ways."

Def. Ex. 11, at 23.  Mr. Elshinawy also asked the agents to confirm his suspicions that he was being followed, but the agents neither confirmed nor denied that they had been following him.

13

FBI agents interviewed Mr. Elshinawy a fourth time on July 27, 2015.  The agents wanted to learn more about Ibacs, the company that sent the payments to Mr. Elshinawy on behalf of ISIS.  Mr. Elshinawy knew little more than the fact that the company existed.  He told the agents that he was in communication with only one person from the company regarding the money transfers, and that he did not know his name. The agents were interested in learning whether the company planned to send Mr. Elshinawy more money in the future, but Mr. Elshinawy explained that he abruptly ended contact with the individual from the company "a while ago."  Def. Ex. 11, at 26.  Mr. Elshinawy also explained in more detail the PayPal transactions and the process of drop shipping.  He falsely stated that his rationale for accepting money from ISIS was to defraud the organization and make money in the process.

On October 9, 2015, the FBI executed a search warrant on Mr. Elshinawy's residence and vehicle.  They seized several items from his home, including the two laptops that Mr. Elshinawy previously allowed the government to search.  FBI agents also interviewed Mr. Elshinawy a fifth time, but ceased questioning after multiple requests by Mr. Elshinawy for an attorney.  That same day, as part of a coordinated effort, agents also interviewed Mr. Elshinawy's sister, Mona Elshinawy, and her husband, Abd-el Hamid Elbadawy, at their residence in Arkansas.  *See* Def. Ex. 8.  The agents asked Mona and her husband to urge Mr. Elshinawy to cooperate with the government's investigation, and she contacted Mr. Elshinawy that day.  *Id.*  At the conclusion of the search, Mr. Elshinawy was given a target letter that required him to obtain counsel by October 16, 2015 and have that attorney contact the government.  *See* Affidavit of Douglas Miller, Esquire, attached as Def. Ex.13.

The Federal Public Defender's Office was appointed to represent Mr. Elshinawy on October 14, 2015.  *Id.*  Attempts by the defense and the government counsel to resolve the case

before an indictment were unsuccessful.  *Id.*  On December 2, 2015, a terrorist attack, for which

ISIS claimed responsibility, occurred in San Bernardino.  On December 10, 2015, authorities in

the United Kingdom executed a search of Ibacs and arrested Abdul Samad in his home.  The

government arrested Mr. Elshinawy the next day, on December 11, 2015.

## IV.    ARGUMENT

To assist the Court in fashioning a sentence that is sufficient, but not greater than

necessary, this Memorandum discusses in sequence the issues concerning the appropriate

guidelines calculation applicable to the facts of this case.[5]

### A.  In Order to Maintain Uniformity in Sentencing, The Guidelines Establish That The Punishment Imposed Must Be Connected to the Offender's <u>Real Conduct.</u>

Through passage of the Sentencing Reform Act of 1984, Congress set out to create a

fairer, more honest sentencing scheme.  Congress established the Sentencing Commission to

promulgate the guidelines and monitor sentencing practices in federal courts.  Central to the

guidelines is the development of a system that "diminishes sentencing disparity" and this goal

"depends for its success upon judicial efforts to determine, and to base punishment upon, the *real*

*conduct* that underlies the crime of conviction." *United States v. Booker*, 543 U.S. 220, 250

(2005) (emphasis in original).

The guidelines set forth several steps for determining a defendant's sentence range.  *See*

U.S.S.G. §1B1.1.  First, the sentencing court must determine the appropriate offense guideline

---

[5] In the interest of brevity, discussion regarding certain steps in the Court's guidelines analysis has been omitted.  For example, defense counsel need not devote extensive discussion to the fact that Mr. Elshinawy's acceptance of responsibility merits a two-level downward adjustment, pursuant to § 3E1.1(a).  Defense counsel has also omitted discussion concerning the grouping of Counts One through Four as a single group, pursuant to § 3D1.2 of the guidelines.  The defense has no objection to the grouping of all counts in the Indictment, but maintains an objection to any adjustment for obstruction of justice that would apply to the entire group. *See infra* IV.B.ii.2

section applicable to the defendant's particular offense of conviction.  Second, the court must

determine the base offense level and consider whether any special offense characteristics, cross

references, notes, or special instructions apply.  Third, the court must consider whether any

Chapter 3 adjustments for victim, role, or obstruction of justice apply. If a defendant is convicted

of multiple counts, the court must calculate each conviction separately and then determine

whether the counts group together for calculation purposes.  Next, the court should provide

further adjustments if the defendant has accepted responsibility for his actions.  Finally, the court

must determine the defendant's criminal history category and locate the sentence range by

matching the defendant's criminal history category to the total offense level via the sentencing

table.  After calculation of the guidelines, the court must consider the facts set forth in § 3553(a).

Mr. Elshinawy's guidelines calculation for Counts One through Four follows.

### B.  The Guidelines Range for Mr. Elshinawy's Terrorism-Related Convictions in Counts One Through Three of the Indictment Is 63-78 Months.

Counts One through Three of the Indictment are terrorism-related offenses, which share

the same Chapter Two offense section, U.S.S.G. § 2M5.3.  Accordingly, the analysis related to

these Counts is identical for guidelines calculation purposes.

#### i.  Mr. Elshinawy's Maximum Base Offense Level Pursuant to U.S.S.G. § 2M5.3 is Level 28.

There is no dispute that § 2M5.3 governs three of the four counts of conviction pertaining

to terrorism, and provides for a total base offense level of 28. None of the specific Cross-

References in § 2M5.3 is applicable to this case.  The offenses of conviction did not result in

death, were not tantamount to attempted murder, and did not involve the provision of any

nuclear, chemical, or biological weapon or material, or any weapon of mass destruction.  *See* §

2M5.3(c)(1)-(3).

**ii. No Chapter Three Adjustments Are Appropriate As to Any Count of Conviction.**

The next step in the Court's analysis is to apply any adjustments in Chapter Three related to victim, role, and obstruction of justice. *See* U.S.S.G. § 1B1.1(3). The government contends that the terrorism enhancement of § 3A1.4, which provides for an upward adjustment of 12 levels and criminal history category VI, is required. The United States Probation Office, ("USPO"), apparently relying on the Statement of Facts, agrees with the government and also recommends application of § 3C1.1, which provides a two-level increase for obstructing or impeding the administration of justice. The defense submits that the Court should find that neither adjustment is appropriate in this case because Mr. Elshinawy's conduct does not meet the definition of a "federal crime of terrorism," as defined in 18 U.S.C. § 2332b(g)(5), and there is insufficient evidence upon which the Court may make a factual finding to support application of the adjustment for obstruction of justice.

**1. Application of the Terrorism Enhancement of U.S.S.G. § 3A1.4 Is Neither Required Nor Appropriate In This Case.**

The government's position that the terrorism enhancement of § 3A1.4 is required fails for at least two reasons. First, in the post-*Booker* era of sentencing, the guidelines are advisory, and courts have the discretion to depart or vary from guidelines sentences. *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, the Court is not *required* to apply the enhancement, and indeed, other courts have declined to do so. *See, e.g.*, *United States v. Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005); *United States v. Stewart*, 686 F.3d 156, 163 (2d Cir. 2012).

Second, Mr. Elshinawy's conduct does not meet the definition of a "federal crime of terrorism" in § 3A1.4, and therefore, the enhancement *cannot* apply. The legislative history of the statutes giving rise to § 3A1.4 demonstrates that Congress did not intend for the enhancement to sweep too broadly. The first version of the terrorism enhancement derived from the Violent

Crime Control Act of 1994.  That statute directed the Sentencing Commission to amend the guidelines to provide for an enhancement for a felony "that involves or is intended to promote international terrorism."  H.R. Res. 3355, 103rd Cong. 1994 (enacted).  In 1996, through passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress directed the Sentencing Commission to amend the guidelines so that the terrorism enhancement would only apply to "federal crimes of terrorism," as defined in 18 U.S.C. § 2332b(g).  That definition, which had been "overly broad," *see* 141 Cong. Rec. H.13976–77 (daily ed. Dec. 5, 1995) (statement of H. Jud. Ch. Henry Hyde), was narrowed "in order to keep a sentencing judge from assigning a terrorist label to crimes that are truly *not* terrorist, and to adequately punish the terrorist for his offense."   H.R. Rep. No. 104–384, at 114 (1995).

Today, the term is defined in 18 U.S.C. § 2332b(g)(5) to mean: (A) an offense that is calculated to influence or affect the <u>conduct of government</u> by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of any of several enumerated statutes, including § 2339B (relating to providing material support to terrorist organizations) and § 2339C (relating to financing terrorism). While there is no debate that Mr. Elshinawy's convictions in Counts One through Three satisfy the second element of the definition, Mr. Elshinawy's conduct does not satisfy the first element of the definition—that it was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.

The government must prove by a preponderance of the evidence that Mr. Elshinawy had the specific intent to commit an offense that was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.  *See United States v. Chandia*, 675 F.3d 329, 339 (4th Cir. 2012).  The Court "must resolve any factual

disputes that it deems relevant to application of the enhancement, and then, if it finds the

requisite intent, should identify the evidence in the record that supports its determination."

*United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2014) (internal quotation marks omitted).

The Court may consider hearsay evidence and other information regardless of whether such

evidence would be admissible under the Federal Rules of Evidence.  U.S.S.G. § 6A1.3(a);

*accord United States v. Assi*, 586 F. Supp. 2d 841, 848 (E.D. Mich. 2008).

 "A defendant has the requisite intent if he or she acted with the purpose of influencing or

affecting government conduct, and planned his or her actions with this objective in mind."

*United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014).  In determining whether the

defendant acted with the requisite specific intent, the Court cannot rely on the defendant's mere

knowledge of the terrorist organization's purpose, or the terrorist purpose of the defendant's co-

conspirators.  *See, e.g.*, *United States v. Chandia*, 675 F.3d 329, 340 (4th Cir. 2012) (noting that

the district court "did not repeat the mistake" of relying solely on the defendant's knowledge of

the organization's terrorist purpose, but rather, inferred by a preponderance of the evidence that

the defendant acted to advance that purpose in providing material support to the organization's

leader); *United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014) (citing *Chandia* and

upholding the district court's application of the terrorism enhancement, reasoning that the court

did not rely on the terrorist purpose of the defendant's co-conspirators in its finding of specific

intent).

A critical examination of cases in which the terrorism enhancement was applied

demonstrates a clear and direct connection between the defendant's actions and government

conduct.  In *United States v. Hassan*, 742 F.3d 104 (4th Cir. 2015), the Fourth Circuit upheld

application of the terrorism enhancement, finding sufficient evidence that, taken together,

supported the district court's conclusion that each defendant possessed the specific intent to influence or affect government conduct.  The Fourth Circuit highlighted the following factual findings of the district court: (1) defendant Hassan was part of a loose group of conspirators whose stated goal was to kill non-Muslims; (2) Hassan shared  the view that jihad imposed upon Muslims an obligation to help in the fight against NATO forces; (3) Hassan took a trip to the Middle East to find people who could assist him to join the mujahedeen; (4) Hassan created and disseminated his own rhetoric on the internet; and (5) Hassan offered himself as a fighter on the battlefield.  *Hassan*, 742 F.3d at 149.

With respect to Hassan's two co-defendants, the Fourth Circuit also affirmed the district court's factual findings related to specific intent, noting that one co-defendant traveled to the Middle East to engage in violent jihad and advocated via Facebook and other postings an intent to wage violent jihad.  *Id.* at 149-50.  A third defendant (1) expressed a desire to launch challenges against military occupation; (2) maintained relationships with known terrorists; (3) participated in firearms training; (4) received 15 thousand dollars to support the mujahideen; and (5) participated in efforts to convert another individual.  *Id.* at 150.

Similarly, in *United States v. Wright*, 747 F.3d 399, 409 (6th Cir. 2014), the court held that the following facts were sufficient to support application of the terrorism enhancement: (1) the defendants expressed interest in obtaining explosives; (2) the defendants explicitly expressed interest in beating up cops at NATO and G8 summits in Chicago; (3) the defendants participated in a recorded conversation addressing the feasibility of using explosives in or immediately outside government buildings; and (4) the defendants shared the view that the bombings were a terrorist act.  *Wright*, 747 F.3d at 409–10.  The Court reasoned that

> The evidence demonstrates that Wright, Baxter, and Stevens undertook the bridge-bombing plot within a context of plans that they understood to implicate

> government interests. They intended to engage in violent protests in Chicago, which—to their minds, at least—would likely involve combat with law enforcement officers. They considered using explosives to damage two government buildings, although they did not follow through. They expected that the government would respond to the bridge bombing—that the bombing would "influence or affect" the government—by taking new security measures. These conversations establish that Wright, Baxter, and Stevens were aware of the consequences of their acts and chose to act in ways that would bring about those consequences, even if they had other goals in mind, such as antagonizing the 'one percent.'

*Id.* at 410; *see also United States v. Assi*, 586 F. Supp. 2d 841 (E.D. Mich. 2008) (noting that the defendant wanted to support Hizballah's fight against Israeli troops in Lebanon); *United States v. Stafford*, 782 F.3d 786, 792 (6th Cir. 2015) (noting that the defendant targeted government infrastructure leading the court to state that "such a target when great harm to innocent individuals is contemplated, is at least some evidence of intent to affect government conduct"); *United States v. Mohamed*, 757 F.3d 757, 759 (8th Cir. 2014) (noting that the defendant admitted that "he assisted men with traveling to Somalia, so that the men could fight against Ethiopian troops who were in Somalia assisting the internationally-recognized Transitional Federal Government").

Here, Mr. Elshinawy lacked the specific intent to influence or affect government conduct. Mr. Elshinawy's particular objectives, beyond harboring the idea of committing some generalized terrorist attack, are unknown.  Mr. Elshinawy and Tamer did not discuss the nature or target of any terrorist attack, and whatever discussions Mr. Elshinawy did have about a terrorist attack occurred via encrypted applications, for which records are irretrievable. Mr. Elshinawy described to the agents during his first and second interviews that he was provided little to no specific direction by his ISIS contacts regarding the type of attack to launch.  His ISIS contacts merely provided Garland, Texas as a reference.

The Court also cannot impute the intent of Mr. Elshinawy's co-conspirators to Mr. Elshinawy.  In *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009), the Second Circuit rejected the government's argument that specific intent could be imputed to the defendant from his co-conspirators' relevant conduct under section 1B1.3(a) of the guidelines.  In *Stewart*, one of the defendants, Mohamed Yousry, was convicted of conspiring to defraud the United States, in violation of 18 U.S.C. § 371, and providing and concealing material support to the conspiracy, in violation of 18 U.S.C. § 2339A. The government conceded that it lacked evidence that Yousry's offenses were calculated to influence or affect the conduct of government.  However, the government sought application of the enhancement, arguing that Yousry's offenses nevertheless "involved" a federal crime of terrorism.

The Second Circuit disagreed. The district court reasoned that Yousry's offenses could only "involve" a federal crime of terrorism if the defendant committed a federal crime of terrorism, as that term is defined in 18 U.S.C. § 2332b(g)(5). Because the definition of a federal crime of terrorism incorporates a specific intent requirement, the lack of proof of the defendant's particular specific intent precluded application of the enhancement.  The government tried to circumvent the court's position by arguing that specific intent could be imputed to Yousry by the relevant conduct of his co-conspirators, and "it was reasonably foreseeable to Yousry that his co-conspirators were acting in a manner calculated to influence or affect the conduct of government." The Second Circuit affirmed the district's court's decision not to apply the enhancement, reasoning that it could not "cannot conflate Yousry's acts with his co-conspirators' mental states." *Stewart*, 590 F.3d at 139.

Here, Mr. Elshinawy had no knowledge of Ibacs' goal to obtain drone technology on behalf of ISIS, and there is no evidence relating to Mr. Elshinawy that he took any steps in

furtherance of that specific goal. This Court cannot impute Mr. Elshinawy's co-conspirators' conduct in attempting to obtain drone technology on behalf of ISIS for use in the battlefield, to satisfy the specific intent requirement.  There is also no evidence that Mr. Elshinawy had any input into other Ibacs transactions.  Mr. Elshinawy was not part of the organization of Ibacs and his contact with the company appears to be limited solely to conversations directed at getting money for his operation, but he had no specific plan in mind.

Should the Court agree with Mr. Elshinawy that the terrorism enhancement does not apply, it must consider Application Note 4 to § 3A1.4, which provides two exceptions for cases that involve terrorism, but which do not otherwise fit within the definition of a "federal crime of terrorism." Note 4 instructs the Court to not apply the enhancement, but to depart upward in cases where the offense involved or was intended to promote an enumerated offense (such as § 2339B and § 2339C), but the motive was to intimidate or coerce a civilian population.  Note 4 explains that the Court may not depart upward higher than the Guidelines range that would have resulted if the terrorism enhancement would have applied.  Significantly, however, unlike the terrorism enhancement which mandates an increase in the base offense level to 32, the levels of upward departure in Application Note 4 are discretionary and capped.

An upward departure is not warranted here based on the evidence.  No concrete evidence exists to determine the nature of the attack that Mr. Elshinawy was contemplating.  Therefore, the Court similarly cannot draw any conclusions as to whether Mr. Elshinawy's motive was to intimidate or coerce a civilian population.  As this case demonstrates, since Mr. Elshinawy never actually formulated a specific plan, neither the enhancement nor Note 4 applies.

   **2.   There Are No Facts Which Merit A Two-Level Adjustment For Obstruction of Justice.**

Mr. Elshinawy did not stipulate to any adjustment for obstruction of justice as part of his plea agreement, and while the PSR includes this adjustment, it lacks any description of facts upon which the adjustment is based. This Court should find that application of the adjustment is inappropriate because there is no evidence upon which the Court may make a factual finding that Mr. Elshinawy's false statements or activities actually obstructed any part of the government's investigation.

Section 3C1.1, Obstructing or Impeding the Administration of Justice provides that,

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels

The Commentary to § 3C1.1 notes that "obstructive conduct can vary widely in nature, degree, planning and seriousness" and cross-references Notes 4 and 5, which provide examples illustrating conduct covered, and not covered, by the adjustment. *See* § 3C1.1 Note 3.

Not one of the examples of covered conduct in subsections (A)-(K) merits application of the adjustment. Subsection (G) provides as an example of obstructive conduct, "providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense." Here, however, Mr. Elshinawy's false statements did not significantly obstruct or impede the government's investigation.

The Statement of Facts to the plea agreement notes that Mr. Elshinawy "provided false information regarding the amount of monies he had received from ISIS operatives . . . and falsely claimed his intent was to defraud ISIS of funds." The Statement of Facts also notes that Mr. Elshinawy "concealed and mischaracterized" the true nature of his relationship with ISIS and the support he provided to ISIS. These statements may be materially false for the purpose of guilt,

24

but they did not impede or obstruct the investigation.  Mr. Elshinawy revealed to the FBI that he had received approximately $6,700 from ISIS, not the complete amount; however, it is undisputed that on July 17, 2015, Mr. Elshinawy described to the FBI how he received the money and from whom it was sent.  Mr. Elshinawy also logged into his PayPal account and displayed his entire transaction history to the FBI, which allowed for the agents to view each transfer with the exception of the Western Union payment and the payment to Rachel's account.  Furthermore, Mr. Elshinawy's false statement that he was "scamming" ISIS, while material, does not rise to the level of obstructionist conduct.  His motive, whether to defraud ISIS, or to actually commit a terrorist attack, is of no consequence, given that by the time the government began its investigation, Mr. Elshinawy had abandoned plans for any attack and revealed to the FBI the fact that he had received money.  Rather than obstructing or interfering in the government's investigation, Mr. Elshinawy essentially confessed to Counts One through Three of the Indictment during his first interview with the FBI, granted access to his laptop, and provided intelligence regarding ISIS's financial operations.

The Statement of Facts also provides that Mr. Elshinawy "took steps to block and erase his communications over social media with Individual #1, and exhorted his brother to do the same with his own social media account."  The Statement of Facts goes on to state that Mr. Elshinawy "directed his brother to warn Individual #1 that he had been 'revealed and uncovered.'"  Here, too, the conduct does not meet the example provided in subsection (D) of § 3 C1.1, which describes obstructive conduct as "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding . . . or attempting to do so."  Mr. Elshinawy's act of deleting his Facebook chats with Tamer could not have obstructed the government's investigation because the

government obtained all relevant communications from Tamer's Facebook account, and Mr. Elshinawy disclosed to the government the nature of his conversations with Tamer.

Finally, Mr. Elshinawy's direction to his brother to warn Tamer that he had been uncovered was to discourage Tamer from continuing to send messages to Mr. Elshinawy and his brother, both of whom had no desire to travel to Syria or to associate with ISIS at that time.   Mr. Elshinawy also did not destroy his laptops; he voluntarily provided those devices to the government to search, and he agreed to the government's multiple requests to reestablish communication with Tamer (though he never ultimately contacted Tamer).  Mr. Elshinawy's conduct, therefore, can hardly be characterized as obstructionist.

### C.  The Guidelines Range for Count Four Is 63-78 Months.

Mr. Elshinawy pleaded guilty to Count Four of the Indictment—providing false statements to FBI agents, in violation of 18 U.S.C. § 1001(a).  The statutory maximum sentence for a violation of § 1001(a) is 8 years, "if the offense involves international or domestic terrorism (as defined in § 2331)."  18 U.S.C. § 1001(a).  The applicable Chapter Two offense section for a conviction pursuant to § 1001 is U.S.S.G. § 2J1.2 "Obstruction of Justice."  Section 2J1.2(a) provides a starting base offense level of 14, to which an additional 12 levels may be added

> If the (i) defendant was convicted under 18 U.S.C. § 1001 or § 1505 and (ii) statutory maximum term of eight years' imprisonment applies because the matter relates to international terrorism or domestic terrorism

Mr. Elshinawy concedes that, because he pleaded guilty to a violation of 18 U.S.C. § 1001(a), for which a maximum sentence of eight years applies, the Court may impose a 12-level increase to the base offense level of 14, which yields a total base offense level of 26.

### D.  Mr. Elshinawy Has No Criminal History and Any Guidelines Sentence Should Reflect The Absence of This History.

For all the reasons stated above, the Court should find that neither the terrorism enhancement of § 3A1.4, nor the obstruction of justice adjustment applies.  When considering Mr. Elshinawy's criminal history score, the Court should note that application of the terrorism enhancement would result in a fictional criminal history category of VI, the maximum provided in the guidelines.  Such a substantial increase in Mr. Elshinawy's criminal history score substantially over represents his criminal history and contravenes § 3553(a), which requires sentencing courts to consider the particular history of the defendant.  The instant convictions are the only convictions on Mr. Elshinawy's criminal record. Lacking any criminal history, Mr. Elshinawy's true criminal history score is category I.

### E.  No Public Welfare Departure or Any Other Upward Departure Is Appropriate in This Case.

There exists no factual basis to depart upward pursuant to U.S.S.G § 5K2.14, or to any other upward departure in Chapter 5 of the guidelines.  The USPO has recommended that this Court depart upward because "national security, public health, or safety was significantly endangered" by Mr. Elshinawy's offenses.  U.S.S.G. § 5K2.14.  However, the USPO has failed to cite any facts in the Statement of Facts to support such an upward departure.  As explained above, Mr. Elshinawy did not conduct a terrorist attack; he abandoned any idea of an attack before the government began its investigation.  None of Mr. Elshinawy's activities endangered national security, public health, or safety.  Indeed, Mr. Elshinawy's cooperation with the FBI, in which he provided intelligence regarding the funding of ISIS activities, was new and valuable information.  Accordingly, noting in the Statement of Facts supports this departure.

### F.  Consideration of the Section 3553(a) Factors Weighs In Favor of a Guideline Sentence.

A sentencing court is required to consider the factors set forth in § 3553(a) and impose a sentence that is sufficient, but not greater than necessary to reflect the seriousness of the offense,

deter criminal conduct, protect the public from further of the defendant's crimes, and provide the defendant with necessary education or vocational training and treatment. *See* 18 U.S.C. § 3553(a)(2). The factors which warrant special attention here are: (1) Mr. Elshinawy's personal history and characteristics; (2) the nature of Mr. Elshinawy's offenses, particularly the fact that Mr. Elshinawy abandoned plans for a terrorist attack, and had a minimal role in the broader conspiracy; and (3) the range of sentences imposed for defendants with similar records who have been found guilty of similar conduct. Each factor is discussed in turn.

### i. Mr. Elshinawy's Life in the United States Was Riddled With Poverty, Failures, and Strained Relationships.[6]

Mr. Elshinawy was born in Pittsburgh, Pennsylvania on March 8, 1985. He is the second youngest of four siblings. Mr. Elshinawy's father is a retired physician and his mother is a professor in statistics. As a child, Mr. Elshinawy lived between Egypt and Saudi Arabia. His parents spent part of the year working in Saudi Arabia, where incomes were higher, and they returned to Egypt for the remainder of the year. While in Egypt, Mr. Elshinawy and his family lived in Mansoura City and resided in University Housing at Elmansoura University, where his mother taught. Mr. Elshinawy attended Mansoura Military High School from 1997-2000 and Mansoura University from 2000-2005. Mr. Elshinawy studied accounting in college, and following his graduation, worked as an accountant for Egypt of Engineering Industries. In 2007, he decided to move to the United States.

Mr. Elshinawy moved to Maryland and lived temporarily with his sister, Mona Elshinawy, and her family. Mona was working as a teaching assistant at Howard University in Washington, D.C. After living with Mona briefly, Mr. Elshinawy stayed with friends and acquaintances for short periods, and held low-wage jobs, including delivering newspapers with a

---

[6] *See generally* Def. Ex. 1, for a chronology of Mr. Elshinawy's life from 2007 to 2015.

friend.  Frustrated with his lack of income and unsteady work, Mr. Elshinawy returned to Egypt in November 2008.  While in Egypt, Mr. Elshinawy worked for the Egyptian government as an Agent Manager at Vodafone and Niletel.  He earned commission from the sale of cell phones and telecommunication services.  He got into a car accident, which led to stress and disillusionment, prompting his return back to the United States in June 2010.

Mr. Elshinawy began working for a Maryland-based internet company, Fuddlebucks, which sold products, like outdoor and hunting equipment, online.  There, he met Rachel Rowe, who worked in customer service.  The two became friends and developed a romantic relationship.  Rachel converted to Islam, and on November 11, 2010, she and Mr. Elshinawy were wed at a mosque in Baltimore.  Shortly after their wedding, Ms. Rowe, who suffers from Bipolar Affective Disorder, had a manic episode.  Mr. Elshinawy eventually quit working at Fuddlebucks to care for Rachel.  It was at that time that Mr. Elshinawy decided to start his own drop shipping business, TheCheapMart, LLC, which he registered with the State of Maryland on August 1, 2011.[7]  Not long thereafter, Mr. Elshinawy's ambition to operate his own business waned, and he sought employment with 7-Eleven.  He worked for a 7-Eleven store in Glen Burnie, Maryland, but was frustrated by his failure to advance quickly.  His relationship with Rachel began to deteriorate, and they separated and divorced.  Mr. Elshinawy, again, sought refuge from his problems by leaving the United States and returning to Egypt.

Mr. Elshinawy obtained a job in Egypt working for Stream Global Services in Cairo, as a customer service agent for Sirius XM radio.  Mr. Elshinawy left this job after a few months and decided to start a computer repair business, but was thwarted by the upheaval of the Arab Spring

---

[7] Drop shipping is a form of retail fulfillment where the merchant selling the products does not own or keep any inventory in stock.  Rather, the merchant purchases the inventory directly from the manufacturer, retailer, or another third-party in order to fulfill customers' orders. The third-party then ships the goods directly to the customers.

revolution.  Mr. Elshinawy had resumed talking with Rachel and decided to move back to the United States to reconcile with her and escape the civil unrest.  Upon his return to Maryland in November 2012, Mr. Elshinawy and Rachel went straight to the mosque to be remarried.  Rachel later experienced another episode, which required her hospitalization.  After Rachel left the hospital, Mr. Elshinawy began working for Pizza Bolis delivering food.  He was in dire financial straits and began pawning his belongings for cash.  *See* Def. Ex. 7, at 14–16.  He borrowed money from friends, family, and associates and left a trail of debts with utility, medical, and cable providers.

Mr. Elshinawy got a job delivering newspapers and developed a romantic interest in Rebecca, the daughter of the newspaper distributor.  Mr. Elshinawy told Rachel that he wanted to marry Rebecca, and she allowed him to take a second wife.  However, Mr. Elshinawy divorced Rebecca in early 2014 after only a few short months of marriage, and quit the newspaper job to avoid seeing her.  Mr. Elshinawy's mother had been sending him money via Western Union to supplement his income, but Mr. Elshinawy's debts were overwhelming, making him particularly susceptible to offers of easy money and travel to Syria from his childhood acquaintance, Tamer, in the fall of 2014.

### ii.  Mr. Elshinawy's Association With ISIS Was Brief, and He Severed All Ties With ISIS Before The Government First Questioned Him.

As described in detail above, the period in which Mr. Elshinawy received money from ISIS was brief—approximately three months.  He received money from ISIS and spent it on goods largely unrelated to the furtherance of any terrorist attack.  As the financial charts prepared by the defense's forensic accountant demonstrate, Mr. Elshinawy spent money quickly and his account balances were frequently low or deficient.  *See* Affidavit and Financial Analysis of Jules Dorner, attached as Def. Ex. 14.  In the three-month period of the conspiracy, Rachel's M&T

Bank Checking Account No. x8222, which Mr. Elshinawy shared, was deficient from March 7, 2015 to July 6, 2015.  *Id.* at 24.  The majority of the expenditures from the account during this period were minimal and from fast food or grocery stores, such as Royal Farms, 7-Eleven, and Food Lion.  *Id.* at 26–109.  The most significant expenditure from this account was rent, totaling approximately $800 every month.  *Id.*  Mr. Elshinawy over drafted this account twelve times total, incurring an overdraft fee each time.  *Id.*at 21–25.  A M&T MyChoice Joint Checking Account No. x7713 in Mr. Elshinawy's and Rachel's names was similarly deficient.  The account, which was opened on June 1, 2015, was negative in the amount of $207.49 between July and August 2015, despite an opening balance of more than $2,000.  *Id.* at 110.  Here, too, Mr. Elshinawy spent much of his money on 7-Eleven, QuickMart, Royal Farms, fast food, and gas station purchases.  *Id.* at 111–125.  Mr. Elshinawy also incurred regular ATM withdrawal fees.

Not all of Mr. Elshinawy's purchases were unrelated to his association with ISIS.  Mr. Elshinawy purchased phones and a computer, with the money he received from ISIS.   He used these devices to communicate with Tamer and other individuals associated with ISIS, but he ceased communicating with any other member of the conspiracy by July 15, 2015—two days before the FBI first questioned him.

### iii.   Mr. Elshinawy's Role in the Broader Conspiracy Is Minimal and Attenuated.

The government seeks to punish Mr. Elshinawy for the entirety of the conspiracy relating to ISIS's efforts to obtain drone technology.  However, Mr. Elshinawy's role in the conspiracy was minimal and he neither knew of, nor participated in, any purchases of drone technology or related components on behalf of ISIS.  At most, Mr. Elshinawy received money and allowed the

co-conspirators to utilize his social media and other accounts to communicate with him and other individuals.

According to the government's own chronology of the 235 conspiracy-related events in this case, Mr. Elshinawy was associated with a total of 58 events; the remaining 177 events are completely unrelated to Mr. Elshinawy.[8] *See* Analysis of Government's Chronology of Conspiracy Sequence of Events, attached as Defense Exhibit 15.  In other words, Mr. Elshinawy is associated with 25.11% of the conspiracy-related events.  *See id.*  However, that figure overstates his conduct as it includes Facebook conversations with Tamer and Ahmed, viewing "propaganda" online, and interviews with the FBI.  After excising these activities and limiting Mr. Elshinawy's conduct to the receipt of money, purchases, and communications regarding the receipt of money, Mr. Elshinawy's role in the conspiracy reduces to 12 of 235 events (7 money transactions, 3 purchases, and 2 communications), or a mere 5.11% percent of the overall conspiracy-related activity.  Mr. Elshinawy's receipt of money from Ibacs on behalf of ISIS was unrelated to Ibacs' efforts to obtain drone technology.  Omitting all events of Mr. Elshinawy's receipt of money leaves a mere 5 out of 235 events in which Mr. Elshinawy participated— purchasing and activating cell phones.  These activities reflect only 2.13% percent of the overall activities described.

---

[8] The defense did not include in its calculation any events related to the newspaper articles that Mr. Elshinawy kept in his home.  Mr. Elshinawy delivered newspapers for a living, and often kept extra newspapers in his house and car.  The articles that the government obtained from Mr. Elshinawy's home were not clipped or kept in a particular area—they were found in heaps on the floor.  More important, the newspaper articles were all within approximately one month of when the government searched his home, suggesting that Mr. Elshinawy was not stockpiling or hoarding ISIS-related articles.  If that were true, the government would have observed ISIS-related articles from several months prior, in which ISIS attacks around the world were rampant.  The government's inclusion of these articles in its chronology is a red herring intended to enhance Mr. Elshinawy's role in a global conspiracy that had little to do with him.

The discovery provided by the Government demonstrates that Ibacs, or some version of the company, existed as early as 2006, and continued to operate after Mr. Elshinawy had stopped receiving payments.  Mr. Elshinawy was neither part of, nor privy to, any information about the company's aims or operations beyond his specific transactions.  The only evidence that exists which connects Mr. Elshinawy to Ibacs is the failed MoneyGram receipt showing an attempted transfer of $1,499.99 dollars from Abdul Samad to Mr. Elshinawy, and PayPal receipts bearing the Ibacs email address.  As Dr. Sageman stated in his report, Mr. Elshinawy's connection to Ibacs was the mere receipt of money, which Ibacs sent on behalf of ISIS to fund whatever plans Mr. Elshinawy made for a terrorist attack in the United States, but which were spent almost exclusively on personal needs and debts.  Mr. Elshinawy had no role in Ibac's efforts to obtain drone technology for ISIS.  Accordingly, Mr. Elshinawy should not be punished or sentenced for those activities.

### iv. The Average Term of Imprisonment Imposed By Sentencing Courts for Defendants Convicted of Providing Material Assistance Is Significantly Below 20 Years, the Statutory Maximum.

The Court should consider the sentences imposed for defendants who have similarly been convicted of providing material support to a foreign terrorist organization. The defense has reviewed dozens of material assistance cases involving both § 2339A and § 2339B convictions.[9] At the time of this writing, a total of 41 cases have resolved by plea and 10 cases have resulted in convictions after jury trials.  *See* Analysis of Material Assistance Cases, attached as Def. Ex. 16. Twelve defendants are awaiting sentencing.  In the cases that resolved through a plea agreement, the average term of imprisonment imposed is 14 years.  *Id.*  The average term of imprisonment imposed for defendants who were convicted following trial is 15.7 years.  *Id.*  For all cases which

---

[9] The defense searched for existing material assistance cases on PACER.  The list of cases provided is not exhaustive, as there may be cases of which the defense is not aware.

resolved after 2014, the year in which ISIS was designated a foreign terrorist organization, the average term of imprisonment imposed is16.6 years. *Id.*  The average term of supervised release imposed across all cases is 11.6 years. *Id.*

The Court should consider these averages, in addition to the other § 3553(a) factors described above, and impose concurrent sentences.  The defense further requests that the Court sentence Mr. Elshinawy to a term of imprisonment between 63-78 months (5.25 to 6.5 years) for all the reasons described above.

### G. The Court Should Impose a Term of Supervised Release of No More Than 3 Years For Each Count, to Run Concurrently, and the Court Should Not Impose Any Fines.

Mr. Elshinawy requests that the Court impose no more than a three-year term of supervised release for Counts One through Four, all of which must run concurrently.  Given that Mr. Elshinawy has no income or assets, and a mound of debt that he cannot pay, the Court should decline to impose any fines for Mr. Elshinawy's convictions.

The authorized term of supervised release for Mr. Elshinawy's convictions in Counts One through Three is any term of years or life.  *See* 18 U.S.C. § 3583(j).  The guidelines provide for a term of supervised release of 1-3 years, because Counts One through Three of the Indictment are considered "Class C" felonies.  *See* 18 U.S.C. § 3559(a) (defining a Class C felony as one where the maximum term of imprisonment authorized by statute is more than 10 years, but less than 25 years); U.S.S.G. § 5D1.2(a)(2).  Count Four is a "Class D" felony, which also provides for a term of supervised release of 1-3 years.  *See* 18 U.S.C. § 3583(b)(2); U.S.S.G. § 5D1.2(a)(2).  Each term of supervised release must run concurrently with any other term of supervised release.  18 U.S.C. § 3624(e).

For all of the reasons asserted by Mr. Elshinawy in favor of this Court imposing a guidelines sentence of imprisonment, the Court should similarly find that a guidelines term of supervised release is also appropriate.  Mr. Elshinawy voluntarily abandoned plans for any attack in the United States, confessed to the FBI, and cooperated with the FBI's investigation.  A term of supervised release of life would be disproportionate to the conduct in this case and greater than necessary to achieve the goals of sentencing.

The Court should find that imposing any fine for Mr. Elshinawy's conduct would also result in punishment greater than necessary to achieve the goals of sentencing. As described above, Mr. Elshinawy has no income, assets, or valuable items.  He has existed largely from the largesse of his family and friends, and his relationships are riddled with unpaid debts.  Mr. Elshinawy lacks the financial means to pay a fine for his convictions, and therefore, the Court should find that a fine is not warranted.

**CONCLUSION**

This case rests on three immutable facts: (1) Mr. Elshinawy had not formulated any specific plan for a terrorist operation in the United States and took no steps in furtherance of any specific plan; (2) Mr. Elshinawy stopped all activities relating to an operation before the FBI knocked on his door; and (3) Mr. Elshinawy confessed his crimes to the FBI.  For these reasons, Mr. Elshinawy respectfully requests that this Court impose a sentence between 63-78 months imprisonment for Counts One through Four, all to run concurrently.  Mr. Elshinawy also requests that the Court impose no more than a three-year period of supervised release for each Count, and no fines.

Respectfully submitted,

_____/s/_____

Joshua R. Treem #000037
Stuart O. Simms #27090
Chelsea J. Crawford # 19155
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
jtreem@browngold.com
sos@browngold.com
ccrawford@browngold.com

*Attorneys for Mohamed Elshinawy*


## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on this 14th day of November, 2017, a copy of the foregoing

Defendant Mohamed Elshinawy's Sentencing Memorandum was filed and served through the

CM/ECF system.

_____/s/_____

Joshua R. Treem

36