**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| v. | *   **Criminal No. ELH-16-0009** |
| MOHAMED ELSHINAWY, | * |
| Defendant. | * |

\*\*\*\*\*\*\*

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States, by and through its undersigned counsel, hereby submits the following memorandum of facts and law in support of its sentencing recommendation of 25 years imprisonment and life supervised release in the above-captioned case.  The government submits that sentence is appropriate, in consideration of the factors under 18 U.S.C. § 3553 and the advisory Sentencing Guidelines range.  It is also in line with other sentences in similar cases, and well below the potential maximum sentence in this case.

## **Table of Contents**

**Page**

I.   The Defendant Has Admitted to Providing Material Support to ISIS and to Conspiring With, and Accepting Monies From, Significant ISIS Operatives to Further ISIS's Terrorist Agenda ……………………………………………….   5

II.   Elements of the Terrorism Enhancement   ……………………………………….   7

    A.   Legal Standard   ………………………………………………………….   7

    B.   The False Statement Charge in Count Four Also Qualifies as a "Federal Crime of Terrorism" ………………………………………….   8

    C.   Intent Prong of § 2332b(g)(5) …………………………………………..   12

III.   The Evidence Supports, by a Preponderance, Application of the Terrorism Enhancement under U.S.S.G. § 3A1.4.  ……………………………………..   19

**Page**

A.      The Defendant's Statements are Sufficient to Satisfy the Intent
        Prong of § 2332b(g)(5).   ……………………………………………………   19

    1.      Defendant's Chats with Individual 1   …………………………………   20

    2.      Defendant's Chats with His Brother   …………………………………..   27

    3.      The Defendant's Statements Establish His Intent to Provide
        Material Support to Advance ISIS's Terrorist Purpose.   ……………   38

B.      The Defendant Took Significant Steps to Hide His Activities in Support
        of ISIS.   ……………………………………………………………………   43

    1.      The Defendant Configured His Computers To Avoid Detection.   …….   43

    2.      The Defendant Masked His Online Activities.   ………………………   45

        a.      Proxy Servers   …………………………………………………   45

        b.      TOR   ……………………………………………………………   46

        c.      Dropbox   ………………………………………………………   49

        d.      IP Address Information   ………………………………………   49

    3.      The Defendant Sought to Delete Other Evidence of His Crimes.   ……   51

C.      The Defendant Regularly Accessed Terrorism-Related Propaganda.   ………   52

    1.      Official ISIS Propaganda   ……………………………………………   52

    2.      Photos of Bomb Stash   …………………………………………………   53

    3.      General ISIS/Terrorist Materials   ……………………………………   54

D.      The Preponderance of the Evidence Supports Application of § 3A1.4.   ……..   56

IV.   Government's Sentencing Recommendation   ……………………………………..   59

A.      Seriousness of the Offfense   ……………………………………………   59

    1.      Beginning Phases of the Conspiracy   …………………………………   60

    2.      Purchases of Drone Technology for ISIS by Coconspirators   ………..   61

**Page**

3.  Pledge of Allegiance to ISIS and Start of Money Transfers   ………..   62

   a.   Attempted Payment - $1,500   ……………………………….   63

   b.   First Payment - $1,500   …………………………………….   63

   c.   Second Payment - $1,000   ………………………………….   64

   d.   Third Payment - $1,000   …………………………………….   65

   e.   Defendant Quits His Job   …………………………………….   65

   f.   Fourth Payment - $3,000   …………………………………….   65

   g.   Fifth Payment - $1,200   …………………………………….   66

   h.   Sixth Payment - $1,000   …………………………………….   66

4.  "Pay as you Go" Phones   ……………………………………….   66

5.  FBI Interviews and False Statements   ………………………….   67

6.  Defendant Expresses Concern About Law Enforcement Detection   ….   68

7.  Immediate Months Prior to Defendant's Arrest   …………………….   68

8.  Defendant's Arrest   …………………………………………….   69

9.  Analysis   ……………………………………………………...   70

B.  Protecting the Public from Further Crimes of the Defendant   ……………….   71

C.  The Government's Sentencing Recommendation Is Consistent With
   Other Similar Terrorism Cases.   …………………………………………   72

D.  Respect for the Law, Just Punishment, and Adequate Deterrence   …………..   73

V.  Conclusion   …………………………………………………………….   79

Appendix I

Exhibit 1   Chart of IP Log-In/Out and Location

Exhibit 2A     Description and Analysis of Data from Defendant's Phone
and Broadband Accounts

Exhibit 2B     Data from Defendant's Phone and Broadband Accounts

Appendix II

Exhibit 3A     Items from Defendant's Electronic Media

Exhibit 3B     Terrorism-Related Videos Accessed by Defendant on June 10
and July 13, 2015

Exhibit 4      Timeline of Events in the Conspiracy and Supporting Evidence

Exhibit 5      Chart of Terror-Related Newspaper Articles Found in Defendant's
Residence on December 11, 2015

Exhibit 6      Records Documenting Attempted MoneyGram Transfer to
Defendant in March 2015 from Overseas Coconspirators

Exhibit 9      Expert Report prepared by Flashpoint Counterterrorism Director

Exhibit 10     Expert Report prepared by Baltimore FBI Senior Computer
Scientist

Exhibit 11     September 2017 Sentencing Snapshot – George Washington
University, Program on Extremism

Exhibit 12     Government Sentencing Press Releases, Non-Traveler Cases

Appendix III

Exhibit 7      Translations of Arabic Social Media Chats between Defendant
and Individual 1

Exhibit 8      Translations of Arabic Social Media Chats between Defendant
And His Brother

<u>**Argument**</u>

I.     **The Defendant Has Admitted to Providing Material Support to ISIS and to Conspiring With, and Accepting Monies From, Significant ISIS Operatives to Further ISIS's Terrorist Agenda.**

On August 15, 2017, approximately twenty months after his arrest on December 11, 2015, the defendant plead guilty to all four counts of the indictment pending against him: specifically, conspiracy to provide material support or resources to ISIS, a designated foreign terrorist organization (Count One), and providing and attempting to provide same (Count Two), both in violation of 18 U.S.C. § 2339B(a)(1); unlawful financing of terrorism in violation of 18 U.S.C. § 2339C(a)(1) (Count Three); and making material statements and falsifying or concealing material facts in violation of 18 U.S.C. § 1001 (Count Four).   The plea agreement between the parties addressed only the base guideline levels for each charge, leaving open for argument application of the terrorism enhancement under U.S.S.G. § 3A1.4 and the relevant sentencing factors to be considered under 18 U.S.C. § 3553(a).   Plea Letter, Doc. 120 at 4-6.[1]

The parties' plea agreement also contains a stipulation of certain, though not all, facts the government would have proven beyond a reasonable doubt had this case proceeded to trial.   Doc. 120 at 9-11.   At his rearraignment on August 15th, the defendant agreed with the representations made in the factual stipulation and admitted his conduct as set forth therein.   By virtue of his guilty plea, the defendant has also admitted to the central elements of each of the charged offenses: (1) that he knowingly and intentionally conspired with others to provide material support or resources to ISIS (Count One); (2) that he knowingly provided, and attempted to provide, material support or resources to ISIS (Count Two); (3) that he willfully collected funds, directly or indirectly, with

---

[1]  In its Presentence Report, the U.S. Probation Office has included a two level upward adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1.   The parties did not address that adjustment in their plea agreement.   As such, per the terms of the plea agreement, the government takes no position with respect to application of the adjustment.   *See* Doc. 120 at 5-6.

the knowledge that such funds were to be used, in full or in part, to carry out a terrorist attack intended to cause death or serious bodily injury to a civilian (Count Three); and (4) that he knowingly and willfully made false, fictitious, or fraudulent material statements or representations relevant to a terrorism investigation being conducted by the Federal Bureau of Investigation ("FBI") (Count Four).  *See* Doc. 120 at 1-2.

Most significantly, the defendant has admitted, through his plea to the entirety of the charges as contained in the indictment and through his factual stipulation, to the manner and means of the conspiracy and his provision of material support and resources to ISIS in the form of:

- <u>personnel</u> – including himself and his attempted recruitment of his brother for the purpose of furthering ISIS's cause of violent jihad;

- <u>services</u> – including means and methods of communication, such as social media, electronic mail and messaging accounts and applications, electronic communication devices, and "pay as you go" cellular phones, in many instances registering said devices and accounts under alias names and/or fake addresses; and

- <u>financial services</u> – including use of personal and business bank accounts, online financial accounts, prepaid credit/debit cards, and online e-commerce accounts to transit monies from ISIS operatives overseas to the defendant in the United States to be used to support the commission of a terrorist attack.

*See* Indictment, Doc. 19 at 2-3; Doc. 120 at 9-11.

The defendant was not charged with having committed a terrorist attack.  Fortunately, he was stopped before he could do so when the FBI interceded to question him in July 2015, thereby revealing that he was in their sights.  *See* Govt. Ex. 8, Defendant's Social Media Chats with his

Brother, at 473 ("Tell [Individual 1[2]] that [my] cover has been completely blown."). Nor was the defendant charged with having intended to commit a terrorist attack, although he made clear in his communications (discussed further below) that he sought to commit such an act in the United States. The application of the sentencing enhancement under § 3A1.4 hinges on whether the evidence establishes, by a preponderance, that the defendant's admitted criminal acts were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5).

## II.    Elements of the Terrorism Enhancement under U.S.S.G. § 3A1.4

### A.    Legal Standard

Section 3A1.4 provides that if the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism," the resulting offense level is to be increased by 12 levels, and the defendant's criminal history category "shall be Category VI," regardless of whether the defendant's criminal history as computed under Chapter Four of the guidelines is lower. U.S.S.G. § 3A1.4 and comment. (n.3). A "federal crime of terrorism" has the same meaning "given that term in 18 U.S.C. § 2332b(g)(5)." *Id.*, comment. (n.1).

The definition of a "federal crime of terrorism" under § 2332b(g)(5) has two prongs: first, the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and second, the offense is a violation of specific criminal statutes. Included in those enumerated statutes are the offenses to which the defendant has plead guilty: 18 U.S.C. § 2339B – material support of terrorism as charged in Counts One and Two, and 18 U.S.C. § 2339C – unlawful financing of terrorism as charged in Count Three. 18 U.S.C. § 2332b(g)(5).

---

[2] Individual 1 is identified by the same descriptor used in the parties' plea letter. *See* Doc. 120 at 9.

**B.      The False Statement Charge in Count Four Also Qualifies as a
         "Federal Crime of Terrorism."**

Section 3A1.4 does not limit its application to only those offenses enumerated in

§ 2332b(g)(5).  In *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), the Sixth Circuit upheld

application of the enhancement to a conviction under the general conspiracy statute, 18 U.S.C.

§ 371, to commit offenses against the United States:

> [T]he word "involved" signifies that a defendant's offense included a federal crime
> of terrorism … as defined in 18 U.S.C. § 2332b(g)(5)…. A defendant who intends
> to promote a federal crime of terrorism has not necessarily completed, attempted,
> or conspired to commit the crime; instead the phrase implies that the defendant has
> as one purpose of his substantive count of conviction or his relevant conduct the
> intent to promote a federal crime of terrorism.  On this reading, the offense of
> conviction itself need not be a "Federal crime of terrorism."

*Id.* at 516-17.  *Accord United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004) ("Had

the Guideline drafters intended that § 3A1.4 apply only where the defendant is convicted of a crime

listed in 18 U.S.C. § 2332b(g)(5), they would have included such limiting language.  Instead, they

unambiguously cast a broader net by applying the enhancement to any offense that "involved" or

was "intended to promote" a terrorism crime.").

Significant to this case is the guidance found in Application Note 2 of § 3A1.4, which

provides:

> For purposes of this guideline, an offense that involved … (B) obstructing an
> investigation of a federal crime of terrorism, shall be considered to have involved,
> or to have been intended to promote, that federal crime of terrorism.

U.S.S.G. § 3A1.4, comment. (n.2).  As the parties have agreed, the Chapter Two base offense

guideline for Count Four is found in in § 2J1.2, the guideline applicable to obstruction of justice

offenses.  *See* Doc. 120 at 5.

In *United States v. Benkhala*, 530 F.3d 300 (4th Cir. 2008), the Fourth Circuit upheld

application of § 3A1.4 to the defendant's convictions for obstruction of justice and making false

statements to the FBI and a grand jury investigating material support violations involving training camps run by Lakshar-e-Taiba ("LET"), a designated FTO.  The court explained:

> [A]pplying § 3A1.4 in Benkhala's case seems straightforward.  He was convicted of obstruction offenses.  Application Note 2 [of § 3A1.4] says that obstruction offenses qualify for the enhancement so long as the thing obstructed qualifies as an investigation into a "federal crime of terrorism."  Application Note 1 [of § 3A1.4] tells us that the term "federal crime of terrorism" has a statutory definition.  The statute, 18 U.S.C. § 2332b(g)(5), defines it in two parts.  Benkhala obstructed a grand jury investigation into violations of §§ 2339A and 2339B, which satisfies the second part.  And the violations involved jihadist camps training people to fight the governments of India, Russia, and the United States, which satisfies the first.

*Id.* at 311-12.  The court found the enhancement was further supported by factual evidence indicating the defendant had "attended a jihadist training camp abroad, was acquainted with a network of people involved in violent jihad and terrorism, and lied about both."  *Id.* at 313.

Though the court declined to review the district judge's conclusion that he had to find the defendant "actually" obstructed, rather than attempted to obstruct, the underlying investigation, it did note the district court findings on that issue as further support for the enhancement – specifically, that the defendant's falsehoods delayed and frustrated various parts of the investigation.  "'[B]ecause of Defendant's false or intentionally misleading answers, the Government still [did] not know the identity or whereabouts of the persons about whom Defendant was questioned, their involvement with Lashkar-e-Taiba, and their role in aiding persons to obtain jihad training.'"  *Id.* (quoting district court opinion in *United States v. Benkhala*, 501 F.Supp.2d 748, 757 (E.D. Va. 2007)).

The identical scenario exists in this case.  By way of his guilty plea to Count Four of the indictment charging him with a violation of 18 U.S.C. § 1001, and his factual stipulation in the plea agreement, *see* Doc. 120 at 11, the defendant has admitted that he sought to avoid detection of the full extent of his criminal conduct with, and on behalf of, ISIS by concealing and falsifying

material facts from, and making false statements to, FBI agents who interviewed him in July 2015. He provided false information regarding the total amount of monies he had received from ISIS operatives to conduct a terrorist attack in the United States, and falsely claimed his intent was to defraud ISIS of funds.  Throughout his interviews, he concealed and mischaracterized the true nature and extent of his association with, and relationship to, ISIS operatives and the support he had provided to ISIS.

During the July 17th interview, the defendant lied about a number of important facts, in some cases telling multiple lies about the same topic.  For example:

- *His work status* – He said he had quit his job 5 or 6 months prior (from time of interview).  In fact, he stopped working at a local newspaper in May.

- *His spending* – He said he never had a credit card.  In fact, he had many credit cards.

- *His involvement in politics* – He said he did not talk about politics because it was boring, and Egyptians, like himself, are taught not to discuss politics.  Based on his communications (referenced below), it is clear this was not the case.

- *Individual 1 and his role* – He said his "friend" in Egypt (i.e., Individual 1) was actually an individual by another name with whom he spoke regularly, even on the day of the interview.  (He later admitted Individual 1's true name).

   - He said Individual 1 was scamming ISIS.  In fact, he was a member of ISIS and actively supporting its activities in Syria and Iraq.

   - He said Individual 1 had reached out to him with the purpose of putting him in contact with an ISIS member.  In fact, it appears the defendant initially reached out to Individual 1,[3] who was the defendant's first ISIS contact, and the defendant's contact with other ISIS members did not happen until after the defendant had pledged his allegiance to ISIS on his own, and communicated that fact to Individual 1.  The defendant never revealed during any of his contacts with the FBI that he had pledged allegiance to ISIS.

- *His use of social media* – He said he used to use a particular online social media service, but it became boring so he had switched to using two social communication applications.  In fact, the defendant was a regular user of the online social media service and used it regularly to engage in ISIS-related chats with his brother and Individual 1.

---

[3] *See* Govt. Ex. 7, Defendant's Social Media Chats with Individual 1, at 1.

- *His phones –*

  - He said he only had one phone and insisted he did not have any others.  When an agent pointed to another phone charging on a nearby table, he said that was an old phone of his wife's that he was going to give to his father.  Based on a search of the phone, agents found that it was a phone the defendant used.

  - When pressed by the agents about other phones, he said he had destroyed his cell phone a few days before interview, or possibly in April.  When he contacted his wife, via phone, in the presence of the agents, she reminded him he had destroyed one of his phones with a hammer.

- *The money he received –*

  - He said he did not know who sent him money through Western Union. (He later admitted to knowing monies were sent to him by his mother's aide).

  - He said all the money he had received was from his mother.  Of course, a significant portion of it was from ISIS.

  - He said he had received no other monies other than through Western Union.  Of course, he received the bulk of the money transfers from ISIS through online financial accounts.

  - He said he believed someone from a particular online social communication forum had hacked his account and stolen his identity, and that would be how monies from ISIS might seem to be associated with him.  Of course, this was not true.

  - He said the $1,000 wire transfer (from a coconspirator located in Egypt) was to be used to purchase an iPhone for a friend who was an engineer working in an oil field in Egypt.  Of course, the money was not intended for that purpose.

  - He said all of the money transactions were done over a messaging service associated with his social media account.   He later admitted to only one transaction on the online financial account that was later determined to be used for the bulk of his money transfers.

  - He said the total amount of monies he received from ISIS was $4,000, when in fact, it was approximately $8,700. In his second interview on July 20, 2015, he changed the amount to $5,200, which was still false.

  - He said he was scamming ISIS, which is controverted by the evidence and the defendant's guilty plea.

Thus, the defendant repeatedly lied about the money he received from ISIS and the reasons for it, his relationship with his primary ISIS contact and other ISIS operatives, his use of phones and social media, and other facts that delayed and frustrated the FBI's ability to fully investigate his involvement in the conspiracy to support ISIS and the roles and identities of his coconspirators. Significantly, in both the July 17 interview and follow-up interview on July 20, 2015, he never revealed his true intent and mindset regarding ISIS, or anything about his use of virtual machines, proxy servers, or some of the other methods he used with his coconspirators to mask their conduct. Indeed, as was the case in *Benkhala, supra,* "because of Defendant's false or intentionally misleading answers," the government was left bereft of information regarding the identities and location of the defendant's coconspirators (which continues to this date), the true nature and extent of the conspiracy, and the nature and scope of the activities the defendant undertook to aid ISIS (which also continues to this date). *See* 530 F.3d 313.

### C.      Intent Prong of § 2332b(g)(5)

The application of § 3A1.4 is determined by a preponderance of the evidence. *United States v. Chandia*, 675 F.3d 329, 339 (4th Cir. 2012) (*Chandia III*).  In addition, application of both U.S.S.G. § 2M5.3 and § 3A1.4 terrorism enhancement does not constitute impermissible "double counting" – "Double counting is permissible unless the guidelines expressly prohibit it in a given circumstance." *United States v. Hammoud*, 381 F.3d 316, 356 (4th Cir. 2004) (citation omitted).  Where the § 3A1.4 adjustment "clearly applies to the conduct of [the] offense," it must be imposed since nothing in either §§ 2M5.3 or 3A1.4 "expressly exclude[s]" their joint applicability.  *Id*. (internal citation and quotation marks omitted).

The defendant in *Chandia* was convicted of violations of 18 U.S.C. §§ 2339A (conspiracy) and 2339B (conspiracy and a substantive charge) based on his having provided material support

to an LET official while that official was in the United States.  The support consisted of the defendant picking up the official at the airport, giving him access to a computer and email, and assisting him in shipping paintballs to Pakistan for use in LET military operations.  *United States v. Chandia*, 514 F.3d 365, 370 (4th Cir. 2008) (*Chandia I*).  During the course of several appeals, the Fourth Circuit clarified the standard for application of the § 3A1.4 enhancement.  Where the acts underlying a defendant's convictions are "violent terrorist acts," those "standing alone" raise an automatic inference of the required intent supporting application of § 3A1.4.  *Id*. at 376.  Since that was not the case in *Chandia*, the court held the district court could only apply the enhancement where there was evidence that the defendant did not just know about the FTO's terrorist purpose, but also "intended to advance that purpose in providing material support…."  *Chandia III*, 675 F.3d at 340.

In *Chandia III*, the Fourth Circuit found sufficient evidence of the intent prong where the district judge's findings established, by a preponderance, that 1) the defendant was aware that LET was an organization engaging in acts of terrorism, as evidenced by emails he received, research he did, and websites he visited, all of which were revealed through witness testimony and forensic searches of his computers, and 2) that he was aware that the individual to whom he was providing support was an LET leader, as evidenced by testimony of what the defendant had seen and heard in the LET office in Lahore and in LET-related conversations in which he was present with the official and others, as well as his own efforts in masking his direct communications with the LET leader by engaging in cryptic messaging.

In *Hammoud, supra*, the court upheld application of the enhancement against the defendant, who had been convicted for, among other things, providing material support to Hizballah, a designated FTO.  The court found the evidence establishing the defendant's close

connections to officials of the FTO, and his knowledge of, and personal support for, the FTO's terrorist activities and goals, to be sufficient to satisfy the intent prong of 3A1.4. This evidence included, in addition to the defendant's $3,500 donation to the FTO, videotapes that he played during meetings at his home that included speeches by Hizballah leaders praising men who had martyred themselves against America and Israel and encouraging donations to support Hizballah's operations. 381 F.3d at 340-41.

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), involved defendants convicted of, among other things, material support violations under 18 U.S.C. § 2339A resulting from their efforts to support Islamic violence abroad. The defendants asserted their motives were benign and they were simply providing humanitarian aid to oppressed Muslims. In upholding the district court's application of the terrorism enhancement, the Eleventh Circuit concurred with the district court's finding that the intent prong of § 2332b(g)(5) is focused "on the intended outcome of the defendants' unlawful acts—i.e., what the activity was calculated to accomplish, not what the defendants' claimed motivation behind it was." *Id*. at 1115. With that focus in mind, the court held that "the defendants' support activities were intended to displace 'infidel' governments that opposed radical Islamist goals. [The defendants] spoke expressly about their desire to impose Sharia, toppling existing governments in the process. Defendants' motive 'is simply not relevant.'" *Id*. (quoting *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010).

In *United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004), the defendant's goal was to create upheaval in Miami by bombing and displacing public utilities in the hopes of affecting changes in the government's foreign policy. Even though he had staked out targets and sought weapons and explosives, he lacked the means and the ability to carry out his plans. Despite that fact, the district judge's application of the § 3A1.4 enhancement was upheld on appeal. "[T]he

terrorism enhancement does not hinge upon a defendant's ability to carry out specific terrorist crimes or the degree of separation from their actual implementation. Rather, it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered." *Id*. at 1248.

The majority of other circuit courts have adopted similar interpretations of the intent prong of § 2332b(g)(5). For example:

In *United States v. Awan*, 607 F.3d, 306 (2d Cir. 2010), the Second Circuit held that application of § 3A1.4 was not determined by the defendant's personal motivations for committing his offenses, but rather, whether the offenses were intended to promote a federal crime of terrorism. Defendant Awan was convicted of conspiracy to provide, and providing, material support for use in a conspiracy to murder and maim abroad, and money laundering. The defendant had helped to transfer funds from Sikh supporters in the United States to a Sikh terrorist organization in India to support creation of a separate Sikh state. The district judge did not impose the § 3A1.4 enhancement based on his finding that the defendant "had private purposes in mind," and enjoyed the "prestige and influence" obtained by associating with terrorists and members of the Pakistan intelligence services. *Id.* at 316 (quoting district court opinion).

The appellate court reversed, holding that the defendant's "motive" was irrelevant to the intent prong of § 2332b(g)(5):

> Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive. "Motive" is concerned with the rationale for an actor's particular conduct. "Calculation" is concerned with the object that the actor seeks to achieve through planning or contrivance. Calculation may often serve motive, but they are not, in fact, identical. Section 2332b(g)(5)(A) does not focus on the defendant but on his "offense," asking whether it was calculated, *i.e.*, planned-for whatever reason or motive-to achieve the stated object. Thus … the section is better understood as imposing a requirement that the *underlying felony* [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Clearly, a person may intend and may commit an offense that

15

is so calculated even if influencing or retaliating against government is not his personal motivation. Thus, a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular *motivation* in committing the murder is to impress a more established terrorist with his abilities.

*Id*. at 317 (internal citations and quotation marks omitted).

Since the government had established the defendant knew that the objective of the FTO and the terrorist with whom he dealt "was to influence the Indian government through violence," and that the funds he provided to the FTO "would be used toward that end," the intent prong of § 2332b(g)(5) was satisfied and the application of the enhancement warranted. *Id*.

[Even though] Awan may not have been personally motivated by that objective,…. the government could still prove that Awan's offenses themselves were 'calculated to influence … the conduct of government." ... For example, if the evidence showed that Awan engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object. A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics.

*Id*. at 317-18. *See also United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) (terrorism enhancement warranted "if a defendant's *purpose* in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct'") (citation and internal quotation marks omitted).

In *United States v. El-Mezain*, 664 F3d 467 (5th Cir. 2011), the defendants, who served as officers of the Holy Land Foundation for Relief and Development, a pro-Palestinian charitable organization based in Texas, were convicted of, among other offenses, providing material support to Hamas, a designated FTO. The evidence established that (1) they were aware of the Hamas charter clearly delineating its goals of violence against Jewish people to rid them from Palestine,

16

(2) they had close ties to the organization, and (3) they had made statements supporting Hamas's goals of disrupting the Oslo accords and peace process, and fighting Israel.  The court upheld application of the enhancement, noting, "[t]o the extent that the defendants knowingly assisted Hamas, their actions benefitted Hamas's terrorist goals and were calculated to promote a terrorist crime that influenced government."  *Id*. at 571 (citations omitted).

The defendant in *United States v. Fidse*, 862 F.3d 516 (5th Cir. 2017), plead guilty to an obstruction charge based on his false statements to the FBI regarding his terrorist ties and activities with al-Shabaab, a designated FTO.  The Fifth Circuit upheld imposition of the terrorism enhancement based on evidence establishing that 1) the defendant knew, just by the line of questioning of FBI agents, that he was being investigated with regard to his al-Shabaab activities, and 2) following the interviews, he had asked a companion to recruit others overseas to destroy evidence.  The court held that the defendant "acted with intent to thwart that investigation into a possible conspiracy to provide material support to al-Shabaab … which, as the district court observed, wishes 'to influence and to affect the conduct of multiple governments by intimidation and coercion and through retaliation.'"  *Id*. at 526 (citing in support, among other cases, the Fourth Circuit's opinion in *Benkhala, supra*.)

In *United States v. Haipe*, 769 F.3d 1189 (D.C. Cir. 2014), the defendant plead guilty to hostage-taking stemming from his role in the kidnapping of civilians from an area in the southern Philippines, including nationals of the Philippines and the United States.  The defendant claimed the primary purpose behind his actions was to raise money that would benefit the local Muslim community.  The D.C. Circuit upheld the district court's application of § 3A1.4 – "Haipe's money-raising goals obviously do not preclude a finding of intent to influence government policy.  As the court found, he released the hostages on the condition that 'the government take a host of actions

to benefit the local Muslim community which included fiscal and employment policy changes….'" *Id.* at 1193.   The court noted that this factor, "no matter how desirable the policy changes [might have been], clearly evinced an intent to influence government policy through coercion and intimidation."  *Id.*

In *United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012), the defendant had made statements to an informant that they would load missiles in "our car and bring [them]" to facilitate an attack against United States and foreign forces in Afghanistan.   A number of days later he told the informant he planned to purchase a car with his portion of proceeds from drug sales in which they were participating.   The defendant sought to challenge application of § 3A1.4 by claiming that his intent was to buy a car for personal use for his drug trafficking – not to carry missiles for an attack.   The appellate court upheld the district court's application of the enhancement, stating: "That Mohammed may have intended the car for personal use does not mean he could not also have planned to use the car in the attack, and he identifies no evidence directly contradicting the district court's conclusion that he did."  *Id.* at 202.

Finally, in *United States v. Ali,* 799 F.3d 1008 (8th Cir. 2015), the defendants were convicted of providing and conspiring to provide material support to al-Shabaab, and making a false statement.   The Eighth Circuit upheld application of the terrorism enhancement noting the following facts established the defendants' offenses were calculated to influence or affect the Somali government by intimidation or coercion or to retaliate against that government: the defendants had contact with al-Shabaab members, they had voiced their support of al-Shabaab's efforts, including acts of violence, to expel the Somali government by force, and they had engaged in fundraising in support of that cause.  *Id.* at 1031-32.

Ultimately, the terrorism enhancement should be applied where, as here, the evidence demonstrates that (1) ISIS had a terrorist purpose that the defendant knew about, and (2) the defendant intended to further that purpose in providing material support. *See Chandia*, 675 F.3d at 340.

## III.    The Evidence Supports, by a Preponderance, Application of the Terrorism Enhancement Under U.S.S.G. § 3A1.4

As an initial matter, it is clear that the defendant's contemplated support for ISIS included committing a terrorist attack in the United States.  In his statements to the FBI, he claimed that was what ISIS was expecting from him, which appears consistent with his communications with his coconspirators.  Moreover, it is clear that he was well aware of this goal at the time he was providing material support to ISIS.  Thus, the contemplated commission of a violent terrorist act raises an inference of the required intent supporting application of § 3A1.4.  *Chandia I*, 514 F.3d at 376.

### A.    The Defendant's Statements are Sufficient to Satisfy the Intent Prong of § 2332b(g)(5)

Separate and apart from that inference, however, are the defendant's statements during his discussions with his brother and with Individual 1, detailed further below, which, standing alone, satisfy the requisite intent for application of § 3A1.4

During the course of his chats over social media with Individual 1, the defendant discussed, at length, the goals of ISIS and its justifications for violent jihad.  Their discussions had various references to ISIS's enemies, including the "infidels," "Arab and foreign tyrants," Zionist-Arab states, Israel, Jews and Christians.  It is clear the defendant's plans involved violent attacks – on several occasions, Individual 1 exhorted the defendant: "Be harsh in the killing of Allah's enemies."  The defendant also asked Individual 1 about how to make a silencer for a gun.  Of

course, the chats also reflect non-violent forms of support – including arranging for communications means and warning Individual 1 about the ability to see his location through his social media account.

The defendant's statements in chats with his brother[4] over social media also establish he was intent on advancing the well-known terrorist goals of ISIS in eliminating, through intimidation and coercion by violence, secular and non-Islamic governments, like the United States, in favor of a global Islamic caliphate governed by Sharia law.

The defendant's chat communications were obtained through execution of federal search warrants on the social media accounts of his brother and Individual 1.  The English translations of those communications, which were originally conducted in Arabic, are contained in their entirety in the Sealed Appendix to this motion as Exhibits 7 (Individual 1) and 8 (defendant's brother).[5] Because the defendant's words are critical to the application of § 3A1.4, the government has excerpted passages from those chats relevant to establishing the defendant's purpose, in providing material support to ISIS, to intimidate and coerce, and retaliate against, government conduct.

### 1.      Defendant's Chats with Individual 1[6]

March 13, 2014 – Govt. Ex 7 at 5-6
    The defendant became aware that Individual 1 was fighting with ISIS in Syria and/or Iraq. He admonished his friend to "make sure you turn off the location on your cell phone when you talk to anyone online.  Because your location shows."

September 27, 2014 – Govt. Ex. 7 at 6-13

---

[4]  The defendant's brother resides in Saudi Arabia.

[5]  The defendant has agreed to the accuracy of the translations as completed by FBI certified linguists.

[6]  There are many instances in which the same Arabic words can be spelled differently in English.  For example, "Amir" versus "Emir," "Sharia" or "Shari'ah," "mujahidin" or "mujahedeen."  The chat passages quoted in this memorandum are as contained in the translated documents.

Defendant asked Individual 1 if ISIS were "mujahidin" or "Khawarj" like my brother …
calls them."[7]  Individual 1 espoused the justification for violent jihad against "the enemies of God."
Defendant responded, "My heart really can't be against Muslims after the infidels and hypocrites
have united against them."

Individual 1 asked that God enlighten them with the truth "and grant us victory over the
infidels."  Defendant responded, "Amen.  This is really a time of discord and the end of days."
Individual 1 cautioned, "Remember what the Almighty said – 'Fight all the infidels as they all
fight you.'"

Defendant stated, "Allah tells me this is the truth.  My heart is not able to accept what the
infidels do to Muslims."  Individual 1 responded, "Allah willing, they will all be defeated and
retreat, and we will behead the Arab and foreign tyrants and their low-life evil scholars."
Defendant replied, "May God keep you safe.  Allah willing.  He will keep you safe."  Individual
1 replied, "May Allah give you the good news of heaven.  Either victory or martyrdom, Allah
willing.  Peace be upon you."  Defendant responded, "God's peace, mercy and blessings be upon
you too."

October 5, 2014 – Govt. Ex. 7 at 13-14
Defendant sent Individual 1 a link to a YouTube video entitled, "The Islamic Caliphate is
coming and from the land of Syria," with a specific reference to the end of Israel.  A few hours
later, he sent a message to Individual 1 stating, "Allah willing, the Islamic State is victorious."

October 6, 2014 – Govt. Ex. 7 at 14-19
Defendant stated, "I swear by Allah that many facts were revealed to me indeed; we have
been living for a while under rulers and scholars who facilitated for the rulers their injustice and
humiliation of Muslims…. Thank Allah, … I now live with the Islamic State as if I were over
there."  Defendant expressed his agreement with the Islamic tenets espoused by ISIS's self-
proclaimed leader, Abu Bakr al-Baghdadi, stating, "Allah willing, from victory to victory.  I
honestly praise you that you witness the Islamic Caliphate and live in the State.  One day, I will
also come and live in the State of Islam under the banner of 'there is no God but Allah and
Muhammad is Allah's prophet.'"

October 7, 2014 – Govt. Ex. 7 at 19-20
Defendant sent Individual 1 a link to a posting stating "60 Zio[nist]-Arab states are against
the State of the Caliphate, but it still expands and becomes more powerful."
October 10, 2014 – Govt. Ex. 7 at 20-38

---

[7]  The Khawarj (Kharijites) were an extremist sect in early Islam history.  Some scholars have compared
the beliefs of the sect to the theology of ISIS; however, ISIS followers consider comparisons to the Khawarj
as derogatory.

Defendant stated, "My heart is with the Islamic State … Is this really the Caliphate or am I dreaming?  I think about the matter day and night … Indeed, the banners of Islam are raised. Indeed, Allah is the ruler in the Islamic State."

Individual 1 encouraged the defendant to travel overseas to join ISIS and confirmed he was in Raqqa.  Defendant stated, "My wife and I will come, man.  I want to live there because the Islamic State is coming with a promise from our God."  Individual 1 responded, "Seek Allah's help and be one of the soldiers of Islam, and remember that the Prophet … disavowed those who dwell among the infidels."  Individual 1 cautioned, "be careful that nobody becomes aware of you."  Defendant replied, "Yes, surveillance here is horrible."

Defendant asked if Sharia law applied in the State and stated, "Allah willing, the westerner [meaning himself][8] will be one of the most fierce mujahidin if I am certain that this is the truth." When Individual 1 confirmed that Sharia law "applies to all," the defendant continued, "Enough insults and humiliations to Muslims to the point that a Muslim does not believe the rules of his religion only because they do not match rules of Western nations."

Defendant asked if the roads from Egypt to Turkey and then to Syria were open.  Individual 1 told the defendant to travel directly [to Syria].  When the defendant stated this would not be possible, as "anyone traveling to a Muslim country is investigated," Individual 1 told him to travel to Turkey and he would arrange the defendant's travel from there.

Defendant advised that people in America were scared of the banner of the State being raised in this country "and the declaration of Shari'ah," to which Individual 1 replied, "May God grant us victory."  Defendant directed they refer to one another in code if they had to contact each other in an emergency.

Defendant stated he would be traveling to the [Islamic] State soon and planned to "save up for the ticket and expenses."  He continued, "I must have a tight plan to get out.  It is very hard for Muslims to leave from here." Individual 1 told the defendant to let him know if he needed money or anything else to facilitate his travel.  Defendant cautioned Individual 1 not to write anything about him on the internet "because it is all monitored."  He then stated, "I'm coming, Allah willing. Hopefully, the Lord will forgive my sins and grant us the reward of jihad."

February 17, 2015 – Govt. Ex. 7 at 42-70
Defendant parroted the ISIS mantra, stating he was "[r]emaining and expanding, Allah willing.  This summarizes everything I want to say."  He advised that he had "pledged allegiance

---

[8]  Individual 1 had previously referred to the defendant as the "westerner" ("How are you, westerner?"). *See* Govt. Ex. 7 at 1.

to the Amir [a reference to Abu Bakr al-Baghdadi]**.**  Individual 1 replied that he had pledged his allegiance personally to al-Baghdadi ("I pledge allegiance to him, hand in hand").

Defendant stated, "The whole world is frightened, man.  They hid Islam from us ... But thanks be to Allah, we are witnessing these times.  Individual 1 stated, "I swear by Allah's glory that nothing surpass it, death only happens once, so let it be for Allah's sake.  Defendant responded, "Indeed, and what a disgraceful death is the death for the world.  Some of those who call themselves Muslims are allied publicly with the Christians to kill Muslims … I swear by Allah, my soul is there with the mujahidin.  Everywhere I go here and I see the news, I smile ... I am a soldier of the State, but temporarily away.  He then asked Individual 1 to extend his regards and his allegiance to "the Amir" [al-Baghdadi].

Defendant and Individual 1 joked about seeing each other in [ISIS] videos.  Individual 1 stated, "I pray to God to see you the governor of Washington," to which the defendant replied, "I wish.  But I must deserve it."  Individual 1 replied, "And that is not difficult for God; it is either victory or martyrdom."  Defendant responded, "Allah willing."

Defendant stated, "I like that the [Islamic] State runs its business with might.  Enemies are being identified and identities are being determined, which is Islam."  Individual 1 stated, "An infidel and his killer will not meet in hell," to which the defendant responded, "Finally, Muslims are angry over their dignity and their religion."

Individual 1 advised, "You are at a vulnerable point; through you, brother, we can either be defeated or victorious … Take good care of yourself.  You are now different than before.  Seek Allah's help in everything and don't tell anyone what you have in mind, even for proselytization purposes."  Defendant responded, "Of course not.  It is a crime here.  A very big one.  If I meet our Lord while being, at least, faithful to Muslims, I may have hope for mercy."

March 2, 2015 – Govt. Ex. 7 at 74-93

Individual 1 told the defendant to "hurry."  Defendant responded that he needed time to save money to "manage" [his travel] for both himself and his wife.  He asked if it was better if he traveled by himself.  Individual 1 cautioned, "Do not talk openly.  Rely on Allah and be truthful with Allah."  Defendant responded, "Of course."

Defendant stated, "The westerner [meaning himself] is sick of being in the West," to which Individual 1 replied, "Be patient."  Individual 1 then if the defendant had a particular encrypted social media application.  The defendant proceeded to download and activate it, and then provided his cell phone number to Individual 1 to communicate over the application.  Individual 1 stated, "I will have a brother call you now."  Defendant asked if the brother was "trustworthy," to which

Individual 1 responded, "I am with him."  The defendant then confirmed his code name, but it is unclear if that was stated to Individual 1, or if the defendant was communicating with "the brother."

<u>March 5-6, 2015</u> – Govt. Ex. 7 at 96-97

Defendant told Individual 1, "Allah willing, a huge blessing will happen."  Individual 1 cautioned, "Most importantly do not talk with anyone, not even with me.  May Allah protect you."

<u>March 9, 2015</u> – Govt. Ex. 7 at 104-110

Defendant advised he was "getting things in order" for himself and would "not come now," but "in a bit."  Individual 1 stated, "your friend is with me" [a reference to the "brother" in March 2nd chat].  Defendant responded, "Praise be to Allah.  We will talk in approximately two hours."  He then exclaimed, "Finally I found my loved ones and my brothers.  Thanks be to Allah."

<u>March 13, 2015</u> – Govt. Ex. 7 at 111-13

Defendant asked Individual 1 to do him a favor and deliver "a small message … to our friend" [another apparent reference to "the brother"].  He continued, "I noticed that my phone is being monitored.  The camera opens on its own at weird times.  Tell our friend that I am preparing myself with the highest security measures and will contact him soon, Allah willing.  Please deliver the message."

<u>March 29, 2015</u> – Govt. Ex. 7 at 119-20

Defendant advised, "Soon, Allah willing, I will have a phone on which we can talk any time."  He then stated, "Make supplications for me … We are in need for patience and steadfastness and renewing the commitment."[9]

<u>April 3, 2015</u> – Govt. Ex. 7 at 123-34

Defendant stated, "Soon you'll hear good news, Allah willing," to which Individual 1 responded, "Stay strong."  Defendant replied, "I have many goals, but going slow for safety."  Individual 1 stated, "You've always been a 'gangsta.'"  Defendant responded, "Exactly … I'll come over when I am done, Allah willing."  When Individual 1 indicated he did not want to call the defendant, the latter responded, "I will save your name on a number [and] give it to you soon."

Defendant continued, "And this favor [a possible reference to Individual 1's conveyance of the defendant's pledge to al-Baghdadi, or his request for a favor in the March 13th chat] – I will be indebted to you for it, all my life …How great is it when you show your brother the way to paradise … there was always something missing [meaning from his life].  I have always had a sense of failure.  They hid it from us.  The scholars who served the government.  Well, it's all

---

[9]  The defendant purchased a new cell phone and HP laptop on March 31, 2015.  He activated the cell phone on April 2, registering it under the name "blackeyes" at the address "earth planet, Aberdeen, Maryland."

good.  Now the picture is complete.  And perform jihad with your wealth and your lives for the sake of God."  Individual 1 stated, "Be harsh in the killing of Allah's enemies."

April 21, 2015 – Govt. Ex. 7 at 159-83

Defendant described the "mujahid" as people of "pride" and members of the Muslim Brotherhood as people "who change their morals to satisfy everybody."  He stated, "There is a book called 'Milestones.'  The book says that these societies are not considered Islamic societies because Allah's law is not applied.[10]  And then today, they burned the Islamic books in schools."

Individual 1 referenced a video responding to beheadings by ISIS, which the defendant stated he had seen.  He then stated, "They want us to be peaceful, so the Jews and the Christians kill us and make it permissible.  Individual 1 replied, May Allah make them repent before we get hold of them."  Defendant responded, "Amen.  They did not care for the Muslim's blood."  Individual 1 replied, "The Jews and the Christians let their dogs attack."  Defendant stated, "Brother, they attack like lions on the Muslims," to which Individual 1 responded, "And once we catch a dog he becomes the victim, and then we become Kharijites."

Defendant stated, "Brother the truth has become clear ... Thanks be to Allah, I have found my dream project, Allah willing.  It was a source of anxiety; life without Islam as the main drive for life.  Allah willing, we will meet after I finish my work here."  Individual 1 responded, "Know that Allah is with us and will grant us victory.  There is nothing holding us back from reaching paradise except for them to kill us.  Honesty and renewed commitment the most important thing."

Individual 1 asked, "Do you need anything?"  Defendant responded he needed "supplications" and renewal of his "commitment."  Individual 1 advised, "We just have to do our due diligence and Allah is in control of the consequences," to which defendant stated, "O Allah facilitate things."  Individual 1 told the defendant to "Hurry up."  Defendant replied, "Soon, but you have to know that from my end, I am not behind on anything … Just waiting on the other party."

Individual 1 reminded the defendant of the verse that begins, "Whoever performs jihad has done it for himself.  Indeed Allah is in no need for humans."  Defendant responded, "An honest man could be like a whole army.  Jihad builds up the soul … Supplication is our first weapon, and Allah willing, He will grant us victory."

April 22, 2015 – Govt. Ex. 7 at 190-96

Defendant stated, "By Allah, I am really eager to satisfy Allah Almighty.  I wanted to ask you.  Is making a small thing with a silencer difficult or easy?"  Individual 1 replied, "Definitely,

---

[10]  The defendant appears to be referring to a book by Egyptian Islamist author Sayyid Qutb, first published in 1964, that sets out a plan and call to action to re-create the Muslim world on strictly Quranic grounds.

there is something ready.  It is much better to buy a slave than raising one."  Defendant responded, "You are right.  I hope to find one … That's why I said that if I cannot get one, I will make one."

Defendant told Individual 1, "Listen to the lessons of Sheikh Al'Adnani[11] … he says what exactly is on my mind … may those servants of their government, who watered down the religion, as well as the rulers and those who are not associated with the religion not harm you.  Allah willing, the victory is for us, and humiliation for them … I will completely dedicate my time for that matter, and Allah willing, all will be fine."

<u>April 24, 2015</u> – Govt. Ex. 7 at 199-211

Individual 1 asked for the defendant's help to activate a social media application and provide a phone number, other than his own, through which "they can send a message" [presumably referencing the activation code for the application].  He then directed the defendant to send the number "and open it, so you will be able to receive the message."  The defendant sent the number, opened the line, and confirmed that "the message" had arrived, and provided the access code to Individual 1.

Individual 1 directed that the defendant either cancel the phone, of if he needed it, only use it to call Egypt.  Defendant stated, "Allah willing, I will finish work here and come to you."

<u>April 26, 2015</u> – Govt. Ex. 7 at 215-18

Defendant stated, "You know that this matter has become the most important thing in my life.  I do what I can to follow what I am told … I swear by all Muslim's lives."  Individual 1 replied, "May Allah make your steps firm …The entire village is waiting for you ... Ask Allah for help and make sure to keep it a secret.  You have a lot of enemies; yourself, devils, humans, jinn [Islamic mythological creatures], tyrants of the Arabs, and the Aliens and their soldiers.  Rejoice, if you fear Allah, He will be with you, and He definitely will grant you victory as He promised."

<u>May 1, 2015</u> – Govt. Ex. 7 at 219-20

Defendant sent Individual 1 a recitation of the ISIS mantra, stating: "Remaining and expanding, daring never hesitating, strong and replenished, one, not multiple, knows no crying, revenges the bloodshed, responds to the call, despises the fools, loves jihad, rejects being led, patiently awaits the promise, eliminates the bastards, its life full of kindness, by breaking the Cross, with terrible unswerving constancy, and welcomes the strangers."[12]

---

[11]  Abu Mohammad al-Adnani was a senior ISIS leader, and the organization's spokesperson and chief of external operations.  He was killed in a military coalition airstrike in August 2016.

[12]  The term "breaking the Cross" first appeared in ISIS propaganda in mid-2014 when ISIS publicly threatened attacks in the United States, and then again in October 2014 when ISIS made public threats to attack the Vatican and "break the cross."

<u>May 9, 2015</u> – Govt. Ex. 7 at 222

Defendant stated, "Everyone is scared over here."  Individual 1 replied, "May Allah increase their fear," to which the defendant responded, "Allah willing."

<u>May 25, 2015</u> – Govt. Ex. 7 at 233-34

Individual 1 stated, "May Allah make your steps firm.  Be harsh in the killing of Allah's enemies."  Defendant responded, "May our Lord keep you safe and grant you the highest level of paradise."

The defendant and Individual 1 had one more brief exchange in late June 2015, after which their communications were derailed by the defendant, as he sought to block Individual 1 from his social media account.  On July 19, 2015, Individual 1 sent a message to the defendant asking, "Where are you, chief?  Why are you ignoring us?  I want to check on you."  The defendant never responded.  Govt. Ex. 7 at 244.

## 2.    Defendant's Chats with his Brother ("AA")

While the defendant was undertaking his criminal activities with his ISIS coconspirators, he engaged in many religious discussions with his brother seeking to convince him to join ISIS.  In turn, his brother sought to convince the defendant that ISIS's justification for violent jihad was not grounded in the teachings of the Prophet Muhammed.  During these discussions, the defendant responded to his brother's arguments with cynicism and/or outright rejection of his brother's opinions and explanations.  What is significant in these chats are the defendant's repeated affirmations of support for martyrdom in the cause of violent jihad in retaliation against "the Jews and the Christians," the "infidels", and the "apostates" who have slaughtered Muslims.

<u>March 11, 2015</u> – Govt. Ex. 8 at 11-58

AA advised he had gotten a temporary job to manage his expenses, but was still "thinking where to go."  Defendant jokingly responded, "Most likely the Islamic State is not in your consideration?"  AA replied, "No.  All what I can do is to go to Syria to teach people their religion, but I will not kill Muslims."

Defendant stated, "Swear by Allah that you will not tell anyone. I am ready to pledge allegiance soon. It is a real pledge of allegiance … I will do it through the phone. But with a well-known Emir over there … Keep it a secret, OK? [Individual 1] has pledged the allegiance with Abu Bakr Al Baghdadi personally." AA responded, "You better not, just in case you're being watched, and you will not even be able to make it there." Defendant replied, "No, I am being careful."

AA asked, "[Individual 1] is your connection there, correct?" Defendant replied, "[Individual 1] was the first connection. Now, I have my personal connection.[13] Something super. But I will not go now. If I want to go, I will, but not now." AA asked, "Syria or Iraq?" Defendant replied, "Syria will not be different, man; it is all one country … Most importantly now is that I, thank Allah, have become one of them. Before I die … this is the victorious group … I believe in that 100%." Defendant advised he would be taking his wife with him. He stated, "Man, those are the mujahedeen … My life is for Allah. If I die for the sake of Allah, there is no problem. At the same time, it is impossible for Da'ish [ISIS] to be defeated … There is contact with them. Do you understand? I mean I hear the truth from the mujahidin, and not any mujahidin. People in a position."

AA asked, "why are they slaughtering?" Defendant responded, "because they are fighting them, man. Defendant referenced a verse that AA recited in full – "Therefore, when ye meet the unbelievers (in fight), smite at their necks," stating that "its meaning is the killing with a single blow of the sword." Defendant stated, "Salah al-Din slaughtered thousands of prisoners."[14] AA responded, "We have nothing to do with Salah al-Din. I am talking about the Prophet," and went how to state that slaughtering was doing something against the Prophet.

Defendant remained resolute: "Not a big difference for me. It is a message to the Jews and Christians and their allies. Like how they torture and kill the Muslims … punish with the like of that with which you were afflicted and those who are caught will be slaughtered and a bit more than that. Man, it is a war, and the Muslims were tortured and killed by the most terrible means and weapons. This is revenge for the Muslims. It is okay … No, I am not convinced that it is a violation of the Prophet … We die in the sake of Allah and be mujahidin and martyrs … That is why I said to join the succession of the mujahidin … Because I believe they are mujahidin defending Islam and the vulnerable Muslims."

March 12, 2015 – Govt. Ex. 8 at 60-63

---

[13]   The defendant appeared to be referring to the ISIS "brother" introduced to him during his chat with Individual 1 on March 2, 2015.  *See* Govt. Ex. 7 at 90-93 (referenced above).

[14]   Salah al-Din was the first sultan of Egypt and Syria who led the Muslim military campaign against the Crusaders.

AA advised he was waiting for the defendant to confirm that his ISIS associates were right on the issue of slaughtering, and if so, he would go with him to the Islamic State. Defendant responded, "But I am not going soon. I am not in a hurry." Defendant then joked, "We are not going to Egypt again?" AA responded, "If al-Sisi[15] remains, we will not go unless we form an Islamic army and conquer it as an Islamic conquest." Defendant responded, "That's right. We go to an Islamic State. I already do not feel comfortable in the free lifestyle and things like that."

March 17, 2015 – Govt. Ex. 8 at 68-71

AA advised he might be going to southern Turkey to teach Sharia law, with some travel into Syria to do the same. Defendant stated, "I could fix your paper [travel documents] if you decide to go over there. If you want to go to the [Islamic] State. Lodging and so on … But then don't go to Syria. The place over there is full of mines. Turkey is good and safe." AA responded, "When I go to Turkey, I will have a greater view of the situation [meaning ISIS]."

April 25, 2015 – Govt. Ex. 8 at 80-105

Defendant stated, "Originally, I want to go to Jihad. I do not have dreams or aspirations in this world except the Jihad. I don't have dreams, and I don't want to make money or anything. I want just to go to Jihad and be with the Islamic State. AA responded, "But the Lord said … we are not created for the Jihad only."

Defendant replied, "Yes, of course, but I mean this is my project. Man, stop discouraging … You are making me feel like I am already going and saying Jihad is my Jihad … One of the dreams. Just like there are people dreaming of money, cars, and so on. Like normal … I always have a project in my life, like Rachel was a project. I help her to become a Muslim. Now, I have a bigger project which will be my goal. Do you understand me? … I forgot that I am talking to you here and this thing could be monitored."

AA stated, "The Jihad is a means to make people worship Allah, but not a purpose." Defendant replied, "I believe that today's best Jihad is the Jihad of war. And of course, the other types of Jihad. The Jihad is like the medication I need to treat the sins and the heart diseases … But the Jihad against the self and the physical Jihad [reference to violent jihad] together make you a true Muslim … I am still in the below zero stage. It's all hopes … But we have to be men in a time where men are glorified and who grant victory to Islam … Are you really not sad that the Muslims are less dignified in the world and have the most worthless blood?"

AA advised the defendant to be useful to others as "you do not know which work is accepted by Allah." Defendant responded, "Unfortunately, I cannot … I am in the U.S. Man, anyone who shows he is religious will be targeted … they are recording people who go to the mosque … But they monitor you. And I do not want to be monitored … I am working on a project but it needs a lot of time and effort. AA replied, "all the time could be for the support of the

---

[15]  Abdeh Fatah el-Sisi is the President of Egypt. He was sworn into office in June 2014.

religion … one should think and invent … a way to support the religion."  Defendant responded,
"I have but Satan delays me … My project is very strange.  As soon as I commit a sin, everything
stops.  As soon as I supplicate and pray to our Lord, and I am being good, it starts to work again."
AA asked, "What is the project?  May I know it?  Uh, the travel one?"  Defendant replied, "No.
Man enough what I said here.  May the Lord protect us.  No, I cannot tell you here.  Maybe on
another place on the internet.  But, a great project."

When AA reminded the defendant their parents would be visiting the U.S. and could help
the defendant's "situation," the defendant stated: You are assuming there is no money like before
with mom.  AA stated, "I keep saying when would I live without taking [money] from her."
Defendant replied, "Man, money is meaningless … As long as you are after it, it won't come to
you.  When you lose hope that you will have money, and let it go, it will come to you.  Listen, if
you go to the State of Islam, they will give you money … the State of Islam takes care of its citizens
… Listen to Sheikh al-Adnani and evaluate his speech … see if it agrees with the Quran and
Sunnah or not."  The defendant then sent his brother a YouTube link to the speech.

<u>April 27, 2015</u> – Govt. Ex. 8 at 112-40
Defendant suggested that he and his brother engage in discussions interpreting the Quran
in order to understand it better.  He asked for a recommendation on the best book about al-Sunnah
[the teaching of the Prophet Mohammed] and the battles.

Defendant asked, "Why do the 'Ulama [body of Muslim religious scholars] ignore all the
Jihad verses?"  This prompted a discussion regarding lack of scholarly support for ISIS ideology,
during which AA stated, "He who disagrees with your ideology is not necessarily a coward or
afraid, he might be seeing the truth his way."

Defendant advised, "By the way … I have already pledged allegiance [to ISIS]"  AA asked,
"How did you feel after that … so did you feel at ease?  Defendant replied, "Finally, I am a Muslim
with dignity and pride unlike the Jews and the Christians.  I belong to a State and people who apply
Shari'ah and the Islamic Caliphate.  Huge comfort to the extent that I forgot all my worldly dreams.
I mean money and this and that have only become things that are found in life.  And true life is the
living from the heart with Allah and waiting for death for the sake of Allah.  Because life and death
must be for Allah.  Completely.  And everything has come to me after that.  I received a lot of
money … Money has gone, other money will come.  As soon as I made up my mind … I have
been wanting to repent for a long time.  Now, this is the best motivation for repentance.  This really
needs a man to ponder over the matter with himself.  Specially when it involves death.  At that
moment you discover how my heart clings to life.  That is why I want to read the Quran very well."

Defendant advised that he had already listened and reviewed certain Islamic chants and
verses with Individual 1 that his brother was recommending.  He asked, "And now do you still
have the same opinion about the [Islamic] State?"  AA replied, "I wish I am wrong, and the State
is indeed be the right banner that I should follow.  But I am not at that point yet.  Sometimes I say

to myself hopefully it is the right thing and you reached it before me just like you became committed before I did."

Defendant told AA that the Islamic State has "many spoils [of war] and money and bounties" and related how a man had gotten stoned there for adultery, stating, "that is normal, it is not a big deal." He continued, "The important thing, time will prove my word to you … It is enough that the enemies of Islam fear nobody except for the State. They do not consider the rest of Muslims as real Muslims … They say that the State is the true Islam." AA replied, "And I am neither with nor against your stance, but my heart is not at ease yet."

Defendant then mentioned that the Egyptian President appeared to be in trouble and told his brother to "do a search for that Sinai matter. I do not know much about it, but they pledged their allegiance to the [Islamic] State. And delete chats that have any mention of the State, etc."[16] AA responded, "Okay, prince. These could be like the days of commitment. You reach them before me, and then I will catch up to you." Defendant replied, "Allah willing that is what will happen."

April 28, 2015 – Govt. Ex. 8 at 145-47
AA stated, "There are riots in Baltimore." Defendant responded, "Hahahahahahahahahha. Yes, I know. 100%. Let them burn the police. Well, they are all bunch of infidels attacking each other." AA responded, "Yes, that is fine."

May 4, 2015 – Govt. Ex. 8 at 149-51
Defendant complained about the Saudi Sheikhs calling the two shooters who were killed in Garland, Texas, "terrorists … because they opened fire at a gathering of the offensive images portraying the Prophet … The police killed them and of course, the Sheikhs will call them terrorists. Exactly what the infidels call them. No one thinks about the topic in the first place. If thousands of Muslims are dying and no one thinks about it. For sure, the offensive cartoons are not tak[en] into account." AA responded, "May the Lord grant victory to Islam and honor the Muslims."

May 18, 2015 – Govt. Ex. 8 at 157
Defendant directed his brother to "delete the chats between me and you. Do you understand? About the dialogue."

May 22, 2015 – Govt. Ex. 8 at 162-74
Defendant asked his brother, "When are you going to join the succession? [followed by a smiley face]" AA responded, "Hahaha. You go and tell me. Later I might join you." Defendant

---

[16] The defendant appeared to be referencing a militant group in Egypt that had publicly pledged its allegiance to the Islamic State in late 2014 and was encouraging other Muslims to do the same.

reminded his brother that he joined [ISIS] while in the United States – "The first step you do is with your heart." Defendant challenged his brother to explain why "the esteemed scholars are letting [the Shiites][17] curse the Prophet and the Companions?" AA cautioned, "To mock something that is neither your approach nor your ideology is not right." Defendant replied, "But the Companions did not see that non-Muslims kill Muslims and leave them in cold blood."

May 25, 2015 – Govt. Ex. 8 at 176-82

Defendant told his brother about a dream he had. "We were home at the Housing, and somebody that seems to be from the government, or something like that, appeared to be coming. And of course, I was with the [Islamic] State. I felt that I may die. I kept saying to mom 'make supplications for me. I may die soon; I want to die as a martyr.' And then something came into my room through the window while they were sitting in the living room. When the snake came in, I shut the door and the snake tried to open the door of my room. Indeed, it was able to open it and get out, but I was able to catch and kill it. Do you think this is hallucination or something that has a meaning? … the point is that I was with the State. I felt that I was targeted because of that … What does that snake refer to?"

AA replied, "A snake always refers to the devil or an enemy. Defendant asked, "Ok, is killing it a good thing?" AA responded, "Of course. Killing an enemy or the devil is something praiseworthy."

May 29, 2015 – Govt. Ex. 8 at 187-202

AA told the defendant about Syrians he had met who had come to Saudi Arabia after their homes had been destroyed. He stated, "the man's daughter is married and living in ISIS. They say there is no money, no nothing. The money is with the heads of the battalions and the Emirs only. The ordinary people are living as usual. They [ISIS] give them every month sugar, rice, tea and other food items, and that's it." Defendant responded, "Then, isn't it better than Bashar [al-Assad, the Syrian President], who destroyed their homes?" AA replied, "Yes, it is better … But it is neither the same picture you had in mind, nor what they [defendant's ISIS associates] tried to convey to you."

Defendant replied, "So, they are kind of bad, no nice but not too much. Hahaha … I don't evaluate them … No one told me anything. I was the one who saw it on the videos. He then stated, "I dream of the [Islamic] State almost every day. Yesterday I had a dream that I was at a church where people were killing each other. A weird dream. And I had a gun. And I was also waiting. You are so late. There is aloooooot of people that have seen the truth. But a lot of people hide it. A huge number of people more than you can imagine."

---

[17] Shia is a minority branch of Islam. The distinction between it and the majority Sunni branch of Islam revolves around the issue of succession to the Prophet Muhammad. ISIS adheres to Sunni Islam.

Defendant then challenged his brother: "[T]ell me why the Arab rulers would not liberate Palestine?  Or, for example, assist the Muslims in Burma?[18]  Tell me why the Jews are friends with all Arab Rulers?  Tell me, if the Prophet, peace be upon him, was still alive, would he assist the Americans and attacked the Muslims in Iraq and Syria because they declared Islamic jihad?  Which side do you think the Prophet would be with?  AA responded, "Ok, all Arab rulers are traitors.  I agree with you about this point."

Defendant stated, "Then there is nothing called 'traitors.'  There is something called Shari'ah ruling.  Then you are one who believes in such things."  AA replied, I don't have reliable information about Da'ish [ISIS] to be under its banner.  I am going to pray the afternoon prayers."  Defendant responded, "Remember the mujahedeen in your prayers."

June 6, 2015 – Govt. Ex. 8 at 209-11

Defendant asked his brother to interpret a dream.  He stated, "My wife dreamt that we had a girl.  And when she was born, she kept saying, Allah is Great."  AA said he would think about it.

June 7, 2015 – Govt. Ex. 8 at 219-31

Defendant stated, "mom and dad are coming here.  But I want to leave after they leave the U.S.  I might return with them to Egypt.  I don't want to live here.  I'll stay in Egypt a maximum couple of weeks or so, and then get out … I may not go to Egypt … No, I will not go [to Egypt]."  AA responded that their parents would sense the defendant leaving from Egypt, and it would be better if he "left from outside [another country], they will not sense it."  Defendant replied, "Yes, Allah willing, that is the plan.  So, are you following what I am saying?  Khadijah[19] wants to go with me."  He indicated his wife was not hesitant about Islam and was "normal" now that she had stopped her medication.

AA then commented about the defendant's dream, stating, "It can be interpreted as she [defendant's wife] adopted and believed the same mindset you have, and she is convinced with it, believes and loves it."  He also indicated the girl stating, "Allah is great," "refers to the thoughts that you believe in."  Defendant responded, "Praise Allah – Allah is great."

June 21, 2015 – Govt. Ex. 8 at 242-56

AA related a conversation he had with a sheikh at Al-Haram [the largest mosque in the world located in Mecca].  AA stated, I asked him about Da'ish [ISIS}.  He said the same thing that

---

[18]  Defendant appears to be referring to the Rohingya Muslims who have been fleeing from the military government in Myanmar (formerly known as Burma).

[19]  The defendant is referring to the Arabic name of an American national with whom he resides and to whom he is married under Islamic law.

I believe in.  They kill Muslims and call upon idol worshippers.  Brothers who are knowledgeable and refuse to stand by Da'ish get killed, but the Jews and Christians live and pay the Jizyah tax.[20]

Defendant took umbrage at this representation, stating, "It is all just speculation."  AA continued, "He [the sheikh] knows many people who have gone there and are in contact with him.  He told me that Da'ish in Syria is different from the one in Iraq.  The one is Syria is so terrible.  The one good thing about the ones in Iraq is that they kill Shi'ah."

Defendant replied, "Ok, fine.  That is the same Sheikh who is afraid to say that El-Sisi is a murderer.  He does not object.  People die around, him, but he cannot even talk.  I do not trust him in relaying news … They [the sheikhs] live safely among those who kill Muslims, and they neither can object nor say: 'rise up for jihad.'"  AA responded, "Just the fact that Da'ish thinks differently does not mean they are right … Not everyone who does not fear the authority is right."  Defendant replied, "Enough … let it go, man.  They are wrong.  Pick what makes you live worry-free."

Defendant continued to express his cynicism regarding the representations of the "sheikhs," eventually stating, "Stop talking about this subject.  They are Khawarj, killers, infidels, and apostates.  We are sissies and have no say without the U.S. blessing.  The Arab leaders are their tails, channels, and their Sheikhs.  I heard [the Al-Haram sheikh's] speech in the U.S. from the infidels.  He is just relay[ing] it.  First of all, these are the words of the infidels who fight ISIS.  They use old talk here.  And you have dicks who just repeated.  I am in the country of the masters and you are in the country of the slaves of the master. … We here in the U.S.: they make the decision and the slaves of the Arab leaders execute … Please send my regard to [the Al-Haram sheikh]!  Or maybe not.  He might give my name to the Homeland Security or something."  AA replied, "Okay … The truth about ISIS will appear before too long."

June 28, 2015 – Govt. Ex. 8 at 297-436

On this date, the defendant and his brother engaged in a very lengthy discourse during which they argued about the religious legitimacy of Muslim leaders and ISIS ideology.  The defendant made a number of pointed statements indicating his continued support for ISIS and its cause.

Defendant stated that living in America was better than living in the Gulf countries where "Muslims are demeaned. … Here [the U.S.] Muslims live with dignity with the infidel … Honestly, I cannot live in the Gulf because of my current beliefs even if they showed the usual disrespect to the Americans because I am an American ... Why would I go to the Muslims who are imitating the infidels ... I should forget this progress and freedom and go to the slaves of the Americans?  I am with the master, why would I go to the slaves? … The Gulf also is killing the Muslims and the Mujahedeen based on orders from America … Any dog that decides to kill any Muslims in the Gulf countries is not a Muslim.  In my heart, I am not with them … America and the Gulf have

---

[20]  The "jizyah" tax is levied on non-Muslims living in Muslim lands under Islamic law.

the same goals against the Muslims.  They are executing their wicked deeds first against the Muslims who are in Muslim countries.  That is why the American Muslims are still safe. Temporary safety of course.  Soon, they will start killing Muslims in America."

When AA challenged his brother about statements he made previously about Muslims being monitored in the U.S., the defendant responded, "yes, that is true but it is lesser monitoring because they will not come near you just because they have suspicions unless you are caught red-handed without a shadow of a doubt.  Which means you can do anything you want up to execution of an act, and then you are caught.  You don't just disappear and nobody knows anything about you.  No, there is a case and a lawyer.  The jail is even air conditioned.  But in the Gulf, if they suspect you, you will be like a dead man even though you're alive.

Defendant agreed that he would move to Saudi Arabia "and wait for the Caliphate State there; it is closer than waiting in America."  He stated, "my beliefs have become dangerous; let me stay here, better."  He stated, however, "If Khaled al Rashid [an imprisoned Saudi cleric] got out, I will be coming.  Especially that one.  He is 100% Islamic State."

The men engaged in a discussion about Muslim leaders.  Defendant stated, "Do you think Abu Bakr al Baghdadi would be afraid to curse Al Sisi?  Hahahahahahahaha … The Islam of any ruler who doesn't rule according to what Allah has sent down should be regarded with suspicion."

Defendant stated, "My opinion of the Caliphate State has not changed."  AA responded, "I am not trying to change your mind about the Caliphate State.  I am only trying to show you the goodness outside the Caliphate State."  Defendant responded, "The German guys said the same thing.  Same talk … Where is justice?  Where is true Islam? … it exists but of course the whole world is fighting them … Islam is supposed to be everywhere by now … millions of Muslims were killed before we came to life and millions will be killed and there will be more injustice … God destined us to fight … There should be willingness to die for the sake of Allah."

After a lengthy discourse about fighting fomenting discord amongst Muslims, AA stated, "you should be honest with Allah, give out of your might and power, and admit within yourself that you are weak and God only will affirm you.  And you go perform jihad with the Imam who you think that he is on the true path."  Defendant asked, "aren't you embarrassed to defend the Saudi Sheikhs who nowadays don't support jihad in any place of the world … They are the ones who brainwashed you."  AA responded, "Is the truth what Mohamed Elshinawy only sees!!!, to which defendant cynically replied, "Yes, get riled up and zealous for the religion."  AA stated, I am saying if you think that the [Islamic] State is on the right path, go man and be with them." Defendant replied, "ok, now I am with you."  AA continued, "I would be a traitor to my religion if I see that they are wrong and I stay with them ….That is why I am telling you to fight with the

people about whom you can answer God on the day of judgment and say that you fought with them because they are following the truth … And I think they are wrong."

Defendant stated, "all the previous solutions lead to the suffering of Muslims all over the world … Nothing is left but pride and martyrdom.  [Either] Islam as it was sent without any compromises or martyrdom for the sake of God … you still don't realize that the Muslims are in a state of war … we are at war … Between Islam and its enemies and those who are behind its enemies … they will be abased … don't blame the one who strives and gives himself up for the sake of Allah to achieve the dream of a Caliphate for Muslims after he was failed by the so called scholars and leaders of Muslims, who are slaves to the infidels … Killing the apostates is allowed.

After more discourse, AA stated, "It is not permissible to kill a Muslim who lives in the State if he does not want to join them or fighting with them."  Defendant responded, "Who told you that's what they do?  I was going to live over there not to perform jihad."  AA replied, "If you believe that they are right, then you are obliged to fight with them."  Defendant responded, "You repeat what the Shi'a say that they [ISIS] kill whoever refuses to join them.  Oh man, that is nonsense.  Yes, they kill whoever fights them.  But if people do not want to join them in fighting, that would be fine.  The most important thing he [person who does not fight] does not turn out to be a spy.  I know people who live over there, but they do not perform jihad."  AA asked, "How come you would not fight with them if they are right?"  Defendant replied, "Because of my mother only.  My mother told me not to leave America.  And she is coming.  I was going to go and I had plans in place that can't be said.  But my mother is coming, and I decided.  But that is exactly what happened."

AA stated, "I am not asking you why didn't you go.  I am just saying that if you are over there, you will be killed, either in jihad with them or by people that are against them.  Defendant replied, "Oh man, my wife wanted to come with me … and she knew that we might die on our way before we reach over there … the State has cities that does not have fighting … She believed in the idea … she is no longer swayed by being attached to life when she learned of the reward. AA stated, "Which means … that you may get killed or incarcerated on the way," to which defendant responded, "yes."  AA reminded the defendant, "if anything happens to you, by the time we get to know and when we get to know, forget about me and your siblings, but mom and dad… Do you think it is not obligatory to obey them in such point?  Defendant replied, "I have sold myself to Allah, but Allah rejected [sic] that I would be safe at home and also would provide my blessings.  This is currently the situation … That is what is making me wait.  Their obedience is also jihad.

AA asked, "How about defense jihad?  I mean if the enemy attacks you in your place, do you go to jihad without permission?"  Defendant responded, "Yes."  AA replied, "But performing jihad to spread the religion requires the parents' permission."  Defendant responded, "But I am

more for the migration to the land of the Caliphate with Muslims, and my fate is their fate.  AA then told his brother the story of a follower of the Prophet who did not migrate to the land of the Prophet out of kindness to his mother.  Because of this kindness, Allah inspired the Prophet to say hadith about him.  The defendant responded, "That story touched me so much.  Yes, this is the knowledge that I want to hear.  The righteousness of the guided Caliphs and other people that only God knows about them … It is a good conclusion for the conversation."

June 30, 2015 – Govt. Ex. 8 at 439

    Defendant directed his brother to delete their previous conversation.

August 12, 2015 – Govt. Ex. 8 at 456-60

    AA advised that Individual 1 had contacted him asking for the defendant's numbers and other contact information.  AA stated, "I did not give him anything."  Defendant replied, "No, do not."  AA asked, "Is there anything going on?"  Defendant replied, "Nothing" and stated he had deleted Individual 1 from his social media account.  He asked if Individual 1 had said anything.  AA stated, "He said: 'Send me any program that I can communicate with him on.'  I did not reply to him."  Defendant stated, "Do not ever reply, ok?  His name is in the conversation."  AA stated, "Explain to me what is going on."  Defendant responded, "I told you everything.  I do not know what to tell you … Nothing new.  Do you think the old has finished?  It will continue for a while."[21]

August 15, 2015 – Govt. Ex. 8 at 482-66

    Defendant asked AA if Individual 1 had inquired about him.  AA responded, "He leaves a message saying Peace be upon you, but I neither open nor rely to that message to him.  What is wrong with him?"  Defendant replied, "Because I blocked him.  I severed any contact with him."  AA asked, "Why did you do that?"  Defendant answered, "Because everywhere around me must be monitored by now.  I can't guarantee.  It is a very big matter."  He then indicated he had deleted another individual from his social media account about whom his brother had expressed concerns.

August 26, 2015 – Govt. Ex. 8 at 467-68

    Defendant asked his brother if Individual 1 was still talking to him.  AA responded, "Two days ago, he sent 'peace be upon you,' but I do not reply to him at all."

August 31, 2015 – Govt. Ex. 8 at 468-81, 484

    AA advised, "[Individual 1] keeps sending me 'peace be upon you' so I replied saying that what is between you and my brother is something related to the religion that I do not agree with, and I will not help with something that I do not agree with.  So he got the point that he should not talk to me anymore."  Defendant responded, "For real?"  AA stated, "it seems that he really needs you."  Defendant responded, "But what can I do?  If I tell him what has happened, he may ruin things for me.  What should I do?  I do not know.  You could have told him one word.  Tell him

---

[21]  At this point, the defendant had been interviewed by the FBI.

that Mohamed's cover has been completely blown.  You just tell him that sentence.  That is it, do not talk anymore."  AA said, "He will understand."  Defendant asked, "Are you asking me or you are telling me that he will understand?"  AA replied, "Yes, he will understand right away."  Defendant stated, "Tell him now, if possible, to get it over with  … He will reply with one thing. Just tell me if he says anything … tell him quickly and finish the connection with him."

While they were chatting, AA confirmed that he had sent the message to Individual 1.  AA then asked, "What do you mean by finish the connection with him?"  Defendant stated, "I mean the chat with him."  AA said, "ok, I told him.  When he replies, I will tell you what he said." Defendant stated, "Delete the conversation right away as it happens."  AA asked, "here or there?" Defendant said, "Both, sir, I mean clear both."  When AA asked if the defendant was alright he responded, "Yes, great, thank God … But Allah only knows who was hurt?  Anyhow, God knows of the intentions."  Defendant continued to check in with his brother a few more times that day and again on September 2nd to see if he had received any replies from Individual 1, which his brother had not.

September 22, 2015 – Govt. Ex. 8 at 486-91

AA asked if the defendant had seen a new video release by ISIS indicating that it was releasing its own currency in the form of gold, silver and copper coins. When AA expressed surprise that his brother had not seen the release, the defendant stated, "It's out of my hand.  I am not following … Don't open the wounds."  He asked his brother to send him the video and stated, "Screw our shitty luck!  I seek the forgiveness of Allah, the Mighty."  AA responded, "Watch it, man, and enjoy."  AA then told the defendant that he had not received any replies from Individual 1 and it looked as though Individual 1 had suspended him from his social media account. Defendant said, "I want to go to Saudi Arabia … Don't you have connection with someone who could bring me over?

### 3.   The Defendant's Statements Establish His Intent to Provide Material Support to Advance ISIS's Terrorist Purpose.

In *United States v. Haften*, 2017 WL 532336 (W.D. Wis. February 9, 2017) (unpub.), the

defendant had plead guilty to a violation of 18 U.S.C. § 2339B for having traveled to Turkey with

the intention of going to Syria to join ISIS.  He had posted accounts of his travels and his intentions

on social media, including favorable posts of statements by ISIS leaders and sympathizers.  In one

social media exchange, he expressed his hatred of America and stated that he was "gonna kill me

some American soldier boys;" in another exchange he stated that he wanted to "fight the Americans" and join his "brothers for the war against American liars." *Id*., slip op. at *2.

The defendant argued that his statements and acts were not "rationally" calculated to influence or coerce a government.  Rather, they resulted from his frustration at having been designated a sex offender, and from the after-effects of his childhood head injury which led him to harbor irrational thoughts and theories, including a desire to join ISIS so he could be part of a Muslim community before the world came to an end.  *Id.*

The district judge was not persuaded.  In a pre-sentence ruling, the judge determined that application of § 3A1.4 was warranted.  "Defendant holds many delusional beliefs, but he is not irrational.  Among his beliefs are that America is evil, that it is actively anti-Islam…. His decision to join ISIS to fight against America is a rational act of retaliation, even if some of the beliefs that motivated his decision are delusional."  *Id*., slip op. at *3.  It should be noted that the district judge came to this conclusion despite the defendant having also posted moderate statements on social media indicating that he was not going to Syria to fight, but rather, to help build the caliphate (though also stating that he would defend his people if the "kuffar" came to fight and kill).  *Id.* The court noted that the defendant's more moderate statements might have undercut the requisite intent for § 3A1.4 if "the overall tenor" of his statements "were of the 'help the helpless' variety." *Id.*

> But viewing defendant's communications as a whole, the expressions of charity are only a minor theme.  Defendant's primary reasons for pledging allegiance to ISIS is to join the battle against the enemies of ISIS, most particularly the United States. …There is no charitable wing to which defendant might have committed himself, so that I could regard defendant's pledge to ISIS as calculated only to participate in the development of a peaceful Muslim community and to be with his fellows at the final judgement.

*Id.*

Similarly, here, the defendant made clear throughout the conspiracy that he was seeking to aid ISIS and that he understood and adopted ISIS's goals and purposes, including its desire to undermine, intimidate and coerce government conduct in the United States and elsewhere:

- Defendant advised that people in America were scared of the banner of the State being raised in this country "and the declaration of Shari'ah," to which Individual 1 replied, "May God grant us victory." Govt. Ex. 7 at 30-31.

- Individual 1 stated, "I pray to God to see you the governor of Washington," to which the defendant replied, "I wish. But I must deserve it." Individual 1 replied, "And that is not difficult for God; it is either victory or martyrdom." Defendant responded, "Allah willing." *Id.* at 61-63.

- Defendant sent Individual 1 a link to a video discussing the coming of the Islamic Caliphate and the end of Israel. He followed up with the comment, "Allah willing, the Islamic State is victorious." *Id.* at 13-14. He subsequently sent a link to a posting about how the Islamic State was still expanding and gaining power despite opposition from "60 Zio[nist] Arab states." *Id.* at 19-20.

- "Everyone is scared over here." Individual 1 replied, "May Allah increase their fear," to which the defendant responded, "Allah willing." *Id.* at 222.

- "Listen to the lessons of Sheikh Al'Adnani … he says what exactly is on my mind … may those servants of their government, who watered down the religion, as well as the rulers and those who are not associated with the religion not harm you. Allah willing, the victory is for us, and humiliation for them … I will completely dedicate my time for that matter, and Allah willing, all will be fine." *Id.* at 194-96.

- "[A]ll the previous solutions lead to the suffering of Muslims all over the world … Nothing is left but pride and martyrdom. [Either] Islam as it was sent without any compromises or martyrdom for the sake of God … you still don't realize that the Muslims are in a state of war … we are at war … Between Islam and its enemies and those who are behind its enemies … they will be abased … don't blame the one who strives and gives himself up for the sake of Allah to achieve the dream of a Caliphate for Muslims after he was failed by the so called scholars and leaders of Muslims, who are slaves to the infidels … Killing the apostates is allowed. Govt. Ex. 8 at 395-96, 400, 402-04, 414.

- After the defendant's brother noted, "There are riots in Baltimore," the defendant responded, "Hahahahahahahahhha. Yes, I know. 100%. Let them burn the police. Well, they are all bunch of infidels attacking each other." Govt. Ex. 8 at 145-47.

It is also clear the action contemplated by the defendant involved killing people in the

United States:

- "You know this matter has become the most important thing in my life.  I do what I can to follow what I am told … I swear by all Muslim's lives.  Individual 1 replied, "make your steps firm … Ask Allah for help and make sure to keep it a secret … Rejoice, if you fear Allah, He will be with you, and He definitely will grant you victory as He promised."  Govt. Ex. 7 at 215-18.

- Individual 1 stated, "May Allah make your steps firm.  Be harsh in the killing of Allah's enemies."  Defendant responded, "May our Lord keep you safe and grant you the highest level of paradise."  *Id*. at 233-34.

- "Some of those who call themselves Muslims are allied publicly with the Christians to kill Muslims … I swear by Allah, my soul is there with the mujahidin.  Everywhere I go here and I see the news, I smile ... I am a soldier of the State, but temporarily away."  *Id.* at 49-55.

- When his brother advised that slaughtering people was against the Prophet, the defendant responded, "Not a big difference for me.  It is a message to the Jews and Christians and their allies.  Like how they torture and kill the Muslims … punish with the like of that with which you were afflicted and those who are caught will be slaughtered and a bit more than that … This is revenge for the Muslims … No, I am not convinced that it is a violation of the Prophet … We die in the sake of Allah and be mujahidin and martyrs … That is why I said to join the succession of the mujahidin … Because I believe they are mujahidin defending Islam and the vulnerable Muslims."  Govt. Ex. 8 at 31-50.

- "Islam is supposed to be everywhere by now … millions of Muslims were killed before we came to life and millions will be killed and there will be more injustice … God destined us to fight … There should be willingness to die for the sale of Allah."  Id. at 351-55.

- In discussing whether the defendant needed his parents' permission to commit violent jihad, his brother asked, "How about defense jihad?  I mean if the enemy attacks you in your place, do you go to jihad without permission?  The defendant responded, "Yes."  *Id.* at 430.

The defendant even acknowledged that he could not talk about what he planned to do to

support ISIS in the United States because it was criminal.  Individual 1 advised, "You are at a

vulnerable point; through you, brother, we can either be defeated or victorious … Take good care

of yourself.  You are now different than before.  Seek Allah's help in everything and don't tell anyone what you have in mind, even for proselytization purposes."  The defendant responded, "Of course not.  It is a crime here.  A very big one.  If I meet our Lord while being, at least, faithful to Muslims, I may have hope for mercy."  Govt. Ex. 7 at 68-70.

The defendant's chat communications also indicate that he harbors strong feelings regarding the treatment of Muslims across the globe, reflecting his purpose in joining with ISIS was to facilitate its retaliation against governments opposing its goals.  He repeatedly expressed his anger over what he labeled the "insults and humiliations to Muslims" by the West.  *Id.* at 28.

- "My heart is not able to accept what the infidels do to Muslims."  *Id.* at 10.

- In discussing a video responding to ISIS beheadings, the defendant stated, "They want us to be peaceful, so the Jews and the Christians kill us and make it permissible. Individual 1 stated, May Allah make them repent before we get hold of them, to which the defendant responded, "Amen.  They did not care for the Muslim's blood."  *Id.* at 160-62.

- "Some of those who call themselves Muslims are allied publicly with the Christians to kill Muslims … I swear by Allah, my soul is there with the mujahidin.  Everywhere I go here and I see the news, I smile ... I am a soldier of the State, but temporarily away." *Id.* at 49-52.

- "[T]ell me why the Arab rulers would not liberate Palestine?  Or, for example, assist the Muslims in Burma?  Tell me why the Jews are friends with all Arab Rulers?  Tell me, if the Prophet, peace be upon him, was still alive, would he assist the Americans and attacked the Muslims in Iraq and Syria because they declared Islamic jihad?  Which side do you think the Prophet would be with?  The defendant's brother responded, "Ok, all Arab rulers are traitors.  I agree with you about this point."  Defendant replied, "there is nothing called 'traitors.'  There is something called Shari'ah ruling," to which his brother responded, "I don't have reliable information about Da'ish [ISIS] to be under its banner."  Govt. Ex. 8 at 199-202.

- Explaining why he would not live in the Gulf countries, the defendant stated his belief that Muslims are demeaned in those countries and they share the same goals as America against Muslims: "The Gulf is killing the Muslims and the Mujahedeen based on orders from America … Any dog that decides to kill any Muslims in the Gulf countries is not a Muslim."  *Id.* at 299-318.

Finally, when confronted by the FBI, the defendant ultimately admitted that he received money from ISIS in order to commit a terrorist attack in the United States.  Although he most often avoided talking about his "project" in chats, some of those chats confirm what that project entailed, for example, when he asked Individual 1 how to build a silencer.  *Id.* at 190-92.

Based on these facts and the numerous other chats detailed above, there can be little doubt that (1) ISIS had a terrorist purpose that the defendant knew about, and (2) that the defendant intended to further that purpose in providing material support.  *See Chandia*, 675 F.3d at 340.  The terrorism enhancement applies just by virtue of the defendant's intent as expressed in his statements to his brother and to Individual 1.  However, there is even more evidence that satisfies the intent prong of § 3A1.4.

### B.      The Defendant Took Significant Steps to Hide His Activities In Support of ISIS.

#### 1.      The Defendant Configured His Computers To Avoid Detection.

The FBI seized the defendant's computers and devices on several occasions throughout its investigation, including in July and October 2015.   Examination of those devices by the government's forensic expert, the Senior Computer Scientist for the Baltimore Division of FBI, revealed a number of complicated and technically advanced steps the defendant had taken to protect his activity from detection.

**First**, the defendant had changed the operating system on his computers from Windows to Linux.  Govt. Ex. 10 at 1.  The defendant's computers originally shipped with a Windows operating system installed.  *Id.*  Linux is an advanced operating system used by a small fraction of the population, most commonly by skilled programmers and technicians.  *Id.* at 1-2.  Linux allows technically-savvy individuals to customize their operating system, although the system is more difficult to update (something that Windows and MacOS do automatically), and it is more

susceptible to crashing and significant loss of data. *Id.* at 2. Ninety-eight percent of users choose to avoid these downsides and run more user-friendly operating systems such as Windows or MacOS. *Id.*

There are more than 200 versions of Linux and a variety of options that a user can choose. The defendant chose two particular options for the Linux system that he was operating on his system. First, he chose to equip his operating system with Logical Volume Management ("LVM") that allowed him to make it appear that his physical storage was different than the drive or drives installed on his machine. *Id.* at 2. He also chose to equip his Linux system with a Linux Uniform Key System ("LUKS") encryption. *Id.* These steps worked to make his system significantly more secure, as LUKS encryption cannot be cracked, even by the most sophisticated techniques. But, it also made his system less stable and subject to unrecoverable loss of data. *Id.* These are not options that users would choose unless they were both technically sophisticated enough to manage the risk and the added security benefit was very important.

**Second**, in addition to using the Linux system, the manner in which the defendant used it is significant. He was running Linux off a thumb drive, as opposed to on his hard drive. *Id.* at 3. This is, again, a more cumbersome way to run the operating system on a computer (as opposed to just using the hard drive), but it does have one significant benefit – any files that are created or altered while running the operating system in this way will not be saved to the computer's hard drive so there will be no trail of the user's activities on the computer hard drive. *Id.* This provided the defendant with yet another layer of protection for his activity online.

**Third**, investigators found evidence that the defendant had used at least one virtual machine ("VM"). *Id.* at 3, 5-6. This allowed the defendant to create a virtual computer within his computer. It also allowed him to ensure that whatever activity he was doing in the virtual machine

would not infect the rest of his computer and, once the virtual machine was deleted, there would be no record of that activity. *Id.* at 5-6. The one remaining log record that forensic analysts were able to recover reflected that the defendant had specifically configured this virtual machine to access the internet. *Id.* Taking this extra step would be unusual if the defendant did not intend to use the virtual machine to go online. Of course, because he deleted the virtual machine, there is no record of what websites he was visiting, or other activity he was conducting, while using the machine.

**2.     The Defendant Masked His Online Activities.**

When a user connects to the internet, the website he is accessing identifies him by his IP address. Thus, for example, if a user connects to Facebook using his home computer, he will be identified by a different IP address than if he had connected via his work computer or his cell phone. As a result, the IP address information can be used to identify that user and/or his location. So, for example, among the IP address information recovered from the defendant's accounts, there are a number of connections to those accounts from the defendant's home IP address in Maryland, a number of connections to his brother's social media account from Saudi Arabia-based IP addresses (where his brother was living), and a number of connections to Individual 1"s social media account from IP addresses based in Iraq. Govt. Ex. 1 at 5.

There are, however, ways for a user to mask his or her IP address from the internet and authorities. In fact, even in his communications with Individual 1, the defendant offered advice on masking his location. Govt. Ex. 7 at 5-6 ("[Individual 1], make sure you turn off the location on your cell phone when you talk to anyone online.").

The defendant used a variety of means to hide particular communications:

**a.     Proxy Servers**

Records from the defendant's online accounts reflect that he was connecting to these accounts using a variety of proxy servers.  A proxy server is, essentially, a middle man.  So when using this service, the defendant would connect to the proxy server and then the proxy server would connect to the defendant's social media or electronic mail accounts.  The result would be that the service providers of those accounts would have a record that the proxy server had connected to their site, but not the identity or location of the individual who was using the proxy server.  Thus, records from the defendant's accounts reflect log-ins from various proxy services, including HDS, Brainstorm, and Avast.  *See, e.g.,* Govt. Ex. 1 at 5, 24.

The way that the defendant was using these services is also significant.  Normally, one would expect a security-conscious user to identify a commercial proxy service and then use that service for his connection to the internet.  Here, however, the defendant used a variety of proxy services, both in the United States and abroad, and used them only for certain connections and communications.

### b.    TOR

Records also show that the defendant used several different TOR servers to connect to his accounts.  "TOR" (short for "The Onion Router") is a free service that allows users to conceal their identities by running any connection through at least three additional encrypted servers before reaching the intended website.  In addition, TOR encrypts each individual connection so that the connections cannot be intercepted.  So, for example, if a user is exchanging messages with another user using a TOR connection, they would send a message from the United States that would then travel through three different servers (for example, ones that might be located in Germany, Japan, and the Netherlands) before reaching the intended website.  The response message would then travel back through three separate servers (for example, ones in France, the United Kingdom, and

Turkey).  Since each of those steps is encrypted, it is nearly impossible for someone to identify the location or identity of the original user.  Using a TOR server is also the only way that someone can access the "deep web," a series of websites that are only accessible through a TOR server and that often sell illegal materials and services.  Govt. Ex. 10 at 6.

Although TOR provides an added security benefit, there is a significant downside to using it.  Running connections through a number of different encrypted connections significantly slows down the traffic, making accessing sites much more tedious.  *Id.*  As a result, there are a number of websites that block users accessing them via a TOR server.

The significant limitations of TOR are often only taken on by those who have a need to access the deep web sites or mask illegal activity.  *Id.*  As illegal internet use has expanded, investigators have seen TOR used more by others involved in illegal activity, including those associated with terrorist organizations.

The defendant used TOR on a number of occasions.  For example, on March 21, 2015, the defendant used a TOR server in Germany to access his Cheapmart online financial account and his personal email account.  Govt. Ex. 1 at 12.  Two days later, on March 23, 2015, the online financial account of the ISIS-related U.K. Company that funded the defendant was accessed using the same TOR server.  Govt. Ex. 1 at 13.  Notably, that was the same day that the U.K. Company transferred approximately $1,500 to the defendant in furtherance of the charged conspiracy.  Govt. Ex. 4 at 8.

 It is also notable that the exact same TOR exit node IP address (85.25.103.119) was used to access the defendant's Cheapmart online financial account and personal email accounts on March 21, and to access the U.K. Company's online financial account on March 23.  Govt. Ex. 1

at 12-13.   It is possible for a TOR user to specifically configure their TOR browser to use a particular TOR exit node.   This is very unusual and generally only done by advanced TOR users.

In addition, on March 23, both accounts were accessed by a Google mobile IP address (119.30.39.215) based in Dhaka, Bangladesh.   Govt. Ex. 1 at 2, 13.   All of these connections were in close proximity to one another – the U.K. Company's online financial account was accessed at 0254, then the Cheapmart online financial account was accessed at 0259, and then the U.K. Company's account was again accessed at 0324.   *Id.*   Interestingly the defendant's Cheapmart online financial account was then accessed the same day, at 0815, from a TMobile mobile IP address in the United States.   *Id.*   There are a few possible explanations for this: (1) the defendant may have been using the exact same proxy server in Bangladesh to access his account that his coconspirators in Bangladesh were using to access their accounts, or (2) the defendant may have provided his account information to his coconspirators in Bangladesh so that they could access his account from Bangladesh.

A few weeks later, on April 6, 2015, the defendant used a TOR server to access an email account that he set up under the alias "djblackeyes."   Govt. Ex. 1 at 16.   Notably, he also logged in that same day through his residential broadband account.   *Id.*   Thus, it appears that he sought to protect from scrutiny some – but not all – aspects of his activity.

On May 20, 2015, the defendant used a TOR server to access his social media account. Govt. Ex. 1 at 24.   On that same day, he accessed the same account from five different IP addresses within a time span of approximately 30 minutes.   *Id.*; Govt. Ex. 10 at 6.   Notably, he also used two different proxy servers – Brainstorm and Avast – to access the account.

There are several possible explanations for this activity.   This would be consistent with accepting the added limitations of proxy servers and TOR for certain aspects of his activity but not

others.   This pattern of activity would also be consistent with the use of draft folders to communicate.   Security-conscious individuals will sometimes allow associates access to their accounts so that they can communicate via draft messages.   In order to do this, one party creates a draft message in their account.   Then, another party logs in and reads the draft message, adding to it or replacing it with their response.   Then the original party logs back in to read the response and type a reply.   When the communication is over, the parties can delete the draft message and there is no record of the communication.   In addition, because no message has actually been sent, no message can be intercepted (by the government or anyone else) in transit.

Notably, the defendant appears to have logged into his personal email account frequently (both using direct connections and proxy servers).   *See* Govt. Ex. 1, generally.   When the FBI received the content of that account, however, it did not appear that there were any messages sent from the account.

### c.      Dropbox

Investigators also recovered evidence that the defendant had accessed the Dropbox service installed on his computer.   Govt. Ex. 10 at 6.   This is an online storage service that allows a user to save files and other materials in an online folder, as opposed to on their own hard drive.   The service allows users to send files from their Dropbox account and allows others access to certain portions (or all) of their Dropbox folders.   Dropbox would be another means to exchange and access files between parties without transfers being detected.   No Dropbox files were found on the defendant's computer, which would be consistent with the defendant having deleted his account and all of its content.

### d.      IP Address Information

It is notable that the defendant appeared to be coordinating closely with those from the U.K. Company that were funding him.  The defendant regularly accessed his accounts using IP addresses associated with his U.S.-based broadband account.  *See*, *e.g.*, Govt. Ex. 1 at 5.  On April 30, 2015, he used his broadband (Comcast) IP address 73.172.105.7 to access his Cheapmart online financial account several times.  Notably, that IP address was next used on May 14, 2017, to access both the Cheapmart online financial account <u>and</u> the U.K. Company's online financial account. Govt. Ex. 1 at 21.  Although it is possible that representatives of the U.K. Company provided the defendant with the log-in information for their online financial account, it seems more likely the defendant had configured his home internet connection as a home proxy server and provided his ISIS contacts with access so that they could use that proxy to access their accounts and send him money.   (On May 14, 2015, the defendant received approximately $3,000 from the U.K. Company's online financial account.)   Interestingly, on the same day, May 14, 2015, the defendant's Cheapmart online financial account was accessed by the Intuit proxy server, with IP address 206.108.41.105.  Govt. Ex. 1 at 21.  Just a few days earlier, on both May 6 and May 11, 2015, that same proxy server and same IP address were used to access the U.K. Company's online financial account.  *Id.*

Some of the IP information related to the defendant's electronic accounts also appears to be inconsistent with the defendant logging in from United States.  For example, from May 17 to 23, 2015, the defendant's social media and personal email accounts, and his Cheapmart online financial account, were accessed using Turkey IP addresses (starting with 185).  Govt. Ex. 1 at 22-25.  Those Turkish IP addresses appear to be consistent with a static location in Turkey (such as a home or office internet connection) – essentially as if Comcast Turkey was the connection.  Govt. Ex. 10 at 6-7.  Because there were log-ins around the same time period from the defendant's home

IP address, it appears that he was in Maryland at the time.  There are a few possible explanations – this may have been a complicated home proxy server that was set up by an individual located in Turkey and to which the defendant connected, or, it may have been someone located in Turkey directly connecting to the defendant's accounts.  *Id.*

From June 4-6, 2015, the defendant used IP addresses associated with France-based proxy servers to access a number of different accounts, including his Cheapmart and Doba[22] online financial accounts.  Govt. Ex. 1 at 28-29.  On June 7, 2015, the defendant received an ISIS payment to his Cheapmart online financial account.  Govt. Ex. 4 at 14.

One notable aspect about the defendant's use of means to mask his activity is the variety of different services used to access accounts at different times.  Generally, for those who are interested in the added layer of security, it is common to see someone obtain a proxy server service and then use that service consistently for their online activity.  Govt. Ex. 10 at 7.  In stark contrast to that approach, the defendant changed proxy servers regularly, used TOR for some connections, and used a home-based internet connection to access his accounts and conduct internet activity.

### 3.    The Defendant Sought to Delete Other Evidence of his Crimes.

In addition to masking his online activities and that of his coconspirators, the defendant took steps to delete other evidence of his crimes both before and after he was confronted by law enforcement in July 2015.

As previously noted, records of the defendant's social media communications with his brother and with Individual 1 were obtained as a result of execution of federal search warrants for the accounts used by those two individuals.  A federal search warrant executed on the defendant's social media account showed that he had deleted his conversations with his brother and Individual

---

[22]  Doba is a drop-shipping service the defendant used for his front business.

1.  In addition, the defendant instructed his brother to delete their ISIS-related social media chats, *see* Govt. Ex. 8 at 439 (6/30/15 chat - "Delete our conversation"), and those the defendant's brother had with Individual 1, *see* Govt. Ex. 8 at 476 (8/31/15 chat - "Delete the conversation right away as it happens").

### C.      The Defendant Regularly Accessed Terrorism-Related Propaganda

Investigators were able to recover numerous items of ISIS- and terror-related materials the defendant was accessing or downloading through his electronic accounts, in many instances well after he had been interviewed by federal agents.  As discussed further below, a number of steps were taken to determine what these materials represented and their origin.  The government will present testimony at the sentencing hearing from the Counterterrorism Director for Flashpoint who reviewed certain materials seized from the defendant's accounts and devices to determine where they originated based on Flashpoint's historical knowledge of ISIS (and generally terrorist) materials and propaganda.  *See* Govt. Ex. 9.  In addition, the government's forensic expert, who will also be testifying at the hearing, used several tools to search for these materials to determine where they were located on the internet.  *See* Govt. Ex. 2A.

### 1.      Official ISIS Propaganda

Several of the items recovered from the defendant's computers and electronic accounts were official ISIS media releases.  These are notable because they are different than items that may have been picked up just keeping track of the news via traditional media outlets – they are the particular materials that have been put out by ISIS to their followers and, as a result, are much more difficult to come by than a stock photo on a news site.  For example:

**ISIS Video Release –** Forensic analysis of the defendant's laptop in July 2015 revealed a screenshot of an official ISIS release from November 16, 2014, titled "Although the Disbelievers

Dislike It." This video addressed ISIS's global expansion and showed footage of American Peter Kassig's remains after he was beheaded by an ISIS fighter, who said "Here we are, burying the first American Crusader in Dabiq, eagerly waiting for the remainder of your armies to arrive." Govt. Ex. 3A at 4; Govt. Ex. 9 at 4-5.

**ISIS Anbar Release –** Recovered from the same computer was an official propaganda photo release from ISIS's Anbar provincial media office. This photo bears a release date equivalent to May 18, 2015. In addition, the Anbar provincial media office's watermark is visible on the image's bottom right corner, next to a caption in Arabic indicating that the photo features, "the freeing of the captives of [from] the apostates' prisons in Ramadi." Govt. Ex. 3A at 5; Govt. Ex. 9 at 5.

**ISIS Sinai Release –** Another item obtained from the defendant's broadband account – a photo of a severed head next to an ISIS flag – is an image originally released by the official Sinai provincial media office of ISIS on August 12, 2015. The image features the remains of an ISIS hostage, Croatian national Tomislav Salopek, after the group had beheaded him. The image includes Salopek's severed head atop his body, placed between a knife on one side, and the banner of ISIS on the other. Govt. Ex. 2B at 55-56; Govt. Ex. 9 at 11. Although this photo does not have the official watermark, the defendant accessed it on August 12, 2015, at approximately 3:39PM, the same day that it was released by ISIS. Thus, he accessed this material almost contemporaneously with its release by ISIS, and well after he was approached by the FBI.

## 2.    Photos of Bomb Stash

In a forensic review of the defendant's laptop in July 2015, investigators recovered two photographs of individuals in the desert standing over what appears to be a stash of rockets and bombs. Govt. Ex. 3A at 10-11. These images were found in the Firefox cache folder of the

defendant's laptop, which according to the government's forensic expert, indicates the defendant accessed these photos using the Firefox internet browser.  (The items were last accessed by the defendant on July 11, 2015, at 4:28PM).  Govt. Ex. 10 at 5.

The government's forensic expert attempted to determine where these photos were located on the internet.  Despite searching databases (from Google and Tineye.com) of more than 22 billion images from around the internet, she was unable to locate these images or similar copies. *Id.*  This makes it less likely the defendant accessed these photographs on the public internet, and more consistent with the defendant viewing these materials while using TOR and accessing the deep web, or receiving them through other means.  Govt. Ex. 10 at 5.

### 3.    General ISIS/Terrorist Materials

From July through December 2015, the defendant was also electronically accessing various other terror- and ISIS-related materials, including ISIS-specific blogs, images of ISIS fighters and propaganda, and images of terrorist attacks around the world.  *See* Govt. Exs. 2A, 2B, 3A, and 3B. For example:

- Some of the items found on the defendant's electronic devices in October 2015 –

   - Photo of ISIS fighters posing with the ISIS black flag
     Govt. Ex. 3A at 6, Govt. Ex. 9 at 5 (10/9/15 02:33AM)

   - Photo of Usama bin Laden with a caption in Arabic translated as "Every year may you be the defeater of America"
     Govt. Ex. 3A at 7-8, Govt. Ex. 9 at 5-6 (10/8/15 11:23PM)

   - Photo of Ibn al-Khattab, an associate of bin Laden and a Chechyan jihadist
     Govt. Ex. 3A at 9, Govt. Ex. 9 at 6-7 (7/14/15 4:20PM)

   - A quote from an internet conversation with a recent ISIS convert
     Govt. Ex. 3A at 12-13 (7/11/15 4:38PM)

   - A discussion of the benefit of a Caliphate
     Govt. Ex. 3A at 14-15 (7/11/15 5:43PM)

- o An excerpt from a training program for mujahidin
  Govt. Ex. 3A at 15-16 (7/11/15 5:45PM)

- o YouTube video on how to encrypt and hide files using program "TrueCrypt"
  Govt. Ex. 3B at 1-4 (7/13/15 9:51PM)

- o YouTube video published by the Electronic Brigade of the Islamic State as a tribute to a martyred brother
  Govt. Ex. 3B at 5-13 (6/10/15 4:15AM)

- Some of the items accessed by the defendant through his cellular phone or broadband accounts from July to mid-September 2015 –

  - o Photo of Pamela Geller, who was an ISIS target after she organized the Prophet Mohammed drawing contest in Texas in 2015
    Govt. Ex. 2B at 104-05, Govt. Ex. 9 at 7 (9/10/15 11:00AM)

  - o Several photos of militants with the ISIS flag
    Govt. Ex. 2B at 80-81, 84-85, 122-23, Govt. Ex. 9 at 7, 11 (8/15/15 7:54PM, 8/26/15 01:53AM, and 9/10/15 11:01AM)

  - o Photo of Abu Bakr al-Baghdadi
    Govt. Ex. 2B at 90-91, Govt. Ex. 9 at 7-8 (9/7/15 6:32AM)

  - o Copies of pro-ISIS Tweets, including one that provided a link to "create an account on an encrypted browser like TOR"
    Govt. Ex. 2B at 5-7, 11-13, 22-25, Govt. Ex. 9 at 8-10 (7/6/15 10:29PM and 10:31PM)

  - o Photo of Dr. Ayman al-Zawahiri, founder of the Egyptian Islamic Jihad movement and leader of al-Qaida following bin Laden's death
    Govt. Ex. 2B at 96-97, Govt. Ex. 9 at 9 (9/10/15 11:00AM)

  - o A collage of photos of the attack on the World Trade Center on September 11, 2001
    Govt. Ex. 2B at 102-03, Govt. Ex. 9 at 9-10 (9/10/15 11:00AM)

  - o Images related to the pro-ISIS Islamic Cyber Army
    Govt. Ex. 2B at 126-28, Govt. Ex. 9 at 10 (9/15/15 5:22AM)

  - o Photo of Dzhokhar Tsarnaev, the Boston Marathon bomber
    Govt. Ex. 2B at 114-15, Govt. Ex. 9 at 11 (9/10/15 11:00AM)

  - o Photo of soldiers at Lackland Air Force Base in prayer room
    Govt. Ex. 2B at 98-101 (9/10/15 11:00AM)

- Some of the items accessed by the defendant through his cellular phone or broadband accounts from October 2015 through the date of his arrest in December 2015 –

    o Various Islamic prayers and associated websites
      Govt. Ex. 2A at 4-7, Govt. Ex. 2B at 163-172 (12/6/15 17:22-21:05 UTC, 12/7/15 00:19-23:58, 12/8/15 00:28 UTC, 12/9/15 02:04-06:55 UTC)

    o Maryland State government website identifying federal government agencies in Baltimore
      Govt. Ex. 2B at 129-153 (11/30/15 02:32-02:34PM)

    o ISIS fighters with ISIS flag
      Govt. Ex. 2B at 161 (12/6/15 9:18PM)

    o Picture of crusading warrior with title "One Day ISIS Will Run Into the Wrong Christians"
      Govt. Ex. 2B at 175-76 (12/10/15 10:28PM)

Notably, much of the material the defendant was electronically accessing about terror attacks related to historical attacks, for example, the World Trade Center attack (2001), the Westgate Mall attack in Kenya (September 2013), the Boston Marathon bombing (April 2013), and the downing of Malaysian Air flight MH370 (March 2014). *See* Govt. Ex. 2B. However, he did not limit himself to information and/or images of historical attacks. In the month and a half leading up to his arrest, he was devouring information related to significant terrorist attacks occurring at that time. Located in his residence on the date of his arrest on December 11, 2015, was a trove of newspapers opened to pages containing articles relating not only to overseas ISIS-related bombings, attacks on ISIS strongholds overseas, and domestic ISIS-related arrests, but also multiple articles regarding the Paris bombings in early November 2015, and the San Bernardino attack in early December 2015. *See* Govt. Ex. 5.

### D.    The Preponderance of the Evidence Supports Application of § 3A1.4

Appropriately, the Probation Office is recommending an enhanced sentence, applying § 3A1.4, based on the following:

56

> The defendant is before the Court for a crime against the United States national security. He is part of a known violent terrorist group, ISIS, and readily admits he wishes to wage violent jihad and die as a martyr. As part of his participation, he sought guidance on how to obtain or make explosive devices and a silencer. He received funding from ISIS in the total sum of approximately $8,700.00 to be used to conduct a terrorist attack in the United States. Not only was his conduct limited to his own actions, but the defendant attempted to recruit his brother. He stated he intended to remain in the United States for the time being because he had certain plans of his own to undertake in connection with his ISIS-related activities, and explained how he was taking steps to conceal those activities to avoid law enforcement detection.

Presentence Rpt., Doc. 126 at 19.

The government agrees. The evidence shows that ISIS was a terrorist organization and the defendant was well aware of that – his numerous conversations with Individual 1 and his brother show that he understood, and in fact, approved of ISIS's goal and methods. In addition, the defendant's actions were clearly intended to further that purpose, as evidenced by the types of actions that he took – providing and recruiting personnel, arranging for communications, and transferring money. Moreover, his awareness of ISIS's terrorist purpose is reflected in the extensive research he had done into ISIS-related terrorist attacks around the world and the other ISIS propaganda that he regularly accessed. In addition, that he went to such great lengths to mask what he was doing from law enforcement further demonstrates he was well aware that the people he was supporting were involved in terrorism, and his activities were helping to further that goal.

In terms of recruiting, the defendant has admitted he was trying to get his brother to join ISIS and support the Caliphate. In light of their discussions about the justification for ISIS's violence and the circumstances justifying the killing of its "enemies," it is difficult to imagine a situation in which this recruiting effort was not intended by the defendant to support ISIS and its terrorist purposes.

The defendant also admitted to arranging for communications, some of which he discussed in his chats with Individual 1.  It is apparent that Individual 1 was the defendant's initial ISIS contact and was consistently encouraging him to further his project – i.e., an attack in the United States.  Again, it is difficult to see how assisting Individual 1 by setting up covert communications over which he could further ISIS business would not be intended to support ISIS's terrorist purposes.  As he related to his brother, the defendant also had his own "personal" ISIS contact, i.e., "the brother" introduced by Individual 1, (see Govt. Ex. 8 at 18-19, Govt. Ex. 7 at 90-93), with whom he communicated through a specific encrypted social media application used by his coconspirators (explained further below).

As evidenced by his chat communications, the defendant was planning to commit a terrorist attack in the United States and, as a result, the terrorism enhancement should apply because planning an attack is clearly intended to further the organization's terrorist purpose.  On top of that, he has admitted that the money he received from ISIS was intended to fund the terrorist attack.  So, his assistance in transferring of the monies from ISIS was also intended to support the terrorist purposes of that FTO.

The terrorism enhancement clearly applies in this case.  The defendant's activities were all intended to support ISIS's terrorist purposes to intimidate and coerce, and retaliate against, the United States government and others.   As the concurring judge noted in *United States v. Wright*, 747 F.3d 399, 418 (6th Cir. 2014) (Clay, J., concurring), "So long as the defendant intended to influence [the] conduct of government, the terrorism enhancement will apply even if the defendant also harbored other motivations, such as an intent to gain financial reward or impress a sweetheart."  Here, there is no evidence that the defendant intended his acts in providing material support ISIS to serve any other purpose.

**IV.     Government's Sentencing Recommendation**

As calculated by the Probation Office, the defendant's advisory guideline range stands at 360 to 816 months imprisonment.  The government is mindful of the fact that a two to three week trial has been avoided by virtue of the defendant's guilty plea.  However, the defendant continues to challenge a central tenet of his sentence, namely, application of § 3A1.4, despite the overwhelming evidence supporting that enhancement.  It is also apparent, from the defense expert's report and other materials provided by defense counsel in anticipation of trial, the defendant is seeking to excuse much of his conduct, which begs the question as to whether he has fully accepted responsibility for his crimes.  Indeed, the defense expert's report is replete with self-serving explanations for the defendant's various nefarious acts or statements – though, not surprisingly, many of the defendant's inculpatory statements during his chats with his brother and Individual 1 are omitted.

For the reasons set forth below, the government believes a sentence of 25 years (300 months) imprisonment appropriately addresses the nature and seriousness of the offense, promotes respect for the law, provides an adequate deterrence to criminal conduct, protects the public from the defendant's further crimes, and, most importantly, provides a just punishment for this defendant.

**A.     Seriousness of the Offense**

There are a number of factors that place the defendant's criminal conduct in a category separate and distinct from other terrorism cases across the country involving individuals seeking to travel, or having traveled, overseas to commit violent jihad, or those individuals committing violent acts here in the homeland:  ISIS operatives were able to successfully transfer illicit monies into this country with the defendant's help to fund terrorist acts against the American citizenry.

Moreover, these operatives were significant actors in ISIS operations overseas; namely, development of drone technology for use by ISIS to support its combat operations against the West and other governments not adhering to its extremist ideology.

The defendant could not have accomplished what he did for ISIS if he were not a trusted source. The defendant not only had a well-placed ISIS connection in his childhood friend, Individual 1, his online conduct, much of which he successfully masked and/or destroyed to avoid detection, made him relevant and trustworthy to his other coconspirators. As a result of the defendant's efforts in concealing his criminal acts and those of his coconspirators, the full extent of his nefarious acts have yet to be discovered.

When the defendant's conduct is placed in context with the activities of his coconspirators, his significance to, and involvement in, the conspiracy becomes apparent. The government has prepared a chronological timeline of the relevant events in the conspiracy, based on its seized and subpoenaed evidence, which is contained in the appendix to this motion as Govt. Ex. 4. (This timeline incorporates the facts stipulated to by the defendant in his plea agreement. *See* Doc. 120 at 9-11.) Worth noting is the fact that at the same time the defendant's ISIS coconspirators were sending him monies totaling approximately $8,700 to conduct terrorist operations in the United States, they were spending an almost equivalent amount obtaining various components from companies in Canada, Europe, and the United States relevant to ISIS's development of weaponized drones. The following are some of the significant aspects of the conspiracy timeline:[23]

### 1.      Beginning Phases of the Conspiracy

In the summer of 2014, Individual 2 (the owner of the U.K. Company that was used to fund the defendant) and his close relative (Individual 3 – a Director of the company) left their residences

---

[23] Members of the conspiracy are identified by the same descriptors used in the parties' plea letter. *See* Doc. 120 at 9-10.

in the United Kingdom; Individual 2 transited to Turkey/Syria to join ISIS, and Individual 3 transited to Bangladesh to work in the Dhaka office of the U.K. Company.

In late September and early October 2014, as previously discussed, the defendant was in contact with Individual 1 through social media.  The defendant revealed his support for ISIS and discussed its legitimacy with Individual 1, who was already fighting with ISIS in Syria and Iraq.  The defendant expressed his desire to travel to Syria to live in the Islamic State.

### 2.      Purchases of Drone Technology for ISIS by Coconspirators

At the same time the defendant was discussing his ISIS-related plans with Individual 1, the senior ISIS officials who would later fund the defendant were furthering the early stages of ISIS's development of drones for use on the battlefield.  Beginning in late October 2014 and continuing through early February 2015, Individuals 2 and 3, with the assistance of Individual 4 (an employee of the U.K. Company), were purchasing various items of drone-related technology for shipment to the Turkey/Syria border for subsequent use by ISIS members:

- October 25, 2014
  Individual 2 purchased drone parts for shipment to Turkey/Syria border, including a flight simulator system, remote controller, and programming pad, for $1,707.85.

- October 28, 2014
  Individual 3 purchased LiPo batteries used to operate drones for $4,311.31, paid for through the U.K. Company's financial account.

- October 31, 2014
  Individual 2 purchased antennas used to connect to drones from the ground for the Euro equivalent of $342.00, for shipment to Turkey/Syria border.

- November 5, 2014
  Individual 2 purchased heat-activated film used in drones for $214.47 for shipment to Turkish/Syria border, paid for through the U.K. Company's online financial account.

- December 24, 2014
  Individual 2 purchased a micro turbine used in radio-controlled planes, such as drones, for the Euro equivalent of $3,052, for shipment to Turkey/Syria border, paid for

through the U.K. Company's financial account.  The payment was completed at the direction of Individual 3.

- January 22, 2015
  Individual 3 purchased mobile antennas used to receive and scan analog radio frequencies for the British Pound equivalent of $82.00, for shipment to Turkey/Syria border via the U.K. Company's shipping account.

- February 2, 2015
  Individual 3 purchased GPS bug detectors that detect radio signals for $1,370 for shipment to the Turkey/Syria border.

### 3.      Pledge of Allegiance to ISIS and Start of Money Transfers

As previously noted, on February 17, 2015, the defendant pledged his allegiance to ISIS and its cause and asked Individual 1 to convey that pledge directly to ISIS's leader Abu Bakr al Baghdadi.  He committed himself to violent jihad and confirmed that he would keep his plans for a terrorist attack to himself because it was a crime in the United States.  In early March 2015, Individual 1 connected the defendant with a fellow ISIS "brother."  On March 11, 2015, in a discussion with his brother, the defendant relayed his ISIS-related plans to his brother and asked his brother if he had joined ISIS yet.  A couple of days later, the defendant reiterated to Individual 1 that he was preparing himself for jihad and taking extreme security measures to protect himself and their communications.

Between March 13-17, 2015, Individuals 2 and 3 exchanged separate covert messages over an encrypted messaging application with an individual utilizing a specific named account on that application (Individual 5).  (As referenced below, Individual 5 also had covert exchanges over this application with the defendant.)  Individuals 2 and 5 also exchanged covert messages through the same encrypted messaging application with Junaid Hussain, a now deceased senior ISIS official who was responsible for substantial online efforts to inspire and recruit individuals in Western countries to fight for ISIS.  *See* Govt. Ex. 9, Flashpoint Rpt. at 11-16.

### a.      Attempted Payment - $1,500

On March 17, 2015, Individual 3 directed Individual 4 to wire transfer $1,500 to the defendant and sent identifying information for the defendant through a particular messaging application. Individual 4 executed the transfer through MoneyGram on March 18, 2015. *See* Govt. Ex. 6 at 1-3. The defendant attempted to pick up transfer in Maryland, but was unsuccessful as it has been held up at its initial point of entry into the United States. Govt. Ex. 6 at 4-8. That same day, Individual 3 exchanged covert messages with Individual 5 through the encrypted messaging application. The next day, Individual 2 exchanged separate covert messages with Individual 3 and Hussain over the encrypted messaging application. On March 20, 2015, Individual 3 advised Individual 4 that the MoneyGram transaction had failed, and conveyed information from the defendant that Individual 4 had to contact MoneyGram about it.

During execution of a federal search warrant at the defendant's residence, the FBI found a receipt completed by the defendant that he would have presented to pick up the MoneyGram transfer. Also found were the defendant's handwritten notes containing the MoneyGram reference number, the amount in both U.S. and British currency, the exchange rate, and the sender identifiers for Individual 4 (his name and address). Govt. Ex. 6 at 9-10. The defendant would not have obtained this information had he not been in direct communication with ISIS operatives overseas, nor would Individual 3 had learned of the message conveyed to the defendant when he appeared to pick up the monies in Maryland.

### b.      First Payment - $1,500

On March 23, 2015, Individual 3 sought an alternative means to transfer monies to the defendant. He used an online financial account in the name of the U.K. Company (funded by the company's bank account) to transfer the $1,500 to an online financial account used by the

defendant in the name of a company he had registered in Maryland (this method would be followed through Payment 5).   That same day, Individual 2 exchanged separate covert messages with Individual 3 and Hussain through the encrypted messaging application.

On March 23, 2015, Individual 3 purchased ten GPS bug detectors for $3,175 for shipment to Turkey/Syria border to be paid through the U.K. Company online financial account.   The transaction was subsequently cancelled due to problems with the method of payment.   The next day, March 24, the email account of a U.K. Company business associate was used to complete 12 separate purchases of various items of drone technology, at cost of $1,376.09 each, for shipment to Turkey/Syria border.

In late March 2015, the defendant purchased a new cell phone and laptop.   On April 2, 2015, he registered the phone under a false name and address. (Business records obtained indicate the defendant was using the phone to access the internet, which could include accessing data or communication applications.)   The next day, during a discussion on social media, the defendant told Individual 1 that he had many targets, but was taking his time and would join Individual 1 overseas when he was done.

### c.      Second Payment - $1,000

On April 16, 2015, Individual 3 transferred $1,000 to the defendant via the U.K. Company's online financial account.   Over the next two days, Individual 2 exchanged separate covert messages with Individual 5 and Hussain over the encrypted messaging application.

On April 22, 2015, the defendant asked Individual 1 how to make an explosive device and indicated that if he could not find one, he would make it.   On April 24 and 27, 2015, the defendant told his brother that he wanted to wage jihad and be with the Islamic State, and that this was his

project.  He also confirmed he was receiving monies from ISIS and had pledged his allegiance to the group.  He told his brother to conceal their communications about ISIS-related matters.

### d.       Third Payment - $1,000

On May 1, 2015, Individual 3 transferred $1,000 to the defendant via the U.K. Company online financial account.  The next day, in a conversation on social media with Individual 1, the defendant reiterated his commitment to ISIS and its cause.

On May 7, 2015, Individual 2 ordered more drone-related items – six pantilt mounted units that provide real-time positioning of cameras, lasers, and other small to medium payloads – at a total cost of $18,205 that was paid five days later through a wire transfer from Turkey.

### e.       Defendant Quits His Job

During the month of May, the defendant quit his job at a local newspaper.   By this point, he had received at least three payments from ISIS, roughly every two weeks, totaling $3,500.  He would receive another payment in mid-May and two in June.  He was, in essence, on ISIS's payroll and no longer needed his job.

### f.       Fourth Payment - $3,000

On May 10 and 11, 2015, Individual 2 and Hussain exchanged covert messages through the encrypted messaging application.  A few days later, on May 14, Individual 3 transferred $3,000 to the defendant via the U.K. Company's online financial account.

In late May 2015, the defendant told his brother that he wanted to die as a martyr.  He also explained that he dreamed about ISIS almost every day, explained one dream in which he was in a church with a gun where people were getting killed, and asked his brother to pray for the mujahideen.

### g.  Fifth Payment - $1,200

Between June 1-2, 2015, the defendant and Individuals 2 and 3 were all in contact, individually, with Individual 5 through the encrypted messaging application.  One June 2, the same day he was in contact with Individual 5, the defendant used two separate proxy servers to connect to his electronic accounts and, for the first time, the France-based proxy server that he would then use regularly over the following days.  *See* Govt. Ex. 1 at 27-29.  Between June 3-6, 2015, Individuals 2 and 3 exchanged more covert messages with Individual 5 over the encrypted messaging application.  So, through encrypted means, the defendant had direct contact with the same individual who was in regular contact with Individual 2 and other senior ISIS operatives.

On June 7, 2015, Individual 3 transferred $1,200 to the defendant via the U.K. Company online financial account.  The transaction was disguised as a purchase of two printers for shipment to the U.K. Company office in Wales.  Unlike the previous payments, this payment was received by the defendant through an online financial account in the name of his religious wife (thus, a third method used to get money to the defendant in the United States).

On June 10, 2015, the defendant accessed a YouTube video published by the Islamic State Electronic Brigade.  On June 21-22, 2015, Individual 2 exchanged separate covert messages with Individual 3 and Individual 5 through the encrypted messaging application.  On June 22, 2015, the defendant and another member of the conspiracy located in Egypt exchanged covert messages through the encrypted messaging application.

### h.  Sixth Payment - $1000

On June 28, 2015, the defendant received a $1,000 wire transfer from Egypt in the name of the member of the conspiracy with whom he had exchanged covert messages on June 22.

### 4.  "Pay as you Go" Phones

On July 1, 2015, the defendant purchased two prepaid phones – and changed his phone number – shortly after a traffic stop in Baltimore County. In the first half of July, the defendant accessed ISIS-related photos and propaganda, and information about encryption and hacking.  On July 3, 2015, the pantilt devices and related equipment ordered by Individual 2 were shipped to the U.K. Company office in Wales.

### 5.    FBI Interviews and False Statements

On July 17, 2015, the FBI first approached the defendant and he agreed to an interview. During that interview, as previously discussed, the defendant was untruthful about a number of things, including the amount of money received from ISIS, and in claiming that his intent was to defraud ISIS.  He concealed the true nature of his relationship with ISIS operatives and the support he had provided to ISIS.  Following the interview, the defendant blocked Individual 1 from accessing his social media account; he also purged information (communications with his brother and Individual 1) from that account, though it is not clear from the account records what date that was done.  The next day he streamed an ISIS beheading video.

On July 20, 2015, the FBI again interviewed the defendant and he again made false statements about the money he had received from ISIS.   Around the same time, in late July 2015, Individual 2 set up a front company to use to continue purchasing items of drone-related technology.  This included a purchase by Individual 2 on July 30, 2015, of ten rocket flight computer kits for $381.25 for shipment to the Turkey/Syria border.  The items were subsequently detained by Turkish authorities.  During this time frame in late July, Individual 2 continued to exchange separate covert messages with Individual 5 and Hussain through the encrypted messaging application.  Individual 1 shared ISIS propaganda with an associate and sought to create

electronic and social media accounts with fake identifying information to protect their anonymity and conduct.

### 6.      Defendant Expresses Concerns About Law Enforcement Detection

On August 12, 2015, Elshinawy advised his brother that he had been trying to avoid contact with Individual 1 and expressed concern that he was being monitored.  He told his brother to take steps to conceal their communications.  On that day, and the following days, the defendant accessed ISIS fighter photos and various ISIS propaganda, including photos of a drone and terror bombing sites.

Throughout most of August 2015, Individual 2 continued to exchange separate covert messages with Individuals 3 and 5 and Hussain through the encrypted messaging application.  At this time, Individual 2 was coordinating work being done to modify the pantilt and related equipment previously purchased, with the assistance of Individual 4 to transit the materials to various locations.  On August 24, 2015, Hussain was killed fighting with ISIS in ISIS-controlled territory.  A few days later, the defendant accessed photos of ISIS fighters.  On August 31, 2015, the defendant instructed his brother to tell Individual 1 that his (the defendant's) "cover" had been "completely blown," and to delete any communications with Individual 1.

### 7.      Immediate Months Prior to Defendant's Arrest

In early September 2015, and then again in early October 2015, the defendant accessed ISIS-related propaganda, including a screenshot of a beheading video and various terror bombing sites, as well as a photo of U.S. soldiers in a prayer room at a U.S. military base.  He also began streaming audio files of Islamic prayers.  Between September and October 2015, Individual 2 had Individual 4 ship various of the pantilt devices and related equipment to Spain (where Individual 3 was now residing) for subsequent shipment to "another country where they were needed" "for

the cause of Allah." On October 27, 2015, Individual 2 confirmed to Individual 4 that he had received the equipment.  During this same time period, Individual 2 also advised Individual 4 that he had stopped using the encrypted messaging application and directed Individual 4 on accessing another encrypted application through TOR that had been tested by his ISIS confederates.

On October 9, 2015, federal search warrants were executed at the defendant's residence. On October 16, 2015, Individual 1 provided direction and guidance to an associate regarding ISIS logistics and operations in which the associate could participate.

## 8.     Defendant's Arrest

From mid-November until early December 2015, the defendant was collecting newspaper articles about ISIS-related attacks and activities, including the terrorist attacks in Paris and San Bernardino.  *See* Govt. Ex. 5.  On November 30, the defendant accessed a Maryland government website containing information about, and photos of, federal and state government buildings in Baltimore.  He also accessed ISIS-related photos and newspaper articles.  From December 6-9, 2015, the defendant was accessing streaming websites with Islamic prayers and additional ISIS-related photos.

On December 7, 2015, Individuals 3 and 4, in a conversation over social media, discussed law enforcement searches that had occurred that month at the U.K. Company office in Dhaka, Bangladesh.  Individual 3 stated that law enforcement had some information about Individual 2 and his whereabouts.  On December 10, 2015, Individual 2 was killed fighting with ISIS in ISIS-controlled territory.  On the same day, U.K. law enforcement executed search warrants on the U.K. Company offices in Wales and Individual 4's residence, and the Defendant accessed an image of a crusading warrior with the banner, "One Day ISIS Will Run Into the Wrong Christians."  The next day, the FBI arrested the defendant in Maryland.

9.      **Analysis**

There can be little doubt that this crime is serious.  ISIS is an organization whose stated purpose is the destruction of secular Arab and Western governments.  They have placed particular emphasis on striking at the United States and gone to great lengths to inspire and direct terrorist attacks in the United States.  On October 31, 2017, ISIS was able to inspire Sayfullo Saipov to use a rented truck to kill innocent people in New York, only the latest in a string of ISIS-related attacks, including those in Orlando, San Bernardino, and elsewhere in this country and others.  Whatever the defendant might have accomplished on ISIS's behalf had he not been caught, the fact the defendant provided material support to ISIS in any respect – that he in any way aided in their goals – is incredibly serious.

Moreover, as the timeline above highlights, his involvement was far from fleeting.  He was actively engaged with ISIS operatives over at least a year.  During that period, he pledged his allegiance to ISIS, was introduced to other ISIS members, and took his time in developing his "project."  He repeatedly expressed his continuing allegiance to ISIS and its goals.  The extent of his involvement makes this crime even more serious.

His is also the only reported, publicly-charged case in which ISIS has provided money to someone in the United States to conduct an attack.  In addition, he did not just receive a few hundred dollars from ISIS to rent a truck.  He received six payments over the course of several months totaling almost $9,000.  Notably, most ISIS-related terrorist attacks are not expensive. That amount of money for an attack is indicative of something significantly more complicated than just purchasing a firearm or renting a truck.

**B.      Protecting the Public from Further Crimes of the Defendant**

This defendant took active steps to support ISIS – an organization he knows slaughters people, foments chaos and seeks to overthrow and dominate the West.  He provided them with the ability to get money into the country, to covertly communicate, to conceal and cover his and his coconspirators' tracks from law enforcement detection.  When one combines the defendant's conduct with the evidence of his radical belief system – as established through his conversations with his brother and Individual 1 – it is clear the defendant is not some dupe who got sucked into the "thrill" of dabbling with ISIS operatives and getting boatloads of cash.  Rather, he was an active and knowing facilitator of terrorism.  Add to that his seeking out of radical propaganda – and obsession just before he got arrested with everything ISIS and terror-related – you have the hallmarks of someone undertaking acts calculated to intimidate or coerce, and retaliate against, government conduct.  Once the defendant actively participated in facilitating the mission of ISIS, the reasons for his conduct became something much more than just a result of a personality weakness, stupidity, or a need for cash.  The conversations with his brother are the key – they illuminate the defendant's true criminal mindset.

In *Jayyousi, supra*, the court held that the district judge, through his sentence for a codefendant's material support convictions, had failed to adequately protect the public from the defendant's further crimes.  "Although recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders.  We also reject this reasoning here.  '[T]errorists[,] [even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation."  *Id*. at 1117 (quoting *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (internal citation omitted).  The appellate panel found the defendant

posed "a heightened risk of future dangerousness" due to his jihadi training, noting that he was "far more sophisticated than an individual convicted of an ordinary street crime." *Id.  See also United States v. Kaziu*, 559 Fed.Appx. 32, 39 (2d Cir. March 13, 2014) (unpub.) (in case involving defendant convicted of providing material support to al-Shabaab, court upheld district judge's consideration of defendant's radical beliefs in assessing his future dangerousness).

In his report, the defendant's expert makes much of the fact that the defendant never committed a violent act.  It should be noted that the Fourth Circuit and other courts have held that lack of commission of a violent act by a defendant is not a permissible basis for departure.  In *Jayyousi, supra*, the court, citing its own and Fourth Circuit precedent, held that the district court had

> substantively erred in reducing [the defendant's] sentence based on the fact that [he] did not personally harm anyone and his crimes did not target the United States…. We held in a pre-Booker case that a district court may not reduce a sentence of a terrorist because the terrorist committed an inchoate crime. *Mandhai* [supra], 375 F.3d at 1249.  Post-Booker, the Fourth Circuit has held that '[t]o deviate [a sentence downward] on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct.'

657 F.3d at 1118 (quoting *United States v. Abu Ali*, 528 F.3d 210, 264 (4th Cir. 2008).  In *Abu Ali*, the Fourth Circuit reversed a downward variance (to 30 years) for a defendant convicted of material support, noting the defendant should not have benefitted "simply because his plans were disrupted [by law enforcement]," especially given the lack of evidence that he had changed his criminal mindset.  *Id.* at 265.  (On remand, the defendant was sentenced to life imprisonment, which was upheld on appeal.  *See United States v. Abu Ali*, 410 Fed.Appx. 673 (4th Cir. 2011)).

Similarly, the defendant in this case continued his criminal efforts and interest even after he was interviewed repeatedly by law enforcement.  As discussed above, in the fall of 2015 and leading up to his arrest, he was still researching historical terrorist attacks and collecting newspaper

articles about recent attacks, such as the attacks in Paris and San Bernardino. This is not indicative of someone who has realized the error of his ways in the face of being revealed by law enforcement. Rather, it shows that the defendant's interest in ISIS and its methodologies continued. There is no reason to believe that he does not still harbor those sympathies and, as a result, is a clear danger to the community.

### C. The Government's Sentencing Recommendation Is Consistent With Other Similar Terrorism Cases.

One of the factors that the court must consider is "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

The George Washington University's Program on Extremism indicates that 136 individuals have been charged with offenses related to ISIS since the first arrests in March 2014. *See* Govt. Ex. 11, Sep. 2017 Snapshot. In tracking those cases, the Program found the average sentence to be 14.1 years. *Id.* Almost half of those cases were "traveler" cases in which the defendant did, or was attempting to, travel to Syria or elsewhere to fight with ISIS abroad. *Id.* Although the defendant in this case certainly contemplated traveling to Syria with his wife, as discussed above, he decided to delay his travel pending completion of his "project" in the United States. As a result, for comparative purposes, we focus on the recent "non-traveler" cases.

A review of recent cases (since September 2016) in which the defendant has pled guilty to an offense under 18 U.S.C. § 2339B, and did not travel to Syria or seek to travel to Syria, shows a range of sentences from 88 months to 30 years. (Notably, the 88 month sentence appears to be an outlier. The defendant in that case was 58-years old[24] and had been extradited from Europe after

---

[24] The GW Program on Extremism identifies the average age of defendants in offenses related to ISIS as 28 years old. *See* Govt. Ex. 11.

being charged with providing material support to the Islamic Movement of Uzbekistan ("IMU") while he was living in the Netherlands.)

The remaining sentences range from 8.5 to 30 years, with an average sentence of 18.5 years.  Of the six cases, four received at least 20 years imprisonment (one of those received 30 years) and the other three received 8.5 years and 11 years imprisonment, respectively.  Summaries of the circumstances surrounding these cases as represented in the government's sentencing press releases are below:

• *United States v. Haris Qamar (EDVA 2016-cr-00227) – 8.5 year sentence.*  According to the press release issued on February 17, 2017, the defendant helped a cooperating witness identify and photograph potential attack sites around Washington, DC for an ISIS video to recruit others to conduct lone wolf attacks in the United States.  He also expressed his love for ISIS and willingness to conduct an attack on ISIS's behalf.  Govt. Ex. 12, Stcg. Press Releases, at 1-2.

• *United States v. Mohamed Bailor Jalloh (EDVA 2016-cr-00163) – 11 year sentence.*  According to the press release issued on February 10, 2017, the defendant had previously traveled to Africa where he had met with ISIS members.  He was then involved in discussions with ISIS contacts about conducting an attack in the United States.  The defendant also provided $500 to a contact that he believed was a representative of the Islamic State.  Just prior to his arrest, he had successfully purchased an assault rifle that had been rendered inoperable.  Govt. Ex. 12 at 3-4.

• *United States v. Munir Abdulkader (SDOH 2016-cr-00019) - 20 year sentence.*  According to the press release issued on November 23, 2016, the defendant plotted to murder an employee of a military base, videotaping it so that it could be used as ISIS propaganda, and then to conduct a violent attack on a police station.  As a part of the plan, he conducted surveillance of the police station, and obtained and learned to use firearms.  He had planned to travel to Syria but,

74

when that appeared difficult, planned the attack in Ohio.  During the planning of his attack he was in contact online with ISIS member Junaid Hussain.  Govt. Ex. 12 at 5-6.

• *United States v. Emanual Lutchman (WDNY 2016-cr-06071) – 20 year sentence.* According to the press release issued on January 17, 2017, the defendant was in contact with an overseas ISIS member – Abu Issa Al-Amriki – about conducting an attack in Rochester, New York.  Specifically, he planned to use knives and a machete to attack civilians on New Year's Eve 2015 and had received a directive to conduct that attack.  He planned to travel to join ISIS after the attack.  In preparation for the attack he enlisted others (who were FBI informants), purchased weapons and masks, and made a video pledging allegiance.  Govt. Ex. 12 at 8-10.

• *United States v. Ardit Ferizi (EDVA 2016-cr-00042) - 20 year sentence.*  According to the press release issued on September 23 2016, the defendant hacked into a computer system and stole the personally identifiable information (PII) of the company's customers.  He then culled this down to just the members of the U.S. military and other U.S. government personnel.  He provided that list to ISIS member Junaid Hussain.  Hussain then posted the information online, claiming that ISIS would "strike at your necks in your own lands!"  Govt. Ex. 12 at 11-12.

• *United States v. Christopher Lee Cornell (SDOH 15-cr-00012) - 30 year sentence.* According to the press release issued on December 15, 2016, the defendant planned and attempted an attack on government officials during the State of the Union address in 2015.  Over the course of five months, he researched weapons, bomb construction, and potential targets in Washington, D.C., including the capitol.  He also possessed two semi-automatic rifles and 600 rounds of ammunition.  He also managed to post a call for others to join him after he was arrested for these offenses.  Govt. Ex. 12 at 13-14.

None of these individuals actually committed a terrorist attack in the United States.  Five of the six expressed varying levels of interest in committing an attack, with some going to greater lengths than others to plan an attack – ranging from talking about an attack, to purchasing weapons and identifying targets.  One defendant was a hacker who obtained personal information of military and government personnel to provide to ISIS to post online.  He received a sentence of twenty years after being extradited to the United States.

Here, the Government's recommendation of 25 years' imprisonment is consistent with these prior sentences.

**First**, none of the other referenced individuals who were sentenced for providing material support to ISIS had received money from ISIS to fund their efforts.  In fact, the instant case is an exceedingly rare case in which a defendant has *received* money from ISIS for the purpose of conducting an attack in the United States.  The defendant received almost $9,000.  Among the recent defendants sentenced, the most complicated attack plan, that contemplated by Cornell, would have likely cost a fraction of that.  Moreover, the defendant did not just get a one-time payment; he received the monies over the course of several months in six separate payments, which he received through multiple surreptitious means.  He quit his job not that long after he had begun receiving money from ISIS.  In essence, he was on ISIS's payroll for several months leading up to the FBI's discovery of the payments.  That fact highlights the importance that ISIS placed on the support the defendant was providing, and makes his role far more significant than the lower-level people that ISIS had either inspired or directed to commit attacks in the United States.

**Second,** the one case in which the defendant used his computer skills to aid ISIS was the *Ferizi* case, in which the defendant was sentenced to 20 years.  Here, the defendant did not just use his computer skills to assist ISIS and evade detection, he also pledged his allegiance, planned

to travel to Syria, and planned to commit a terrorist attack in the United States.  Moreover, as noted above, ISIS valued the defendant's services to an extent that they put him on their payroll for several months, which does not appear to have been the case in *Ferizi*.

**Third,** the defendant appears to have continued his efforts <u>after</u> he was initially approached by the FBI about his involvement.  He first covered his tracks by ceasing his direct communications with ISIS personnel (at least through means that the government was able to access), deleting records of his own communications, and instructing others to delete their conversations with him about ISIS.  Then, in the months after, he continued to access and review ISIS propaganda and do historical research into terrorist attacks, as discussed further above.

Finally, a somewhat similar, though factually distinct, case in this District bears mention.  In *United States v. Martinez*, Criminal No. JFM-10-0798, the defendant plead guilty to attempting to use a weapon of mass destruction to kill military personnel.  In dealings with an FBI confidential human source, Martinez indicated that he wanted to commit a terrorist attack in the United States to send a message that American soldiers would be killed as long as the U.S. military continued its "war" against Islam.  *See Martinez*, Doc. 77, Plea Agreement, at 8.  The FBI introduced an undercover officer who worked with Martinez to obtain what Martinez believed to be a bomb, and prepare a location to detonate the bomb outside an Army recruiting center.  Martinez was arrested after he attempted to detonate the device (which had been rendered inert by the FBI).  He was sentenced to 25 years imprisonment pursuant to a plea under Federal Rule of Evidence 11(c)(1)(C).  *Id.*, Docs. 77 and 89.

Although the defendant here was intercepted before he could take the same, specific actions at issue in *Martinez*, his conduct is by some measures even more serious.  He was not a mere foot soldier in ISIS's war against the West. Rather, as discussed above, he was deeply

involved with senior level ISIS individuals operating abroad for at least a year and was, essentially, on their payroll to operate in the United States.  The fact that he went to great lengths to mask his activities from law enforcement only highlights the seriousness of the conduct and the depth of his involvement.

### D.      Respect for the Law, Just Punishment, and Adequate Deterrence

Promoting respect for the law is an important consideration here.  The defendant knew how serious his conduct was and told Individual 1 of his need to be careful because what he was doing was a serious crime in the United States.  He also repeatedly sought to mask his activities and instructed others to do the same.  There is little evidence that he had any serious respect for the law.

There is a clear need for punishment and both specific and general deterrence here.  As discussed above, this is a serious crime – providing support and aid to a global terrorist organization intent on overthrowing Western governments and inspiring terrorist attacks in the United States to kill Americans and instill fear in the populace.  Few crimes more deserving of serious punishment.

Moreover, the defendant not only committed the crime over the course of at least a year but, following the approach by the FBI, instructed others to delete conversations and cut ties, which is completely inconsistent with someone who has realized the errors of his ways.  In addition, his continued research into ISIS and terrorist attacks right up to his arrest indicates that specific deterrence is important in this case.

General deterrence is also a vital consideration.  Individuals can be readily radicalized online, and ISIS has taken great pride in its propaganda and success at attracting adherents using the internet, and inspiring those adherents to commit violent acts.  It is vital that the sentence in

this case make it clear to anyone dabbling in extremism that going down this path has serious consequences.  The sentence requested by the government – 25 years – will send a clear message to others.

## V.     Conclusion

Based on the above, the government submits that a sentence of 25 years imprisonment and life supervised release is appropriate in this case.  This is reasonable in consideration of the factors under 18 U.S.C. § 3553 and the advisory Sentencing Guidelines range.  It is also in line with other sentences in similar cases, and well below the potential maximum sentence in this case.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney


By: _____/s/_____
Christine Manuelian
Assistant United States Attorney


_____/s/_____
Kenneth S. Clark
Assistant United States Attorney