**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>MOHAMED ELSHINAWY<br><br>      Defendant. | Criminal No. ELH-16-0009 |

**DEFENDANT MOHAMED ELSHINAWY'S REPLY
<u>TO THE GOVERNMENT'S SENTENCING MEMORANDUM</u>**

Joshua R. Treem (#00037)
Stuart O. Simms (#27090)
Chelsea J. Crawford (#19155)
Brown, Goldstein & Levy, LLP
120 E. Baltimore St., Suite 1700
Baltimore, MD 21202
Tel:  410-962-1030
Fax:  410-385-0869
jtreem@browngold.com
sos@browngold.com
ccrawford@browngold.com

*Attorneys for Mohamed Elshinawy*

# LIST AND DESCRIPTION OF EXHIBITS
## CONTINUED FROM DEFENDANT'S SENTENCING MEMORANDUM

| | |
|---|---|
| Defense Exhibit 17 | Facebook Conversations with Tamer Elkhodary |
| Defense Exhibit 18 | Facebook Conversations with Ahmed Elshinawy |
| Defense Exhibit 19 | Mohamed Elshinawy's Paltalk Records |
| Defense Exhibit 20 | Criminal Complaint and Supporting Affidavit; Affidavit in Support of October 9, 2015 Search Warrant |
| Defense Exhibit 21 | Indictment |
| Defense Exhibit 22 | Detention Hearing Transcript (Dec. 22, 2015) |
| Defense Exhibit 23 | Text message between Mr. Elshinawy and FBI Agent |

The government's sentencing memorandum does not, and indeed cannot, alter the three immutable facts of this case: (1) Mr. Elshinawy did not carry out a terrorist operation in the United States; (2) to the extent that Mr. Elshinawy had been planning to undertake a terrorist operation, he stopped all activity in that regard before the first interview with the FBI on July 17, 2015; and (3) during his consensual interviews with the FBI, Mr. Elshinawy confessed his crimes.

Given those fundamental facts, the government's argument in favor of the terrorism enhancement of U.S.S.G. § 3A1.4 requires the Court to make inferences not supported by the factual record. There is no evidence from which this Court may make a factual finding that Mr. Elshinawy possessed the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government. Mr. Elshinawy's Facebook conversations do not support such a finding, his computer and online activities do not support such a finding, and his consumption of material described as "terrorism-related propaganda" does not support such a finding. The cases upon which the government relies prove the point.

This Court should decline to apply the enhancement and impose a guidelines sentence of 63-78 months with a five-year term of supervised release. Even if this Court were to disagree with Mr. Elshinawy and find that application of the terrorism enhancement is appropriate, the government's request for a sentence of 25 years and a lifetime of supervised release would result in punishment greater than necessary to satisfy the goals of sentencing. Therefore, a downward departure pursuant to U.S.S.G. § 4A1.3 and a variance sentence would be appropriate in light of the facts of this case measured against sentences imposed in other material assistance cases.

I. **There Remains No Evidence of Mr. Elshinawy's Specific Intent To Support Application of the Terrorism Enhancement of U.S.S.G. § 3A1.4**

The government's 79-page sentencing memorandum shoehorns evidence of Mr. Elshinawy's online communications and activities into the specific intent requirement of § 3A1.4, but neither the communications, nor Mr. Elshinawy's "other activities" demonstrate that his conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." The government's argument forces the Court to make inferences about Mr. Elshinawy's specific intent from a generalized commitment to conduct an unspecified attack. No court—including the Fourth Circuit—has held that the "contemplated commission of a violent terrorist act raises an inference of the required specific intent." *See* Gov't Mem. at 19. This is so because not all terrorist acts are intended to affect the conduct of government. Some are intended to intimidate civilians. Application Note 4 to § 3A1.4 recognizes this distinction, as it precludes application of the enhancement where the "terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See* U.S.S.G. § 3A1.4 cmt.n.4.

This Court should decline to apply the enhancement because there is a lack of evidence to support a finding that Mr. Elshinawy's offense conduct was calculated to influence or affect the conduct of government, as opposed to the civilian population.

### A. No Evidence of Specific Intent in Facebook Conversations

Mr. Elshinawy's speech—his Facebook communications with his brother and Tamer Elkhodary—lacks any nexus to government conduct. Therefore, the speech "standing alone," *see* Gov't Mem. at 19, cannot satisfy the requisite intent of the terrorism enhancement. Moreover, the defense has not found any case where the requisite intent of the terrorism enhancement rested purely on speech.

### 1. Mr. Elshinawy's Communications with Tamer a/k/a "Individual 1"

As reflected in the passages cited by the government, Mr. Elshinawy's communications with Tamer were aspirational; he discussed his desire to live in an Islamic caliphate and his hope that ISIS would be victorious. There is simply no communication from Mr. Elshinawy to suggest that whatever operation or attack he was planning was directed toward government conduct. At most, Mr. Elshinawy described himself as a "soldier of the State, but temporarily away," and his specific references to the "government" were not made in the context of discussing any attack.

On April 3, 2015, Mr. Elshinawy stated

> Can I ever forget? But . . . there was always something missing. I have always had a sense of failure. They hid it from us. The scholars who served the government. Well, it's all good. Now the picture is complete. And perform jihad with your wealth and your lives for the sake of God."

Def. Ex. 17, at 1–3.

On April 22, Mr. Elshinawy used the word "government" again, but stated

> May Allah make you, Tamer, and us firm. And may none of those who are falling behind would harm you. . . And may those servants of their government, who watered down the religion, as well as the rules and those who are not associated with the religion not harm you.

*Id.* at 5–6.

Mr. Elshinawy never discussed the details of any operation or plan with Tamer on Facebook, or in any other forum for which evidence exists. As noted in the Defendant's Sentencing Memorandum, Mr. Elshinawy vaguely referenced "a dream project" and asked whether "making a small thing with a silencer" was "difficult or easy." It is impossible to glean from this information the nature of any attack. In contrast to Mr. Elshinawy's communications, however, Tamer referenced "killings" "fighting" and other violence.

September 27, 2014 - Fight all the infidels as they all fight you. *Id.* at 8.

5

May 25, 2015 - Be harsh in the killing of Allah's enemies. *Id.* at 10.

April 26, 2015 - You have a lot of enemies; yourself, devils, humans, jinn, tyrants of the Arabs, and the Aliens and their soldiers. Rejoice, if you fear Allah, He will be with you, and He definitely will grant you victory as he promised. *Id.* at 12.

Mr. Elshinawy ceased all communications with Tamer after July 14, 2015, and ignored repeated attempts by Tamer to communicate on July 19, 23, 25, and August 3.

### 2. Mr. Elshinawy's Communications with Ahmed Elshinawy

Mr. Elshinawy's communications with his brother similarly lack any reference to government conduct. The government relies on Mr. Elshinawy's general reference to "Jews" "Christians" "infidels" and "apostates" as indicative of Mr. Elshinawy's intent to commit a violent attacked aimed at the government. *See* Gov't Mem. at 27–38. However, the government sets aside the context of Mr. Elshinawy's conversations with his brother, a scholar of Islamic studies, and ignores Mr. Elshinawy's statements in which he clearly stated that he had no desire to engage in jihad. *See* Def. Ex. 18. "I was going to live over there. Not to perform jihad." (June 28, 2015).

As Dr. Sageman described in his expert report, Mr. Elshinawy's communications with his brother were paramount to his decision *not* to travel to Syria and to disentangle himself from ISIS—all communications which occurred prior to the FBI's first interview on July 17, 2015. *See* Def. Ex. 4, at 19. On June 28, 2015, Mr. Elshinawy engaged in a lengthy conversation with his brother on Facebook. *See* Def. Ex. 4, at 14. During that conversation, Ahmed and Mr. Elshinawy discussed ISIS and the fact that it was causing discord among Muslims. *Id.* Ahmed questioned Mr. Elshinawy's stated desire to live in an Islamic caliphate, but not to engage in any fighting. Ahmed then told Mr. Elshinawy the story of Uwais al-Qarani, a follower of the Prophet who cared deeply for his mother. As Dr. Sageman explained,

6

> He [Mr. Elshinawy] said that what was holding him back was that their mother had told him not to leave America. Ahmed told him the story of Uwais al-Qarani, who could not come to the Prophet because he had to take care of his mother, and the Prophet declared that Uwais was one of his best followers because of this care for his mother. As Ahmed pointed out, in Islam, performing jihad requires one's parents' permission. He was right: most traditional Muslims still believe that it requires one's parents' permission to go for jihad. By July 8, Mr. Elshinawy wrote his brother that he was convinced by Uwais's story, meaning that he had given up going to Syria altogether. This abandonment of his project to go to Syria was made on his own, more than a week before his first encounter with the FBI, and Mr. Elshinawy had taken no concrete steps to travel to Syria, further demonstrating his lack of commitment to goals.

*Id.* at 19.

The government reads too much into Mr. Elshinawy's private communications with his brother. Rather than defending a choice to engage in martyrdom for the cause of violent jihad, Mr. Elshinawy was debating the merits of ISIS and jihad, and discussing the plight of Muslims in general.

### 3. No Case Has Relied Solely on Pure Speech for Proof of Specific Intent

The government has cited extensively from *United States v. Haften*, 2017 WL 532336 (W.D. Wis. Feb. 9, 2017), *appeal docketed*, No. 17-1508 (7th Cir. Mar. 9, 2017), to support its position that the government can prove the requisite intent from Mr. Elshinawy's communications alone. However, *Haften* rested application of the terrorism enhancement on more than mere communications, and the substance of the communications overwhelmingly demonstrated that the defendant wanted to join the battlefield to take up arms against ISIS's enemies. The defendant traveled to Turkey intending to reach Syria, where he had planned to join ISIS. In addition, the defendant made several posts on social media regarding his travels and support of ISIS. The defendant's statements included the following:

7

> And American is a damn trap. It's horrible! I hate it, hate, hate it there. So you can have fun, do you da'wah [spreading the word of Islam], but I'm gonna kill me some American soldier boys.
>
> Fuck their godless laws! I hate it! Duck [sic] being a 'sex offender' for life there. They didn't respect me my whole life. A bunch of shaytan's [devils]. Death to them all and their little children.
>
> If they ask you if you know where I am, say the truth, that I went to Iraq, to fight the Americans.
>
> The only thing that matters to me is joining my brothers for the war against American liars.

2017 WL 532336, at *2. These statements and others, which were directed at a foreign government for attacking ISIS, led the court to conclude that, "[u]nder this view of defendant's *actions*, I would find that his criminal conduct was indeed calculated to influence or affect the conduct of government by intimidation or coercion." *Id.* (emphasis added). Of significance, the court acknowledged that the defendant also made "moderating statements" in which he expressed a desire to live in ISIS territory to help the helpless, but that those statements were "only a minor theme" and not the "overall tenor" of the conversations. *Id.*

Here, Mr. Elshinawy's statements pale in comparison to the statements of the defendant in *Haften*, and it is this pallor that distinguishes the instant case from *Haften*. Mr. Elshinawy never discussed the nature or substance of any operation with Tamer or Ahmed, and he never discussed killing soldiers, fighting in battlefields against military forces, or taking up arms against specific governments.

### B. No Evidence of Specific Intent in Mr. Elshinawy's "Other Activities"

In apparent recognition of the fact that Mr. Elshinawy's communications cannot satisfy the specific intent requirement, the government points to Mr. Elshinawy's "other activities," including his use of operating systems, proxy servers, TOR, and Dropbox, and his deletion of Facebook conversations. Here, too, the government's argument requires the Court to make

inferential leaps in judgment as to Mr. Elshinawy's specific intent.  The only conclusion from which the Court may draw from the evidence of Mr. Elshinawy's "other activities" is that, in order to facilitate the receipt of money from ISIS, he masked his activities.  There is simply no connection between Mr. Elshinawy's attempts to conceal his conduct from law enforcement and the intent prong of § 3A1.4.

### 1. Mr. Elshinawy's Operating Systems

The government glosses over a critical fact about Mr. Elshinawy's computers and the evidence that the government retrieved from those computers: Mr. Elshinawy voluntarily surrendered his laptops to the FBI on July 17, 2015 and consented to a search of the laptops.  Indeed, the day after the first FBI interview, Mr. Elshinawy sent a text message to a FBI agent with the password to the Dell laptop.  Mr. Elshinawy's conduct does not evidence a desire to hide his activities. He kept his computers in his home after the government returned them on July 20, 2015, thereby allowing the FBI to search his computers a second time when they executed a search warrant on October 9, 2015.  The government has made no contention that Mr. Elshinawy modified his computers in any way between the date of the first FBI interview and the October 9, 2015 search to prevent the government from obtaining information about his activities.

Moreover, Mr. Elshinawy's use of a Linux operating system is hardly novel or nefarious. The government has omitted the fact that Mr. Elshinawy utilized a form of Linux known as "Ubuntu," a popular and user-friendly interface.  Ubuntu is commercially produced by Canonical, a company that provides management and support for Ubuntu software.  *See* Canonical, https://www.canonical.com/about (last visited Nov. 20, 2017).  According to Ubuntu's website, it is the world's third most popular PC operating system, with more than 40 million desktop users.  *See* Ubuntu, https://insights.ubuntu.com/about/ (last visited Nov. 20,

2017). One version of Ubuntu had more than 7 million unique downloads in 24 hours. *Id.* The government has also omitted the fact that Mr. Elshinawy ran Ubuntu from a thumb drive on his HP computer because the hard drive on that laptop was irreparably damaged—a fact that Mr. Elshinawy told the government on July 20, 2015, and which they corroborated through an independent forensic examination. *See* Gov't Ex. 10.

### 2. Mr. Elshinawy's Online Activities

Mr. Elshinawy's online activities do not definitively lead to the conclusion that he was attempting to conceal criminal conduct from law enforcement, because there are honest, common uses for proxy and TOR servers. Mr. Elshinawy's use of proxy servers predates his involvement in the conspiracy and should bear little weight in the Court's analysis. The government's own chart of IP login information demonstrates that Mr. Elshinawy had been utilizing a VPN/VPS service in January 2015—months before he began receiving funds from ISIS. There are a variety of benign reasons why an internet user would utilize a proxy server. For example, a VPN/VPS server would allow a user to bypass paywalls on certain websites, such as news websites, which require visitors to pay for content after reaching a certain limit. A VPN/VPS server would also allow a user to bypass other website restrictions, such as bans from chatrooms like Yahoo and PalTalk. Mr. Elshinawy had been banned from Paltalk on at least four occasions between March and June 2015. *See* Paltalk Records, attached as Def. Ex. 19.

### 3. Mr. Elshinawy's Deletion of Facebook Communications

The fact that Mr. Elshinawy deleted evidence of his Facebook chats with Tamer and his brother, and warned them both that their conversations could be monitored should also hold little weight, given that Mr. Elshinawy disclosed the nature of his conversations with Tamer to the government and revealed to the FBI his association with ISIS. Mr. Elshinawy's deletion of Facebook communications also demonstrates nothing more than that Mr. Elshinawy was acting

as persons engaged in criminal activity would act. It does nothing to support the *Haften* analysis, since that turns on the substance of the statements, not the method of communication, much of which was on Facebook, hardly a secure site.

### C. Merely Accessing Terrorism-Related Propaganda Is Not Enough to Prove Mr. Elshinawy's Specific Intent

The alleged propaganda that the government recovered or tracked from Mr. Elshinawy's devices says nothing about whether he possessed the specific intent to commit a terrorist attack directed at the government. First, Mr. Elshinawy never disseminated any of the propaganda that he allegedly viewed. This is significant because many material assistance cases involving defendants who consumed propaganda have also involved the public dissemination of that propaganda by the defendant to others. *See e.g.*, *United States v. Hassan*, 742 F.3d 104, 149 (4th Cir. 2014); *United States v. Yaghi*, 2012 WL 147955 (E.D.N.C. Jan. 18, 2012); *United States v. Harlem Suarez*, 15-5016-SNOW (S.D. Fla.); *United States v. Amir Said Rahman Al-Ghazi*, No. 1:15-cr-00268 (N.D. Oh.); *United States v. Abdurasul Hasanovich Juraboev*, No. 1:15-cr-00095-WFK (E.D.N.Y); *United States v. Munther Omar Saleh*, No. 1:15-cr-003930MKB (E.D.N.Y); *United States v. David Wright, et al.*, No. 1:15-cr-10153-WGY (D. Mass.); *United States v. Nader Elhuzayel*, No. 8:15-cr-00060-DOC (C.D. Cal.). Indeed, the government's own expert on social media and propaganda, Alexandra Kassirer, states in her expert report that ISIS relies on fighters within its ranks to reach out to prospective recruits through social media accounts. Gov't Ex. at 12. For example, Junaid Hussain, ISIS's social media guru, used Twitter to encourage other ISIS supporters to commit attacks. *See id.* at 12-16. Ms. Kassirer's report, which fails to mention the dissemination of any ISIS-related propaganda by Mr. Elshinawy, implicitly acknowledges that any propaganda that Mr. Elshinawy viewed, he did so in private and never shared via Twitter, Facebook, or any other social networking website.

Second, the government overstates the alleged "propaganda" that Mr. Elshinawy accessed. The government has included in its list of "General ISIS/Terrorist Materials" photos from legitimate news agencies such as the BBC, The Daily Mail UK, EgyptianNews.net, Aljezeera.net, and France24.com. The government has also included several websites streaming Islamic prayers, such as Islam-call.com and other websites pertaining to Islam, such as Islamicfinder.org. None of these websites are directly related to terrorism.

Third, Mr. Elshinawy viewed the majority of the "General ISIS/Terrorist Materials" that the government cites after his first interview with the FBI; a time when he had ceased communicating with his ISIS contacts and receiving money. Mr. Elshinawy was under heavy surveillance beginning on June 24, 2015 through his arrest on December 11, 2015, and had no plans to undertake any attack during that period.

## II. The 18 U.S.C. § 3553(a) Factors Lean In Favor of a Guidelines Sentence

The government's request for a sentence of 25 years and a lifetime of supervised release far exceeds the punishment appropriate for Mr. Elshinawy's conduct. The government, unsurprisingly, attempts to hold Mr. Elshinawy responsible for the conduct of his co-conspirators with whom he had no contact or involvement beyond that necessary to effectuate the money transfers. The co-conspirators were responsible for purchasing drone technology on behalf of ISIS. Mr. Elshinawy did not know about Ibacs' effort, and therefore, he should not be punished for this conduct. The government's own chronology of the conspiracy demonstrates this conclusively. *See* Gov't Ex. 4. The government may wish that more evidence existed of a connection between Mr. Elshinawy and the Ibacs conspiracy, but trying to cobble together disparate transactions confuses the law of conspiratorial liability with sentencing liability, the latter of which focuses on what a defendant actually did.

### A. Seriousness of the Offense

Mr. Elshinawy understands that accepting money from a foreign terrorist organization knowing that the money is intended for the purpose of committing a terrorist attack in the United States, and lying about some of his activities to the FBI, are serious crimes. Mr. Elshinawy has taken responsibility for his conduct by pleading guilty to the Indictment. However, Mr. Elshinawy's case is unique for what he *did not do*—commit a terrorist attack, and the punishment imposed should reflect that Mr. Elshinawy: (1) never committed an attack; (2) ceased communicating and accepting money from ISIS before the FBI intervened; and (3) revealed to the FBI his criminal activities.

The government goes to great lengths to impress upon the Court that Mr. Elshinawy was a significant member of the ISIS conspiracy and a "trusted source." *See* Gov't Mem. at 60. This is an absurd contention. Mr. Elshinawy did nothing to gain ISIS's trust. Indeed, if any trust had been placed in him—which it had not—he plainly violated that trust by failing to spend the money sent to him to conduct an operation, then ignoring ISIS's "suggestions" and failing to conduct an operation, and revealing information about his connections to Ibacs to the FBI.

Moreover, the government's investigation and subsequent prosecution of Mr. Elshinawy suggests that the government did not view Mr. Elshinawy as a serious threat, and that his case had nothing to do with the UK conspiracy. The government did not arrest Mr. Elshinawy until nearly six months *after* it began its investigation, and curiously, the arrest occurred mere days after the terrorist attack in San Bernardino. During its investigation, the FBI urged Mr. Elshinawy to re-establish communications with his ISIS contacts, knowing that Mr. Elshinawy had previously terminated his relationships with ISIS associates.

13

Finally, the Indictment and affidavits in support of the October 9, 2015 search warrant and criminal complaint, filed in December, and the Indictment filed in January 2017, demonstrate that the government was not pursuing Mr. Elshinawy for his role in the Ibacs conspiracy to purchase drone technology. *See* Def. Exs. 20, 21. None of these charging documents or affidavits mentions Ibacs or the UK conspiracy to obtain drone technology, even though the government was fully aware of Ibacs' existence at the time and its connection to ISIS. *See* Def. Ex 9. Furthermore, the affidavit in support of the October 9, 2015 search does not include any terrorism offense as the criminal offense for which the search was being conducted. Rather, the affidavit included money laundering, in violation of 18 U.S.C. §§ 1956(a)(2) and 1956(h), and making material false statements, in violation of 18 U.S.C. § 1001.[1]

### 1. Mr. Elshinawy Had No Involvement in the Ibacs Conspiracy

Mr. Elshinawy received money from Ibacs. He did not purchase any materials, including drone technology, for Ibacs or ISIS. Mr. Elshinawy did not know of Ibacs' drone purchases, and the fact that the same "senior ISIS officials" who were funding Mr. Elshinawy were also funding purchases of drone-related technology through Ibacs, does not contradict this fact. This is a classic wheel-spoke conspiratorial organization. In his expert report, Dr. Sageman explained that terrorist organizations, such as ISIS, compartmentalize their operations for security purposes.

> Clandestine organizations, like terrorist organizations, separate, or compartmentalize in the intelligence jargon, their various operations for security reasons. If one operation is compromised, this compartmentalization allows the other clandestine operations to continue undetected. Furthermore, they protect these sensitive operations with the "need to know" principle strictly limiting knowledge of this operation to those needing to know about it: other members

---

[1] The government's colloquy with the Court at Mr. Elshinawy's detention hearing similarly lacks any reference to the UK conspiracy to obtain drone technology on behalf of ISIS. *See* Def.'s Detention Hr'g, attached as Exhibit 22.

who do not need to know are kept in the dark about them. This is consistent with what the analysis of the discovery material indicates: Mr. Elshinawy did not need to know about the IBACS global conspiracy to acquire protected technology and was kept in the dark about it, as the pattern of IBACS related communication confirms.

Def. Ex.4, at 23. Dr. Sageman further opined in his report that ISIS used Ibacs to fund Mr. Elshinawy's operation in addition to its efforts to obtain drones because it lacked an infrastructure in the United States—a mistake that likely led to the demise of Ibacs.

### 2. Mr. Elshinawy Used The Funds From ISIS to Pay Household and Other Personal Expenses

The government's chronology makes clear that Mr. Elshinawy did not use the funds he received from ISIS in furtherance of any terrorist attack in the United States. *See* Gov't Ex. 4. The chronology demonstrates that on March 28, 2017, Mr. Elshinawy purchased one cell phone from Walmart, *see* Gov't Ex. 4, at 9, and on July 1, 2015, he purchased two prepaid phones. *See id.* at 16. Mr. Elshinawy used most of the money from ISIS for household expenses, debts, junk food, and marijuana. *See* Def. Exs. 1 and 7. Mr. Elshinawy paid $1,067 for a new couch for his apartment, and spent money daily on fast food items from convenience stores such as Royal Farms and 7-Eleven. *See generally* Def. Ex. 14, at 101–103, 111–113. Mr. Elshinawy spent some of the money he received from ISIS on marijuana. Records of Mr. Elshinawy's intercepted communications demonstrate that he smoked marijuana daily and had no fewer than five drug dealers from whom he purchased the drug. Significantly, Mr. Elshinawy's expenditures during the period in which he received the $8,700 from ISIS were consistent with his pattern of expenditures dating back to approximately 2008. *See* Def. Ex. 14, at 1–3.

### 3. Mr. Elshinawy Cooperated with the FBI

Over the course of four separate interviews with FBI agents, Mr. Elshinawy revealed his association with ISIS and provided information concerning his receipt of money. Mr. Elshinawy

15

has admitted that he was not completely truthful with the FBI about all of the details concerning his receipt of the money. However, Mr. Elshinawy ultimately revealed that he had accepted thousands of dollars from ISIS, which ISIS intended Mr. Elshinawy to use to commit a terrorist attack in the United States. Mr. Elshinawy also explained his relationship with Tamer, and how Tamer connected him to another ISIS member. Mr. Elshinawy provided the name and contact information of Ibacs and stayed in touch with one of the lead FBI agents via cell phone during the FBI's investigation. Mr. Elshinawy and the agent communicated via telephone every day from July 20 to July 23 and exchanged dozens of text messages. Mr. Elshinawy sent what appears to be one of the last text messages to the agent on October10, 2015—one day after the FBI searched his home and car.

> Hey []. I had a horrible stressful day yesterday! I'm going Monday to hand the paper for public defender. I thought about what you said yesterday . I would like to meet before Monday to discuss this matter. The headline is that I'm ready for full cooperation . Working together. But if this as you said will be the path away of court and my family. I'm so hurt. And I understand your disappointment for me not meeting earlier. If we can meet (in a non scary way please) and have a trust relationship between us then I'm think there will be no more disappointing and it will work out great. I just want to be sure that me having a full cooperation with you will allow me to have a normal life so I can work and live in peace. What do you think? And if we meet and have agreement.. am I gonna still have to get a lawyer and all that or you will take it from there just between us? What do you think?

Def. Ex. 23. Mr. Elshinawy had believed that he was cooperating with the FBI by providing them valuable information about ISIS and its operations.

### B. Protecting the Public from Further Crimes of the Defendant

Mr. Elshinawy has no criminal history and he—on his own accord—abandoned any plans for a terrorist operation in the United States. By the time the FBI intervened and questioned Mr. Elshinawy, he had already (1) stopped receiving payments from ISIS; (2) ceased all communications with ISIS; and (3) terminated lines of communication with ISIS by destroying

the cell phone that he used to communicate with his ISIS contacts.  Therefore, Mr. Elshinawy is unlike those defendants whose activities with a foreign terrorist organization ceased only after the FBI intervened.

Given ISIS's current political, financial, and territorial position in the world today, it is virtually impossible for Mr. Elshinawy to commit this offense again.  Today, ISIS is on the run and lacks the financial resources it had in the first half of 2015.  As Dr. Sageman testified in his report

> The emergence of the Islamic State came from a unique confluence of developments (the hopes and disillusionment of the Arab Spring, the corruption and moral bankruptcy of the Iraqi and Syrian regimes, the lack of local opportunities of Muslim youths in the Arab world and Europe…) that is not likely to reproduce itself in the near future.

Def.'s Ex. 4, at 24.

### III. The Cases Upon Which the Government Relies Support the Defense's Argument That a Sentence Far Below 20 Years Is Appropriate.

The government has included a list of six cases in its memorandum, all of which the government contends support its request for a 25-year sentence and lifetime supervised release. However, the cases are factually dissimilar from the instant case and actually support the defense argument that a guidelines sentence without application of the terrorism enhancement, or any other upward departures or variances, is an appropriate sentence.

Many of the cases cited by the government share an element of affirmative conduct on the part of the defendant to commit, or aid in the commitment of an attack targeted at the government or civilians.  *See, e.g.*, *United States v. Haris Qamar* (EDVA 2016-cr-00227) (defendant identified and photographed specific sites around D.C.); *United States v. Munir Abdulkader* (S.D.Oh. 2016-cr-00019) (defendant plotted to murder an employee of a military base); *United States v. Emanual Lutchman* (W.D.N.Y. 2016-cr-06071) (defendant purchased

weapons and masks in furtherance of an attack on civilians on New Year's Eve); *United States v. Ardit Ferizi* (E.D.Va. 2016-cr-00042) (defendant provided a list of names of military members and government personnel to ISIS contacts); *United States v. Christopher Lee Cornell* (S.D.Oh. 15-cr-00012) (defendant attempted attack on government officials during the 2015 State of the Union Address, identified targets in D.C., and possessed semi-automatic weapons).

Mr. Elshinawy's conduct stands in stark contrast to the conduct of the defendants described above. Significantly, Mr. Elshinawy did not target government officials, buildings, military personnel, or any other government-related entity or individual. Mr. Elshinawy also did not purchase weapons, ammunition, masks, or any materials associated with a violent attack. Mr. Elshinawy neither knew of, nor acted to assist any party concerning the acquisition or utilization of drones. Finally, Mr. Elshinawy did not travel to Turkey or Syria, or to any other ISIS-territory to engage in training or recruitment. Rather, Mr. Elshinawy used the money he received from ISIS for his own personal purposes. Mr. Elshinawy's conduct does not warrant a sentence of 25 years. A 25-year sentence would be five years *longer* than the sentence imposed in *Ardit Ferizi*, where the defendant provided the names of military personnel to Junaid Hussain, and five years *fewer* than the sentence imposed in *Christopher Lee Cornell*, where the defendant actually attempted an attack on government officials.

A guideline sentence of 63-78 months is commensurate with Mr. Elshinawy's actual conduct.

## IV. Even If the Court Finds That the Terrorism Enhancement Applies, The Court Should Depart Downward Pursuant to § 4A1.3 on the Ground that the Defendant's Criminal History Category Over-represents His Criminal History and Vary Downward from the Guidelines Range to Level 26.

If this Court finds that application of the terrorism enhancement is appropriate, which it is not, it may nevertheless reach a guideline sentence between 63-78 months through a downward

18

departure and variance. Precedent exists in this Circuit for applying the enhancement and departing downward on the ground that the defendant's criminal history category over-represents his criminal history. The court in *United States v. Benkahla*, 501 F. Supp. 2d 748, 757 (E.D.Va. 2008) did just that. There, the court departed downward over the government's objection that the guidelines foreclosed a downward departure under §4A1.3 after application of the terrorism enhancement. The court explained

> First, no text within § 4A1.3 restricts or prohibits its application after the application of the § 3A1.4 enhancement. Several guidelines other than 3A1.4 prescribe specific criminal history categories such as: § 4B1.1 ("career offenders" are category VI); § 4B1.4("armed career criminals" are category IV at minimum); and § 4B1.5("repeat and dangerous sex offenders" are category V at minimum). Notably, § 4A1.3 explicitly restricts or prohibits its application in the event that one of these other guidelines apply. Specifically, § 4A1.3 prohibits a downward departure in the cases of armed career criminals under § 4B1.4 and repeat sex offenders under § 4B1.5, and limits downward departures to one category at most in the case of a career offender. Unlike with the other guidelines that specify a criminal history category, § 3A1.4 is listed nowhere in the guideline or its application notes. Without any prohibition or limitation, it is clear that the Commission did not intend to restrict a court's discretion with respect to criminal history downward departure under § 3A1.4.

*United States v. Benkahla*, 501 F. Supp. 2d 748, 758 (E.D. Va. 2007), *aff'd,* 530 F.3d 300 (4th Cir. 2008).

A downward departure pursuant to §4A1.3 from criminal history category VI to criminal history category I would place Mr. Elshinawy in a guideline range of 235-293 months (Category I, Base offense level 38). However, this guideline range still results in a sentence that is greater than necessary to meeting the sentencing goals of 18 U.S.C. § 3553(a)(2). Therefore, this Court should find that a variance sentence is necessary to serve the factors of 18 U.S.C. § 3353(a).

For all of the reasons set forth in Mr. Elshinawy's Sentencing Memorandum, *see* Mem. at 27–35, he respectfully requests that this Court impose a sentence between 63-78 months imprisonment for Counts One through Four, all to run concurrently. Mr. Elshinawy also requests

19

that the Court impose no more than a three-year period of supervised release for each Count, and no fines.

                                           Respectfully submitted,

                                                /s/
                                          Joshua R. Treem #000037
                                          Stuart O. Simms #27090
                                          Chelsea J. Crawford #19155
                                          BROWN, GOLDSTEIN & LEVY, LLP
                                          120 East Baltimore Street, Suite 1700
                                          Baltimore, Maryland 21202
                                          jtreem@browngold.com
                                          sos@browngold.com
                                          ccrawford@browngold.com

                                          *Attorneys for Mohamed Elshinawy*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November, 2017, a copy of the foregoing Defendant Mohamed Elshinawy's Reply to the Government's Sentencing Memorandum was filed and served through the CM/ECF system.

                                          /s/
                                          Joshua R. Treem