IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA,     :
                              :
        v.                    :          Criminal No. 15-2716-TJS
                              :
MOHAMED ELSHINAWY,            :
                              :
        Defendant.            :
                              :
- - - - - - - - - - - - - - - x          December 22, 2015

                                         Baltimore, Maryland


**DETENTION HEARING**


     BEFORE:   THE HONORABLE STEPHANIE A. GALLAGHER, Judge

APPEARANCES:                  CHRISTINE MANUELIAN, Esq.
                              Office of the U.S. Attorney
                              National Security Section
                              36 S. Charles Street, Fourth Floor
                              Baltimore, MD  21201
                                On Behalf of the Government

                              JOSEPH A. BALTER, Esq.
                              DOUG MILLER, Esq.
                              Law Office Of Joseph A. Balter, LLC
                              Mt. Washington Mill
                              1340 Smith Avenue, Suite 200
                              Baltimore, MD  21209
                                On Behalf of the Defendant

Audio Operator:               Jill Waryu

Transcription Company:        CompuScribe
                              5100 Forbes Boulevard
                              Suite 101
                              Lanham, MD  20706
                              (301) 577-5882


Proceeding recorded by electronic sound recording, transcript
produced by transcription service.

lcj
<span style="float:right">2</span>

<u>I N D E X</u>

Page

Preliminary Matters     3

Comments by Christine Manuelian, Esq.
  On Behalf of the Government     3

Comments by Joseph A. Balter, Esq.
  On Behalf of the Defendant     8

Comments by Christine Manuelian, Esq.     22

Comments by Joseph A. Balter, Esq.     30

Ruling by Judge Stephanie A. Gallagher     32

KEYNOTE: "---" indicates inaudible in the transcript.

1          P R O C E E D I N G S

2          (Whereupon, at 3:32 p.m., the proceeding began.)

3          THE CLERK:  The Honorable Stephanie A. Gallagher

4  presiding.

5          THE COURT:  Good afternoon.  Please be seated.

6  Ms. Manuelian?

7          MS. MANUELIAN:  Good afternoon, Your Honor.  We are

8  here for a detention hearing in United States versus Mohamed

9  Elshinawy.  Case Number is 15-2716TJS.

10          THE COURT:  Thank you. Mr.  Balter?

11          MR. BALTER:  Good afternoon, Your Honor.  Joseph

12  Balter from the Federal Public Defender Office along with Doug

13  Miller on behalf of Mohamed Elshinawy.

14          THE COURT:  All right.  And are we ready to proceed

15  with the hearing?

16          MR. BALTER:  We are, Your Honor.

17          MS. MANUELIAN:  Yes, Your Honor.

18          THE COURT:  Ms. Manuelian?

19          MS. MANUELIAN:  Your Honor, I assume that you have

20  already had an opportunity to take a look at the complaint

21  affidavit.  And I don't want to belabor the information that

22  is laid out in significant detail in that affidavit.  I just

23  wanted to highlight a couple things for the Court.

24          Obviously we are moving for detention based on

25  flight risk as well as danger to the community.  It is, I

lcj                                                                          4

1   think, very clear from the affidavit that through some

2   excellent investigative work, the FBI was essentially able to

3   interrupt this Defendant's long-term planning with respect to

4   utilizing funds that he was receiving directly from ISIL

5   operatives for some sort of nefarious activity, whether it was

6   an attack or whether it was causing destruction or something

7   along those lines.

8        The information that we obtained via search warrants

9   from various social media applications indicated that he had a

10  clear intent to participate and join ISIL.  He expressed his

11  desire to go and live among the members of the Islamic State.

12  And the only reason he had not done that to date, at least

13  prior to when he was initially questioned by the FBI in July

14  of this year, was because he had some of his own planning that

15  he wished to undertake.

16       His communications with his associates, one of whom

17  had -- we were able to delineate in the affidavit was clearly

18  a member of ISIL and an ISIL operative by his own

19  conversations that we were able to obtain over social

20  media -- were very clear.  He pledged his allegiance early in

21  2015, the Defendant to ISIL.  Communicated that information to

22  the operative, which was one of his childhood friends.

23       We know that he had traveled to Egypt and had

24  returned for a lengthy period of time, returning -- in 2012,

25  returning sometime in late 2014.  During a period of time when

lcj                                                                    5

1   there was a lot of upheaval in Egypt and many people were

2   seeking to flee.  It was the period that we all refer to as

3   the Arab Spring.

4          There are questions about -- the Defendant, when he

5   met with the FBI initially in July, and essentially provided

6   some information that was accurate or appears to be accurate

7   but some information that was clearly not accurate.

8          Left out many details about what his true intentions

9   were, what he was undertaking, the amount of money that he

10  received from ISIL was very clear that we interrupted whatever

11  was going on in the scheme of things in terms of his

12  communications with ISIL and his assistance and material

13  support to them.

14         That material support was provided numerous ways in

15  terms of providing various methods of communication via social

16  media, via e-mail accounts, via pay-as-you-go phones that we

17  were able to determine through subpoenaed information was

18  indicating potential use by overseas actors.

19         Those accounts for the phones, the e-mails and the

20  like were opened under aliases clearly in an effort by this

21  Defendant to try and cover his tracks.  There were a number of

22  phones that he never revealed he was using or obtained.  He

23  never revealed that to the FBI.

24         It was through very significant investigative work

25  that a lot of the layers were able to be peeled back to find

lcj                                                                            6

 1   out that in fact he was obtaining various phones and utilizing

 2   various methods of communications, much of which the law

 3   enforcement cannot necessarily see the substance of.

 4          And this is part of the reason why the Government

 5   has serious concerns about this Defendant being let go under

 6   any conditions of release, because he will very easily be able

 7   to duplicate and restart any communications with ISIL

 8   operatives outside the detection of law enforcement.

 9          The means that he was using in this case were

10   obviously done so that law enforcement could not detect what

11   he was up to, and in some instances he was successful in being

12   able to conceal information from the FBI.

13          The communications, Your Honor, I think with his

14   brother that are outlined in the complaint affidavit, are a

15   very clear indication of how this -- what this Defendant's

16   true intentions were.

17          And though he may try to articulate -- I am sure

18   Mr. Balter may argue that this was, that he was, the Defendant

19   was in fact being truthful when he said he was trying to scam

20   ISIS to obtain money just for his own personal use, that is

21   directly controverted by his attempts to recruit his brother

22   during the timeframe that he claims he was simply scamming

23   ISIL.

24          If he were actually serious or if he were really

25   attempting to scam ISIL there would be no reason for the

1   necessity of the ways in which he tried to conceal his

2   communications and he certainly wouldn't be talking about the

3   fact that he pledged his allegiance to ISIL, that he wanted to

4   live among the Islamic State, that he wanted to commit

5   Jihad -- all of these conversations that I think are

6   summarized, which he had with his brother.  Not with another

7   ISIL operative but his own family member.

8          I think that seriously undercuts what might, at some

9   point in time, be his defense, that he was being allegedly

10  truthful with the FBI.  It took many months of investigation

11  after his initial meetings with FBI agents to peel the layers

12  back, as I previously mentioned, and actually get to the

13  bottom of what was really going on, and what this Defendant

14  was doing.

15         He is a serious flight risk.  He is obviously

16  looking at significant time under the charges that he is

17  facing.  He obviously -- we know from the information that we

18  obtained via warrant that his desire is to go overseas, to

19  join his friend, and to be with members of the Islamic State.

20         So he has every incentive to flee the jurisdiction

21  of this Court and could easily do so and skip over one of the

22  borders before the Government would be able to track him down.

23         So he is a serious flight risk but I think more so

24  than that, he is a danger to the community given his pattern

25  of conduct during the course of this year and given how he

1   has -- the information or the way in which he tried to pull

2   the wool over the eyes of the FBI when initially confronted

3   about his activities.

4           So for those reasons, Your Honor, we would request

5   that he remain detained pending trial.

6           THE COURT:  Mr. Balter?

7           MR. BALTER:  Thank you very much, Your Honor.  Your

8   Honor, just by way of introduction, I think it deserves to be

9   said at this point that this, in terms of the underlying

10  charges here, this is a very, very unusual case.

11          In terms of cases of material support of terrorism,

12  what we are generally talking about is one of two things.  One

13  is that an individual may, in furtherance of terrorism, may be

14  involved in some kind of actual plotting of some kind of

15  violent activity, either an attack in which arms are used, an

16  attack in which some kind of explosives are used.  The type of

17  actual, aggressive attack against human beings.

18          The other way in which material support is generally

19  shown is in the context of perhaps giving some kind of

20  financial support to a terrorist organization.  That is the

21  heartland of cases that the courts have -- in which the courts

22  have considered these matters related to material support of a

23  terrorist organization.

24          What we have here is something totally different.

25  The crux of the information that the Government has presented

lcj                                                                    9

1    about what Mr. Elshinawy did is that he simply received some

2    money, and it was a relatively small amount.

3          The Government claims that it was about $8,000.

4    There was some dispute as to whether or not in fact there

5    was -- he had told them about all the money.  He certainly

6    readily acknowledged to them that there were two large

7    transfers that, hey, he had received.  And he gave them an

8    explanation of what was happening, was that this was a scam

9    that was going on.

10          As he was an individual who was short of funds.

11   There was an opportunity for him to perhaps get some money.

12   It may have been an ill-conceived idea but the only plan that

13   there was, if any, was for him to get money and not do

14   anything in exchange for that.

15          And that is a critical difference between this and

16   other cases that have been charged along these lines.  I think

17   we have to look at this entire case and the strength of the

18   case in that context.

19          I think it is important to remember that

20   Mr. Elshinawy is charged by complaint at this point with not

21   providing material support alone but simply at this point

22   attempting to provide material support.

23          And the reason why it is significant that the

24   Government has charged this as an attempt at this point is

25   because of the fact that they couldn't establish even probable

1   cause to show that there had been any material support.

2          What he did in simply getting these funds or

3   receiving these funds -- didn't give any material support to

4   ISIS or any other terrorist organization.

5          And the important difference in the elements that

6   they would have to prove if it went to trial is, first of all,

7   that there was a specific intent.  The statute that he is

8   charged under, if it weren't an attempt under 2339(b), simply

9   has a mental standard of knowingly.  That he might know that

10  something was about to happen.

11         By charging an attempt, of course, and it is

12  boilerplate in the law on this and it is in the --- penal

13  code, is an attempt requires specific intent to accomplish

14  something in the way of material support.  And that is clearly

15  lacking.

16         The other element of intent that is clearly lacking

17  is that there was some kind of substantial step toward

18  achieving what that ultimate goal was, and there was clearly

19  no substantial step.  They followed him constantly, I am sure,

20  for a period of at least six months.

21         If the Court looks, distills what the timeline of

22  this case is, the Government alleges in the affidavit that

23  they became aware of what they call a nefarious transfer in

24  June of 2015.  If the Court is also aware, Mr. Elshinawy was

25  at liberty for the next six months, and there were several

lcj      11

1   instances in which law enforcement intervened, and we submit

2   to try to catch him at something or to try to get more

3   information that would sustain a charge and they just weren't

4   able to.

5       We know in June of 2015, on the 28th, there was a

6   Western Union transfer of $1,000 to Mr. Elshinawy.  All right?

7   And the way the Government characterized this in their

8   affidavit was that they became aware of the fact that this was

9   going to happen, and then after the transfer was made, they

10   apparently conducted surveillance, they saw Mr. Elshinawy go

11   into a convenience store near his home.

12       They saw him obtain the funds.  They followed him to

13   a bank where a deposit was made.  They learned that there was

14   $800 of the $1,000 apparently deposited.

15       And what this set in -- what this began at that

16   point was from what we can only infer, in light of the fact

17   that they suspected terrorist activity, is constant

18   surveillance, which was conducted over the next six months.

19       Now I would infer, Your Honor, that most likely the

20   suspicion and the surveillance of Mr. Elshinawy went back much

21   further than June of 2015. The Government isn't telling us

22   when he actually became suspicious.  They are simply telling

23   us when they became aware that, that transfer was taking

24   place.

25       The affidavit alleges that there was a Paypal

lcj               12

1   transfer that took place three months earlier in March of '15.

2   I don't know if that was -- they were aware of that

3   beforehand.  I don't know what their level of intelligence was

4   but we certainly know it most likely went back before June 28

5   to the extent that they were ready to go at that point by

6   basically devoting extensive resources toward his

7   surveillance.

8          We know that there was -- he was involved in a

9   vehicle stop two days after June 28.  And while it doesn't say

10   this in the affidavit, I would be amazed if that wasn't a stop

11   that was set up for the purpose of seeing if a stop could be

12   made, what they could find on Mr. Elshinawy's person.

13          What he might be carrying in his vehicle, what he

14   might be carrying on his person, anything that they might be

15   able to find that would link him to their suspicion that there

16   was terrorist activity.

17          It is very, very clear that there was nothing found.

18   There was nothing -- no allegation that anything of any type

19   of significance was located.  The affidavit did say that after

20   the arrest was made, they continued to follow him, which of

21   course establishes that there must have been some type of

22   coordination between the agents who were investigating this

23   case and the local police who may have generated the stop.

24          The agents, I am sure, wanted to disguise the fact

25   that the Government agents were behind it so they wouldn't be

lcj                                                                                    13

1   tipping Mr. Elshinawy off to the fact that he was a subject of

2   their surveillance.  But it is clear that is what the case

3   was.

4       So at this point, I think the Court has to infer

5   that every conceivable investigative tool that the FBI uses to

6   track down terrorists was being used.  I would anticipate that

7   there were warrants that were issued to track his car.  I

8   would anticipate that there were, to the extent possible, that

9   there were Title III warrants to intercept his phone calls.

10       I would anticipate that there were observations that

11   were being made of everywhere he went.  They started

12   the -- they may have already started the process they were

13   going after every social media outlet he was connected with,

14   every bank account, looking for evidence in which he was

15   taking that money that he was receiving and spending it in

16   some way that would further terrorism.

17       And what is clear from this affidavit for a period

18   of six months they didn't put together a shred of evidence

19   that he was doing anything to materially aid any type of

20   terrorism, be it ISIS or any other terrorist organization.

21   All they had was an individual who was receiving these funds

22   from somebody from allegedly from an ISIS functionary and

23   taking it for his own use.

24       And that is exactly what he told them.  They went to

25   see him on July 17.  So he had been -- they had obviously been

1    conducting surveillance of him at least through the 28th of

2    June at that point, so for several weeks.  The agents went to

3    interview him.

4          There was a noncustodial interview at his home.

5    They confronted him with some of the evidence.  They asked him

6    whether or not he had received the monetary transfer.  He

7    indicated that he did, and not only that, he voluntarily gave

8    the agents his computers.  I believe they looked at the

9    computers there.

10          They took the computers with them.  He showed them

11   the place on his computer where they would find evidence of

12   the fact that he had received the money, the money payments.

13   I believe it was the Paypal payments.  He gave them the

14   password to his computer.  They took that computer away.

15   There is the allegation that he wasn't completely truthful.

16   We haven't seen, you know, any reports with regard to that

17   meeting.

18          It is all in terms of conclusory statements that the

19   agents are making at this point.  But I certainly, you know,

20   wouldn't be surprised if there was room for misunderstanding

21   about what they asked him but for the most important

22   information they asked him about, did you obtain this

23   information?  He acknowledged it.  He indicated that he had

24   been in contact with a childhood friend.  He indicated that he

25   had referred him to someone from ISIL, and yes, he had

1  received that money and he also said that he was -- that the

2  purpose of getting the money was not terrorism but because of

3  the fact that he was planning on scamming them out of the

4  money.

5          Three days later, they return to see him again.

6  There is a second interview, and the Government makes much of

7  the fact that he hadn't admitted to every single transfer.

8          There was no motivation he would have had to say,

9  yes, one transfer and not the next.  I infer it was the kind

10 of situation there were multiple transfers.  He admitted to at

11 least three of them.  There is a question about the other two.

12         The significance of the fact that he didn't admit to

13 all of that is very slight.  What is most significant is again

14 the fact that he did.  He told them what his motivations were.

15 And he was absolutely cooperative with them.

16         I think the Court at this point also has to take

17 into account the fact that there was not an arrest made either

18 at that point or the day before when he had supposedly

19 admitted to the agents that he had in fact received this money

20 from individuals identified as being from ISIS shows that the

21 Government couldn't have considered him to be a threat at that

22 point.

23         They couldn't have considered him to be a threat to

24 public safety.  He was out and about, going his way.  I am

25 sure that they were conducting surveillance on him 24/7.  And

lcj                                           16

1   to the extent that reduced whatever the risk was that may be

2   significant, but they also would have seen that he was doing

3   nothing to create a risk to anyone.

4        He worked as a paperboy.  He delivered papers by

5   throwing papers on people's porches.  He was out and about.

6   There wasn't that quantum of evidence that showed that he was

7   a threat.

8        Similarly with regard to him being a flight risk.

9   They knew exactly where he was.  He obviously was not going

10   anywhere.  The proof is in the pudding to the extent that six

11   months went on in which there was never any question about

12   where he was going to be.

13        And the Government knew the lion's share of

14   everything that is in that affidavit from the time that they

15   first spoke to him.  Now they may have had other motivations

16   in terms of either wanting to see where he went, whom he tried

17   to talk to, who the individuals were he was in contact with.

18        There was nothing of significance in terms of

19   certainly anybody he talked to within the United States.

20   There was nothing of significance of showing he tried to buy

21   guns.  There is nothing to show that he tried to buy

22   explosives.  Anything that would be used to carry out any type

23   of terrorist attack.

24        There was no communications other than these chats

25   that they keep referring to, which were not specific in any

1  way from what I have seen.  And again, we are relying at this

2  point on Government interpretations of what was said in

3  Arabic.

4          I note some of the nomenclature that was used by the

5  agents in the way it was described in terms of whether or not

6  something was operational frankly sounds more like something

7  when we hear from an FBI agent because that is the way they

8  refer to whether or not individuals who are planning some type

9  of activity are actually going to do something.

10          And so I would doubt that was something translated

11  from the original Arabic but in any event it is just talk.

12  There is just nothing there that is specific.  The

13  investigation went on.  We went to the point they executed a

14  search warrant on October 9.  There is no indication anything

15  came out of that search warrant at all.

16          Just like there was nothing that came out of those

17  computers that proved anything when he voluntarily gave it to

18  them without notice back in July.

19          After the search warrant was executed, they sent him

20  a target letter.  They didn't go out an arrest him.  They sent

21  him a target letter.  Mr. Elshinawy, you are the target of a

22  federal investigation.  Please get yourself a lawyer or apply

23  to have a lawyer appointed for you, which he did within a

24  matter of days.

25          He applied for a lawyer under the CJA Act.  The

1  federal public defender was appointed.  Myself and Mr. Miller

2  were immediately in contact with Mr. Elshinawy.  He made

3  arrangements to come to our office.  We contacted the

4  Government to let him know we were in a position to be able to

5  talk with them.  Communications went back and forth for some

6  time.

7          Every time we reached out to reach Mr. Elshinawy, he

8  was always available to come and confer with us and to talk to

9  us, and quite frankly before the arrest of him was made on

10  December 11, the last communication between the Government and

11  the defense was a message that the defense had sent over to

12  the Government.

13          And while that doesn't say anything in itself with

14  regard to flight risk, it does say that the communications

15  were going on during this whole period of time and nothing had

16  happened during this whole period that showed that there is

17  any level of increase in risk than there was six months ago,

18  nine months ago or whatever period of time it was when the

19  Government started this investigation.

20          And Your Honor, I think it is within that context

21  that the Court has to consider whether or not there are

22  conditions that can be set that will ensure the safety of the

23  community and will ensure that Mr. Elshinawy makes his court

24  appearances.  Mr. Elshinawy continues to enjoy the presumption

25  of innocence like every American citizen does.

lcj                                                                    19

1            He is an American citizen.  He was born in this

2    country.  His parents are of Egyptian origin.  He was brought

3    back to Egypt and was raised in Egypt and was educated in

4    Egypt, and several years ago he returned to this country.  He

5    married an American citizen.  He has been a law-abiding

6    citizen.  He comes into this court without a criminal record.

7            What goes part and parcel with the presumption of

8    innocence he enjoys is that the Bail Reform Act says that the

9    Court should be issuing conditions of release unless no

10   condition of release will assure that he will make his court

11   appearances and will not be a danger to the community.

12           And this is an unusual recommendation that I have to

13   make.  And what I am going to recommend to the Court is we

14   stay with the tried and true.  I would request that the

15   Government put on the record exactly what the investigative

16   and surveillance techniques they utilized for the last six to

17   nine months were because they obviously worked in making sure

18   that Mr. Elshinawy did not go anywhere or that the American

19   public in any way was placed at risk.

20           We know that those conditions exist.  I can only

21   infer and speculate what they are but they did work.  And so

22   we will consent to any type of condition that the Government

23   wants.  If the Government wants Mr. Elshinawy to consent to

24   the entry of another Title III warrant so that all his

25   telephones are being tapped, we will agree to that.

1     If the Government wants us to consent to an order

2   for another GPS tracker to be placed on his car, we will

3   consent to that.  The only thing that I would recommend that

4   hasn't come up yet is we will obviously consent to an

5   electronic location monitor being placed on his ankle so that

6   he would be able to be tracked in that additional way.

7     So I suppose what I am suggesting then is that

8   Government surveillance plus Court-ordered location

9   monitoring.  But I challenge the Government to explain how it

10  can be that they let this man remain at liberty for this

11  period of time, and all of a sudden he becomes a risk?

12     And Your Honor, I can only infer this, and again it

13  is something -- the public concern at this point is very

14  legitimate and very real for all Americans.  We know on

15  December 2 there was an act of alleged terrorism that took

16  place on the other side of the country, which has created an

17  incredible level of concern by all Americans.

18     And there can be no denying that is a legitimate

19  concern.  On the other hand, Mr. Elshinawy, like every other

20  person charged in our court system, has the right to have his

21  case individually adjudicated, and the fact that we are

22  concerned about something that happens somewhere else can't be

23  the triggering mechanism for why he should be detained.

24     And again I don't think there is any lack of

25  coincidence here that it was just days after San Bernadine

1   took place, in which the Government chose, well, now is the

2   time that we have to arrest Mr. Elshinawy, and now all of a

3   sudden every risk that we thought was under control, they

4   obviously did, is no longer under control.

5          I don't think one follows the other.  So for that

6   reason, Your Honor, the pre-trial report indicates where

7   Mr. Elshinawy was living.  I ask the Court to issue an order

8   allowing him to be released on a condition that he go back

9   home with an electronic monitor, and I think that the

10  Government then will resume whatever level of surveillance and

11  monitoring they had, and the ends of justice will be met in

12  that way.  Thank you.

13         THE COURT:  How do you respond, Mr. Balter, to the

14  Government's allegation that they were not adequately able to

15  monitor him because according to the communications they did

16  intercept, he was taking steps to conceal certain

17  communications over social media and otherwise?

18         MR. BALTER:  Your Honor again, I think those

19  allegations in the affidavit are of a totally conclusory

20  nature.  And that is why the only thing I can respond to --

21  they knew 90 percent of all this information six months ago.

22  Whatever that risk was, it wasn't so much that they felt, when

23  he said, I got money from ISIS, they had to arrest him right

24  then and there.

25         I mean, one could say that is shocking.  I mean,

lcj                                                            22

1    one's reaction could be, wait a minute.  Somebody said they

2    were getting money from ISIS and you didn't just arrest them

3    right on the spot?  That is a legitimate inquiry.

4           But that having been the case, and that having been

5    made the calculation by the Government on several occasions,

6    and then having made the assessment that, wait, nothing is

7    going on here, which is creating such as a risk that we can't

8    leave him out with the type of surveillance and monitoring

9    that we have, answers the question by itself.

10           It is now self-serving for the Government to say

11    there are all these risks and we can't monitor them.  If that

12    was the case, how did we get through the last six months?

13    Nothing has changed.  What has changed is San Bernadine.  What

14    didn't change is what was going on with him.

15           THE COURT:  Thank you.  Ms. Manuelian?

16           MS. MANUELIAN:  Your Honor, I would venture to guess

17    that if we arrested the Defendant on the spot after we spoke

18    with him in July, Mr. Balter would be here saying, where is

19    the evidence, Judge?  Where is the evidence that connects this

20    individual to ISIL?

21           It took another six months for the FBI to actually

22    peel the layers back and find the evidence that brings us into

23    court today.  I hear a lot of speculating and assumptions made

24    by Mr. Balter but he has not actually really addressed the

25    crux of the evidence that we have laid forth in this

lcj      23

1   complaint.

2      And let me just say one thing, Your Honor. The Bail

3   Reform Act, as I read it, doesn't put an obligation upon law

4   enforcement to go ahead and continue to monitor and take steps

5   to surveil and otherwise follow a Defendant who is now in the

6   custody of the U.S. Marshal Service.

7      The Bail Reform Act provides that there are

8   conditions that can be imposed in which to guarantee the

9   safety to the community and make sure that the Defendant

10   appears in court.

11      That does not include the FBI taking part in

12   fulfilling those conditions that would render the Defendant

13   not a flight risk or that would ameliorate his danger to the

14   community. And part and parcel to what is going on here is

15   the fact that the FBI, thanks to this Defendant taking steps

16   to conceal what he was doing, did not have the adequate

17   information to ascertain the substance of what he was doing

18   with ISIL, the phones that he was using, the e-mail accounts

19   that he was using.

20      The chat applications that he was employing, all at

21   the direction of the ISIL operatives with whom he was

22   communicating, and we know in August after he was visited by

23   or spoke to the FBI, he is telling his brother, in

24   communications over social media, I have been uncovered, I

25   have been revealed. And he was taking steps to lay low

lcj                                                        24

1   because he knew that the FBI was onto him in some form or

2   fashion.

3         So I have to point out -- let me just address very

4   quickly a number of things that Mr. Balter raised.  First of

5   all, this is not an usual case.  What is unusual about this

6   case, as opposed to other material support cases, is this is a

7   Defendant who actually received money from ISIL as opposed to

8   lone wolves who are out there exercising their sympathy with

9   ISIL and wanting to do something to support the cause.

10        This individual is directly communicating with ISIL

11   operatives overseas.  The material support that has been

12   provided: Right now in the complaint, he is charged simply

13   with attempted material support because the money he received,

14   which was $8,700, $3,500 of which he concealed from the FBI,

15   that money was -- he obtained by his own admission, received,

16   to utilize in connection with causing destruction or

17   committing some sort of terrorist attack that ISIL could claim

18   responsibility for.

19        He also provided himself has personnel.  That is

20   material support under 2339(b).  He sought to recruit his

21   brother, and those communications are outlined in the

22   complaint, to join the Islamic State.  He also provided means

23   and methods of communication which, is providing material

24   support.

25        He provided e-mails under aliases that could be used

1  or accessed by his associates.  He provided pay-as-you-go

2  phones and phone numbers when asked.  As a matter of a fact,

3  his childhood friend specifically asked for an unattributable

4  phone number, and that is identified in the criminal complaint

5  affidavit.

6  He utilized and downloaded various applications for

7  which he could communicate covertly at the instruction of ISIL

8  operatives.  He also provided financial services, some of

9  which is outlined in the criminal complaint affidavit.

10  A facility in which it could appear as though he

11  were shipping articles or items to individuals overseas

12  through Paypal when in point of fact he wasn't shipping

13  anything.  That was the method by which they could get the

14  money to him, which is a very significant thing for ISIL to

15  try to get money into the United States to try to commit

16  terrorist acts over here.

17  So the substantial step that he took with respect to

18  the money was the way in which he allowed for these

19  individuals to get the money here but beyond that he actually

20  provided material support.  And obviously this case is going

21  to be going forward to indictment in a few weeks, and

22  Mr. Balter is well aware of that.

23  We have discussed when the Government anticipates it

24  will be returning an indictment.  This is just a criminal

25  complaint but it lays out a significant amount of the evidence

1  that the Government has.

2      We prevented this individual from undertaking

3  whatever acts he was seeking to do.  And I also have to point

4  out that we also charge in this criminal complaint obstruction

5  of agency proceedings as well as the false statement given

6  what he was trying to do and sort of stringing the FBI along.

7      While at the same time of going ahead and

8  communicating with his associates to tell them that he had to

9  lay low and take extra security precautions because he had

10  been uncovered.

11      I have to make one mention about the computer, and

12  we do highlight this.  He gave a laptop that the FBI could do

13  nothing with.  And that frankly is very consistent with this

14  individual trying to take steps to not reveal the full extent

15  of his activities for ISIL.

16      That laptop had an operating system on it that

17  doesn't store any information so there is nothing that could

18  be obtained from that, and the Defendant knew it.

19      I have to say, however, that in October, when the

20  search warrant was executed, that is how we found out that he

21  was still in communication with ISIL operatives from what was

22  on his phone and that is how we found out that he was still in

23  communication with the individual we ultimately determined to

24  be his brother and we were able to secure those social media

25  discussions with his brother through a search warrant as a

1  result of following up on what we seized on October 9.

2          THE COURT:  During the search warrant of the house

3  you recovered the phone, and that is where the communications

4  came from?

5          MS. MANUELIAN:  Yes, Your Honor.  We saw that he was

6  still in contact with two individuals, one of whom had ISIL

7  related -- appears to be an ISIL operative who had a lot of

8  ISIL propaganda on the account that we ultimately searched.

9          And then the other account, of course, was with his

10  brother, and that is how we got all these conversations that

11  clearly undercut the Defendant's story that he gave to the FBI

12  about committing a scam.

13          And I also have to point out that he is not legally

14  married to the woman he lives with.  They have never been

15  married.  She is, I think, they have a religious understanding

16  and she represents herself to be his wife but they are not

17  legally married under U.S. law.

18          THE COURT:  Let me just ask the other question that

19  I know Mr. Balter would ask.  What explains the delay from the

20  Government's perspective between the May execution of the

21  search warrant and October and the eventual arrest of

22  Mr. Elshinawy in December?

23          MS. MANUELIAN:  Your Honor, we were still working on

24  amassing our evidence.  When that search warrant occurred, we

25  learned that we -- we identified a number of other phones, we

1 identified these other individuals, whose accounts we were

2 able to secure through search warrants.  So the investigation,

3 we were still uncovering evidence that was going to show that

4 the Defendant was not being truthful and that there was more

5 to what he was doing with ISIL than he had revealed to us.

6        The entire last six months has essentially been

7 piecing together a criminal case on this Defendant because he

8 did not reveal information to us and we did not know how

9 to -- it was very difficult for us to ascertain exactly what

10 he was doing and what devices he was using to communicate with

11 ISIL operatives.

12        Mr. Balter makes this conclusory statement that we

13 have all this information in front of us.  Frankly, if we did,

14 we would have arrested this gentleman a long time ago but we

15 didn't.  The case has been slowly built over the course of the

16 last six months to get us to the point where we are right now,

17 and it has nothing to do with the timing of San Bernadine.

18        It has everything to do with where we are at this

19 point in time with respect to our ability to have moved

20 forward on the criminal charges.

21        There are also other issues that caused some delay

22 because as you well know, in these matters, we have to

23 coordinate with many other law enforcement and intelligence

24 agencies, and so there were some issues with us, with the

25 timing of how we could proceed.

lcj                                                                      29

1          But primarily the focus of what we were trying to do

2     was to build the various pieces of evidence that would support

3     the charges in this case and ultimately we -- the Government's

4     intent is in moving forward with an indictment, to present an

5     indictment that charges actually material support.

6          We charge this at this point in time because it is

7     the criminal complaint and we are going to go ahead and piece

8     together the rest of the case, which hopefully that indictment

9     will be presented to the grand jury in the next few weeks.

10         And Your Honor, obviously whatever concerns there

11    were about what Mr. Elshinawy was doing in the last six months

12    since we last saw him in July, obviously there were steps that

13    the FBI took to ensure the safety of the community.  At this

14    point in time, however, the FBI is not in charge of ensuring

15    the safety of the community and ensuring that this Defendant

16    is not a flight risk.

17         This Defendant is now in the custody of the U.S.

18    Marshals, and under any other terms and conditions of release,

19    which would be supervised by pretrial services, not by the

20    FBI -- there is nothing that is going to guarantee the safety

21    of the community.

22         We will not be able to determine what it is he is

23    doing with any other pay-as-you-go phones, with e-mails, with

24    laptops, with any other ways in which he can communicate or

25    try to get others to communicate for him.  And he certainly

1   has every incentive to flee the jurisdiction of the court.

2      MR. BALTER: Your Honor, let me just add a couple

3   points. First of all, with regard to this notion of fleeing,

4   when the Federal public defender was first appointed and we

5   had conversations with the Government, there were frank

6   discussions about what the Government was contemplating in

7   terms of charges.

8      Mr. Elshinawy knew what type of charges and what

9   kinds of penalties were possible --

10      THE COURT: At what point were you?

11      MR. BALTER: This occurred -- I believe it was

12   slightly after the execution of the search warrant. So my

13   guess is, I think, I don't know the exact dates. I think it

14   would have been mid to late October. And so we have been

15   representing -- there was a CJA order or rather an --

16      (Pause)

17      THE COURT: I understand that Mr. Balter made the

18   point that he didn't flee from October to now.

19      MR. BALTER: That is correct, Your Honor. And

20   obviously to the extent that I was suggesting that the

21   Government could continue with their surveillance, I

22   understand that the Court cannot impose that obligation on the

23   Government. But I think that it is indicative of the fact

24   that Mr. Elshinawy, by the assessment of the Government, was

25   not a flight risk, was not a risk to public safety in a way

1  that he presented an imminent threat.

2          To the extent that the Court is concerned, as I

3  indicated, about whether or not he will make his appearances

4  in court, I think that making the requirement that he have

5  electronic monitoring is a perfectly reasonable one, and I

6  would ask and recommend that be added to it.

7          So with those, with that said, I would simply make

8  the recommendation that the Court order conditions of release

9  with electronic monitoring, and hopefully if the Government

10  will take whatever steps that are necessary to monitor

11  Mr. Elshinawy's whereabouts and the safety of the community.

12          MS. MANUELIAN:  Judge, I just want to correct one

13  thing on the record.  Mr. Balter says that obviously the

14  Government didn't think that Mr. Elshinawy was a concern or a

15  threat.  That is just not true.  And as I said, there were

16  steps that were taken to ensure the safety of the community

17  over the course of the last six months since learning of the

18  information that ultimately brought the agents to

19  Mr. Elshinawy's doorstep to start in July.

20          I just want that to be clear on the record because

21  it is absolutely false that the FBI or the Government was not

22  concerned about his threat.  We took steps to ensure that was

23  addressed.

24          THE COURT:  Thank you.

25          (Long pause)

1          THE COURT:  All right.  I thank both sides for their

2     presentations.  Let me explain my order and the reasons for

3     it.  I have issued an order of detention in the State.  First,

4     this is a case in which the Government may properly seek

5     detention.  The Defendant is charged under Sections 18 United

6     States Code Section 2339(b)(a)(1), 18 United States Code 1505

7     and 18 United States Code Section 1001.

8          Based on the Government's proffer there is probable

9     cause to believe the Defendant committed the charged offenses.

10    I found by a preponderance of the evidence from the

11    information produced at the hearing that there is a serious

12    risk that the Defendant will not appear, although ultimately I

13    do conclude that there could potentially be conditions to

14    ameliorate the flight risk.

15          But I find by clear and convincing evidence from the

16    information produced at the hearing that the Defendant poses a

17    risk to the safety of other persons in the community, and by

18    clear and convincing evidence that there is no condition or

19    combinations of conditions to reasonably assure community

20    safety.

21          Specifically I am relying on the following: First,

22    the nature of the offense, and in particular when I refer to

23    the nature of the offense, I mean those communications with

24    his brother in August that indicate efforts to conceal

25    communications from law enforcement and used some type of

1  mechanism that cannot be monitored by law enforcement.

2          In a case of this nature, that causes some

3  significant public safety concerns.  Second, the strength of

4  the evidence against the Defendant.  Third, the fact that

5  there apparently is still unverified background information in

6  the Defendant's pretrial report, which I find to be an issue

7  both in terms of safety to the community and in terms of

8  potential flight risk.

9          Fourth, significant foreign ties, which present

10 flight risk, although I do believe conditions such as

11 potentially a substantial bail could help ameliorate the

12 flight risk issue but again that would not help with respect

13 to the danger to the community.

14         And finally pretrial service's recommendation of

15 detention.  So for all those reasons, I have issued an order

16 of detention in this case.  Is there anything further that we

17 can address in this matter today?

18         MS. MANUELIAN:  No, Your Honor.  Thank you.

19         MR. BALTER:  No, Your Honor.  Thank you.

20         THE COURT:  We need a preliminary hearing date, I

21 guess.

22         MS.        :  I think it was waived, Your Honor.

23         MS. MANUELIAN:  Yes, Your Honor.  It has been

24 waived.

25         THE COURT:  Oh, it was --- already?  All right,

lcj                                                                      34

1   thank you.

2          THE CLERK:  All rise.  This honorable Court now

3   stands in recess.

4          (Whereupon, at 4:24 p.m., the hearing adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

lcj                                                                      35

### C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the

duplicated electronic sound recording of the proceedings in

the above-entitled matter.




_Laura C. Jackson_ _____   _6/14/17_
Laura C. Jackson          Date
Transcriber