**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | CRIMINAL NO. ELH 16-0009 |
| v. | * | |
| | * | |
| MOHAMED ELSHINAWY, | * | |
| | * | |
| Defendant. | * | |
| | * | |

*******

**DEFENDANT'S OPPOSITION TO THE GOVERNMENT'S MOTION
TO STRIKE EXPERT TESTIMONY OF MARC SAGEMAN**

The Government attempts to limit Mr. Elshinawy's right to provide evidence that will inform this Court's sentencing determination by moving to strike testimony from Marc Sageman, Ph.D., a terrorism expert offered by the defense for the upcoming evidentiary hearings. Since the filing of the Government's motion, the defense has furnished a copy of Dr. Sageman's report, thereby disclosing the basis for his opinion and rendering moot the Government's earlier objections. Nevertheless, the Government persists in attacking Dr. Sageman's opinions by asking this Court to hold its motion in abeyance until it can conduct voir dire. The Government's positions are irrelevant, unsupported, and without merit.

There cannot be any serious debate about Dr. Sageman's expertise in the area of Islamic Terrorism.   His resume describes the "gold standard" of his background and qualifications.  Indeed he has spent his professional life combatting terrorism through firsthand experience, his research and teaching, and his assistance to Presidents and Congress over the past 30 years.

The Government in its motion does not challenge Dr. Sageman's expertise.   Its challenge is to the basis for his opinions, *i.e.* his methodology.  However as is made clear by case

law, statute and the sentencing guidelines, such challenges at sentencing go to the weight of the opinions, not to their admissibility.

## I.      Legal Standard

18 U.S.C. § 3661 states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661. Accordingly, the Federal Rules of Evidence do not apply to sentencing hearings. Fed.R.Evid.1101(d)(3).

The U.S. Sentencing Commission's Guidelines instruct that "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." USSG § 6A1.3(a). "Prior to the advent of guideline sentencing virtually no limitations were placed on what a court could consider at sentencing," and "a reading of 6A1.3(a) therein and its Commentary clearly shows that the sentencing rules have not changed." *U.S. v. Bowman*, 926 F.2d 380, 381 (4th Cir. 1991).

Indeed, the Fourth Circuit has found that evidence that is otherwise inadmissible at trial is reliable for a sentencing determination. *See e.g. id.* (uncorroborated hearsay); *Lee*, 540 F.2d at 1212 (illegally obtained evidence); *U.S. v. Nichols*, 438 F.3d 437, 441-443 (4th Cir. 2006) (voluntary statements obtained in violation of *Miranda*). This is because "[a] policy of full information during sentencing, unrestricted by the strict rules of evidence, enhances reliability by providing the sentencing with more relevant evidence, whether presented by the government or the defendant." *U.S. v. Umana*, 750 F.3d 320, 347 (4th Cir. 2014).

Accordingly, the traditional standards for expert testimony found in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993) do not apply at a sentencing. *U.S. v. Seay*, 553 F.3d 732, 741 (4th Cir. 2009) ("the Federal Rules of Evidence, on which *Daubert* is based, do not apply at sentencing."); *see also U.S. v. Fields*, 483 F.3d 31, 342 (5th Cir. 2007) ("No Circuit that we are aware of has applied *Daubert* to sentencing."). Instead, the "indicia of reliability" standard in § 6A1.3(a) provides sentencing courts "considerable latitude to consider evidence at sentencing," and thus broad discretion to admit expert opinions. *Seay,* 553 F.3d at 741-42 (citation omitted).

## II.     Argument

### a.  Stale Objections

On October 2, 2017, the defense gave notice that it intended to present Dr. Sageman's opinion at the evidentiary hearings. That designation included a generalized preview of his anticipated opinion. On October 19, the Government moved to strike Dr. Sageman's testimony on the grounds that "[t]he *defense* . . . details *potential* opinions that . . . do not have a sound basis in either methodology or experience" and "large portions of his *proposed* testimony are simply selective regurgitations of hearsay . . ." Gov't's Mot. Strike, 3 (emphasis added). **These objections were based entirely on defense counsel's generalized representations of Dr. Sageman's anticipated testimony.** *See id.* On October 30, 2017, the defense furnished the government with Dr. Sageman's 24-page report, thereby disclosing his opinions and the basis for them. This report, not the October 2, notice is Dr. Sageman's testimony

Apparently that was not good enough for the Government. On November 2, 2017, the Government advised; "we still have serious concerns about the basis for and substance of Dr.

Sageman's proposed opinions." Gov't.'s Ltr., 1, Nov. 2, 2017, ECF No. 129. However the Government failed to articulate any specific concerns and has yet to do so.

    **b. Misunderstanding and Misapplying Rule 702 and *Daubert***

    The Government relied, and continues to rely, on improper authority to support its now-irrelevant Motion and request for voir dire. First, nearly every argument in the Government's Motion regarding the purported unreliability of Dr. Sageman's opinion was based on Rule 702 and *Daubert*, which apply to trials and not sentencing. *See e.g.* Gov't's Mot. Strike at 3-5 (noting that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" but arguing that Dr. Sageman's "opinion is based solely on 'the *ipse dixit* of the expert," and "even had Dr. Sageman done some analysis . . ., similar 'profile' evidence has been held inadmissible and unreliable under *Daubert*.") (citations omitted). The Government similarly requested that Dr. Sageman's opinion "be tested" by a *Daubert*-style voir dire.  Neither standard applies to sentencing proceedings. *U.S. v. Seay*, 553 F.3d 732, 741 (4th Cir. 2009). The Government attempted to create a nexus between those rules and the "indicia standard of reliability," but failed to provide authority for such contentions. *See* Gov't.'s Mot. Strike, 6-7. (quoting two cases standing for the proposition that speculative opinions are inadmissible under Rule 702; "[a]lthough the Rules of Evidence do not apply here, this sort of speculation is similarly inadmissible.").

    Likewise, the Government's argument that Dr. Sageman's opinion "consist[ed] of nothing more than the regurgitation of self-serving hearsay" overlooks the exceptions applicable at sentencing. First, the cases upon which the Government rely in its Motion concern hearsay admissibility at trial, not sentencing. *See id.* at 8-11. Second, in the sentencing context, "reliance

on uncorroborated hearsay was permissible before the guidelines, and §6A1.3(a) does nothing to change that rule." *Bowman*, 926 F.2d at 381; *see also U.S. v. Moncivais*, 492 F.3d 652, 658 (6th Cir. 2007) ("hearsay evidence is admissible at sentencing"). Even in the context of trial, "[t]he test is whether the expert is giving an independent judgment or 'merely acting as a transmitter for testimonial hearsay.' *U.S. v. Thompson*, 417 Fed. App'x 256, 257 (4th Cir. 2011) (unpublished) (quoting *U.S. v. Johnson*, 587 F.3d 625, 635 (4th Cir.2009)). Here, Dr. Sageman's report clearly describes the foundation for his opinions. It is based on the stipulated statement of facts, Mr. Elshinawy's communications, items in the "conspiracy sequence of events," the discovery material and interviews. Even if such sources contain hearsay, such evidence is acceptable at a sentencing hearing. Accordingly, Dr. Sageman's opinion passes muster for the sentencing proceeding.

### c.   The "Indicia of Reliability" Standard

The Government misreads how the "indicia of reliability" standard is applied.  It claimed that Dr. Sageman's "proposed testimony has none of the 'indicia of reliability' necessary for admission" or "that would indicate that it should be admitted[,]" Gov't.'s Mot. Strike, 8-10, but the "indicia of reliability" standard does not govern the *admissibility* of evidence at sentencing. Rather, the standard governs the evidence on which the sentencing court can rely. *See U.S. v. Malone*, 828 F.3d 331, 337 (5th Cir. 2016) ("we have interpreted subsection 6A1.3(a)'s 'sufficient indicia of reliability' language 'to require that the *facts used by the district court* for sentencing purposes be reasonably reliable'—a standard not intended to be onerous." (emphasis added)) (footnote omitted).

For example, in *United States v. Hatfield*, the government offered testimony from an expert economist to aid the court's calculation of forfeiture. 795 F.Supp.2d 219, 230 (E.D.N.Y.

2011). On the "threshold question of this testimony's admissibility[,]" the Court rejected the Defendant's argument that the expert's opinion "so flawed or speculative that it fail[ed] to comply with either the Federal Rules of Evidence, or the expert testimony standards established in *Daubert*." *Id.* at 229. Applying the "indicia of reliability" standard instead, the court explained that "even though Professor Harris' analyses are far from perfect (and the Court does not entirely accept his findings), they are at least admissible. *Their imperfections go not to their admissibility, but to their weight and credibility*." *Id.* at 230 (citing *U.S. v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (emphasis added).

This distinction is clear from the plain language of the statute and Guidelines.  Whereas the statute says "[n]o limitation shall be placed on the information . . . which a court of the United States may *receive and consider*" at the sentencing hearing, 18 U.S.C. § 3661 (emphasis added), the Guidelines only limit what information can be *considered*. *See* U.S.S.G. § 6A1.3(a). This is because the "sentencing court is entitled to a presumption that it is capable of disregarding evidence that it deems unsupported or improper." *U.S. v. Slaby*, 668 Fed. App'x 480, 481 (4th Cir. 2016) (unpublished) (citing *U.S. v. Fay*, 668 F.2d 375, 380 (8th Cir. 1981)); *see U.S. v. Johnson*, 935 F.2d 47, 51 (4th Cir. 1991) ("we rely upon the integrity of district court judges and trust their ability to disregard any attempt to impermissibly influence a sentencing decision."). The distinction recognizes "the sentencing judge's ability to properly evaluate that evidence." *U.S. v. Powell*, 650 F.3d 388, 392 (4th Cir. 2011), *cert. denied*, 565 U.S. 922 (2011).

Thus, the "indicia of reliability standard" does not require a sentencing judge to exclude purportedly unreliable expert testimony. In fact, expert testimony based on *undisclosed* or *unknown* methodology may still be acceptable at a sentencing proceeding. *See U.S. v. Wilkinson*, 90 F.3d 259, 265-66 (4th Cir. 2010) ("At no time did the government produce, through Dr.

Untiet or otherwise, any of the underlying data on which Dr. Untiet relied in order to perform his loss calculations or create Tables 1, 2, and 3."); *U.S. v. Hammoud*, 483 Fed. App'x 865, 868 (4th Cir. 2012) (unpublished) (At resentencing, "Hammoud was given an opportunity to cross-examine the agent, but the district court did not require the agent to reveal 'sources and methods' by which the information was provided."). Rather, *United States v. Bowman* explained the requisite procedure under this standard:

> The sentencing judge in the instant case carefully followed the above procedure. The presentence report advised the appellant of the evidence he would be faced with at sentencing. The testimony in question was given under oath in open court where appellant had an opportunity to observe the witness, cross examine him and present evidence in rebuttal of his testimony. We, therefore, conclude that the trial judge properly considered the uncorroborated testimony of Armstrong in finding that Bowman did possess a weapon during the commission of the offense in question.

926 F.2d 380, 381 (4th Cir. 1991) (footnote omitted).

Nearly every case cited in the Government's motion to illustrate the "indicia of reliability" standard speaks to the court's reliance on the evidence, not its admissibility. *See* Gov't.'s Mot., 2-3;  *see e.g.* U.S. v. Driver, 132 F.3d 34 (6th Cir. 1997) ("the district court's reliance on the testimony of Special Agent Tichenor in determining the value of the properties was not erroneous").

Moreover, the only case that does speak to admissibility referenced in the Government's motion is *United States v Bowker, see* Gov't.'s Mot., 2, and that case fully supports the defense's position on this matter. 372 F.2d 365 (6th Cir. 2004), *vacated on other grounds* 543 U.S. 1182. There, the Sixth Circuit reviewed the sentencing court's decision to admit expert testimony from an FBI agent under the "indicia of reliability" standard and held that the court did not abuse its

discretion in accepting the testimony. *Bowker*, 372 F.2d at 392-93. This excerpt, which was also supplied in the motion to strike, provides the Sixth Circuit's reasoning:

> Agent McNamara has been with the FBI for 15 years and is assigned to the FBI as a behavioral analyst. His duties include looking at the behavior of criminals, conducting research with convicted offenders and disseminating the results of that research, and working on active criminal cases as a law enforcement consultant. McNamara has been trained in a variety of disciplines, including criminal justice, psychology, forensic science, anthropology and psychiatry. Based on his review of transcripts and other materials pertaining to Bowker's case, McNamara testified that Bowker had engaged in multimedia attempts to contact Knight, including letters, email, telephonic contacts, and the sending of gifts. McNamara opined that the sending of gifts in a stalking case is 'significantly important in the areas of increased dangerousness.' He further testified that Bowker escalated his activity, from contacts through the mail, to telephonic and electronic mail contact, to traveling interstate to pursue Knight. McNamara also indicated that Bowker's past history of violence, including domestic abuse, was a predictor of future dangerousness or violence. As a consequence of these findings, McNamara concluded that Bowker was a more dangerous type of stalker.

Like the FBI agent in *Bowker*, Dr. Sageman has more than 30 years of experience working with federal agencies in the field of terrorism. The *Bowker* agent's duties included looking at the behavior of criminals, conducting research, and consulting on cases. Dr. Sageman's portfolio is built on the same duties; his life's work has been looking at the behavior of terrorists, conducting and publishing research, and serving as a terrorism consult to civilian agencies, branches of the military, academic institutions, and parties to litigation. Whereas the *Bowker* agent was trained in a variety of disciplines, including psychology and forensic sciences Dr. Sageman is a forensic psychologist and holds a doctoral degree in sociology. Most importantly, just as the *Bowker* agent determined the subject's level of dangerousness based on his history and behavior indicative of dangerousness in the context of his crime, Dr. Sageman

opined on Mr. Elshinawy's dangerousness. In light of these similarities, the Government's reference to *Bowker* does nothing more than to undermine its position.

    d.  **Methodology and Experience**

Dr. Sageman has spent more than 40 hours reviewing the discovery in this case; including 6.5 hours interviewing Mr. Elshinawy and another 1.1 hours interviewing his wife. It is difficult to imagine what else Dr. Sageman could have done to get the information on which he based his report.[1]

In *United States v. Paracha*, the terrorism expert's "methodology consist[ed] of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information …" 2006 WL 12768 at *20 (S.D.N.Y. 2006). The Court reasoned that he had studied "the micro-history of al Qaeda" and worked "collaboratively with his peers, gathering additional information and seeking out and receiving comments on his own work." *Id.* Moreover, his methodology was "similar to that employed by experts that have been permitted to testify in other federal courts involving terrorist organizations." *Id.* (citing *United States v. Damrah*, 412 F.3d at 625 and *Hammoud,* 381 F.3d at 337). Thus, "[w]hatever the general pitfalls of the 'vetting process' that is employed by [the expert] and others in his field, it is a sufficiently reliable methodology to meet the requirements of Fed.R.Evid. 702." *Id.*

Other courts have approved of testimony from terrorism experts where it was "apparent that these subjects are [the expert]'s life work." *U.S. v. Abu-Jihaad*, 553 F. Supp. 2d 121, 125-26 (D. Conn. 2008); *see also Strauss v. Credit Lyonnais of S.A.*, 925 F. Supp. 2d 414, 443-44 (E.D.N.Y. 2013) (where terrorism expert worked as an analyst and commentator for an Israeli

---

[1] The more than 40 hours does not include telephone conferences or the calls with the attorneys, nor the time taken to write his report.

newspaper, covering terrorism and other security topics, and had experience working with Israeli's security agency, his "analysis appear[ed] to comport with the 'same level of intellectual rigor that characterizes a terrorism expert.'").

Here, Dr. Sageman has spent more than 33 years working in national security, specializing in terrorist threats; he worked for the CIA on assignments in the Middle East, he served as a consultant with the Secret Service and continues to be a Special Advisor to top Army officials, all on the topic of terrorism. He has a degree from Harvard, an M.D. in Psychiatry, and a Ph.D. in sociology from New York University. He teaches classes and gives lectures at some of the nation's finest institutions on the very topic he opines about here. In short, he has the "intellectual rigor that characterizes a terrorism expert."

He has published more than 30 articles on terrorism, at least six of which are peer reviewed. His 2011 "AQAP External Operations" appears in the U.S. Department of Defense publication, *Influencing Violent Organizations Pilot Effort: Focus on Al Qaeda in the Arabian Peninsula (AQAP)*. He has authored several books on terrorism and even testified before the 9/11 Commission. In other words, the study of terrorism is his life's work.

Furthermore, Dr. Sageman's report explains his methodology. His opinion is based on first-hand interviews that he conducted with Mr. Elshinawy and Mr. Elshinawy's wife. He reviewed the entire record of the case and the "totality of the discovery materials." He used his medical expertise in psychiatry to assess Mr. Elshinawy's statement of mind and cross referenced that assessment with his knowledge of foreign terrorist organizations to assess Mr. Elshinawy's expectations. This methodology is the "gold standard" for terrorism experts.[2]

---

[2] Although he will not opine about future dangerousness, he has been permitted to express that opinion in a separate case. In *United States v. Mohamud*, the U.S. District Court of Oregon found that Dr. Sageman's opinion that the defendant "had a low probability of turning to violence" was reliable under *Daubert* and concluded that his testimony was admissible at trial. No. 3:10–CR–00475–KI, 2013 WL 71806, at *4-6 (D. Or. Jan. 4, 2013). Before

### III.   Conclusion

The Government's motion should be denied.

Respectfully submitted,

_____/s/_____
Joshua R. Treem #000037
Stuart O. Simms #27090
Chelsea J. Crawford #19155
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
jtreem@browngold.com
sos@browngold.com
ccrawford@browngold.com

*Attorneys for Mohamed Elshinawy*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 29, 2017 a copy of the foregoing Mohamed Elshinawy's Opposition to the Government's Motion to Strike the Expert Testimony of Marc Sageman was filed and served on all counsel of record through CM/ECF system.

_____/s/_____
Joshua R. Treem

---

that case, "Dr. Sageman developed a model with 65 indicators that are divided into stages of an individual's turn to violence, which he believes is a process for an individual." *Id.* at *5. Dr. Sageman then applied this model to that matter; "Dr. Sageman concluded defendant's age and personal issues made him vulnerable to inducement, which spawned a turn to violence in defendant that would not have occurred without the inducement." *Id.* The court found that Dr. Sageman could "provide insight into the terrorism community that would assist the jury." *Id.* at *6. "The social psychology concepts are also unknown territory for a lay person and are relevant to the issues to be decided." *Id.*"