IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

 *Plaintiff*,

 v.              Criminal No. ELH-16-009

MOHAMED Y. ELSHINAWY,

 *Defendant*.

## MEMORANDUM OPINION

Defendant Mohamed Y. Elshinawy is a United States citizen of Egyptian descent, born in 1985. Although defendant spent much of his life in Egypt and Saudi Arabia, he began to travel frequently between Egypt and the United States, beginning in or about 2007. On December 11, 2015, defendant was arrested in the State of Maryland, where he then resided. ECF 6. About a month later, on January 13, 2016, he was indicted on charges that included conspiracy to provide and providing material support to ISIS, a designated foreign terrorist organization ("FTO"). ECF 19. Elshinawy entered a plea of guilty to all charges on August 15, 2017, and is awaiting sentencing.

This Memorandum Opinion resolves several issues pertinent to sentencing. Most significantly, it addresses (1) whether Elshinawy is subject to a 12-level terrorism enhancement under Section 3A1.4 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), and (2) whether the defendant beached his proffer agreement with the government. I shall also briefly consider other potentially applicable sections of the Guidelines.

For the reasons that follow, I conclude that the defendant is subject to the terrorism enhancement. I reach that conclusion without relying on any information provided by the

defendant during his proffer session with the government on August 2, 2017. Nevertheless, I am satisfied that the defendant has breached his proffer agreement.

## I. Procedural Background

On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq as a FTO. ECF 120 at 9. In May 2014 and September 2015, the Secretary of State amended the designation to add various aliases, including the Islamic State of Iraq and the Levant ("ISIL"); the Islamic State of Iraq and al-Sham ("ISIS"); the Islamic State of Iraq and Syria ("ISIS"); and Daesh, among other names.

The Indictment (ECF 19) contains four counts, as follows: conspiracy to provide material support or resources to ISIS, a designated FTO, *i.e.*, personnel (including the defendant himself), services (including means and methods of communication), and financial services, in violation of 18 U.S.C. § 2339B(a)(1) and §§ 2339B(d)(1)(A), (D), (E), and (F) (Count One); providing and attempting to provide material support to ISIS, in the form of personnel (including the defendant), services (including means and methods of communication, and financial services, in violation of 18 U.S.C. § 2339B(a)(1) and §§ 2339B(d)(1)(A), (D), (E) and (F) (Count Two); unlawful financing of terrorism, in violation of 18 U.S.C. §§ 2339C(a)(1)(B), 2339C(a)(3) (Count Three); and willfully making materially false statements and representations to agents of the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2) (Count Four). *Id.* The Indictment refers, *inter alia*, to Individual #1, who has since been identified as Tamer Elkhodary ("Elkhodary"), an Egyptian national who resides overseas. He is also defendant's childhood friend and a member of ISIS.

On August 15, 2017, the defendant entered a plea of guilty to all four counts of the Indictment (ECF 119). The defendant's Plea Agreement (ECF 120) exposes the defendant to a

maximum sentence of 68 years of incarceration. *Id.* ¶ 3. Of import here, the terms of the Plea Agreement leave open the critical question of whether the defendant is subject to the twelve-level terrorism enhancement under U.S.S.G. § 3A1.4.

Counsel on both sides have devoted considerable time and effort to the issue of the terrorism enhancement, as well as to other issues relevant to sentencing under 18 U.S.C. § 3553(a), as evidenced by their voluminous and comprehensive submissions. Elshinawy's initial sentencing memorandum is docketed at ECF 138, supported by numerous exhibits. The government's initial sentencing memorandum is docketed at ECF 139, also with multiple exhibits. Defendant's reply is at ECF 143, with exhibits, and the government's reply is at ECF 145, with exhibits. Additional government exhibits are docketed at ECF 202 and ECF 208. Further, the government submitted a video that it claims is relevant under 18 U.S.C. § 3553(a) (ECF 219), as well as a copy of its PowerPoint presentation, used at a sentencing hearing. ECF 231. By my calculation, the parties' submissions well exceed 2,500 pages.

During the pendency of sentencing proceedings, several disputes arose between the parties. To start, on November 29, 2017, shortly before the Court was to hold the first sentencing hearing, the government claimed that the defendant breached his proffer agreement of July 14, 2017. *See* ECF 148 (government's letter of November 29, 2017); ECF 172-2 (proffer agreement). At its core, the basis of the claim rests on certain representations, assertions, and contentions contained in the sentencing memoranda submitted by defense counsel, which the government contends are materially different from the defendant's statements made during his

proffer on August 2, 2017. Therefore, the government argues that it is entitled to introduce relevant portions of defendant's proffer. The defense vigorously disputes the claim of breach.[1]

The matter concerning the proffer is tantamount to a case within a case, as the parties' flurry of submissions reflects. With regard to the proffer, the government's submissions include the following: ECF 148; ECF 155; ECF 164; ECF 172; ECF 195; ECF 204; ECF 215; and ECF 218. The defendant's submissions are docketed at ECF 151; ECF 179; ECF 187; ECF 199; ECF 210; and ECF 230.

The parties also vigorously disputed the admissibility of the opinion testimony of defendant's expert, Marc Sageman, M.D., Ph.D. On October 19, 2017, the government filed a motion to strike Dr. Sageman's testimony (ECF 125), which the defense opposed. ECF 152. *See also* ECF 155 and ECF 157. At the hearing on December 4, 2017, I orally denied the government's motion to bar the testimony of Dr. Sageman, for the reasons that I set forth on the record. He was received as a defense expert in terrorism, counter-terrorism, and psychiatry. *See* ECF 192 (Tr. of December 4, 2017), at 40-43.

Then, on December 8, 2017, the government disclosed that it had just learned the surprising news that on November 28, 2017, FBI agents involved in this case submitted to an on-the-record interview with two Associated Press reporters. ECF 181. Once a transcript of the interview was obtained, it was produced to the defense. Elshinawy suggests that the FBI agents' comments during the interview support his view that he is not subject to the terrorism enhancement because he "was not operational," had "no ties to any other ISIS members in the

---

[1] The FBI's Form 302, detailing the defendant's proffer, was prepared on August 31, 2017, but it was not provided to defense counsel until November 29, 2017. In any event, two defense attorneys were present during the proffer on August 2, 2017, and they do not contest the accuracy of the content of the Form 302.

United States," and even the FBI did not believe the defendant was planning an attack. *See* ECF 199 at 3-5.

On December 4, 2017, December 5, 2017, February 12, 2018, and February 16, 2018, the court held sentencing hearings, at which both evidence and argument were presented. The parties also submitted proposed sentencing findings of fact and conclusions of law on February 13, 2018. *See* ECF 223 (defendant); ECF 225 (government).

Despite defense counsel's valiant effort on behalf of the defendant, they cannot turn the proverbial sow's ear into a silk purse.[2] Without regard to use of the proffer material, and for the reasons stated below, I conclude that the evidence readily demonstrates that the terrorism enhancement applies here.

## II.      The Terrorism Enhancement

The terrorism enhancement under U.S.S.G. § 3A1.4 is "steep." *United States v. Fidse*, 778 F.3d 477, 481 (5th Cir. 2015) ("*Fidse I*"). Section 3A1.4 provides that if the offense of conviction "is a felony that involves, or was intended to promote a federal crime of terrorism," the resulting offense level is increased by 12 levels, and the defendant's actual criminal history category automatically becomes a category VI, regardless of the defendant's criminal history. U.S.S.G. § 3A1.4(a), (b). If, after the increase of 12 levels, the resulting offense level is less than 32, the court must increase the offense level to 32. U.S.S.G. § 3A1.4(a).

A "federal crime of terrorism" is a "key term." *United States v. Chandia*, 514 F.3d 365, 375 (4th Cir. 2008) ("*Chandia I*"). Under Application Note 1 to U.S.S.G. § 3A1.4, the term "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)."

---

[2] Defendant's claim, among others, that he eventually abandoned his desire to commit a terrorist attack is relevant under 18 U.S.C. § 3553(a), but it does not bear on whether the terrorism enhancement applies.

A federal crime of terrorism under § 2332b(g)(5) consists of two components. First, the offense must constitute a violation of one or more enumerated felonies. The specified felonies include three of the offenses to which the defendant has pleaded guilty: 18 U.S.C. § 2339B (Material Support of Terrorism, as charged in counts One and Two) and 18 U.S.C. § 2339C (Unlawful Financing of Terrorism, as charged in Count Three). Second, there is a "specific intent requirement," which means that the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *See* §§ 2332b(g)(5)(A), (B); *see also Chandia I*, 514 F.3d at 375-76.

Notably, the government bears the burden of proof. But, it need only prove the application of § 3A1.4 by a preponderance of the evidence. *United States v. Fidse*, 862 F.3d 516, 523 (5th Cir. 2017) ("*Fidse II*"); *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014); *United States v. Chandia*, 675 F.3d 329, 339-40 (4th Cir. 2012) ("*Chandia III*"); *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008).

In applying § 3A1.4, a district court must identify the particular federal crime of terrorism that the defendant intended to promote; assure satisfaction of the elements of § 2332b(g)(5)(A); and support its conclusions with reference to facts from the record. *United States v. Graham*, 275 F.3d 490, 517 (6th Cir. 2001). The Court explained in *United States v. Hassan*, 742 F.3d 104, 148 (4th Cir. 2014) (quoting *Chandia I*, 514 F.3d at 376): "[A] court deciding whether to impose the terrorism enhancement must 'resolve any factual disputes that it deems relevant to application of the enhancement,' and then, if it finds the requisite intent, 'should identify the evidence in the record that supports its determination.'" *See also Chandia III*, 675 F.3d at 331; *United States v. Chandia*, 395 F. App'x 53, 56 (4th Cir. 2010) ("*Chandia II*").

Both sides seem to agree that the convictions in counts One, Two, and Three constitute felonies enumerated by the applicable statute. ECF 223 at 2; ECF 225 at 1-2. But, the parties vehemently disagree as to whether the government has satisfied the specific intent requirement, *i.e.*, that the crimes were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

The false statement charge in Count Four is not an enumerated felony in § 2332b(g)(5). However, Application Note 2 to U.S.S.G. § 3A1.4 provides, in part, that "obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

This is not a case involving an actual terrorist act, which would, "standing alone, support application of the terrorism enhancement" based on "an automatic inference of the required intent." *Chandia I*, 514 F.3d at 376. However, "the terrorism enhancement can be applied to inchoate offenses, such as attempt and conspiracy." *Wright*, 747 F.3d at 407. This is "consistent with the text of § 3A1.4(a), which extends the enhancement to felonies 'that involved or [were] *intended to promote* a federal crime of terrorism' . . . ." *Id.* (bracket and italics in *Wright*; citation omitted). Thus, even if a terrorist act was only contemplated, rather than executed, this may give rise to an inference of the requisite intent under § 3A1.4. *See Chandia I*, 514 F.3d at 376.

As indicated, Elshinawy is charged with conspiracy to provide material support, as well as substantive offenses. And, in *United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008), which involved federal crimes of terrorism, the Court said, in regard to sentencing, that "unrealized harm" is not a basis to deviate from the Guidelines, because it would be tantamount to

"requir[ing] an act of completion for an offense that clearly contemplates incomplete conduct."
*Id.* at 264. The Court added: "By definition, conspiracy offenses do not require that all objects
of the conspiracy be accomplished." *Id.*[3]

In order to apply the enhancement, however, there must be evidence in the record that
establishes that the defendant "intended to advance [a terrorist] purpose in providing material
support . . . ." *Chandia III*, 675 F.3d at 340. However, the claimed personal motive for the
offense is "simply not relevant" to the intent inquiry. *United States v. Jayyousi*, 657 F.3d 1085,
1115 (11th Cir. 2011) (quoting *United States v. Awan*, 607 F.3d 306, 317 (2nd Cir. 2010)). Nor
must the government prove that the defendant had the means or ability to implement his plans.
*United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004). Rather, "it is the defendant's
purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is
triggered." *Id.* But, influencing or affecting government need not be the defendant's "ultimate
or sole aim." *Wright*, 747 F.3d at 408; *see Jayyousi*, 657 F.3d at 1114-15; *Awan*, 607 F.3d at
317. And, of import here, specific intent may be found without direct evidence of the
defendant's state of mind. *Wright*, 747 F.3d at 408; *United States v. Dye*, 538 F. App'x 654, 666
(6th Cir. 2013).

The rules of statutory construction apply when interpreting the Guidelines. *United States
v. Ashford*, 718 F.3d 377, 382 (4th Cir. 2013). Thus, the terms in the Guidelines are generally
accorded their ordinary and common meanings. *Awan*, 607 F.3d at 313; *United States v.
Stewart*, 590 F.3d 93, 137 (2d Cir. 2009).

A defendant's offense "involves" a federal crime of terrorism "when his offense includes
such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of

---

[3] In the context of sentencing, the *Abu Ali* Court also said that the absence of injury to
others does not "trivialize the severity of [the] offenses." 528 F.3d at 264.

terrorism as defined in 18 U.S.C. § 2332b(g)(5) . . . ." *Awan*, 607 F.3d at 313. With regard to the phrase "intended to promote," it must be construed "to avoid redundancy" with the word "involves." *Id.* at 314. Applying the ordinary meaning of the phrase, an offense is "intended to promote" a federal crime of terrorism when it is "intended to help bring about, encourage, or contribute to" such a crime. *Id.*; *see also Mandhai*, 375 F.3d at 1248.

As to the phrase "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" in 18 U.S.C. § 2332b(g)(5)(A), the "standard" for the enhancement focuses on the offense, asking "'whether it was calculated, i.e., planned—for whatever reason or motive—to achieve the stated object.'" *United States v. Ali*, 799 F.3d 1008, 1031 (8th Cir. 2015) (citations omitted); *see United States v. Mohamed*, 757 F.3d 757, 760 (8th Cir. 2014). Further, "'[c]alculation is concerned with the object that the actor seeks to achieve through planning or contrivance.'" *Ali*, 799 F.3d at 1031 (citations omitted).

In *United States v. Siddiqui*, 699 F.3d 690 (2nd Cir. 2012), the Second Circuit explained: "Many courts . . . interpret 'calculated' as nearly synonymous with intentional." *Id.* at 709. For that proposition, the court cited, *inter alia*, *Chandia III*, 675 F.3d at 333 n.3. The *Siddiqui* Court said, 699 F.3d at 709: "Thus, 'if a defendant's *purpose* in committing an offense is to influence or affect the conduct of government by intimidation or coercion, . . . application of the terrorism enhancement is warranted.'" (Emphasis in *Siddiqui*; citations and some quotation marks omitted). And, the court rejected the defense's argument that "long-term planning" is a requirement for the enhancement. *Id.* Rather, the court made clear that "the terrorism enhancement is applicable where a defendant acts according to a plan-whether developed over a

long period of time or developed in a span of seconds—with the object of influencing government conduct or retaliating . . . ." *Id.*

The *Chandia* trilogy is particularly illuminating. There, the defendant was convicted of conspiring to provide and providing material support to a FTO, in violation of 18 U.S.C. §§ 2339A and 2339B. The material support of the defendant included that he went to the airport to pick up an official of Lashkar-e-Taiba ("LET"), a FTO; gave him access to a computer; and helped with the shipment of materials to Pakistan for use by LET. *Chandia I*, 514 F.3d at 370. The defendant had also travelled to Pakistan to attend military training camps operated by LET. *See Chandia III*, 675 F.3d at 332. The district court applied the terrorism enhancement, without explanation. *Chandia I*, 514 F.3d at 376.

In the first appeal, the Fourth Circuit remanded because "the district court did not make any factual findings related to the intent element. *Id.* Instead, [the district court] appeared to assume (erroneously) that the enhancement automatically applies to a material support conviction." *Id.* On remand, the district court again applied the enhancement, noting that the defendant "'clearly knew' of LET's [terrorist] purpose and 'was clearly involved in assisting it.'" *Chandia II*, 395 F. App'x at 59. The defendant appealed again, and the Fourth Circuit again remanded, observing that "facts that the district court relied upon essentially restate the facts underlying [the defendant's] material support conviction, without explaining how these facts speak to [the defendant's] motive for providing the support." *Id.* at 60.

At the third sentencing, the trial court found that the evidence showed, *inter alia*, that 1) the defendant knew that LET engaged in acts of terrorism, as evidenced by emails he received, his research, and websites he visited; and 2) he knew the individual to whom he provided support was a leader of the FTO, as evidenced by testimony of what the defendant witnessed in Lahore,

Pakistan and his efforts to conceal his communications with the FTO's leader by use of encrypted messaging. *Chandia III*, 675 F.3d at 336-37. The district court concluded that the defendant's "actions here and his support, intended to influence or affect government conduct by intimidation or coercion or to retaliate against government conduct." *Id.* at 337.

On appeal for the third time, the Fourth Circuit upheld the application of the enhancement, finding that "the court did not repeat the mistake of relying solely on [the defendant's] knowledge of LET's terrorist purpose; it reasonably inferred by a preponderance of the evidence that [the defendant] intended to advance that purpose in providing material support to [the LET official]." *Id.* at 340.

Thereafter, in *Hassan*, 742 F.3d 104, the Fourth Circuit again considered whether, under 18 U.S.C. § 2332b(g)(5), certain conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." It concluded that the district judge properly found that the three defendants all possessed the requisite intent. *Id.* at 149. In this regard, the trial judge's findings are informative.

As to defendant Hassan, the trial judge's finding was based on evidence such as Hassan's desire to wage "violent jihad"; he "'became part of a loose group with conspirators whose goal was to kill non-Muslims' . . . ."; the defendant played a "role in advancing 'jihadist propaganda' . . . ."; he tried "'to offer himself as a fighter'"; and he traveled to the Middle East. *Id.* at 149. As to defendant Yaghi, the court found specific intent because, *inter alia*, the defendant "initiated a corrupt relationship" with an individual he "'sought out'" at an Islamic Center in order "'to learn more about traveling abroad to commit violent jihad.'" *Id.* Further, the trial court relied on the defendant's travels to the Middle East and his postings on Facebook as evidence of intent to commit jihad. *Id.* In the trial court's words, the defendant "had gone

'beyond words to actions' . . . ." *Id.* at 150. And, of particular relevance here, as to defendant Sherifi the court noted, *inter alia*, that he received $15,000 to support the mujahideen. *Id.*

*United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004) (en banc), *vacated on other grounds*, 543 U.S. 1097 (2005), *reinstated*, 405 F.3d 1034 (4th Cir. 2005), also provides guidance. There, the defendant was convicted, *inter alia*, of providing material support to Hizballah, a FTO. The Court determined that the intent prong of § 3A1.4 was satisfied based on evidence that the defendant donated $3,500 to the FTO, played videotapes during meetings at his home that included speeches by leaders of Hizballah praising men who had martyred themselves against the United States and Israel, and encouraged donations to support the FTO. *Id.* at 340-41.

The recent case of *United States v. Van Haften*, 881 F.3d 543, 544 (7th Cir. 2018), is also helpful to the analysis. In that case, the defendant pleaded guilty to attempting to provide material support to a FTO. *See* 18 U.S.C. § 2339B(a)(1). At sentencing, the district court concluded that the terrorism enhancement applied. The Seventh Circuit affirmed. *Id.* at 545.

Of relevance, the trial judge found that the defendant's writings on Facebook and elsewhere established "a direct causal link between his hatred of the United States government and his desire to 'join[] my brothers for the war against American liars' and 'kill me some American soldier boys.'" *Id.* at 544. These statements persuaded the trial court that the defendant sought to retaliate against the government "for its treatment of Muslims in general" and for the defendant in particular, because he had previously been designated a sex offender. *Id.* To be sure, the defense highlighted several inconsistent statements of the defendant, thereby "muddying the waters" and suggesting that the defendant's motivations did not support the

finding. *Id.* But, the appellate court observed that the defendant's own statements demonstrated that he "sought to join ISIS to take up arms against America . . . ." *Id.* at 545.

In *United States v. Ali*, *supra*, 799 F.3d 1008, the defendants were naturalized citizens who were born in Somalia. *Id.* at 1014. They were convicted of providing and conspiring to provide material support to al-Shabaab, a FTO, and of making a false statement. *Id.* at 1014. At sentencing, the district court applied the terrorism enhancement after concluding, *inter alia*, that the defendants' offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate. *Id.* at 1032. The trial court pointed to defendants' contact with al-Sabaab members; their "vocal support" of the FTO's efforts "to expel" by "force" Somalia's Transitional Federal Government ("TFG"); and their "fundraising efforts in support of that cause." *Id.* at 10312. The court also noted that defendant Hassan expressed "joy" when she learned of a suicide bombing that targeted a TGF minister. *Id.* And, defendant Ali said "Thanks God" upon learning that the FTO had killed "forces aligned with the TGF . . . ." *Id.* The Eighth Circuit affirmed. *Id.* at 1034.

Many other cases are consistent with the principles discussed above. *See, e.g.*, *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *United States v. Mohammed*, 693 F.3d 192 (D.C. Cir. 2012); *United States v. El-Mezain*, 664 F.3d 467, 451 (11th Cir. 2011).

The defendant correctly observes that if the terrorism enhancement does not apply, the Court must consider Application Note 4 to § 3A1.4. *See* ECF 138 at 28. Note 4 provides, in part, that if the offense involved or was intended to promote an enumerated offense, "but the terrorist motive was to intimidate or coerce a civilian population, rather than to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government

conduct," then an upward departure is "warranted." However, the departure may not exceed the top end of the Guidelines range that would have applied with the terrorism enhancement.

Pursuant to Application Note 2 to § 3A1.4, the False Statement charge in Count Four may qualify as a federal crime of terrorism. *See Fidse II*, 862 F.3d at 522-25; *Awan*, 607 F.3d at 314; *Mandhai*, 375 F.3d at 1247-48. Application Note 2 to § 3A1.4 states, in part: "For purposes of this guideline, an offense that involved . . . (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism." Therefore, the government maintains that the enhancement applies to Count Four, as well. *See* ECF 139 at 8; U.S.S.G. § 3A1.4, n.2.[4]

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008), is informative as to the issue. In that case, the defendant was convicted of making material false statements to the grand jury, obstructing justice, and making material false statements to the FBI. On appeal, the defendant complained that the district court erred in applying the terrorism enhancement under § 3A1.4. *Id.* at 310. Recognizing the "duty to harmonize Guidelines and commentary," the Fourth Circuit observed, *id.* at 12:

> One might wonder, in the abstract, whether obstructing an investigation into a federal crime of terrorism necessarily 'involve[s]' a federal crime of terrorism, but plainly one could think that it does, and Application Note 2 decides the matter. Indeed, the language of Application Note 2 is identical in all material respects to the language of § 3A1.4 itself. There is no inconsistency of any kind.

Further, the Court noted that application of § 3A1.4 in the defendant's case was "straightforward." *Id.* at 311. In this regard, the Court pointed out that the defendant was convicted of obstruction offenses, and Application Note 2 provides that obstruction offenses qualify for the enhancement, "so long as the thing obstructed qualifies as an investigation into a

---

[4] The base offense level for Count Four is found in U.S.S.G. § 2J1.2.

'federal crime of terrorism.'" *Id.* In the Court's view, the provision was satisfied because the defendant obstructed a grand jury investigation into violations of statutes specified as federal crimes of terrorism (§§ 2339A and 2339B) and the violations involved the training of people at jihadist camps. *Id.* at 312.

The Fifth Circuit has further clarified that an obstruction offense "could still 'qualify for the enhancement if it was *intended to promote*—that is, "was intended to encourage, further, or bring about"—a federal crime of terrorism.'" *Fidse II*, 862 F.3d at 523 (quoting *Fidse I*, 778 F.3d at 481) (emphasis in *Fidse II*) (alterations omitted).

With this legal framework in mind, I turn to a summary of the facts. The facts establish that defendant pledged allegiance to the leader of ISIS, knowing the terrorist purpose of ISIS and in support of it; he accepted funds from ISIS to commit a terrorist attack in this country; he was committed to waging jihad; and defendant's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion . . . ." 18 U.S.C. § 2332b(g)(5)(A).

### III.    Factual Summary[5]

#### A.  The Plea Agreement

A review of the relevant facts necessarily begins with the Plea Agreement (ECF 120), which contains a "Stipulated Statement of Facts," included as Attachment A ("Stipulation"). *Id.* at 9-11. In the Stipulation, the defendant has admitted to facts that satisfy all of the elements of each of the charged offenses.[6]

---

[5] In general, I cite to the electronic pagination as it appears on CM/ECF. The electronic pagination does not always correspond to the page numbers found on the parties' submissions.

[6] In view of the volume of evidence presented to the Court, I need not decide if the Stipulation, standing alone, is sufficient in and of itself, to establish applicability of the terrorism enhancement.

In "broad terms" (ECF 138 at 7), the Stipulation sets forth facts that include the following: defendant pledged allegiance to ISIS; he accepted money from ISIS to fund a terrorist attack in the United States; he used various forms of social media to communicate with coconspirators; he attempted, albeit without success, to recruit his brother to join ISIS; and he lied to the FBI during the course of the investigation. *See id.* The details of the Stipulation follow.

Among other things, defendant admits that he knowingly and intentionally conspired with others to provide material support or resources to ISIS (Count One); that he knowingly provided, and attempted to provide, material support or resources to ISIS (Count Two); that he willfully collected funds, directly or indirectly, with the knowledge that such funds were to be used, in whole or in part, to carry out a terrorist attack intended to cause death or serious bodily injury to civilians (Count Three); and he knowingly and willfully made false statements to agents of the FBI with respect to a terrorism investigation (Count Four). *See* ECF 120 at 9-11.

The Stipulation reflects that in September and October of 2014, the defendant conversed with "Individual #1." *Id.* at 9. (As noted, Individual #1 is the defendant's friend and coconspirator, Tamer Elkhodary, who is a member of ISIS). The defendant admitted that he knew ISIS is a foreign terrorist organization; he expressed his belief "in the legitimacy of ISIS"; he expressed his support for an Islamic caliphate; and he expressed "his hope that ISIS would be victorious and its enemies defeated." *Id.* In addition, defendant acknowledged his "readiness to travel to Syria . . . to live in the Islamic State . . . ." *Id.*

On February 17, 2015, through social media, defendant "pledged his allegiance" to ISIS; described himself as a "soldier" of ISIS; committed himself to "violent jihad"[7]; and asked Elkhodary to "convey his message of loyalty to ISIS leadership." ECF 120 at 9. And, the defendant agreed not to discuss his "plans for a potential terrorist attack . . . ." *Id.* In other chats with Elkhodary between March and June of 2015, the defendant "sought guidance" from Elkhodary "on how to obtain or make some sort of explosive device and a silencer." *Id.* And, he discussed his efforts to undertake "extreme security measures" to conceal his activities. *Id.* In addition, the defendant discussed his "preparedness for Jihad . . . ." *Id.*

Between March and June 2015, defendant received approximately $8,700 from his ISIS coconspirators, "to be used to conduct a terrorist attack in the United States." *Id.* at 10; *see also* ECF 230. Most of the monies were received through transfers from an online financial account associated with an organization referred to in the Plea Agreement as the "UK Company," which was based in Wales, United Kingdom, and Dhaka, Bangladesh. ECF 120 at 10. The UK Company was "made up of a number of related entities," and its primary business" consisted of the provision of IT products and services. *Id.* (In other submissions, the UK Company is referred

---

[7] "Jihad" refers to "holy war," *United States v. Farhane*, 634 F.3d 127, 132 (2d Cir. 2011), "'undertaken as a sacred duty by Muslims.'" *United States v. Kahn*, 461 F.3d 477, 483 n.1 (4th Cir. 2006) (citation omitted). "Mujahideen" are "*jihad* warriors." *Farhane*, 634 F.3d at 132. *See also Clay v. United States*, 403 U.S. 698 (1971) (per curiam) (Douglas, J., concurring) (defining "jihad").

In *American Freedom Defense Initiative v. King County*, No. C13-1804RAJ, 2014 WL 345245, at *7 (W.D. Wash. January 30, 2014), Judge Richard Jones offered a balanced definition of "jihad" (citations omitted):

> [T]he term "jihad" has several meanings, including: (1) "a holy war waged on behalf of Islam as a religious duty"; (2) "a personal struggle in devotion to Islam especially involving spiritual discipline"; (3) "a crusade for a principle or belief"; (4) "(among Muslims) a war or struggle against unbelievers"; (5) "(also greater jihad) Islam the spiritual struggle within oneself against sin."

to as "Ibacs"). The owner of the UK company, identified as "Individual #2, was a national of Bangladesh who traveled to Syria in 2014 to join ISIS and to "assist in its development of weaponized drone technology." ECF 120 at 10. He was killed on December 10, 2015, while fighting with ISIS. *Id.*

Defendant agreed that Individual #2 relied on "Individual #3," a Director of the UK Company, as well as on "Individual #4," an employee of the UK Company, to use financial and business accounts associated with the UK Company to send monies to defendant. *Id.* They also purchased drone technology for ISIS. *Id.*

"By utilizing the UK Company's name and business accounts, members of the conspiracy were able to conceal the true nature of their ISIS-related transactions." *Id.* The money transfers to defendant were "disguised" to avoid detection. *Id.* Similarly, the defendant attempted to conceal his identity to protect himself from exposure to law enforcement. *Id.* The defendant used devices and accounts with "alias names and/or fake addresses" (*id.*) to communicate "surreptitiously" with members of the conspiracy. *Id.* at 11.

The Stipulation states, in part, *id.* at 10:

The bulk of the monies were received [by defendant] through transfers from an online financial account associated with the UK Company, in some instances emanating from Bangladesh where Individual #3 was located, into ELSHINAWY's online financial account in the name of TheCheapMart, LLC, a business name he had previously registered in Maryland. One of the money transfers was received into an online financial account associated with ELSHINAWY's religious wife. The transfer was falsely disguised to appear as purchase of printers rather than a cash transfer. The last money transfer was sent to ELSHINAWY via wire from a location in Egypt in the name of another member of the conspiracy.

Further, the Stipulation recounts, *id.* at 10-11:

ELSHINAWY used various monikers to register business and social media accounts, such as "mojoeusa," "Mo Jo," "Black Eyes," and others, in order to conceal his identity. He then used those accounts, while in Maryland, to

18

communicate with other members of the conspiracy and facilitate its objectives. In addition to the use of social media, ELSHINAWY and members of the conspiracy utilized various other forms and methods of communication, in some instances registering devices and accounts under alias names and/or fake addresses, in order to conceal from law enforcement their criminal association, the substance of their communications, and their criminal activities. ELSHINAWY himself created and/or used various of these forms and methods to surreptitiously communicate with members of the conspiracy in order to facilitate the transfer of monies to him from ISIS operatives, to conceal his communications and activities with those operatives, and to provide those operatives with the ability to use and access communication accounts at will.

In addition, the defendant stipulated that he attempted to recruit his brother, Ahmed Elshinawy, to join ISIS. ECF 120 at 11. Ahmed Elshinawy resides in Saudi Arabia. *Id.* Among other things, the defendant told his brother that he had "plans" in the United States, for which he intended to remain in this country temporarily; he was "taking steps" to avoid detection; and he expressed his "desire" to "wage violent Jihad and die as a martyr." *Id.*

According to the Stipulation, defendant was interviewed by agents of the FBI in July 2015. At the time, defendant provided false information as to the total sum of monies he had received from ISIS operatives. *Id.* Moreover, he falsely claimed that he took the money "to defraud ISIS of funds." *Id.* In addition, defendant "mischaracterized the true nature and extent of his association with and relationship to, ISIS operatives and the support he had provided to ISIS." *Id.*

Soon after the first FBI interview of defendant, Elshinawy "took steps to block and erase his communications over social media with [Elkhodary], and exhorted his brother to do the same with his own social media account." *Id.* Defendant "also directed his brother to warn [Elkhodary] that he (ELSHINAWY) had been 'revealed and uncovered.'" *Id.*

## B. Other Evidence[8]

### 1. Background

Defendant, a United States citizen, was born in Pittsburgh, Pennsylvania in 1985. ECF 138 at 33. He is one of five children born to parents who are professionals with advanced degrees. *Id.*; *see also* ECF 138-12 at 1-19 (sworn statement of defendant's father, Yousef Elshinawy, M.D.); ECF 138-12 at 30 (statement of defendant's mother, Fatma Abdelaty, Ph.D.); ECF 138-8 (Aff. of defendant's sister, Mona Elshinawy, Ph.D.).[9] At the time of defendant's birth, his father was engaged in medical training at the University of Pittsburgh. ECF 138-12 at 8. It appears that the defendant's parents are not United States citizens, and they returned to Egypt when the defendant was three months old. ECF 138-12 at 30. The defendant grew up primarily in Egypt and Saudi Arabia, and attended college in Egypt. ECF 138 at 33.

Around 2007, the defendant began to travel between Egypt and the United States. He returned to the United States in 2007, but went back to Egypt in 2008. ECF 138 at 33-34. Then, in 2010, he again returned to the United States and married a woman who converted to Islam. *Id.* at 34. Due to problems with work and his marriage, defendant returned to Egypt in 2011. *Id.* However, the defendant again returned to the United States in November 2012. *Id.* at 35. According to the defendant, he was in "dire financial straits" and faced debt that was "overwhelming." *Id.* By the fall of 2014, claims defendant, his financial situation made him "susceptible to offers of easy money and travel to Syria from his childhood acquaintance, Tamer . . . ." *Id.*

---

[8] Given the volume of evidence submitted by both parties, it is difficult to summarize all of the facts. By referencing some facts and omitting others, I do not mean to suggest that the factual summary recounts all of the relevant information.

[9] The defendant's siblings are also quite accomplished. *See* ECF 138-12 at 8-10.

The government vigorously disputes that defendant's conduct was motivated by financial hardship. *See* ECF 145 at 25-26. It asserts, correctly, that a review of defendant' finances "does not paint the picture of utter desperation . . . ." *Id.* at 25.

## 2. Use of Social Media

This is not a case based on mere words. Nevertheless, the defendant's use of social media was both extensive and revealing. In particular, defendant's chats with his brother, Ahmed Elshinawy, and his friend, Tamer Elkhodary, are significant.[10]

### a. Chats with Tamer Elkhodary

In March 2014, defendant and Elkhodary had a chat via Facebook, in which Elkhodary encouraged defendant to "do jihad." ECF 139-9 at 7. According to the records obtained by the government, the two corresponded only occasionally over the next several months. During an exchange with Elkhodary on September 9, 2014, defendant said, ECF 139-9 at 12: "My heart is not able to accept what the infidels do to Muslims." Elkhodary responded, *id.*: "Allah willing, they will all be defeated and retreat, and we will behead . . . foreign tyrants . . . ." Defendant signified his agreement when he answered: "May God keep you safe." ECF 139-9 at 12.

As early as October 2014, defendant expressed his support of ISIS. In an exchange with Elkhodary on October 5, 2014, defendant praised "the end of Israel" and the "coming" of the Islamic Caliphate. Defendant also said, *id.* at 14: "Allah willing, the Islamic State is victorious." The next day, October 6, 2014, defendant asserted, *id.* at 17: "I now live with the Islamic State as if I were over there." A few days later, on October 10, 2014, defendant told Elkhodary that he "watch[ed] videos day and night in order to get the news." *Id.* at 20-21. Moreover, he told

---

[10] The chats are translated from Arabic. There is no dispute as to the accuracy of the translations. Notably, the government was unable to recover all of defendant's chats with Elkhodary and with his brother. ECF 193 (Tr. of 12/5/17) at 61.

Elkhodary that ISIS was becoming "more powerful," despite opposition from "60 Zio[nist]-Arab states . . . ." *Id.* at 20. And, defendant announced, *id.* at 21: "My heart is with the Islamic State." He asked Elkhodary, *id.*: "Is this really the Caliphate [?]", adding, *id.* at 22: "I think about the matter day and night."

By the fall of 2014, defendant indicated that he wanted to move to the Islamic State. On October 10, 2014, defendant told Elkhodary, via social media: "My wife and I will come, man. I want to live there, because the Islamic State is coming with a promise from our God. So, if it is the Islamic State, I just want to live there." *Id.* at 25. Elkhodary reminded defendant that Allah "disavowed those who dwell among the infidels." *Id.* After defendant inquired several times if "Shari'ah [law is] applied" in Rakka (*id.* at 25, 26, 27), he asserted, *id.* at 27: "[T]he westerner [*i.e.*, defendant] will be one of the most fierce mujhahidin if I am certain that this is the truth."[11] Elkhodary told defendant to "come to Turkey and, Allah willing, [he would] arrange everything" for defendant. *Id.* at 29. Elshinawy responded: "I am coming soon." *Id.* at 35.

Defendant then discussed with Elkhodary his plan to "save up for the ticket [a]nd expenses." *Id.* at 36. He noted that he needed "a tight plan to get out." *Id.* Elkhodary said, *id.*: "If you need money or anything, let me know." Defendant said, *id.* at 38: "I'm coming, Allah willing. Hopefully, the Lord will forgive my sins and grant us the rewards of jihad." And, he admonished Elkhodary "not [to] write anything on the Internet because it is all monitored." ECF 139-9 at 37.

In addition, defendant voiced complaints to Elkhodary about the United States. For example, defendant complained on October 10, 2014, that "surveillance [in the United States] is

---

[11] Elkhodary had previously referred to defendant as the "westerner" in a chat in January 2014. ECF 139-9 at 1. At that time, Elkhodary wrote to defendant: "How are you, westerner?" *Id.* In addition, defendant referred to himself as "westerner." *See* ECF 139-9 at 78.

horrible." *Id.* at 26. Defendant also complained that whenever he "come[s] to America" he is "stopped and searched" because of his "name and looks." *Id.* at 33.

Also on October 10, 2014, defendant discussed with Elkhodary "the situation here," (*i.e.*, the United States), claiming: "People are scared . . . They are now afraid of raising the banner of the State [*i.e.*, ISIS] in America and the declaration of Shari'ah." *Id.* at 30-31. Elkhodary responded, *id.* at 31: "May God grant us victory." And, defendant told Elkhodary, *id.* at 32: "[W]e must have a secret word in our talk for emergencies."

In the early months of 2015, Elshinawy pledged allegiance to ISIS. On February 17, 2015, Elshinawy told Elkhodary: "Between you an[d] me I pledged allegiance to the Amir." ECF 139-9 at 46. Elkhodary responded, *id.*: "Allah willing, you will benefit and be beneficial." Further, Elkhodary told defendant that he (Elkhodary) had personally "pledged allegiance to him [*i.e.*, the Amir], hand in hand." *Id.* at 47. Defendant responded: "If you give [al-Baghdadi] my regards and my allegiance [y]ou would have done me a favor." *Id.* at 56.

The government claims, correctly, that the Amir is a reference to Abu Bakr al-Baghdadi, the ISIS leader. *See* ECF 139-9 at 23. Indeed, in a chat between defendant and his brother on March 11, 2015, defendant specifically told his brother that Elkhodary had pledged allegiance to al-Baghdadi. *See* ECF 139-10 at 16.

Also on February 17, 2015, defendant observed, *id.* at 49: "Some of those who call themselves Muslims are allied publicly with the Christians to kill Muslims." He added, *id.* at 52: "[M]y soul is there [w]ith the mujahidin." In the same exchange, defendant proclaimed: "I am a soldier of the State [*i.e.*, ISIS], but temporarily away." *Id.* at 55. Elkhodary told defendant: "You are at a vulnerable point; through you, brother, we can either be defeated or victorious . . . you are now different than before . . . and don't tell anyone what you have in

mind . . . ." ECF 139-9 at 68-69. Defendant responded: "Of course not. It is a crime here. A very big one. If I meet our Lord while being, at least, faithful to Muslims, I may have hope for mercy." *Id*. at 70.

Elshinawy's entanglement with ISIS deepened. On March 2, 2015, Elkhodary told defendant, "Hurry." *Id.* at 74. Defendant indicated that he "need[ed] time to save money to manage [his travel] . . . ." *Id.* at 75. Elkhodary admonished defendant: "Do not talk openly." *Id.* at 78. During the chat, defendant said, *id.* at 83: "The westerner is sick of being in the West."

Thereafter, Elkhodary instructed defendant to download and install Telegram, an "app" that enables the use of encrypted communications, and defendant agreed to do so. *Id.* at 85-90.[12] Elkhodary also told Elshinawy: "I will have a brother call you now." *Id.* at 90. Elshinawy asked, "Trust worthy?" *Id.* at 91. Elkhodary responded, "I am with him." *Id.* The defense concedes that, after defendant activated the App, Elkhodary "connected [the defendant] to an unidentified individual in Syria." ECF 138 at 9.

Elshinawy subsequently contacted Elkhodary on March 6, 2015, and told him, "Allah willing, a huge blessing will happen." ECF 139-9 at 96. Elkhodary responded: "Most importantly do not talk with anyone, not even with me. May Allah protect you." *Id.* at 97.

In a chat on March 9, 2015, Elshinawy told Elkhodary: "I am getting things in order for myself. I will not come now. In a bit." *Id.* at 104. Several days later, defendant wrote: "I need a favor from you. A small message to deliver to our friend. I noticed that my phone is being monitored. The camera opens on its own at weird times. Tell our friend that I am preparing myself with the highest security measures and will contact him soon, Allah willing." ECF 139-9

---

[12] The defendant concedes that Telegram is an encrypted messaging application that "does not retain records of users' communications." ECF 138 at 9.

at 112-13.  On March 13, 2015, Elshinawy wrote to Elkhodary: "Done, all is perfect."  ECF 139-9 at 113.

As discussed, *infra*, defendant received his first monetary transfer from ISIS operatives on March 23, 2015.  ECF 139-6 at 8.  It was in the approximate amount of $1,500.  As noted in the Stipulation, the money was intended to fund a terrorist attack.

By April 2015, defendant's attack planning was underway.  On April 3, 2015, Elshinawy told Elkhodary, "Soon, you'll hear good news, Allah willing."  ECF 139-9 at 123.  Elkhodary told defendant to "Stay strong" and Elshinawy replied, "I am . . . ." *Id.*  Defendant also said: "I have many goals[.]  But going slow for safety."  ECF 139-9 at 124.[14]  "Praise be to Allah," responded Elkhodary, "You've always been a 'gangsta.'"  *Id.* at 125.  Elshinawy replied: "Exactly.  I'll come over when I am done, Allah willing."  *Id.* at 125-26.  He added: "I ask Allah, the Almighty, the Lord of the great throne to grant us righteousness, steadfastness, and faithfulness. . . . And this favor."  *Id.* at 128-29.  He also told Elkhodary: "I will be indebted to you for it, all my life . . . . How great it is when you show your brother the way to paradise."  *Id.* at 129.  Towards the end of their chat, defendant referenced "jihad" (*id.* at 133), and Elkhodary advised Elshinawy: "Be harsh in the killing of Allah's enemies."  *Id.* at 134.  Elshinawy responded, "Victory is patience for an hour[.]  Allah willing."  *Id.* at 135.

Elshinawy sought moral support for his attack planning in an exchange with Elkhodary on April 6, 2015.  Elkhodary asked defendant, "How are you doing?"  *Id.* at 137.  Elshinawy responded: "O' Lord.  I am passing through the hardest phase right now; Allah is the one who is sought for help."  *Id.* at 139.  Elkhodary advised, "[F]aithfulness.  May Allah make things easy for you."  *Id.*  "O' Lord," answered Elshinawy, "[we ask for] faithfulness and renewed

---

[14] The government suggests that "goals" referred to "targets."  ECF 139-6 at 10.

commitment." *Id.* at 140 (Bracket in original). Ten days later, on April 16, 2015, ISIS affiliates sent Elshinawy another $1,000. *See* ECF 139-6 at 10.

"Thanks be to Allah, I have found my dream project," proclaimed defendant on April 21, 2015, referencing an attack plan. ECF 139-9 at 165. He continued: "It was a source of anxiety; life without Islam as the main drive for life." *Id.* Defendant also wrote, *id.* at 166: "Allah willing, we will meet after I finish my work here." *Id.* at 166. In response, Elkhodary wrote: "Know that Allah is with us and will grant us victory. There is nothing holding us back from reaching paradise except for them to kill us. Honesty, and renewed commitment[.] The most important thing. Do you need anything?" *Id.* at 168-69. Elshinawy replied, "I need supplications. And renew my commitment, Allah willing." *Id.* at 170.

In the same chat, defendant asked Allah to "facilitate things." *Id.* at 171. "Hurry up, Shin," Elkhodary wrote. *Id.* at 172. "Soon," Elshinawy wrote back, "but you have to know that from my end, I am not behind -- on anything, thanks be to Allah[.] Just waiting on the . . . The other party." ECF 139-9 at 172-173. Later, defendant added, "Jihad builds up the soul[.]" *Id.* at 180.

By late April 2015, defendant was consumed with his "dream project." On April 22, 2015, Elshinawy wrote in a chat with Elkhodary: "By Allah, I am really eager to satisfy Allah Almighty[.]" *Id.* at 190. Then, defendant posed a question of significance, *id.* at 191: "I wanted to ask you. Is making a small thing with a silencer difficult or easy?" *Id.* at 191.[15] Elkhodary responded, "Definitely, there is something ready. It is much better to buy a slave than raising one." Elshinawy replied. "You are right. I hope to find one. . . . By Allah, I really hope so,

---

[15] By "small thing," the government suggests that Elshinawy was referring to an explosive. *See* ECF 139 at 64.

brother[.]  That's why I said that if I can not get one, I will make one[.]"  ECF 139-9 at 192.

Elkhodary replied, *id.* at 193:  "May Allah make it easy for you and for us."

Defendant told Elkhodary, *id.* at 194:  "Listen to the lessons of Sheikh Al-'Adnani.

Praise be to Allah.  By Allah, he says what exactly is on my mind."  Defendant also said, *id.* at

195-96:  "And may those servants of their government, who watered down the religion, as well

as the rulers and those who are not associated with the religion not harm you[.]  Allah willing,

the victory is for us, and humiliation is for them."  Defendant added, *id.* at 196:  "I will

completely dedicate my time for that matter, and Allah willing, all will be fine."

I pause to note that Aaron Zelin, the government's expert in terrorism and jihadi groups,

submitted a report in which he cited Abu Muhammed al-Adnani's call for ISIS supporters to

conduct attacks in their home countries as a major contributor to the "huge spike in various types

of attacks."  ECF 145-4 at 3.  At the sentencing hearing, Zelin testified that al-Adnani had

delivered a speech exhorting ISIS supporters in western countries to "conduct terrorist attacks in

their own home countries" rather than travel to the Middle East.  ECF 190 at 95-96.  Dr.

Sageman largely agreed with Zelin's assessment, and added that the attacks in western countries

were also "in retaliation [for] western bombings in Syria."  *Id.* at 109-10.

On April 25, 2015, Elkhodary told defendant to provide him with a phone number to

facilitate covert communications.  *Id.* at 199-204.  Then, on April 26, 2015, defendant said to

Elkhodary, *id.* at 215:  "[T]his matter has become the most important thing in my life.  I do what

I can to follow what I am told."  Elkhodary replied, *id.*:  "May Allah make your steps firm."  He

added, *id.* at 217:  "The entire village is waiting for you."  Defendant answered, *id.*:  "O God,

make it easy."  Elkhodary instructed defendant to "make sure to keep it secret."  *Id.* at 218.  And,

he said, *id.*:  "Rejoice, if you fear Allah, He will be with you, and He definitely will grant you

victory as He promised." The defendant recited the ISIS mantra to Elkhodary on May 1, 2015, exhorting jihad. ECF 139-9 at 219.

In a chat on May 9, 2015, defendant told Elkhodary: "Everyone is scared over here." *Id.* at 222. Elkhodary answered: "May Allah increase their fear." *Id.* Defendant signified his agreement, stating, *id.*: "Allah willing."

In an exchange on May 25, 2015, Elkhodary told defendant: "Be harsh in the killing of Allah's enemies." *Id.* at 234. Defendant responded, *id.*: "May our Lord keep you safe and grant you the highest level of paradise." Then, each said, "Amen." *Id.*

Defendant and Elkhodary communicated for the last time on July 14, 2015, a few days before the FBI approached defendant on July 17, 2015. ECF 139-9 at 240. Thereafter, Elkhodary attempted to contact defendant on July 18, 19, 25, and August 3, 2015, without success. *Id.* at 241-46. For example, on July 19, 2015, Elkhodary wrote: "Where are you, Chief? Why are you ignoring us? I want to check on you." ECF 139-9 at 244. Defendant did not respond.

### b. Chats with Ahmed Elshinawy

Defendant's brother, Ahmed Elshinawy ("Ahmed"),[17] has been described as an Islamic scholar. ECF 223 at 5. During the same general period in which defendant chatted with Elkhodary, he also had many conversations with his brother, also through social media. Ahmed seemed quite skeptical if not resistant to defendant's views of ISIS, and the two engaged in lengthy, intellectual discussions about their respective ideologies with regard to Islam. *See*, *e.g.*, ECF 139-10 at 12, 28, 49, 414. Defendant sought to persuade his brother as to his views, without success. *See*, *e.g.*, ECF 139-10 at 28.

---

[17] To distinguish defendant from his brother, I shall refer to defendant's brother by his first name.

In a discussion between defendant and Ahmed on March 11, 2015, defendant said: "My life is for Allah. If I die for the sake of Allah, then there is no problem." ECF 139-10 at 25. Defendant also informed Ahmed that he was "ready to pledge allegiance [to ISIS] soon[.]" *Id.* at 13. He explained: "This Emir is busy. I will do it soon." *Id.* at 16. And, he told his brother: "Tamer has pledged the allegiance with Abu Bakr Al Baghdadi personally." *Id.* Moreover, defendant disclosed that although Elkhodary was his "first connection," he now had his own "personal connection[.]" *Id.* at 18. Notably, defendant also stated that he had "become one of them[.]" *Id.* at 21.

On April 25, 2015, defendant complained that the police took his car because he did not have certain "papers" (ECF 139-10 at 79) and he would "have to pay a lot of money to get it back." *Id.* at 80. Then, he went on to express his desire "to go to Jihad." *Id.* He added, *id.*: "I do not have dreams or aspirations in this world except the Jihad. . . . I want just to go to Jihad and be with the Islamic State." Ahmed responded: "[W]e are not created for the Jihad only" (*id.* at 81), and defendant answered, *id.*: "Yes, of course, but I mean this is my project. Man, stop discouraging." *Id.*

During the chat, defendant also said, *id.* at 83: "Now I have a bigger project which will be my goal." He added, *id.* at 88: "I believe that today's best Jihad is the Jihad of war." And, defendant said: "I am working on a project but it needs a lot of time and effort." *Id.* at 98. When Ahmed asked if he could know of the project (*id.* at 99), defendant responded, *id.* at 100: "No. I cannot tell you here." But, he added that perhaps he could reveal it "on another place on the Internet." *Id.* Nevertheless, defendant claimed it was "a great project." *Id.*

In a discussion on April 27, 2015, defendant told his brother that he had "already pledged allegiance" to ISIS. ECF 139-10 at 122. When Ahmed inquired how defendant felt after doing

so, defendant responded, *id.*: "Finally, I am a Muslim with dignity and pride unlike the Jews and Christians . . . . I belong to a State and people who apply Shari'ah and the Islamic Caliphate." Defendant added that "true life is . . . waiting for death for the sake of Allah." *Id.* at 123. Defendant also disclosed to his brother that he had "received a lot of money." *Id.* at 125. Moreover, he said, *id.* at 126-27: "Now, this is the best motivation for repentance. This really needs a man to ponder over the matter with himself[.] Specially when it involves death."

During a chat on April 28, 2015, Ahmed mentioned the riots in Baltimore. ECF 139-10 at 145.[18] Notably, defendant laughed in response (*id.*) and said, *id.* at 146: "Let them burn the police." He added, *id.*: "They are all [a] bunch of infidels attacking each other."

In a chat on May 4, 2015, defendant complained about comments made by Saudi sheiks as to the two shooters killed in Garland, Texas at "a festival promoting offensive cartoons of the Prophet." ECF 139-10 at 150. Defendant lamented that "the Sheikhs will call [the assailants] terrorists . . . exactly what the infidels call them." *Id.* Then, on May 22, 2015, defendant asked his brother: "When are you going to join the succession?" *Id.* at 162. Ahmed responded, in part, *id.* at 163: "Later I might join you."

Weeks later, on June 28, 2015, while on Facebook, defendant and Ahmed engaged in a lengthy, philosophical discussion about ISIS. *See* ECF 139-10 at 266-437. Defendant declared to his brother: "Killing the apostates is allowed." *Id.* at 414. Ahmed told defendant that in order to perform jihad, one needs the permission of his parents. *Id.* at 428-29. To support his view, Ahmed related the story of Uwais al-Qarani, a follower of the Prophet Mohammed, who did not travel to see the Prophet because he was caring for his mother. *Id.* at 432-35. Uwais nonetheless

---

[18] The riots erupted in April 2015 following the death of an African-American man named Freddy Gray. Mr. Gray was injured while in police custody following his arrest, which some regarded as illegal, and he later died from his injuries.

is remembered as being an admirable follower of Mohammed. *Id.* at 434. Ahmed suggested that, just as Uwais did not travel to see the Prophet because he was caring for his mother, defendant should not travel to the Islamic State out of kindness to their mother. *Id.* at 435. Defendant said, *id.* at 436: "That story touched me so much."

On July 8, 2015, some nine days before the FBI interviewed defendant for the first time, defendant wrote to his brother: "I am convinced with the story." *Id.* at 442. When Ahmed asked, "which story?," defendant responded: "That last one you told me about." *Id.* at 443.

Defendant asserts in his Sentencing Memorandum that, as a result of this story, defendant "decided not to travel to Syria." ECF 138 at 13. He cites to ECF 138-2, which is an excerpt of various chats. There is no indication in the chats that defendant affirmatively abandoned his plans to travel to Syria. In any event, a decision not to travel to Syria is not tantamount to a decision by defendant to abandon his pledge to ISIS and its terrorist purposes. And, as discussed, *infra*, on July 11, 2015, and other dates, defendant accessed online material that makes clear his continued commitment to ISIS.

In a chat on August 12, 2015, Ahmed told the defendant that he (Ahmed) had been contacted by Elkhodary, who was trying to reach the defendant. *Id.* at 456-57. Elshinawy instructed Ahmed not to provide his contact information. *Id.* at 458. Defendant explained that he had "deleted" Elkhodary from Facebook. *Id.* at 457.

Elkhodary continued his efforts to contact defendant via Ahmed, and Ahmed shared that information with defendant on August 15, 2015. ECF 139-10 at 461-62. Defendant explained to Ahmed that he had "blocked" Elkhodary and "severed any contact with him." *Id.* at 462-63. Defendant added: "Because everywhere around me must be monitored by now." *Id.* at 463. And, defendant said, *id.* at 464: "It's a very big matter." Then, on August 26, 2015 (*id.* at 467)

and again on August 31, 2015 (*id.* at 468), Ahmed reported that Elkhodary was still trying to reach him concerning defendant. Elshinawy said, *id.* at 471-72: "Tell him that Mohamed's cover has been completely blown. You just tell him that sentence. That is it, do not talk anymore."

Ahmed was interviewed on the record by defense counsel on October 11, 2017. ECF 138-6. He is very close with the defendant. *Id.* at 9-10. Ahmed stated that in 2015 the defendant "was trying to convince" Ahmed that he, the defendant, was "right" with regard to his religious beliefs. Ahmed described the defendant as "confused." *Id.* at 19.

### C. Money Transfers and Purchases

On March 18, 2015, ISIS affiliates made the first attempt to transfer money to Elshinawy. In particular, ISIS attempted to transfer $1,500 through the wire service MoneyGram. ECF 139-6 at 8; ECF 139-8 at 1, 4. Although that transaction failed, during the search of defendant's Maryland residence in October 2015, the FBI found a handwritten note containing reference information for the transfer. ECF 139-6 at 8; ECF 139-8 at 9.

ISIS affiliates successfully transferred about $1,500 to Elshinawy on March 23, 2015.[19] *See* ECF 139-6 at 8. Then, on March 29, 2015, Elshinawy wrote to Elkhodary, "Soon, Allah willing, I will have a phone on which we can talk any time." ECF 139-9 at 120. Two days later, on March 31, 2015, the defendant purchased a cell phone and an HP laptop at a local Walmart. *See* ECF 139-6 at 10. On April 2, 2015, Elshinawy activated the phone and registered it under the alias "Black Eyes," with the address "earth planet, Aberdeen, Maryland." *Id.*; *see also* ECF 193 at 81-82. Jonathan Cobo, an FBI Staff Operations Specialist, testified that the phone was

---

[19] Because of fees associated with the transfers, defendant did not receive the full amounts of the transferred funds. For purposes of this Memorandum Opinion, the discrepancy is not material.

primarily for data usage.  ECF 193 at 59.  This phone account was deactivated on May 3, 2015.  ECF 139-6 at 10.

On April 16, 2015, ISIS affiliates sent Elshinawy approximately $1,000.  *See* ECF 139-6 at 10.  Defendant received another transfer of funds through Ibacs on May 1, 2015, in the sum of about $1,000.  ECF 139-6 at 11.  The next day, on Facebook, defendant reiterated his commitment to ISIS.  ECF 139-6 at 11.  Then, on May 14, 2015, defendant received a transfer of funds from the UK Company, in the approximate amount of $3,000.  *Id.* at 12.

Defendant purchased another phone on May 18, 2015.  ECF 193 at 86.  He registered it under the alias David John.  *Id.* at 59, 86.  The phone was used until June 18, 2015.  *Id.* at 59.  Notably, it was utilized extensively for data usage; defendant consumed three gigabytes of data in the one month that he used the phone.  *Id.*

Defendant received yet another transfer of funds from Ibacs on June 7, 2015, in the amount of about $1,300.  ECF 139-6 at 11.  The transaction was falsely characterized as payment for an eBay purchase of two Canon printers for shipment to the Ibacs office in Cardiff, Wales.  *Id.*  Thereafter, on June 28, 2016, defendant received his last monetary transfer.  In particular, he received a Western Union wire transfer from Mohamed Elbarbary, an individual located in Egypt, in the amount of $1,000.  *Id.* at 16.

On July 1, 2015, while at a Walmart in Baltimore County, Maryland, defendant purchased two prepaid Samsung cell phones.  *See* ECF 193 at 92; ECF 139-6 at 16.[20]  Defendant also changed his cell phone number.  ECF 193 at 92.

As noted, defendant received a total of about $8,700 from ISIS.  A review of bank and business records indicates that the defendant spent at least $1,350 of the money he received from

---

[20] The purchase followed a traffic stop of defendant by local police, which occurred late on June 30, 2015.  ECF 193 at 92.

ISIS to purchase communication devices, such as phones, calling cards, a laptop computer, a hotspot for internet access, and a virtual private network ("VPN"). PayPal records defendant's use of two PayPal accounts. Defendant converted almost $3,000 into cash between March 30, 2015 and May 17, 2015, which is not accounted for in terms of deposits or expenditures. *See* ECF 193 at 63; ECF 208 at 4. And, defendant used a portion of the funds for personal expenses, such as the purchase of furniture.

Of note, Mr. Zelin's report indicated that "there has only been one case in the United States where IS[IS] has provided funds to an individual to conduct an attack on its behalf. That is the case of Mohamed Elshinawy." ECF 145-4 at 4.

### D. FBI Interviews

Defendant was interviewed by the FBI on four occasions: July 17, 2015; July 20, 2015; July 22, 2015; and July 27, 2015. ECF 138-9 at 2; *see also* ECF 138-11.

The FBI conducted the first of several interviews with the defendant on July 17, 2015. ECF 138-10 (FBI Form 302); ECF 138-11; ECF 145-2 at 1-9 (excerpts). In that interview, conducted at defendant's residence in Maryland, defendant admitted that he received money from ISIS to be used to conduct a terrorist attack in the United States. ECF 138-10 at 6. But, he claimed he never intended to conduct an attack, nor did he receive guidance as to weapons or methods. *Id.* Rather, he "needed money and saw an opportunity to take" it from "'the world's most dangerous group'. . . ." *Id.* He stated that he took the money "to scam ISIL . . . ." and used it to pay bills and to buy furniture. *Id.* Elshinawy also told the agents that he only received a total of $4,000 from an overseas ISIL operative. *Id.*

During a second interview with FBI agents on July 20, 2016, defendant explained what he viewed as ISIS's motivation for wanting to attack the United States. He said, ECF 145-2 at 3:

"If they hurt the United States, that means they are comparable [sic] of being a big power just like the United States." He also gave the FBI the phone number he had for "the money guy." ECF 145-2 at 4.

The third interview occurred on July 22, 2015, at a Starbucks coffee shop. *See* ECF 138 at 18. At that meeting, defendant said, ECF 138-11 at 23: "I wanna know like my legal situation. I wanna know and I'm like if we are in trouble 'cause if I'm in trouble then I should go ahead and try to get myself out of trouble…, get a lawyer on my case and stuff like this but then we will be in separate ways."

In an FBI interview of defendant on July 27, 2015,[21] the defendant again denied that he planned to conduct an attack for ISIS. ECF 145-2 at 10-16. He expressed a view that Elkhodary was also "living off" ISIS without doing anything for them. *Id.* at 10. But, defendant amended his earlier statement as to the amount of money he had received. He claimed that he had received no more than $5,200 from an ISIS operative. *Id.* at 11. In fact, as stated, he had received about $8,700. Notably, defendant acknowledged that he was told by his ISIS contact to undertake "Anything . . . destructive, go ahead and do it. Anything that hurts people, go ahead and do it . . . anything, anywhere, do anything!" He agreed that the caveat was "[a]s long as it is in the United States." *Id.* at 15.

### E.  Dr. Sageman

Marc Sageman, M.D., Ph.D., was called by the defendant and received as an expert in terrorism, counter-terrorism, and psychiatry. His credentials are impressive. Dr. Sageman's

---

[21] The government's timeline (ECF 139-6) shows that the defendant was interviewed on July 17 and July 20, 2015, but not July 27, 2015. *Id.* at 18. But, ECF 145-3 at 10 is labeled "July 27, 2015, Meeting with FBI . . . ." At one of the sentencing hearings, the government acknowledged the inadvertent omission of the July 27, 2015, interview on ECF 139-6. The government's timeline also omits any reference to the July 22, 2015 interview.

report is docketed at ECF 138-4. In preparation for the report, Dr. Sageman reviewed the extensive discovery in this case and interviewed the defendant at length. *See* ECF 138-4; ECF 192 (Tr. of 12/2/17) at 45. Dr. Sageman also reviewed defendant's proffer statements.

He opined that "the objective evidence was overwhelming that [the defendant] certainly had a desire to go to Syria and join the Islamic State." ECF 192 at 48. Indeed, Dr. Sageman testified that from about October 2014 to June 2015, it was "very obvious," from defendant's Facebook dialogue with Elkhodary, that the defendant wanted to join ISIS and "fight on its behalf" as "a soldier . . . ." *Id.* at 48-49. However, according to Dr. Sageman, the defendant "changed his mind in June of 2015" as to his plans and merely wanted "to live in the caliphate . . . ." *Id.*

In addition, Dr. Sageman testified that the defendant "never really wanted to recruit his brother," Ahmed, to join ISIS. ECF 192 at 53-54. Rather, "he would have liked to have his brother go with him . . . ." *Id.* at 54. But, Dr. Sageman maintains that Ahmed eventually talked defendant out of joining ISIS. *Id.* at 54-55.

Dr. Sageman claimed that although the defendant "wanted to conduct an attack," the "nature of the attack was very vague." ECF 192 at 51. According to Dr. Sageman, "several targets were discussed" but none was ever determined. *Id.* at 51. The Garland, Texas incident in May 2015 was merely provided to defendant as a "model of an attack." *Id.* at 52. Dr. Sageman recognized that the defendant regarded the attack as a "project." *Id.* Nevertheless, he claimed that defendant did not intend to commit suicide in the attack, although he was "happy [to] die in the path of . . . Allah." *Id.* at 53.

Further, Dr. Sageman conceded that the defendant "lied to the government about his past plan to join the Islamic State and his past plan to carry out a terrorist attack on its behalf." *Id.* at

61.  But, Dr. Sageman testified that the defendant "already had given up those plans" by the time the FBI interviewed defendant in July 2015.  *Id.*

According to Dr. Sageman, the period from mid-February 2015 to late April 2015 is particularly relevant.  During that period, Elshinawy was in frequent contact with Elkhodary.  Of import here, Dr. Sageman, the defendant's own expert, opined that "the evidence is overwhelming that [the defendant] tried to conduct an attack in the United States, or at least desired to conduct such an attack, for about two-and-a-half months."  ECF 192 at 50-51; *see also id.* at 128.  Further, Dr. Sageman said:  "[F]or two-and-a-half months, [the defendant] was very dedicated to carrying out an attack here in the United States."  *Id.* at 64.  Although Dr. Sageman maintains that the defendant is currently not dangerous (*id.* at 64-66), he acknowledged that in the winter and spring of 2015, the defendant was "very dangerous."  *Id.* at 67.

## F.  Concealment

Defendant went to great lengths to conceal his online remarks, as well as his online activities.  As early as March 2014, defendant advised Elkhodary to "turn off the location on [his] cell phone" to avoid detection of his location.  ECF 139-9 at 5.   Defendant also noted on October 10, 2014, that he took steps to avoid detection because "the internet is monitored here in America."  *Id.* at 21; *see also id.* at 37 (reiterating that the internet is monitored).  And, on May 18, 2015, defendant told Ahmed to "delete [their] chats . . . Do you understand?"  ECF 139-10 at 157.  Defendant gave a similar instruction to his brother on June 30, 2015.  *Id.* at 439.

The defendant admits that he used encrypted applications, such as Telegram and Surespot, TOR ("The Onion Router"), and other systems to prevent detection.  ECF 138 at 9; ECF 223 at 6.  He also used proxy servers and VPNs "to mask his online accounts, such as Facebook, gmail, and Paypal."  ECF 223 at 6.  On July 13, 2015, he accessed a video on the use

of a software program, TrueCrypt, for instruction on encrypting files. ECF 193 at 56-57. Such conduct supports the conclusion that defendant acted with nefarious purpose.[22]

As noted earlier, Elkhodary instructed defendant to install Telegram, for the purpose of encrypted communications. ECF 139-9 at 85-90. Defendant concedes that he used one of his phones to talk via Telegram. ECF 138 at 9. Cobo, the FBI Staff Operations Specialist, testified that the government could not recover any of defendant's communications via Telegram. ECF 193 at 61. Further, defendant concedes that there are no records of these conversations. ECF 138 at 9. To the extent that the government recovered any records of communications via Surespot, another encrypted medium, the records did not include content. ECF 193 at 61-62.

On July 17, 2015, defendant consented to a search of his Dell and HP laptop computers. *See* ECF 138-10 at 7, 9, 10. Although the government recovered important information from defendant's computers, it was unable to make a complete recovery because of the defendant's use of encryption. ECF 193 at 63. A forensic examination of defendant's laptop computers revealed defendant's use of highly sophisticated means to avoid detection. For example, he used a Linux-based operating system, "Ubuntu," in lieu of the Windows Operating System installed by the manufacturer. *See* ECF 138-12 (expert report of Susi Hajeski, FBI computer scientist); ECF 223 at 6; *see also* Hajeski testimony, ECF 192 (Tr. of 12/4/17); ECF 193 (Tr. of 12/5/17).

Susi Hajeski, an FBI employee, was received as an expert in computer science. ECF 192 at 178. She testified at length about the many ways in which the defendant obfuscated his identity and his communications while using the internet and social media. Among other things, as noted, he used a Linux operating system on his computers. *Id.* at 215. In 2015, Linux held a

---

[22] The defense maintains that the defendant's use of proxy servers "to disguise the location of his IP address predated the period in which he received money from ISIS. ECF 223 at 7; *see* 139-1 at 5. This is of no moment.

1.6% market share, worldwide.  *Id.* at 217.  Hajeski explained that one must have the technical

ability to use it.  *Id.* at 217-18.  Moreover, the defendant configured the Ubuntu version of the

Linux operating system with "two very specific options[.]"  *Id.* at 218.  These were a Logical

Volume Management ("LVM") and a Linux Uniform Key System ("LUKS"), for encryption.  *Id.*

at 218; *see also* ECF 223 at 6.  According to Hajeski, there is no way "to break into the LUX

[sic] encryption[.]"  *Id.* at 219.

A thumb drive was also recovered from defendant's computer.  ECF 192 at 219.  It can

be used "in place of the hard drive inside the computer," in order "to bypass the internal hard

drive . . . ."  *Id.* at 220.  Because files created while running the operating system are saved to the

thumb drive and not the hard drive, there is no trail on the hard drive as to the user's activities.

As Hajeski put it, "nothing ever shows up on the computer."  *Id.*

The FBI also found evidence of defendant's use of "a virtual machine" ("VM") on his

computers.  *Id.* at 223.  Hajeski explained, *id.* at 220-21:  "You can delete it as soon as you close

it out.  And then it's erased forever."  In other words, defendant could ensure that his activity on

the VM was inaccessible, including as to the websites that he accessed.

Clearly, defendant's conduct ensured that the record of his conduct and his statements is

incomplete.

### G.  The Searches and Forensic Analysis

The grand jury and the government issued countless subpoenas for records in connection

with this case.  *See*, *e.g.*, ECF 138-9.  In addition, search warrants were also issued.  *Id.*  I need

not (and cannot reasonably) discuss all of the evidence that was obtained.  I will, however,

highlight some of the information obtained through this process and the ensuing forensic

analysis.

The FBI searched defendant's Maryland residence on December 11, 2015. It recovered a large box containing numerous newspaper articles about ISIS, including as to the San Bernandino and Paris terrorist attacks. ECF 139-7; ECF 193 at 45-49; ECF 145, Govt. Ex. 13 at 3-41.[23] The newspapers were dated between November 2, 2015 and December 7, 2015, and included *The New York Times*, *The Washington Post*, *The Wall Street Journal*, *The Baltimore Sun*, and *The Washington Times*. Almost every one was found opened to an article about ISIS. Govt. Ex. 13 at 3-41; ECF 193 at 45-49. As the government aptly puts it, these news articles are a clear "indicator of the defendant's true mindset . . . ." ECF 145 at 28.

The government called Alexandra Kassirer as a fact witness. Ms. Kassirer is the Director of Counter-Terrorism at a company known as Flashpoint, a New York cybersecurity and intelligence firm. ECF 192 (Tr. of 12/4/17) at 133. Her report is docketed at ECF 139-11. Kassirer specializes in terrorist communications, particularly online communications, including monitoring the areas in which "these actors operate." ECF 192 at 135. She described it as "the deep and dark web . . . ." *Id.*[24]

Kassirer related that various items of significance were recovered from the defendant's Dell laptop. ECF 192 at 141. The computer contained official ISIS propaganda. *Id.* at 141,

---

[23] Curiously, government Exhibit 13 does not appear on the docket as an exhibit to ECF 145. However, government Exhibit 13 was included with the courtesy copy of ECF 145 that was provided to the Court.

[24] In *United States v. McLamb*, 880 F.3d 685, 686 (4th Cir. 2018), the Fourth Circuit explained: "The dark web is a collection of encrypted networks providing strong privacy protections to its users." *Id.* The Court also said: "The Onion Router ("TOR") is an encrypted online network, one of several networks that make up the dark web. TOR uses a series of relay computers to mask the identity of online users. As a result, TOR obscures how, when, and where users access the internet." *Id.* at 688.

Kassirer characterized TOR, referenced earlier, as an "anonymizing browser." ECF 192 at 151.

143.[25]  It also contained information from mainstream news outlets.  *Id.* at 145-46.  One of the items was accessed on July 11, 2015, and came from ISIS's "official Anbar provincial media office out of Iraq."  *Id.* at 143.

The laptop also revealed that in July 2015 defendant accessed a screenshot of an official ISIS video released in November 2014, titled "Although the Disbelievers Dislike It."  ECF 139-5 at 4; ECF 139-11 at 4-5.  The video included footage of the remains of American Peter Kassig, who was beheaded by ISIS.  ECF 139-11 at 4.  On August 12, 2015, the defendant accessed an image of a severed head of an individual, adjacent to an ISIS flag.  ECF 192 at 152.  It was "an official piece of [ISIS] propaganda."  *Id.* at 153.

Defendant's phone and broadband accounts revealed items of ISIS and terrorist materials that were accessed by defendant or downloaded, including *after* defendant's interviews by the FBI.  *See* ECF 139-2; ECF 139-3; ECF 139-4; ECF 139-5.  Indeed, several items were accessed from his cellphone or broadband accounts in the period between October and December 2015.  *See*, *e.g.*, ECF 139-2 at 4-7; ECF 139-3 at 129-153; ECF 139-3 at 161; ECF 139-3 at 175-76.  These included ISIS-specific blogs, images of ISIS fighters and propaganda, and images of global terrorist attacks.

On September 7, 2015, the defendant accessed a photograph of Abu Bakr al-Baghdadi.  ECF 192 at 146.  The defendant accessed information on September 10, 2015, which appeared "to come from mainstream media."  *Id.* at 146; *see also id.* at 145.  It depicted fighters in Somalia, Shabaab mujahideen.  *Id.* at 146.  A week later, on September 15, 2015, the defendant accessed an image of Osama bin Laden, Al-Qaeda's former leader, and a video.  ECF 192 at

---

[25] Kassirer explained the difference between official propaganda from ISIS and material available generally on the web.  *Id.* at 154.

150.[26] Kassirer referenced a quote from the "AQ leader" (ECF 192 at 150), stating: "We declare jihad against the US government because the US government is unjust, criminal and tyrannical." *Id.* at 151.

On October 9, 2015, the defendant accessed an image that was "not an official piece of propaganda." ECF 192 at 144. The image depicts "mass individuals [who] are carrying a flag that ISIS frequently uses as its own, the black flag with the Shahada, or the declaration of faith." *Id.* at 144. And, on October 10, 2015, the defendant accessed a photograph of Ibn Al-Khattab. *Id.* at 144.

In Kassirer's report, she identified other relevant material accessed by defendant. For example, she identified a photo of Pamela Geller, a critic of Islam who organized a cartoon contest in Garland, Texas in May 2015, in which participants "lampooned the Prophet Muhammad." ECF 139-11 at 7. She related that the event became the site of an attempted mass shooting by two ISIS supporters. *Id.* *See also* ECF 139 at 55-56 (detailing items accessed by defendant through his broadband accounts).

Cobo also testified for the government as to items recovered from defendant's computers, phones, and broadband accounts. *See* ECF 193 at 26. Some of his testimony duplicated that of Kassirer. Cobo reviewed government exhibits 2A, 2B, 3A, and 3B, docketed, respectively, at ECF 139-2; ECF 193-3; ECF 139-4; and ECF 139-5. The exhibits are noteworthy, and include digital material accessed by defendant, some of which was captured by the government in real time. *See*, *e.g.*, ECF 193 at 28.

On July 6, 2015, defendant accessed images of executions performed by ISIS. ECF 193 at 32. On July 19, 2015, just two days after defendant's first interview with the FBI, he accessed

---

[26] In her report, Kassirer spelled the first name as "Usama." *See* ECF 139-11 at 6.

another image of a beheading and also streamed a video of a beheading. *Id.* at 34, 93. He again accessed a video of a beheading and a "still shot" of a beheading on September 9 and September 10, 2015, respectively, and the photo showed the ISIS flag. *Id.* at 40-41.

Defendant's activity on July 11, 2015, is relevant in light of defendant's claim that, as a result of his chats with his brother in late June and early July of 2015, he abandoned his plan of attack. On that date, defendant accessed an article about ISIS, found on his Dell laptop. ECF 193 at 53-54. He also accessed an item written by Abu Bakr Al-Barqawi. *Id.* at 54-55. It "outlines the benefits of establishing a caliphate . . . and how the goal . . . is to defeat the global infidel system." *Id.* at 55; *see also* ECF 139-4 at 14.[27] The government also recovered from defendant's Dell laptop an article accessed on July 11, 2015, outlining five "points" that are required "to become a mujahideen, that is a fighter for Allah." ECF 193 at 55. Point Four calls for "educating mujahidin on many political issues" in order to learn of "political jihad." ECF 139-4 at 16.

As late as November 30, 2015, defendant accessed images of government buildings in Baltimore, via his phone, which were captured by the government in real time. ECF 193 at 41-44. These included the Federal Reserve Building, the DEA building, the Customs House, and a U.S. Coast Guard ship docked at the Inner Harbor in Baltimore. *Id.* at 41-43.

In addition, the data on the defendant's broadband and phones contained images of other terrorist attacks. ECF 193 at 35. These included the attack by al-Shabaab on the Westgate Mall in Nairobi, Kenya, in which 67 people were killed. *Id.*

---

[27] Like so many other items of relevance, the article was translated from Arabic.

## IV.    Discussion

Defendant has pleaded guilty to offenses that are eligible for the terrorism enhancement under U.S.S.G. § 3A1.4.  The question here is whether, under 18 U.S.C. § 2332b(g)(5)(A), the offenses were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  By a preponderance of the evidence, I conclude that they were.

In his opposition to application of the terrorism enhancement, defendant maintains that three facts are "immutable" in this case.  ECF 199; ECF 143 at 3:  (1) Defendant did not carry out any terrorist operation; (2) to the extent the defendant had been planning a terrorist operation, he ceased activity before the first interview with the FBI on July 17, 2015; and (3) during defendant's consensual interviews with the FBI, he confessed to his association with ISIS and his receipt of money from ISIS.  Moreover, the defendant also contends that he "never spent the money . . . for this purpose" and he "never formulated any particular or specific terrorist plot in the United States."  ECF 230.  As a result, defendant contends that "[t]here is no evidence from which this Court may make a factual finding that Mr. Elshinawy possessed the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government."  ECF 143 at 3; *see also* ECF 138 at 26.

I am satisfied that the evidence demonstrates that (1) Elshinawy was well aware of ISIS's terrorist purpose; (2) he supported that terrorist purpose; and (3) he intended to carry out a terrorist attack in the United States for the purpose of influencing or affecting the conduct of government and for intimidation.  Even assuming the truth of defendant's "immutable facts," the terrorism enhancement applies.

It is undisputed that Elshinawy knew of ISIS's terrorist purpose and of its terrorist tactics. Defendant also agreed in the Stipulation that he knew ISIS is a foreign terrorist organization. ECF 120 at 9. A search of defendant's apartment recovered a large box of articles about ISIS and the terrorist attacks associated with it, including the attacks in Paris and San Bernadino. *See* ECF 139-7. His laptop computer contained, *inter alia*, graphic and vile videos and photos of beheadings and other executions by ISIS, as well as material concerning violent terrorist attacks. *See, e.g.*, ECF 139-11 at 4; ECF 193 at 32, 40, 41, 93. Moreover, defendant discussed with Elkhodary the killing and beheading of "the Arab and foreign tyrants and their low-life evil scholars." ECF 139-9 at 12.

Citing *Chandia III*, 675 F.3d at 340, the defense asserts that "the Court cannot rely on the defendant's mere knowledge of the terrorist organization's purpose, or the terrorist purpose of the defendant's co-conspirators." ECF 138 at 24. Of course, "knowledge of . . . terrorist purposes . . . does not alone show that [the defendant] had the intent required for the terrorism enhancement." *Chandia II*, 395 F. App'x at 59. Here, however, defendant affirmatively intended to advance the terrorist purpose of ISIS.

Elshinawy did not regard himself as a mere observer to the activities of ISIS. He pledged his allegiance to ISIS and the ISIS leader. ECF 139-9 at 46. He told Elkhodary, ECF 139-9 at 52: "[M]y soul is there [w]ith the mujahidin." Defendant considered himself "a soldier of the State [*i.e.*, ISIS], but temporarily away." *Id.* at 55. He praised Abu Muhammed al-Adnani, the ISIS spokesman who called for ISIS's supporters abroad to carry out attacks at home, recommending al-Adnani's speech to both Elkhodary (ECF 139-9 at 194) and his brother. ECF 139-10 at 104. Again and again, he hoped aloud for "victory" for the Islamic State. *See, e.g.*, ECF 139-9 at 17, 106, 183, 196.

According to Elshinawy, his speech, "standing alone," does not satisfy the requisite intent for the terrorism enhancement. ECF 143 at 4. Defendant insists that there is no basis to support a factual finding that he "possessed the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against the government." ECF 143 at 3; *see also* ECF 138 at 26. In defendant's view, the government asks the Court to find specific intent "from a generalized commitment to conduct an unspecified attack." ECF 143 at 4. He insists: "No court . . . has ever held that the 'contemplated commission of a terrorist act gives rise to an inference of the requisite specific intent.'" *Id.* (citation omitted). In this regard, the defendant maintains that his communications with his brother and Elkhodary lack any "nexus to government conduct." ECF 138 at 4. And, defendant characterizes his communications with Elkhodary as merely "aspirational" in terms of his desires, such as his hope that "ISIS would be victorious." *Id.* at 5.

Defendant's speech does not stand alone; this is not a case of mere words. It is clear that defendant was committed to jihad; he had in mind a terrorist "project," *i.e.*, a plan of attack, and he was working towards accomplishing it. It is of no moment that an attack was not consummated by defendant; inchoate offenses are subject to the enhancement. *See*, *e.g.*, *Wright*, *supra*, 747 F.3d at 407. As the Fourth Circuit said in *Abu Ali, supra*, 528 F.3d at 264: "By definition, conspiracy offenses do not require that all objects of the conspiracy be accomplished."

Defendant's receipt of funds from ISIS to commit a terrorist attack in the United States is acutely significant. Defendant attempts to minimize the import of the funds he received from ISIS. He points out that he spent the money he received from ISIS "quickly," ECF 138 at 35; the "majority" of the expenditures were for personal expenses; and his bank account was sometimes

overdrawn. *Id.* at 36; *see* ECF 138-14 (Affidavit of Jules Dorner, Investigative Consultant).[28] Nevertheless, it is undisputed that defendant used some of the ISIS money to purchase phones and a computer, and the devices were used to communicate with Elkhodary and other persons associated with ISIS. *Id.* Notably, the evidence suggests that defendant is the only person known to have received ISIS funds for an attack in the United States. *See* ECF 145-4 at 4.

It is clear that the money was given to defendant by ISIS, and accepted by defendant from ISIS, for the express purpose of committing a terrorist attack in the United States. Defendant admitted that he was instructed by ISIS to commit a destructive act in the United States (ECF 145-2 at 15); he was committed to carrying out his "dream project," which was a coded reference to an attack plan (ECF 139-9 at 165); and he inquired about obtaining or building a "small thing" with a "silencer," which the governments suggests refers to an explosive device. *Id.* at 191-92. I am unaware of any alternative explanation from the defense.

ISIS has a goal of influencing or affecting the conduct of government by intimidation or coercion. Mr. Zelin's report indicates that an increase in home-grown attacks has led "law enforcement in the United States and Europe . . . to make a number of difficult decisions" about how to prioritize immediate threats. ECF 145-4 at 4. Elshinawy himself explained to the FBI agents that ISIS's "strategy" is to "[b]e destructive everywhere." ECF 145-2 at 16. He compared an ISIS-style terrorist attack to "the cinema guy that just shoot[s] people," presumably referring to the attack in Aurora, Colorado. *Id.* But, he elaborated, an attack like that "doesn't make people scared as if this was terrorism. . . . [T]errorism is . . . more of a fear than just . . .

---

[28] As the government points out (ECF 145 at 25), the defendant's records were incomplete. Among other things, they do not include the PayPal credit/debit card to which most of the ISIS funds were transferred. *See* ECF 208-1 at 25.

someone who went crazy." *Id.* He explained, ECF 145-2 at 3: "If [ISIS can] hurt the United States, that means they are comparable [sic] of being a big power just like the United States."

Beyond that, however, Elshinawy also expressed a desire to retaliate against "rulers" and government conduct. He believed that "we have been living for a while under rulers and scholars who facilitated for the rulers their injustice and humiliation of Muslims." ECF 139-9 at 14. He complained about being profiled because of his name and appearance. *Id.* at 33. Following his praise of al-Adnani's exhortation to ISIS supporters to attack in their own countries, defendant said, *id.* at 195-96: "And may those servants of their government, who watered down the religion, as well as the rulers and those who are not associated with the religion not harm you . . . . Allah willing, the victory is for us, and humiliation is for them."

*Chandia III* shows that the provision of material support to a terrorist organization, with the intent to further the organization's terrorist purpose, is sufficient to sustain an application of the terrorism enhancement. 675 F.3d at 340. This standard is easily met here. Elshinawy's own expert, Dr. Sageman, determined that for at least a two-month period in 2015, defendant "was very dedicated to carrying out an attack here in the United States." ECF 192 at 64.

Defendant points out that he had "ceased communicating with any other member of the conspiracy by July 15, 2015—two days before the FBI first questioned him." ECF 138 at 36. And, he notes that he ignored repeated attempts by Elkhodary to communicate during late July and August 2015. ECF 143 at 6. The evidence, recounted earlier, does not support the conclusion that defendant abandoned his commitment to ISIS before his first encounter with the FBI on July 17, 2015. Defendant ceased communicating with Elkhodary only because he had been caught. Moreover, defendant continued to view ISIS material and propaganda well after his Facebook chats with Elkhodary had ceased. But, even if defendant's characterization were

correct, it is of no moment. By July 2015, the offense was completed; material support had been given, and the money had been received.

Furthermore, defendant recognizes that "whatever discussions" he had about a terrorist attack "occurred via encrypted applications, for which records are irretrievable." ECF 138 at 26. It is impossible to know when defendant ceased planning his attack, because so much of his communication with his ISIS contacts took place via encrypted channels, such as Telegram and Surespot, and encrypted browsers like TOR.

Application Note 4 to § 3A1.4 is not an appropriate alternative to the terrorism enhancement in this case. ISIS's terrorist purpose and Elshinawy's efforts in support of that purpose were clearly oriented towards an act of terrorism in this country, designed to disrupt governments, rather than civilian-oriented coercion. *See United States v. Jordi*, 418 F.3d 1212, 1216-17 (11th Cir. 2005) (applying Application Note 4's upward departure to a case involving the bombing of abortion clinics).

## V. Other Sentencing Guidelines Considerations

### A. Grouping

The Presentence Report ("PSR") provides that all four counts are grouped for purposes of the calculation of the advisory Guidelines range. ECF 126, ¶ 21. The first three counts group under U.S.S.G. § 3D1.2(d), and Count Four groups with counts One, Two, and Three, pursuant to § 3D1.2(c). *Id.* The defense has not objected to the grouping (ECF 138 at 20 n.5), nor did the government address grouping in its sentencing memoranda. I concur with the PSR's determination.

## B.  False Statement Offense

Given that all four counts are grouped, and given that I shall apply U.S.S.G. § 3A1.4 to the material support offense, it is unlikely that the offense level resulting from Count Four is material to the calculation of the advisory Guidelines range.  Nevertheless, I shall briefly review the parties' arguments.

With respect to Count Four, making false statements to the FBI in the course of an investigation, in violation of 18 U.S.C. § 1001, the parties advance several contentions as to the application of the Guidelines.  As a threshold matter, defendant's plea agreement specifies that "the applicable sentencing guideline for the offense in Count Four . . . is U.S.S.G. § 2J1.2, which provides for a base offense level of 14."  ECF 120 at 5.

The government asserts that Count Four also qualifies for the terrorism enhancement under U.S.S.G. § 3A1.4.  ECF 139 at 8.  The defense maintains that the terrorism enhancement under § 3A1.4 does not apply to Elshinawy at all.  *See* ECF 143.  But, as to Count Four, the defense concedes that "the Court may impose a 12-level increase to the base offense level of 14," because the false statement count relates to international or domestic terrorism under U.S.S.G. § 2J1.2(b)(1)(C).  ECF 138 at 31.  In its view, this would result in an offense level of 26 for the false statement count.  However, I note that Application Note 2(B) to U.S.S.G. § 2J1.2 states: "If § 3A1.4 . . . applies, do not apply subsection (b)(1)(C)."

I have found that the terrorism enhancement is appropriate with regard to defendant's material support of ISIS.  But, I cannot conclude, by a preponderance of the evidence, that it is warranted in regard to the conduct charged in Count Four.

As discussed in detail, *supra*, § 3A1.4 applies to an offense that is (1) calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against

government conduct," and (2) is a violation of one of several statutes.    18 U.S.C. § 2332b(g)(5)(A)-(B).  As the government points out, however, the enhancement can apply even to offenses not specifically enumerated in 18 U.S.C. § 2332b(g)(5).  *See* ECF 139 at 8.  The government contends that Elshinawy's false statement offense is one such example, and points to Application Note 2 of § 3A1.4, which provides, in relevant part: "[A]n offense that involved . . . obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

Defendant's false statement offense may be eligible for the terrorism enhancement under Application Note 2 and 18 U.S.C. § 2332b(g)(5)(B).  However, I do not find that the offense conduct for Count Four was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," as required by 18 U.S.C. § 2332b(g)(5)(A).  Despite the fact that defendant continued to harbor support for ISIS after his initial encounters with the FBI, it seems apparent that his false statements were motivated more by an instinct for self-preservation than the specific intent to advance ISIS's terrorist purpose. *See, e.g.*, ECF 138-11 at 23 ("I wanna know like my legal situation.  I wanna know and I'm like if we are in trouble . . . .").  His false statements to the FBI tended to make him seem less culpable by denying his criminal intent and downplaying the amount of money involved.  *See* ECF 120 at 11.  There is little indication that his lies were calculated to aid ISIS or to further its goals.  *See Fidse II*, 862 F.3d at 523.  Accordingly, § 3A1.4 does not apply to Count Four.

### C.  Obstruction Enhancement

Defendant objects to the two-level upward adjustment in the PSR for obstruction of justice, under U.S.S.G. § 3C1.1.  *See* ECF 126, ¶ 27.  Elshinawy argues that his false statements did not "actually obstruct[] any part of the government's investigation."  ECF 138 at 29.

Application Note 5 to U.S.S.G. § 3C1.1 lists several examples of conduct ordinarily not covered by that section, including "making false statements, not under oath, to law enforcement officers," unless the false statement significantly obstructed or impeded the official investigation. However, Application Note 4 to § 3C1.1 lists examples of covered conduct, including "destroying or concealing or directing . . . another person to destroy or conceal evidence that is material to an official investigation . . . or attempting to do so."

Notably, the plea agreement did not contemplate a two-level upward adjustment. ECF 120. Therefore, the government claims that it "takes no position with respect to the application of the adjustment." ECF 139 at 5 n.1. Although the PSR applied the § 3C1.1 enhancement (ECF 126, ¶ 27), I shall decline to do so. In my view, the conduct at issue is largely embodied in Count Four. I note, too, that the enhancement, even if applied, would not affect the advisory Guidelines Range.

## VI.     Proffer Agreement

### A. Background

The government claims that the defendant has breached his proffer agreement. Therefore, it asks the Court to allow the government to make use of the statements proffered by the defendant on August 2, 2017, in the presence of two of his attorneys, government counsel, and federal agents. The defense disputes the claim of breach and urges the Court to bar admission of the defendant's statements made during his proffer session.

The proffer agreement is docketed at ECF 172-2. It is dated July 14, 2017, and was signed by the defendant and one of his lawyers on July 17, 2017. The proffer session itself took place on August 2, 2017.

As part of the proffer agreement, the government agreed not to introduce proffer information directly against the defendant, except under certain circumstances. Paragraph 1(b) is of particular relevance. It states, ECF 172-2 at 1:

> If your client is convicted and is before the court for sentencing, and any evidence or argument used in support of your client is materially different from any proffer information, the Government may use proffer information in cross-examination, rebuttal, or argument.

As noted, the parties have filed numerous submissions in connection with the proffer issues. In ECF 215-1, the government outlines the proffer statements of the defendant at issue, and compares them to certain sentencing arguments made by his lawyers and his expert witness, which the government contends are contrary to the proffer statements. In particular, the government identifies seven different arguments made in Elshinawy's sentencing memoranda or expert testimony materially conflict with information related in his proffer session. ECF 215-1.

The FBI prepared a Form 302 after defendant's proffer session, documenting defendant's statements, but it was not produced to defense counsel until November 29, 2017. ECF 151 at 2. Indeed, it was not produced until *after* the defense submitted its opening Sentencing Memorandum (ECF 138) and its Reply (ECF 143).[29] Of course, defense counsel was present at the proffer.

At the defense's request, the defense was also provided with the FBI notes of the defendant's statements, used to prepare the Form 302, and does not dispute the accuracy of the notes. *See* ECF 187. Moreover, defense counsel has represented that the Form 302 accurately recounts the defendant's statements at the proffer session. Therefore, defense counsel agreed

---

[29] The Court was not provided with the Form 302 documenting the defendant's statements at the proffer.

that it was unnecessary for the government to call a witness to testify to the defendant's statements at the proffer session.

Although the defense does not dispute the content of the Form 302, it vigorously opposes the claim of breach. Among other things, it asserts that the government's contention "has now called into question not just the extent of defense counsel's advocacy, but also the effectiveness of our representation." ECF 179 at 1.

Of relevance here, defense counsel stated at a hearing that in the event that the Court finds a breach of the proffer agreement, the defense would seek admission of the entirety of defendant's proffer statements. The government does not oppose this request. Nevertheless, I reiterate that I need not consider the content of defendant's proffer for purposes of reaching a decision as to the applicability of the terrorism enhancement. In my view, the evidence is sufficient to find that § 3A1.4 applies in this case, exclusive of any information contained in the proffer.

The government maintains that, regardless of the Court's ruling as to the terrorism enhancement, the Court must resolve the issue of breach of the proffer agreement because, among other reasons, it will bear on the parties' factual assertions at sentencing and on appeal. I agree.

Although the parties filed numerous submissions regarding the proffer dispute, few of the filings have directly addressed the substance of the parties' disagreement. In late November 2017, following the submission of the parties' sentencing memoranda, the government initially asserted in a letter to the Court that "an issue has arisen regarding discrepancies between the arguments made in the defense memoranda and the defendant's statements to the government during [the] proffer." ECF 148 at 1. The government identified seven alleged discrepancies, but

they were not the same seven discrepancies that the government now alleges. *Id.* at 1-4. The defense responded to some of the assertions in the government's letter. ECF 151. Thereafter, the government submitted another letter to the Court (ECF 155), responding to the defense's letter (ECF 151), but not addressing the substance of the disputed proffer statements. In early December, the government supplemented its initial submission on the subject with a brief letter, noting several relevant cases that had addressed proffer agreements. ECF 164.

Shortly thereafter, the government submitted a chart, detailing ten alleged discrepancies between defendant's sentencing arguments and defendant's proffer statements. ECF 172-1. These alleged discrepancies roughly correspond to the discrepancies now asserted by the government, but not on a one-to-one basis. The defense responded to these allegations in some detail. ECF 178.

In early January, the government submitted a new list of what it termed "Contrary Sentencing Arguments." ECF 195. This list of alleged discrepancies corresponds to the most recent set of allegedly contrary arguments (ECF 215-1), although it was presented in a different format. The defense responded in a six-page letter, briefly addressing the government's assertions and quoting at length from an interview of one of the case agents by an Associated Press reporter. ECF 199. The government replied with a four-page letter (ECF 204), seeking to "correct a number of assertions made by defense counsel that are inaccurate, or a mischaracterization of the government's arguments and the evidence." *Id.* at 1. Finally, the government submitted a revised chart, quoting from the defendant's sentencing memoranda and exhibits, and comparing the quotations to summaries of the defendant's proffer that the government deemed materially inconsistent. ECF 215-1. The defense did not respond.

To be sure, the government has sought to narrow its contentions. But, because of the evolving allegations from the government and the absence of a comprehensive response from the defense, I am left to fill in some of the gaps in the parties' arguments. First, however, I must address the proper legal standard for the question at hand.

## B.  Proffer Agreement Construction

Courts have construed proffer agreements to be a species of contract and have held that, as such, they must be interpreted according to their terms. In *United States v. Gillion*, 704 F.3d 284, 292 (4th Cir. 2012), the Court said: "We interpret a proffer agreement based on the language it contains." (Citation omitted). *See also United States v. Cobblah*, 118 F.3d 549, 551 (7th Cir. 1997) ("As a contract, a proffer agreement must be enforced according to its terms. It is the language of the contract that binds the parties.") (citation omitted), *cert. denied*, 522 U.S. 1034 (1997).

U.S.S.G. § 1B1.8(a) states: "Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable guideline range, except to the extent provided in the agreement." The Fourth Circuit has said, *United States v. Lopez*, 219 F.3d 343, 346 (4th Cir. 2000): "Cases upholding the use of proffer statements during sentencing involve proffer agreements that explicitly allowed the government to use the information during sentencing under certain conditions precedent."

Here, the proffer agreement provides: "If [Elshinawy] is convicted and is before the court for sentencing, and any evidence or argument used in support of [Elshinawy] is *materially*

*different* from any proffer information, the Government may use proffer information in cross-examination, rebuttal or argument." ECF 172-2 at 1 (emphasis added). It is apparent that "any evidence or argument" includes arguments made by counsel on Elshinawy's behalf, such as those in his sentencing memoranda. The question is whether the arguments advanced by the defense were "materially different" from the information provided by Elshinawy during the proffer session.

To my knowledge, the Fourth Circuit has not directly addressed the meaning of "materially different" in the context of a proffer agreement. But, the decisions of other circuits are instructive. In *United States v. Bloate*, 534 F.3d 893, 901 (8th Cir. 2008), *rev'd on other grounds*, 559 U.S. 196 (2010), the Eighth Circuit considered a proffer agreement that provided, *id.*: "[T]he government may use any statements made or other information provided by [the defendant] to rebut evidence or arguments materially different from any statements made or other information provided by [the defendant]." In his proffer, the defendant had admitted to possessing drugs and firearms in his apartment. *Id.* at 902. However, at trial, the defendant presented the testimony of his landlord and the girlfriend of the defendant's son. The landlord testified that the defendant did not have a finalized lease for the apartment, but had been permitted to store some items there. *Id.* at 896. Both the landlord and the son's girlfriend suggested that the back door to the apartment may have been open and accessible when the incriminating evidence was found. *Id.* at 897.

The government asserted that this evidence breached the proffer agreement because it suggested facts materially different from the defendant's admissions in the proffer; *i.e.*, that the apartment did not belong to the defendant and that someone else might have placed the guns and drugs there. Therefore, the government moved to admit the proffer statement in rebuttal. *Id.*

The defendant argued that he was merely providing grounds for reasonable doubt, as he was entitled to do.  *Id.* at 901.

The Eighth Circuit affirmed the admission of the proffer statement.  It explained that the two witnesses' "testimony attempts to prove that [the defendant] did not possess the items found within the apartment, which is materially different than what he admitted during the proffer session."  *Id.* at 902.  Thus, even though the testimony of the landlord and the girlfriend was not directly contradictory to the proposition that the defendant possessed the contraband in the apartment, it sought to advance a proposition that was materially different, and so constituted a breach of the proffer agreement.

In *United States v. Krilich*, 159 F.3d 1020, 1025 (7th Cir. 1998), for years the leading case on this question, Judge Easterbrook of the Seventh Circuit took a somewhat stricter view. In that case, the defendant signed an agreement stating that the government could use the statements made in his proffer if the defendant were to "subsequently testify contrary to the substance of the proffer or otherwise present a position inconsistent with the proffer."  *Id.* at 1024.  As a threshold matter, Judge Easterbrook acknowledged that testimony drawn out through cross-examination by defense counsel could qualify as "present[ing] a position inconsistent with the proffer."  *Id.* at 1025.  But, Judge Easterbrook emphasized that the purpose of the proffer agreement—to give the defendant a reason to tell the truth at the proffer while still allowing him to defend himself—could only be fulfilled "if the judge must find genuine inconsistency before allowing use of the [proffer] statements."  *Id.*  Judge Easterbrook wrote, *id.* at 1025-26: "Statements are inconsistent only if the truth of one implies the falsity of the other."

However, the *Krilich* Court's application of this principle was not as straightforward as might be implied by Judge Easterbrook's declaration.  The court identified two statements that it

found were inconsistent with the defendant's proffer. In the proffer, the defendant had admitted that he had planted a golf ball in a hole to fake a prize-winning hole-in-one for the son of an influential politician, as part of a bribe in exchange for a zoning variance for a development project. *Id.* at 1024, 1026. But, at trial, defense counsel first elicited testimony from two witnesses who said they "didn't think [the defendant] was at the ninth hole" when the politician's son teed off. *Id.* at 1026. Because this "testimony implied that [the defendant] did not fake the hole-in-one, [it was] contrary to what he admitted in his proffer." *Id.* Second, defense counsel "had the vice president of [the defendant's] company testify that he was not aware of any bribes paid to any public official in connection with any project. The implication was that if someone so close to [the defendant] (and the projects) was unaware of bribes, there must not have been any." *Id.* Crediting this testimony would therefore require discrediting the defendant's proffer admissions. The court said, *id.* (emphasis added): "These statements [went] well beyond casting doubt on the prosecutor's evidence; they advance[d] a position *inconsistent* with the proffer . . . ."

A recent case from the Second Circuit further clouds the inquiry. In *United States v. Rosemond*, 841 F.3d 95, 103 (2d Cir. 2016), the defendant entered a proffer agreement in which the government stipulated that it would not use the proffer statements, "except that they could be used 'as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [the defendant] at any stage of a criminal prosecution.'" *Id.* Accordingly, the question presented was whether the defendant had made "a factual assertion at trial that contradict[ed] a statement made during the proffer session," which would constitute a waiver of the defendant's protection against the use of his proffer statements. *Id.* at 107. Reviewing its prior cases, the Second Circuit observed, *id.* at 108 (internal citations

omitted): "Rebuttal is 'necessarily a flexible concept,' and not 'limited to evidence that directly contradicts what it opposes; rather, rebuttal encompasses any evidence that the trial judge concludes fairly counters and casts doubt on the truthfulness of factual assertions advanced, whether directly or implicitly, by an adversary[.]'"

However, the *Rosemond* Court noted that "defense counsel must be permitted to 'draw the jury's attention to the lack of evidence' presented on specific elements without triggering the waiver." *Id.* (quoting *United States v. Oluwanisola*, 605 F.3d 124, 132 (2d Cir. 2010)). "To hold otherwise . . . would prevent defense counsel from challenging the Government's lack of evidence on a particular element . . . ." *Rosemond*, 841 F.3d at 108 (citation omitted). The court acknowledged, *id.*: "The line between challenging the sufficiency of the Government's evidence and implicitly asserting new facts can be a fine one." And, it emphasized, *id.* (citations omitted): "'Particular caution is required when the purported fact is asserted by counsel rather through witness testimony or exhibits. In evaluating defense arguments and questions . . . district courts [should] 'consider carefully what fact, if any, has actually been implied to the jury before deciding whether proffer statements fairly rebut it.'"

Summarizing cases from various circuits, the court stated that certain actions, such as, *inter alia*, "arguing generally that the Government has not met its burden of proof," "arguing specifically that the Government has failed to prove particular elements of the crime, such as intent, knowledge, identity, etc.," or "arguing that the Government failed to present corroborating evidence," do *not* trigger waiver provisions in a proffer agreement. *Id.* at 109. On the other hand, "arguing that a shooting was 'an intended kidnapping gone wrong,' when the defendant admitted in a proffer session that the shooting was 'an intentional murder,'" would trigger such a provision. *Id.* at 110 (citation omitted). Applying these principles to the facts of

the case, the Second Circuit concluded that the defendant "should have been permitted to argue, without triggering the proffer waiver, that the Government failed to prove that he intended to murder" the victim, even though the defendant had admitted in his proffer that he knew, as a result of his actions, the victim would be killed. *Id.*; *see also id.* at 103.

It is not clear whether "inconsistent" and "materially different" are equivalent terms, although at least one court has treated them as such. *See United States v. Jasin*, 215 F. Supp. 2d 552, 589 (E.D. Pa. 2002). Nor is it evident whether, if the terms are equivalent, "inconsistent" should be interpreted narrowly, as in *Krilich* in the context of proffer agreements, or more broadly, as other courts have suggested in roughly analogous evidentiary contexts. *See United States v. Agajanian*, 852 F.2d 56, 58 (2d Cir. 1988) (noting that "statements need not be diametrically opposed to be inconsistent"); *see also Jasin*, 215 F. Supp. 2d at 589-90 (collecting authority).

I interpret these cases as suggesting a general rule that an argument is likely to contradict or materially differ from a proffer statement when it suggests the existence of a state of facts incongruous with the state of facts indicated in the proffer. Of course, the cases discussed above all considered evidence presented at trial to prove guilt or suggest innocence. Here, the question is not whether Elshinawy has fulfilled the elements of the crime charged; he has pleaded guilty. Rather, the question is whether his conduct triggers the application of U.S.S.G. § 3A1.4.

## C. Application

As indicated, the government identified seven separate categories of arguments in defendant's Sentencing Memorandum and Dr. Sageman's expert report that it claims are materially different from the statements that defendant made at his proffer. ECF 215-1. According to the government:

(1) "Defendant argues he received no definitive instructions regarding attack planning and points to his false statements to the FBI in July 2015 to support of [sic] his claim." ECF 215-1 at 1.

(2) "Defendant argues he had no attack plans of his own and took no steps to further any such plan." *Id.* at 2.

(3) "Defendant argues that due to certain conversations with his brother, he decided to abandon his ISIS-related plans before the FBI visited him on July 17, 2015." *Id.* at 3.

(4) "Defendant argues that his use of a Linux operating system is not a factor that evidences his intent to conceal his criminal conduct." *Id.* at 4.

(5) "Defendant argues his association with ISIS was brief." *Id.* at 5.

(6) "Defendant argues he was fully cooperative with the FBI." *Id.* at 6.

(7) "Defendant argues his contact with the UK Company was limited to getting money for his operation." *Id.* at 7.

The government insists that each of these arguments was asserted in Elshinawy's submissions to the Court or testimony at the sentencing hearing, and that each is "materially different" from defendant's statements during his proffer on August 2, 2017. At the hearing on February 12, 2018, defense counsel argued that the government has challenged the defendant's advocacy. In its view, the disputes are largely semantic.

I shall address each of the categories, in turn. In doing so, I am mindful that the defense has consistently maintained that Elshinawy's conduct was not "calculated to influence or affect the conduct of *government*," or "retaliate against *government* conduct," and therefore defendant is not subject to the terrorism enhancement. *See* ECF 138 at 23 (emphases added). Thus, much of the Sentencing Memorandum is devoted to arguing that the evidence does not show any

attempt by defendant to influence government. In context, at least some of the defense's assertions go to support *that* contention. ECF 138 at 9, 26. Moreover, "defense counsel must be permitted to 'draw the [factfinder's] attention to the lack of evidence' presented on specific elements without triggering the waiver." *Rosemond*, 841 F.3d at 107 (citation omitted). By analogy, the defendant must be allowed to argue that the government cannot prove Elshinawy's conduct requires the application of the § 3A1.4 enhancement.

## 1. Defendant's Instructions

As to instructions that defendant received from ISIS affiliates, the government points to four contentions advanced by the defense that are allegedly contrary to the proffer statement: two from Elshinawy's Sentencing Memorandum (ECF 138) and two from the report of defendant's expert, Dr. Sageman. ECF 138-4. They are as follows:

- "In late March 2015, Mr. Elshinawy began receiving money from ISIS to fund some kind of operation in the United States, the nature of which is unknown." ECF 138 at 9.

- "[W]hatever discussions Mr. Elshinawy did have about a terrorist attack occurred via encrypted applications, for which records are irretrievable. Mr. Elshinawy described to the agents during his first and second interviews that he was provided little to no specific direction by his ISIS contacts regarding the type of attack to launch. His ISIS contacts merely provided Garland, Texas as a reference." ECF 138 at 26.

- "As the FBI 302 of his July 17, 2015 interview stated, 'no guidance was given' but 'the Draw Mohammed Contest in Texas was given as an option.'" ECF 138-4 at 20.

- "In the discovery material, there is no act in furtherance that might shed light on what Mr. Elshinawy's plan might have been. Mr. Elshinawy told the FBI that he was not given specific direction by his contact, who mentioned the Garland, Texas attempted attack against participants in the Draw Mohammed contest." ECF 138-4 at 21.

According to the government, these assertions are contrary to the following proffer statements (ECF 215-1 at 1):

- Defendant stated his ISIS contact ("the guy in Syria"), with whom he communicated regarding the money transfers, gave him three options for a terrorist attack – be a suicide bomber, do some sort of operation, or travel to Syria to fight with ISIS. Defendant said he was not ready to be a suicide bomber or travel to Syria, so he decided to conduct his own operation.

- Defendant stated his ISIS contact sent three encrypted and password protected pictures of three different people as potential targets, one of whom was in Texas. Defendant "googled" the name of the Texas subject and discovered he owned an insurance company in Texas. Defendant knew this individual to be the target of an ISIS assassination for which the defendant would be the intended killer.

- Defendant stated his ISIS contact sent him an encrypted Book of the Mujahideen as a guide for ways in which to conduct the intended assassination.

- During the planning to assassinate the subject in Texas, the ISIS contact advised the defendant on ways to maintain operational security, including not using credit cards for gas or hotels, buying face masks and a police scanner, and using multiple passports to evade law enforcement while traveling.

- Defendant advised his ISIS contact that he needed $6-7,000 for a new car to drive to Texas to do the assassination. Both agreed that this much money could not be sent at once, so the plan changed.

The proffer statements establish that Elshinawy agreed to, and planned to, "conduct his own operation," because he "was not ready to be a suicide bomber" and he was not ready "to travel to Syria . . . ." ECF 215-1 at 1. This is consistent with defendant's assertion that "he began receiving money from ISIS to fund some kind of operation in the United States . . . ." ECF 138 at 9.

However, defendant's assertion in his Sentencing Memorandum that he "was provided little to no specific direction by his ISIS contacts regarding the type of attack to launch" (ECF 138 at 26) is contrary to the information he provided in the proffer. Excerpts of the 302 quoted by the defense, ECF 178 at 4-5, make clear that defendant was offered a comparatively specific plan, and that he was willing to carry it out. The fact that the resources needed to execute the assassination were not immediately available does not erase Elshinawy's willingness to "be the intended killer." ECF 215-1 at 1. Guidance *was* given, in the form of an assassination proposal,

a guide for conducting assassinations, and methods of evading detection. Moreover, the guidance was accepted. Defendant's arguments are contrary to his statements in the proffer, and accordingly I find that the proffer agreement was breached.

## 2. Defendant's Plans

The government maintains that several statements in defendant's sentencing memoranda and Dr. Sageman's testimony are materially inconsistent with defendant's proffer statements concerning his attack plan. It refers to the following assertions by defendant:

- "Mr. Elshinawy's particular objectives, beyond harboring the idea of committing some generalized terrorist attack, are unknown." ECF 138 at 26.

- "[Defendant's] contact with the [UK] company appears to be limited solely to conversation directed at getting money for his operation, but he had no specific plan in mind." ECF 138 at 28.

- "No concrete evidence exists to determine the nature of the attack that Mr. Elshinawy was contemplating. Therefore, the Court similarly cannot draw any conclusions as to whether Mr. Elshinawy's motive was to initmdate or coerce a civilian population. As this case demonstrates, since Mr. Elshinawy never actually formulated a specific plan, neither the [terrorism] enhancement nor Note 4 [of § 3A1.4] applies." ECF 138 at 28.

- "… Mr. Elshinawy had not formulated any specific plan for a terrorist operation in the United States and took no steps in furtherance of any specific plan …." ECF 138 at 40.

- "Mr. Elshinawy never discussed the details of any operation or plan with Tamer on Facebook, or in any other forum for which evidence exists…. Mr. Elshinawy vaguely referenced 'a dream project' and asked whether 'making a small thing with a silencer' was 'difficult or easy.' It is impossible to glean from this information the nature of any attack." ECF 143 at 5.

- Dr. Sageman testified that the nature of the attack defendant wanted to conduct was vague and there was nothing specific the defendant zeroed in on, but then acknowledged that defendant provided different information in his proffer. ECF 190 at 50-51.

The government argues that these statements do not square with the following admissions in Elshinawy's proffer, ECF 215-1 at 2:

- Defendant stated that after the Texas plan was shelved, he was instructed to check for events to target and provide progress reports to his ISIS contact of what he was doing.

- Defendant stated that he agreed to make a bomb that he would place somewhere where it would kill a lot of people. The ISIS contact said ISIS would provide whatever monies the defendant needed to accomplish his task.

- Defendant said he told [Elkhodary] and the ISIS contact that he did not know how to make a bomb, or what to do: he was told to take his time and he would be taught. Defendant said he subsequently received 16-17 encrypted Dropbox links of videos on how to make a bomb. He stated that he used Linux and Trucrypt and an unnamed browser to access and view these videos, which provided step by step instructions on how to make a peroxide based bomb.

The first example from Elshinawy's Sentencing Memorandum sought to compare Elshinawy's case with other cases in which the terrorism enhancement was applied. *See* ECF 138 at 26. In contrast to other instances, where "the specific intent to influence or affect government conduct" was evident, defense counsel asserted that "Mr. Elshinawy's particular objectives . . . are unknown." In context, it appears to me that the defense was referring to Elshinawy's *political* objectives, like the intent to affect government conduct, rather than his *tactical* objectives, like building and detonating a bomb.

Second, the government points to defendant's statement that his "contact with the [UK] company appears to be limited solely to conversation directed at getting money for his operation, [and] he had no specific plan in mind," and argues that the assertion conflicts with Elshinawy's admission that he agreed to make a bomb. I disagree. This portion of the Sentencing Memorandum advances the contention that there is no evidence that Elshinawy knew of Ibacs' goal of obtaining drone technology, and that Elshinawy took no steps in furtherance of Ibacs' attempt to obtain such technology. ECF 138 at 27-28. Rather, the defense posits that Elshinawy's only contact with Ibacs was in relation to obtaining money. *Id.* at 28. The evidence suggests that this is accurate, and that Elshinawy "had no specific plan" with regard to drones.

Likewise, the defense's argument that "[i]t is impossible to glean . . . the nature of any attack" from Elshinawy's reference to "a dream project," and his asking whether 'making a small thing with a silencer' was 'difficult or easy'" (ECF 143 at 5), was also arguably made in support of defendant's contention that his conduct was not intended to affect government conduct. In defendant's Reply Sentencing Memorandum, these statements follow the defense's averment that Elshinawy never said he wanted to attack the government. *Id.* Therefore, the reference to "nature of any attack" seemingly pertained to the objective, rather than the nature of the weapon.

Furthermore, Dr. Sageman's acknowledgement that the proffer is "far more detailed" than the discovery material (*see* ECF 190 at 51) is irrelevant to the question of whether the proffer statements are materially different from the defense's arguments.

However, the government's third point hits its mark. In his Sentencing Memorandum, Elshinawy addresses Application Note 4 to U.S.S.G. § 3A1.4, which, as discussed, concerns terrorist activity directed only at civilian populations. ECF 138 at 28. In this context, he asserts, *id.*: "No concrete evidence exists to determine the nature of the attack that Mr. Elshinawy was contemplating. Therefore, the Court similarly cannot draw any conclusions as to whether Mr. Elshinawy's motive was to intimidate or coerce a civilian population. As this case demonstrates, since Mr. Elshinawy never actually formulated a specific plan, neither the enhancement nor Note 4 applies."

But, in his proffer, defendant admitted that he agreed to make a bomb and use it to kill many people. In this regard, defendant's sentencing argument differs materially from defendant's proffer statement. In the first instance, the claim that there is "[n]o concrete evidence as to the nature of the attack" is completely contradicted by the proffer statement that defendant agreed to make a bomb and, indeed, about sixteen or seventeen encrypted videos with

instructions were sent to him on how to make a bomb. If one were to read defendant's Sentencing Memorandum and take its assertions as true, one would be surprised to learn that in fact Elshinawy had agreed to make a bomb and kill a lot of people with it.

Given that "[d]efendant stated that he agreed to make a bomb that he would place somewhere where it would kill a lot of people," the defendant's assertion that "the Court similarly cannot draw any conclusions as to whether Mr. Elshinawy's motive was to intimidate or coerce a civilian population" may go too far. That is merely argument. It is understandable, if unavailing, for Elshinawy to argue that, absent direct evidence, the Court should not find the specific intent to influence the government. But, if defendant planned to make a bomb, agreed that he would place the bomb "somewhere where it would kill a lot of people," and received and reviewed "step by step instructions on how to make a peroxide based bomb," it is difficult to simultaneously accept that no conclusions can be drawn "as to whether Mr. Elshinawy's motive was to intimidate or coerce a civilian population." *See* ECF 138 at 28. In this instance, I find that Elshinawy has breached the proffer agreement by presenting an argument that is materially different from information he provided during the proffer.

### 3. Influence of Defendant's Brother

The government claims that defendant's arguments in his Sentencing Memorandum and Reply, and in Dr. Sageman's report and testimony, concerning the influence of defendant's brother on defendant's decision to abandon his terrorist plans, are inconsistent with his proffer statements, in which he did not state that his brother was a major influence. The government identifies the following defense assertions:

- "Mr. Elshinawy's brother, Ahmed Elshinawy, was critical to Mr. Elshinawy's decision to abandon any plan for a terrorist attack …. [O]n July 8, nine days before the FBI knocked on his door, [defendant] wrote to Ahmed that he was

'convinced' of the story [of Uwais told to him by his brother on June 28], and, as a result, decided not to travel to Syria." ECF 138 at 12-13.

- "As Dr. Sageman described in his expert report, Mr. Elshinawy's communications with his brother were paramount to his decision not to travel to Syria and to disentangle himself from ISIS – all communications which occurred prior to the FBI's first interview on July 17, 2015." ECF 143 at 6.

- "By July 8, Mr. Elshinawy wrote his brother that he was convinced by Uwais' story, meaning that he had given up going to Syria altogether.'" ECF 138-4 at 19.

- "By July 8, 2015, Ahmed convinced Mr. Elshinawy not to go to Syria and not to engage with the Islamic State with the story of Uwais al-Qarani. As mentioned earlier, this abandonment happened before the FBI came to interview Mr. Elshinawy." ECF 138-4 at 22.

- Dr. Sageman's testimony, opining that the defendant had abandoned his ISIS-related plans after being convinced, and talked out of it, by his brother. ECF 190 at 49-50, 69-71.

The government asserts that these statements are contrary to the proffer, ECF 215-1 at 3:

- Defendant stated that at a point in time, not specified, he received a suspicious Friend request on his social media account and suspected he was being followed by the FBI.

- Defendant stated that after he received the suspicious Friend request, he told his ISIS contact and Individual 1 that the FBI was onto him and he was stopping, prompting the ISIS contact to instruct him to abort and come to Syria.

- When asked about his brother, Defendant never identified any influence from his brother affecting his plans regarding attack planning, travel to Syria, joining ISIS, etc.

These statements are not inconsistent with the defense's argument. The government's assertion turns on a supposed omission from defendant's proffer, and assumes that if defendant's brother had in fact been pivotal in defendant's decision to abandon his plans, defendant would have mentioned it. But, defense counsel asserted in argument that Elshinawy was simply never asked a question that would have elicited such a response. The Court has not been provided with the questions asked during defendant's proffer session such that I could conclude that this is true or false.

It may have been that Elshinawy's brother contributed to defendant's decision not to travel to Syria. *See, e.g.*, ECF 139-10 at 442-43 (Facebook message from Elshinawy to his brother, stating: "I am convinced with the [Uwais] story"). That does not lead to the decision that defendant abandoned his commitment to ISIS. But, the arguments propounded by the defense are not at odds with the proffer.

### 4. Use of Linux

The government insists that the assertions in Elshinawy's Reply regarding his use of a Linux operating system on his computer are materially different from his statement in the proffer. In the Reply, the defense said:

- "Mr. Elshinawy's conduct [in consenting to search of his computers in July 2015] does not evidence a desire to hide his activities." ECF 143 at 9.

- "The government has made no contention that Mr. Elshinawy modified his computers in any way between the date of the first FBI interview and the October 9, 2015, search to prevent the government from obtaining information about his activities." ECF 143 at 9.

- "… Mr. Elshinawy's use of a Linux operating system is hardly novel or nefarious." ECF 143 at 9.

- "… Mr. Elshinawy utilized a form of Linux known as 'Ubuntu,' a popular and user-friendly interface." ECF 143 at 9.

- "… Mr. Elshinawy ran Ubuntu from a thumb drive on his HP computer because the hard drive on that laptop was irreparably damaged…." (raising inference that this was the sole, or primary, reason for utilizing Linux). ECF 143 at 10.

- And, during cross-examination of a government expert at the hearing, defense counsel sought to have the expert, Ms. Hajeski, confirm that the Ubuntu interface for Linux that defendant was using was commonly used and user friendly – in response Ms. Hajeski testified that Linux is not a very popular system, Ubuntu is not that common, and Ubuntu is not among the more user-friendly versions of Linux. ECF 190 at 13-14.

According to the government, these assertions, and the conduct on cross-examination, do not square with the proffer. There, "Defendant stated his ISIS contact told him to use Linux if he wanted to hide his tracks." ECF 215-1 at 4.

The government seeks to contrast the defendant's assertion that Elshinawy's conduct in consenting to a search of his computers in July 2015 "does not evidence a desire to hide his activities" with his admission in the proffer that he was told to use Linux to "hide his tracks." Indeed, one could easily infer from the proffer statement that Elshinawy's choice to use Linux, having been told to do so, *did* evidence a desire to hide his activities. But, the "defense [was] careful in its arguments regarding Mr. Elshinawy's operating systems." ECF 178. The "conduct" that the defense averred "does not evidence a desire to hide his activities" was the conduct of consenting to a search, rather than choosing Linux.

The defense insists that the "use of a Linux operating system is hardly novel or nefarious." ECF 143 at 9. To the contrary, I have determined that Elshinawy's adoption of Linux *is* indicative of his nefarious behavior. But, such a conclusion does not mean that the defense was precluded by the proffer from arguing otherwise. The assertion of a weak or failing argument is not equivalent to a breach of the proffer agreement.

As a result, I cannot conclude that defendant's assertions concerning Linux are materially different from his proffer statement.

### 5. Duration of Association with ISIS

Elshinawy's Sentencing Memorandum includes a subheading which states, ECF 138 at 35: "Mr. Elshinawy's Association With ISIS Was Brief, and He Severed All Ties With ISIS Before The Government First Questioned Him." The government challenges the notion that the

association was brief, citing defendant's proffer statement that "his support of ISIS began when he was in Egypt during the Egyptian revolution" in 2012 and 2013.  ECF 215-1 at 5.

The notion of what is "brief" is not fixed and often depends on the context.  In any event, the defense clarifies that "the period in which Mr. Elshinawy received money from ISIS was brief—approximately three months."  ECF 138 at 35.  To some, that could be considered "brief."  Moreover, stated "support" for ISIS, as Elshinawy admitted he expressed for several years, is not necessarily the same as an actual "association" with ISIS.

The government has established a timeline that speaks for itself.  Defendant's attempt to characterize it as "brief" is of no moment and does not constitute a breach of the proffer agreement.

### 6.  Elshinawy's Cooperation with the FBI

The government points to several instances in Elshinawy's Sentencing Memorandum and Reply where the defense claims Elshinawy was cooperative with the FBI's investigation.  It asserts that these claims are contrary to defendant's proffer statements, in which he admitted to deleting files and throwing away evidence.  ECF 215-1 at 6.

To be sure, the defense cites instances where Elshinawy voluntarily gave the government evidence or offered to help the investigation, *see, e.g.*, ECF 138 at 16 (volunteering his history of involvement with ISIS), 17 (consenting to search of his computers), 31 (agreeing to reestablish communication with Elkhodary).  But, the Sentencing Memorandum also concedes Elshinawy's lies and obfuscation.  *See, e.g.*, ECF 138 at 16 (lying about the source of the ISIS money), 19 (falsely stating that he was trying to defraud ISIS).

I cannot conclude that the defense's arguments are materially different from the proffer statements simply because they seek to emphasize the good parts and downplay the misdeeds of

the defendant. Furthermore, there is no danger of the Court being misled in this instance, because the government presented ample evidence of the defendant's lack of cooperation, and argued on that basis. *See* ECF 139 at 51-52.

### 7. Elshinawy's Contact with Ibacs

Finally, the government asserts that two of Elshinawy's sentencing arguments about Ibacs are contrary to his proffer statements. His Sentencing Memorandum asserts:

- "[Defendant's] contact with the [UK] company appears to be limited solely to conversations directed at getting money for his operation. . . ." ECF 138 at 28.

- "Mr. Elshinawy was neither part of, nor privy to, any information about the [UK] company's aims or operations beyond his specific transactions." ECF 138 at 38.

The government contends that this is inconsistent with one of his defendant's proffer statements, ECF 215-1 at 7:

- Defendant stated that in one of his conversations with his ISIS contact, with whom he spoke every day for several months via Telegram and Surespot, the contact told him that they [ISIS] would win the war if it were not for the USA's drones, stating, "the drones are killing us."

These statements are not inconsistent. There is no contention that Elshinawy had any involvement with ISIS's attempt to obtain drone technology, even if he was told in passing of the problems caused by American drones.

### D. Finding of Breach

For the most part, on careful scrutiny, defendant's sentencing arguments do not run afoul of the proffer agreement. In context, the lion's share of the arguments are defensible even if they are unsuccessful. However, as noted, defendant's assertions that there was no plan of attack, and that he had no specific direction from his contact, are undermined by his proffer. So, too, is his claim that "[n]o concrete evidence exists to determine the nature of the attack that Mr. Elshinawy was contemplating," and "[t]herefore, the Court similarly cannot draw any conclusions as to

whether Mr. Elshinawy's motive was to intimidate or coerce a civilian population" (ECF 138 at 28). These claims are materially different from the defendant's admissions during the proffer, including that "he agreed to make a bomb that he would place somewhere where it would kill a lot of people" (ECF 215-1 at 2), and his short-lived assassination plan. *Id.* at 1.

As in *Bloate*, 534 F.3d at 902, Elshinawy's argument "attempts to prove that [the defendant] did not [intend to carry out an attack], which is materially different than what he admitted during the proffer session." And, as in *Krilich*, 159 F.3d at 1026, "[t]hese [arguments] go well beyond casting doubt on the prosecutor's evidence; they advance a position inconsistent with the proffer . . . ."

## VII.    Conclusion

For the purpose of the Guidelines calculation, all four counts are grouped together, under U.S.S.G. §§ 3D1.2(c) and (d). The base offense level for Count One, conspiracy to provide material support to ISIS, is 26, pursuant to U.S.S.G. § 2M5.3. In the Plea Agreement, the parties have stipulated to the two-level increase provided for by the specific offense characteristic at § 2M5.3(b)(1)(E), for the provision of material support with knowledge that the funds are to be used in the commission of a violent act. *See* ECF 120 at 4. Accordingly, the offense level for Count One is 28.

The evidence presented shows that Elshinawy provided material support to ISIS, and that his offense was calculated to aid ISIS's terrorist purpose of affecting government conduct. As a result, I shall apply the terrorism enhancement under U.S.S.G. § 3A1.4. This twelve-level increase results in an offense level of 40. I shall decline to apply the enhancement for obstruction under U.S.S.G. § 3C1.1. The parties have also agreed that a two-level reduction is

appropriate under U.S.S.G. § 3E1.1, for defendant's acceptance of responsibility for the offense. ECF 120 at 5. Therefore, the total offense level is 38.

Because I apply § 3A1.4, Elshinawy's criminal history category is VI. *See* U.S.S.G. § 3A1.4(b).

Based on a total offense level of 38 and a criminal history category of VI, defendant's Guidelines Range ordinarily would be 360 months in prison to life. However, because defendant's maximum sentence cannot exceed 68 years, his Guidelines Range is 360 months to 816 months, pursuant to U.S.S.G. § 5G1.2(b).

Furthermore, I find that defendant has breached the proffer agreement.

An Order follows.


Date: March 28, 2018                              _____/s/_____

                                                  Ellen Lipton Hollander
                                                  United States District Judge