IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MOHAMED Y. ELSHINAWY

*Petitioner*,

v.

UNITED STATES OF AMERICA

*Respondent.*

CRIMINAL No. ELH 16-009
Related Civil No. ELH-20-3163

**MEMORANDUM OPINION**

Petitioner Mohamed Elshinawy, who is now self-represented, has filed a post-conviction petition under 28 U.S.C. § 2255.  ECF 237 (the "Petition").  He challenges his convictions for conspiracy to provide and providing material support, in the form of personnel, services (including means and methods of communication), and financial services to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(d)(1)(A), (D), (E), and (F)[1]; unlawful financing of terrorism, under 18 U.S.C. § 2339C(a); and false statements to the Federal Bureau of Investigation ("FBI"), in violation of 18 U.S.C. § 1001(a)(2).  *Id.*  The convictions followed Elshinawy's entry of a guilty plea to those charges on August 15, 2017.  ECF 119; *see also* ECF 19 (Indictment); ECF 120 (Plea Agreement).  On April 2, 2018, defendant was sentenced to a total term of imprisonment of 240 months (20 years).  ECF 244 (Judgment).

The Petition asserts eight claims, six of which are grounded in allegations of ineffective assistance of counsel. *See* ECF 273. In the remaining two claims, Elshinawy maintains that his statements throughout the case were involuntary because he feared law enforcement as well as his

---

[1] ISIS is also known as the Islamic State of Iraq and al-Sham; the Islamic State of Iraq and Syria; the Islamic State of Iraq and the Levant; and ISIL.

own counsel, and that his constitutional rights were violated because the Court allowed defendant's religion to be used as evidence of bad character. *Id.* at 7, 25.  Several exhibits are appended to the Petition.

The government opposes Elshinawy's Petition. ECF 283. It contends, among other things, that several of defendant's claims could have been raised on direct appeal, rendering them procedurally defaulted.  Further, the government contends that all of the claims are without merit. *See id.* Elshinawy has replied. ECF 285.

Petitioner has also filed a "Motion to request Different Judge to evaluate the Defendant's habeas claim to avoid Conflict of Interest." ECF 275 ("Motion").  There, he expresses concern as to the judge's ability to "rul[e] about her own fairness regarding the defendant's court procedures." *Id.*  The government opposes the motion. ECF 283 at 30-31.[2]

No hearing is necessary to resolve the Petition or the Motion. For the reasons that follow, I shall deny the Motion and the Petition.

## I.   Factual and Procedural Background[3]

Elshinawy is a United States citizen of Egyptian descent.  ECF 126 (Presentence Report or "PSR") at 2.  He was born in Pittsburgh, while his father was engaged in medical training.  However, defendant's parents are not United States citizens, and the family returned to Egypt when

---

[2] Petitioner had asked for the appointment of counsel.  ECF 274.  But, he subsequently asked to withdraw that request.  ECF 284.  I shall grant ECF 284.

[3] The facts are largely derived from the factual stipulation in Elshinawy's Plea Agreement, to which he stipulated, under oath.  *See* ECF 120 at 9-11.  I also incorporate here the factual summary set forth in my Memorandum Opinion of December 16, 2016 (ECF 83) and my Memorandum Opinion of March 28, 2018 (ECF 234).

Throughout the opinion, I cite to the electronic pagination.  It does not always correspond to the page number imprinted on a particular document.

defendant was an infant.  *See* ECF 234 at 20.  Defendant spent a good portion of his life in Egypt and Saudia Arabia, raised by well educated parents: his father is a retired physician and his mother is a professor of statistics.  ECF 126, ¶ 40; ECF 234 at 20.  Defendant, too, is college educated. ECF 126 at 2.

In or about 2007, Elshinawy began to travel frequently between Egypt and the United States. On December 11, 2015, he was arrested in Maryland.  ECF 6 (Arrest Warrant).  About one month later, on January 13, 2016, the defendant was indicted.  ECF 19.

The Indictment contained four counts.  In particular, defendant was charged with conspiracy to provide (Count One) and providing (Count Two) material support to ISIS, a designated foreign terrorist organization, in the form of personnel, services, and financial services, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(d)(1)(A), (D), (E), and (F); unlawful financing of terrorism, in violation of 18 U.S.C. §§ 2339C(a)(1)(B) and 2339C(a)(3) (Count Three); and making false statements to the FBI regarding his ISIS-related activities, in violation of 18 U.S.C. § 1001(a)(2) (Count Four).  *Id.*

On August 15, 2017, pursuant to a Plea Agreement (ECF 120), Elshinawy entered a plea of guilty to all charges.  ECF 119.  The Plea Agreement included a "Stipulated Statement of Facts," designated as Attachment A. ECF 120 at 9-11 ("Stipulation").

In the Stipulation, Petitioner admitted that he knowingly and intentionally conspired with others to provide material support or resources to ISIS (Count One); that he knowingly provided and attempted to provide material support or resources to ISIS (Count Two); that he willfully collected funds, directly or indirectly, with the knowledge that such funds were to be used, in whole or in part, to carry out a terrorist attack intended to cause death or serious bodily injury to

civilians (Count Three); and he knowingly and willfully made false statements to agents of the FBI with respect to a terrorism investigation (Count Four). *Id.*

The Stipulation reflects Petitioner's discussions in September and October of 2014 with "Individual # 1," his childhood friend and a self-described member of ISIS, who resided in ISIS-controlled territories. *Id.* at 9. In these conversations, Petitioner expressed "his support for an Islamic caliphate, his belief in the legitimacy of ISIS" and its leader, Abu Bakr al-Baghdadi, his "hope that ISIS would be victorious and its enemies defeated, and readiness to travel" with his wife to Syria, through Turkey, in order "to live in the Islamic State . . . ." *Id.*

Further, on February 17, 2015, in a social media conversation with Individual #1, Elshinawy "pledged his allegiance" to ISIS, "described himself as its soldier, committed himself to committing jihad, and asked Individual # 1 to convey his message of loyalty to ISIS leadership." *Id.* Defendant also agreed not to discuss his potential plans for a terrorist attack, recognizing "that such an attack would be a crime in the United States." *Id.*

Specifically, Individual # 1 stated: "You are at a vulnerable point; through you, brother, we can either be defeated or victorious . . . you are now different than before . . . and don't tell anyone what you have in mind." ECF 139-9 at 68-69 (social media chat translations). Elshinawy responded, "Of course not. It is a crime here. A very big one. If I meet our Lord while being, at least faithful to Muslims, I may have hope for mercy." *Id.* at 70. In April 2015, Elshinawy told Individual # 1, "Soon, you'll hear good news, Allah willing." *Id.* at 123. Individual # 1 told Elshinawy: "Be harsh in the killing of Allah's enemies." *Id.* at 134. And, Elshinawy responded, "Victory is patience for an hour[.] Allah willing." *Id.* at 135.

From March through June 2015, Elshinawy discussed "his preparedness for jihad, his efforts at undertaking extreme security measures . . . and his ISIS-related activities . . . ." ECF 120

at 9.  He also "expressed his indebtedness to Individual #1 for showing him the way to martyrdom, reiterating his commitment to ISIS and its cause."  *Id.*  He also asked for information about how to make an explosive device and a silencer.  *Id.*  And, he discussed steps he had taken to conceal his activities. *Id.*

Beginning in March 2015, Petitioner received money transfers from a foreign entity based in Wales, United Kingdom, and Dhaka, Bangladesh (the "UK Company"). *Id.*  The funds were "to be used to fund a terrorist attack in the United States."  *Id.* at 10.  The UK Company provided IT-related products and services, and the owner, Individual #2, was a national of Bangladesh who had joined ISIS in 2014 and assisted in the development of weaponized drone technology. *Id.* at 10.  Individuals #3 and #4, who were associated with the UK Company, helped to send monies to defendant and to purchase components of drone technology for Individual #2.  *Id.*[4]

Elshinawy received most of the money through transfers from an account associated with the UK Company, deposited into an online financial account, TheCheapMart, LLC, a business name defendant had registered in Maryland, as well as through his wife's account. *Id.* The transfer to his wife's account was "disguised" as the purchase of printers.  *Id.*  By utilizing the UK Company's name and business accounts, members of the conspiracy were able to conceal the true nature of their ISIS-related transactions.  In total, from March to June 2015, Elshinawy received $8,700.00 from participants in the conspiracy, "to be used to conduct a terrorist attack in the United States." *Id.*

Petitioner and his coconspirators also engaged in "various activities to facilitate their efforts on behalf of ISIS and its cause."  *Id.*  This included registering devices and accounts with alias names and phony addresses.  *Id.*

---

[4] Individual #2 was killed in December 2015 while fighting with ISIS.  ECF 120 at 10.

Defendant also stipulated that he attempted to recruit his brother, Ahmed Elshinawy, to join ISIS. *Id.* at 11. Elshinawy told Ahmed: "My life is for Allah. If I die for the sake of Allah, then there is no problem." ECF 139-9 at 25. He explained to his brother how he had received money from ISIS and would be receiving more in the future. ECF 120 at 11. And he explained that he had "plans" in the United States, for which he intended to remain in this country temporarily, he was "taking steps" to avoid detection, and he had a "desire" to "wage violent Jihad and die as a martyr." *Id.* He also told his brother that "[k]illing the apostates is allowed." ECF 139-9 at 414.

In July 2015, FBI agents interviewed Petitioner. ECF 120 at 11.  In the first of several interviews, Elshinawy admitted that he received money from ISIS to be used to conduct a terrorist attack in the United States. ECF 138-10 at 6 (FBI Form 302). But, Elshinawy provided false information about the amount of money he had received and "falsely claimed" that he took the money with the "intent . . .  to defraud ISIS of funds." ECF 120 at 11. Elshinawy also minimized the "true nature and extent of his association with and relationship to, ISIS operatives and the support he had provided to ISIS." *Id.* In an interview on July 27, 2015, Elshinawy acknowledged that his ISIS contact told him to undertake "[a]nything . . . destructive, go ahead and do it. Anything that hurts people, go ahead and do it . . . anything, anywhere, do anything!" ECF 145-2 at 15 (FBI interview excerpts).

After the FBI interviews, Elshinawy "took steps to block and erase his communications over social media with Individual #1 . . . ."  ECF 120 at 11.  And, he "exhorted his brother to do the same with his own social media account" and "directed his brother to warn Individual #1 that he (ELSHINAWAY) had been 'revealed and uncovered.'"  *Id.*

The guilty plea transcript is docketed at ECF 262. Two of defendant's three defense attorneys appeared with him at the Rule 11 hearing. *Id.* at 1. The defendant was 32 years of age at the time. *Id.* at 2.

The plea colloquy reflects that the defendant was sworn. *Id.* As to defense counsel, the Court asked, "Are you fully satisfied with the legal services provided to you by your lawyers in this case?" ECF 262 at 6. Elshinawy responded, "Yes, your honor." *Id.* Further, the Court asked defendant if he had "any complaints whatsoever about any aspect of the representation provided to [him] by [his] lawyers?" *Id.* The defendant answered: "No." *Id.*; *see also id.* at 7. In addition, the Court asked the defendant if he had discussed with his lawyers the evidence they believed the government would present at a trial, as well as any defenses he might have to the charges. *Id.* at 5. The defendant answered, *id.*: "Yes, I did." Thereafter, the Court fully reviewed the terms of the Plea Agreement with Elshinawy, and also advised him of his rights and the waiver of them by pleading guilty. *Id.* at 6-13, 30-38.

The Plea Agreement indicated that Elshinawy was exposed to a maximum of sixty-eight years of incarceration. ECF 120 at 2. During the plea colloquy, the Court advised defendant of his total prison exposure. ECF 262 at 12. The Court also reviewed certain disputes between the parties. And, the defendant was told that it was the Court's responsibility at sentencing to resolve all disputes. ECF 262 at 18.

With respect to the calculation of the Sentencing Guidelines ("Guidelines" or "U.S.S.G."), the Plea Agreement left open and unresolved the question of whether Elshinawy was subject to a twelve-level terrorism enhancement under U.S.S.G. § 3A1.4 for Counts One, Two, and Three. ECF 120 at 4-5. And, the Court highlighted the parties' disagreement. ECF 262 at 17. Defendant was told that, if the enhancement applied, his offense level would increase from 28 to 40, with a

required criminal history category of VI.  ECF 262 at 17-18, 23; ECF 120 at 5.[5]  The parties also disagreed about the applicability of a 12-level enhancement as to Count Four, which had a base offense level of 14.  ECF 120 at 5; ECF 262 at 18-19; ECF 120 at 5.  If the enhancement applied, the statutory maximum of twenty years for Counts One, Two, and Three would become the Guidelines.  ECF 262 at 19-20.

Notably, in the Plea Agreement the government did not agree to recommend a particular sentence.  ECF 120 at 6.  Rather, it agreed to recommend "an appropriate sentence," in light of the Guidelines and the factors in 18 U.S.C. § 3553(a).  *Id.*  The Court told the defendant, ECF 262 at 24:  "[W]hat you think is an appropriate sentence and what the government thinks is an appropriate sentence might be worlds apart.  Did you realize that?"  The defendant answered, *id.*:  "Yes, Your Honor."  Both sides reserved the right to appeal the sentence.  ECF 120 at 6.

With respect to sentencing, the Court held evidentiary hearings on December 4, 2017, December 5, 2017, February 12, 2018, and February 16, 2018.  *See* Docket.  The focus largely concerned the terrorism enhancement under U.S.S.G. § 3A1.4.  In addition, the parties disputed whether defendant had breached his proffer agreement.  *See* ECF 172-2 (Proffer Agreement).  In particular, the government claimed that Petitioner had included facts and arguments in his sentencing memoranda inconsistent with statements made during his proffer on August 2, 2017.  ECF 148 (government's letter of November 29, 2017). Both sides filed numerous and detailed submissions as to various sentencing issues.

The hearings and exhibits culminated in a 75-page Memorandum Opinion and Order issued by the Court on March 28, 2018.  ECF 234, ECF 235.  The Court concluded, *inter alia*, that defendant had indeed breached the proffer agreement.  ECF 234 at 5.  Moreover, the Court was of

---

[5] The defendant had no prior criminal record.  *See* ECF 126, ¶¶ 32, 33, 34, 35.

the view that "the evidence readily demonstrates that the terrorism enhancement applies here." *Id.*[6] The Court observed, *id.*: "Despite defense counsel's valiant effort on behalf of the defendant, they cannot turn the proverbial sow's ear into a silk purse.[]"

Sentencing was held on March 30, 2018.  ECF 239.  The Guidelines called for a sentence ranging from 360 to 816 months of imprisonment.  *See* ECF 245 (Statement of Reasons), at 1.  The government sought a sentence of 300 months (25 years).  The Court sentenced defendant to concurrent terms of 240 months of imprisonment (20 years) as to Count One, Count Two, and Count Three, and to a concurrent term of eight years as to Count Four, for a total term of twenty years, with credit for time in custody from December 11, 2015. ECF 244 (Judgment).

Thereafter, Elshinawy noted an appeal to the United States Court of Appeals for the Fourth Circuit. ECF 246. The Fourth Circuit affirmed Elshinawy's convictions and sentence in an unpublished opinion issued on July 16, 2019.  *See United States v. Elshinawy*, 781 F. App'x 168 (4th Cir. 2019); ECF 264.  The mandate issued on August 21, 2019.  ECF 268.  Petitioner subsequently filed a certiorari petition to the United States Supreme Court, which was denied on February 24, 2020.  *Elshinawy v. United States*, ___ U.S. ___, 140 S.Ct. 1221 (2020); ECF 269.

Additional facts are included in the Discussion, *infra*.

## II.  Legal Standards

### A.  Section 2255

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose

---

[6] The Memorandum Opinion did not address all issues pertinent to sentencing.  *See* ECF 238.

such a sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *See Hill v. United States*, 368 U.S. 424, 426-27 (1962) (citing 28 U.S.C. § 2255); *see United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

Under § 2255, the Petitioner must establish (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law so fundamental as to render the entire proceeding invalid. *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003). And, "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill*, 368 U.S. at 428).

The scope of collateral attack under § 2255 is narrower than on appeal, and a "'collateral challenge may not do service for an appeal.'" *Foster v. Chatman*, ⸺ U.S. ⸺, 136 S.Ct. 1737, 1758 (2016) (quoting *United States v. Frady*, 456 U.S. 152, 165 (1982)). A failure to raise a claim on direct appeal constitutes a procedural default that bars presentation of the claim in a § 2255 motion, unless the petitioner can demonstrate "cause and actual prejudice resulting from the errors of which he complains," or "actual innocence." *Pettiford*, 612 F.3d at 280 (citing *United States v. Mikalajunas*, 186 F.3d 490, 492-93 (4th Cir. 1999)); *see Bousley v. United States*, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal.") (internal quotations and citations omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see also Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Reed v. Farley*, 512 U.S. 339, 354 (1994) (stating that "the writ is available only if the petitioner establishes 'cause' for the waiver and shows 'actual prejudice resulting from the alleged violation.'"); *Finch v. McKoy*, 914 F.3d

292, 298 (4th Cir. 2019) (discussing requirements for a claim of actual innocence); *United States v. Linder*, 552 F.3d 391, 397 (4th Cir. 2009).

However, failure to raise on direct appeal a claim of ineffective assistance of counsel is not regarded as procedurally defaulted. *Massaro v. United States*, 538 U.S. 500, 509 (2003). Thus, such a claim is not barred under § 2255.  Moreover, such claims ordinarily are not litigated on direct appeal. Generally, such claims are litigated in a § 2255 action to allow for development of the record. *Massaro*, 538 U.S. at 504-06 (2003); *United States v. Ladson*, 793 F. App'x 202 (4th Cir. Feb. 12, 2020) (per curiam).  Thus, claims of ineffective assistance are cognizable on direct appeal "only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010); *see also Ladson*, 793 F. App'x at 203.

In reviewing the Petition, the Court is mindful that a self-represented litigant is generally "held to a 'less stringent standard' than is a lawyer, and the Court must liberally construe his claims, no matter how 'inartfully' pled." *Morrison v. United States*, RDB-12-3607, 2014 WL 979201, at *2 (D. Md. Mar. 12, 2014) (internal citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Commonwealth of Virginia Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (per curiam) (same); *Quintero v. Garland*, 998 F.3d 612, 634 (4th Cir. 2021) (same).

Pursuant to 28 U.S.C. § 2255(b), the court must hold an evidentiary hearing "[u]nless the motion and the files and records conclusively show that the prisoner is entitled to no relief . . . ." *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021); *see United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004). Ordinarily, a district court has discretion as to whether to hold a hearing,

but "a hearing is required when a movant presents a colorable Sixth Amendment claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claim . . . ." *Mayhew*, 995 F.3d at 176-77. If the district court "denies relief without an evidentiary hearing," the appellate court will "construe the facts in the movant's favor." *United States v. Akande*, 956 F.3d 257, 261 (4th Cir. 2020); *see also United States v. Turner*, 841 F. App'x 557, 559 (4th Cir. 2021) (same)

In my view, no hearing is necessary. As discussed below, no colorable claims have been presented.

### B.  Ineffective Assistance of Counsel

The Sixth Amendment to the Constitution guarantees a criminal defendant the right to the effective assistance of competent counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *see also Buck v. Davis*, —— U.S. ——, 137 S.Ct. 759, 775 (2017). Ineffective assistance of counsel is a well recognized basis for relief under collateral attack. *See generally Missouri v. Frye*, 566 U.S. 133 (2012); *Lafler v. Cooper*, 566 U.S. 156 (2012); *Padilla v. Kentucky*, 559 U.S. 356 (2010).

To mount a successful challenge under 28 U.S.C. § 2255 based on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test set forth in *Strickland*, 466 U.S. at 687–88; *see Williams v. Taylor*, 529 U.S. 362, 390 (2000); *United States v. Palacios*, 982 F.3d 920, 923 (4th Cir. 2020); *Akande*, 956 F.3d at 260; *United States v. Winbush*, 922 F.3d 227, 229 (4th Cir. 2019); *United States v. Hall*, 771 F. App'x 226, 227 (4th Cir. 2019) (per curiam); *United States v. Carthorne*, 878 F.3d 458, 465 (4th Cir. 2017); *United States v. Powell*, 850 F.3d 145, 149 (4th Cir. 2017). First, the petitioner must show that counsel's performance was deficient. Second, the petitioner must show that he was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 687; *see Buck*, 137 S.Ct. at 775; *Chaidez v. United*

*States*, 568 U.S. 342, 348 (2013); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000); *Hill*, 474 U.S. at 57; *Winbush*, 922 F.3d at 229; *Powell*, 850 F.3d at 149*; United States v. Rangel*, 781 F.3d 736, 742 (4th Cir. 2015); *United States v. Dyess*, 730 F.3d 354, 361 (4th Cir. 2013); *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012); *United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011); *see also United States v. Richardson*, 820 F. App'x 225, 226 (4th Cir. 2020) (per curiam); *United States v. Baker*, 719 F.3d 313, 318 (4th Cir. 2013). The petitioner must prove his claim by a preponderance of the evidence. *Pettiford*, 612 F.3d at 277; *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958); *United States v. Mayhew*, 995 F.3d 171, 176 (4th Cir. 2021).

The first *Strickland* prong, known as the "performance prong," relates to professional competence. The petitioner must demonstrate that his attorney's performance fell "below an objective standard of reasonableness," as measured by "prevailing professional norms." *Strickland*, 466 U.S. at 688; *see Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Richardson*, 820 F. App'x at 225; *Powell*, 850 F.3d at 149; *Hall*, 771 F. App'x at 227. The central question is whether "an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 690).

The Supreme Court has recognized that the "first prong sets a high bar." *Buck*, 137 S.Ct. at 775; *see also Powell*, 850 F.3d at 149. In *Padilla*, the Court stated, 559 U.S. at 371: "Surmounting Strickland's high bar is never an easy task." Notably, a "lawyer has discharged his constitutional responsibility so long as his decisions fall within the 'wide range of professionally competent assistance.'" *Buck*, 137 S.Ct. at 775 (citation omitted). Consequently, the performance prong is "'difficult'" to establish. *Lawrence v. Branker*, 517 F.3d 700, 709 (4th Cir. 2008) (quoting *James v. Harrison*, 389 F.3d 450, 457 (4th Cir. 2004)).

To satisfy the high bar, the burden is on the petitioner to establish "'that counsel made errors so serious that his "counsel" was not functioning as the "counsel" guaranteed by the Sixth Amendment.'" *Richter*, 562 U.S. at 88 (quoting *Strickland*, 466 U.S. at 687).   Notably, "the *Strickland* standard must be applied with scrupulous care," because "the standard of judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105; *see United States v. Morris*, 917 F.3d 818, 823 (4th Cir. 2019).   Indeed, "[k]eenly aware of the difficulties inherent in evaluating counsel's performance, the Supreme Court has admonished that courts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Lawrence*, 517 F.3d at 708 (quoting *Strickland*, 446 U.S. at 689); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011); *Richter*, 562 U.S. at 104; *Richardson*, 820 F. App'x at 225-26; *Lee v. Clarke*, 781 F.3d 114, 122 (4th Cir. 2015).

Under the second *Strickland* prong, the petitioner must show that his attorney's deficient performance "prejudiced [his] defense." *Strickland*, 466 U.S. at 687. To satisfy the "prejudice prong," a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also Buck*, 137 S.Ct. at 776; *Lafler*, 566 U.S. at 163; *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceedings. *Strickland*, 466 U.S. at 687. However, a petitioner is not entitled to post-conviction relief based on prejudice where the record establishes that it is "not reasonably likely that [the alleged error] would have made any difference in light of all the other evidence of guilt." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

A court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."

*Strickland*, 466 U.S. at 697. Nor must a court address both components if one is dispositive. *Jones v. Clarke*, 783 F.3d 987, 991 (4th Cir. 2015). This is because failure to satisfy either prong is fatal to a petitioner's claim. As a result, "there is no reason for a court...to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

## C.  Ineffective Assistance as to Plea Bargaining

A guilty plea is a "waiver of [a defendant's] right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970). It is "a grave and solemn act . . . ." *Id.*  For a guilty plea to be valid, it must be voluntary.  *Id.*  And, "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." *Id.*; *see Bradshall v. Stumpf*, 545 U.S. 175, 183 (2005) (same).  Thus, the plea must reflect an "intelligent choice among the alternative courses of action open to the defendant."  *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).

A plea cannot be "voluntary in the sense that it constituted an intelligent admission . . . unless respondent received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Henderson v. Morgan*, 426 U.S. 637, 645 (1976) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)).  However, the Supreme Court clarified in *Marshall v. Lonberger*, 459 U.S. 422, 436 (1983), that "it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit." *Marshall*, 459 U.S. at 436 (1983) (quoting *Henderson*, 426 U.S. at 647) (internal quotations omitted).

Of relevance here, the Sixth Amendment right to counsel extends to the plea-bargaining process. *McMann v. Richardson*, 397 U.S. 749, 771 (1970); *United States v. Murillo*, 927 F.3d 808, 815 (4th Cir. 2019); *Hall*, 771 F. App'x at 227; *see also Frye*, 566 U.S. at 140-44; *Lafler*, 566

U.S. at 162.  Moreover, a plea agreement "is an essential aspect of the administration of criminal justice . . . ." *United States v. Lewis*, 633 F.3d 262, 269 (4th Cir. 2011).  The plea process is governed by Rule 11 of the Federal Rules of Criminal Procedure.

When a criminal defendant claims ineffective assistance of counsel after pleading guilty, he is "bound," absent clear and convincing evidence to the contrary, "by the representations he made under oath during a plea colloquy." *Fields v. Attorney Gen. of Md.,* 956 F.2d 1290, 1299 (4th Cir. 1992); *see Blackledge v. Allison*, 431 U.S. 63, 74-75 (1977); *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005). Indeed, "a defendant's solemn declarations in open court affirming a [plea] agreement ... 'carry a strong presumption of verity.'" *Lemaster*, 403 F.3d at 221 (quoting *Blackledge*, 431 U.S. at 74). Therefore, conclusory allegations in a § 2255 petition that are contrary to testimony provided at a Rule 11 hearing are "palpably incredible and patently frivolous or false." *Lemaster*, 403 F.3d at 222. As the Fourth Circuit has explained, "courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." *Id. See also Blackledge,* 431 U.S. at 74; *White*, 366 F.3d at 295-96; *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003).

In *Hill v. Lockhart*, *supra*, 474 U.S. 52, the Supreme Court explained that, "where ... a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness [and intelligence] of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Id.* at 56 (citation omitted). And, in assessing whether counsel's performance was deficient, courts adopt a "strong presumption" that counsel's actions fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Notably, the prejudice prong of the *Strickland* test is slightly modified in the context of plea bargaining. *Hooper v. Garraghty*, 845 F.2d 471, 475 (4th Cir. 1988). In *Hooper*, the Fourth Circuit explained, *id.* (quoting *Hill*, 474 U.S. at 59): "When a defendant challenges a conviction entered after a guilty plea, [the] 'prejudice' prong of the [*Strickland*] test is slightly modified. Such a defendant 'must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Accord Burket v. Angelone*, 208 F.3d 172, 189 (4th Cir. 2000); *see also Richardson*, 820 F. App'x at 226. And, the defendant has the burden to establish a reasonable probability that, but for counsel's deficient performance, he would not have pled guilty. *Murillo*, 927 F.3d at 817.

*Hooper*, 845 F.2d 471, is illustrative. There, the defendant, who had a history of mental illness, pled guilty in a Virginia court to second-degree murder. *Id.* at 472. However, his lawyers failed to obtain a psychiatric evaluation before the defendant's entry of the guilty plea. *Id.* Hooper subsequently filed a habeas corpus petition, which the district court denied. *Id*. On appeal, the Fourth Circuit noted that the "burden is on Hooper to establish a reasonable probability that if his lawyers had obtained a psychiatric report, he would have rejected the plea agreement" and gone to trial. *Id.* at 475.

The Fourth Circuit examined a psychiatric report obtained after the guilty plea against the background of the circumstances Hooper faced at the time he decided to plead guilty. The Court was not persuaded that the report provided evidence sufficient to establish a reasonable probability that Hooper would have declined the plea agreement and gone to trial, even if his counsel had obtained a psychiatric report at the time. *Id.* at 475-76. Although the Court concluded that the failure to obtain a psychiatric report fell below the objective standard of reasonableness established

by *Strickland*, it was satisfied that Hooper was not prejudiced because there was no reasonable probability that the deficiency changed the outcome of the proceeding.

The Fourth Circuit has acknowledged that, on post-conviction, a defendant who has pled guilty "has an incentive to claim, in retrospect, that the result of the plea process would have been different regardless of whether that claim is, in fact, true." *Murillo*, 927 F.3d at 815; *see Lee v. United States*, ⸺ U.S. ⸺, 137 S.Ct. 1958, 1967 (2017) ("Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have [pled] but for his attorney's deficiencies."). Therefore, "to prevent criminal defendants with bargainer's remorse from simply claiming they would not have taken a deal but for a bit of bad advice," the defendant must "provide evidence of [his] sincerity." *Murillo*, 927 F.3d at 816. In particular, the defendant "must point to evidence that demonstrates a reasonable probability that, with an accurate understanding of the implications of pleading guilty, he would have rejected the deal." *Id.*

In the context of a plea bargain, "the defendant is the master of the outcome." *Murillo*, 927 F.3d at 815. Moreover, "[t]he prejudice analysis in the context of the plea-bargaining process requires a fact-based evaluation of the weight of the evidence." *Id.* To this end, "plea agreement language and sworn statements must be considered in their context[.]" *Id.* at 817; *see Lemaster*, 403 F.3d at 221-22.

### III.  Discussion

### A.  Motion for New Judge

I first consider defendant's Motion for a new judge, because it is a threshold issue.  If I were to agree with Petitioner, I would not proceed to address the remaining claims.

Defendant asserts that "it would be a conflict of interest for Judge Hollander to make a ruling about her own fairness regarding the defendant's court procedures." ECF 275 at 1. For this

reason, he requests that "his habeas claim under 28 U.S.C. § 2255 . . . be reviewed by different [sic] judge." *Id.*

The government's response is set forth in a half page.  ECF 283 at 31.  It points out, *id.*: "[T]he § 2255 motion often will be ruled upon by the same district judge who presided at trial. The judge, having observed the earlier trial, should have an advantageous perspective . . . ."  *Id.* (quoting *Massaro v. United States*, 538 U.S. 500, 506 (2003)).

To support its position, the government cites 28 U.S.C. § 455.  In my view, both 28 U.S.C. §§ 144 and 455 are relevant.

Section 144 is titled "Bias or prejudice of judge," and § 455 is titled "Disqualification of justice, judge, or magistrate judge." Under both § 144 and § 455, the judge whose objectivity is being challenged by a motion to recuse is the one who first reviews the matter of disqualification.

I begin with 28 U.S.C. § 455(a).  It states: "Any justice, judge, or magistrate judge of the United States shall disqualify [herself] in any proceeding in which [her] impartiality might reasonably be questioned." The term "proceeding" in § 455 includes the usual stages of a criminal trial and appellate review, as well as "other stages of litigation." *Id.* § 455(d)(1); *see also United States v. Cherry*, 330 F.3d 658, 666 (4th Cir. 2003) (the presiding judge has the discretion to recuse herself).

As the Supreme Court has observed, § 455(a) "deals with the *objective appearance* of partiality." *Liteky v. United States*, 510 U.S. 540, 553 n.2 (1994) (emphasis in original). Under this "'objective standard,'" the court asks "'whether the judge's impartiality might be questioned by a reasonable, *well-informed* observer who assesses *all the facts and circumstances*.'" *United States v. Stone*, 866 F.3d 219, 230 (4th Cir. 2017) (emphasis in original) (quoting *United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998)); *see also In re Beard*, 811 F.2d 818, 827 (4th Cir.

1987). Thus, disqualification is warranted "only if it appears that [a judge] harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." *Liteky*, 510 U.S. at 558.

Notably, a "presiding judge is not . . . required to recuse [herself] simply because of 'unsupported, irrational or highly tenuous speculation.'" *Cherry*, 330 F.3d at 665 (quoting *DeTemple*, 162 F.3d at 287); *see United States v. Lentz*, 524 F.3d 501, 504 (4th Cir. 2008). "The alleged bias must derive from an extra-judicial source [and] . . . result in an opinion on the merits on a basis other than that learned by the judge from [her] participation in the matter." *Beard*, 811 F.2d at 827. Put simply, "[t]he proper test to be applied is whether another with knowledge of all of the circumstances might reasonably question the judge's impartiality." *Id.*

Section 144 of 28 U.S.C. states, in pertinent part:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The standard for recusal under 28 U.S.C. § 144 requires a petitioner's affidavit in support of a recusal motion to establish adequately that the judge has a "personal bias or prejudice" either against the movant "or in favor of any adverse party." *See Sine v. Local No. 992 Int'l Bhd. of Teamsters*, 882 F.2d 913, 914 (4th Cir. 1989). Notably, "'[a]ssertions merely of a conclusory nature are not enough, nor are opinions and rumors.'" *United States v. Farkas*, 669 F. App'x 122, 123 (4th Cir. 2016) (per curiam) (quoting *United States v. Haldeman*, 559 F.2d 31, 34 (D.C. Cir. 1976)).

In *Sine*, 882 F.2d at 914, the Court said: "A judge against whom an affidavit under § 144 is filed must pass upon the legal sufficiency of the facts alleged." For an affidavit to be legally

sufficient under § 144, it must allege "*personal* bias or prejudice caused by an extrajudicial source other than what the judge has learned or experienced from [her] participation in the case." *Id.* (emphasis in *Sine*) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). In other words, the "nature of the bias must be personal rather than judicial." *Sine*, 882 F.2d at 914 (citing *Shaw v. Martin*, 733 F.2d 304, 308 (4th Cir. 1984)).

A "clear and convincing" standard of review is applied to the determination of whether the facts in the affidavit are legally sufficient to convince a reasonable person of the existence of a personal bias or prejudice. *Chitimacha Tribe v. Harry L. Laws Co.*, 690 F.2d 1157, 1165 (5th Cir. 1982). If the defendant's affidavit is legally sufficient, the court must recuse itself. *Sine*, 882 F.2d at 914. On appeal, a presiding judge's denial of a recusal motion is reviewed for abuse of discretion. *Stone*, 866 F.3d at 229; *United States v. Mitchell*, 886 F.2d 667, 671 (4th Cir. 1989).

Applying these standards here, I must deny Petitioner's request for a new judge. Petitioner alleges that I will be biased in reviewing my own fairness, but this is precisely the kind of conclusory allegation that is not grounds for recusal. ECF 275 at 1. Moreover, his claims essentially concern ineffective assistance of counsel.  The only ground of error alleged to have been committed by the Court concerns the alleged use of his religion as evidence of bad character. ECF 273 at 25.  But, as discussed, *infra*, this claim was procedurally defaulted.  Moreover, there is no factual basis for such an assertion.

I am mindful that my responsibilities require me to resolve dutifully and carefully those cases that are assigned to me, without bias, sympathy, prejudice, or partiality.  It would be a dereliction of duty to transfer the case to another judge, because there is no basis to do so.

### B.  Ground One

Petitioner asserts that one of his attorneys, Stuart Simms, rendered ineffective assistance of counsel when he "erroneous[ly] informed [Petitioner] that speaking with [another] attorney he wanted to represent him [*i.e.*, Charles Swift] would void the [attorney]/client privilege . . . ." ECF 273 at 4. According to Elshinawy, this advice played a central role in defendant's decision to reject representation from Mr. Swift, a lawyer for the Constitutional Law Center for Muslims in America ("CLCMA"), a non-profit 501(3) organization that handles national security cases of significance to the Muslim community.  ECF 373-3 at 2.  In Petitioner's view, he was deprived of his Sixth Amendment right to "counsel of [his] choosing." ECF 273 at 4.

To support his claim, defendant has provided the Declaration of Charles Swift, Esquire, the Director for CLCMA.  ECF 273-2 at 2-4.  Swift avers that on February 12, 2016, defendant requested assistance from CLCMA.  *Id.* ¶ 2.  He then explains the thorough process used by CLCMA to evaluate whether to handle a particular case.  *Id.* ¶ 3.  The decision to take a case is ultimately made by CLCMA's Board of Directors.  *Id.*

In Swift's view, defendant's case "appeared to meet the [organization's] general criteria." *Id.* ¶ 4.[7]  Therefore, on March 1, 2016, Swift contacted Stuart Simms, one of defendant's court-appointed attorneys, to discuss the case.  *Id.* ¶¶ 4, 5.  Swift indicated to Simms that he "wanted to meet directly" with the defendant.  *Id.* ¶ 5.  However, on March 4, 2016, he received a letter from the defendant, "via Mr. Simms," indicating that the defendant "did not want to participate with

---

[7] This assertion is perhaps at odds with what Mr. Simms wrote in a letter to defendant dated March 3, 2016, discussed *infra*.  ECF 273-2 at 5-7.  There, Simms indicated that Swift did not discern any constitutional issues.  But, to the extent of any factual conflict, it is not material, because I conclude that defendant cannot show prejudice.

CLCMA." *Id.* ¶ 6.  Therefore, CLCMA closed the matter.  *Id.*  As a result, no request for representation of defendant was ever presented to CLCMA's Board of Directors. *Id.*

Years later, on March 11, 2020, CLCMA received a new request from defendant, seeking representation in regard to a habeas petition.  *Id.* ¶ 9.  Swift claims, however, that he is precluded from accepting habeas representation because he would be a factual witness.  *Id.* ¶ 14.[8]

In Swift's view, Mr. Simms provided "erroneous" legal advice to Elshinawy by advising defendant that he would not enjoy the protection of the attorney-client privilege if he discussed his case with an attorney at CLCMA.  *Id.* ¶ 12.  And, Swift suggests that this error implicated defendant's Sixth Amendment right to a lawyer, and may constitute ineffective assistance of counsel.  *Id.* ¶¶ 10, 11.

Specifically, Swift asserts that Simms's advice regarding attorney-client privilege was incorrect under Model Rule 1.18 of the ABA Model Rules of Professional Conduct. *See* ECF 273-2, ¶ 12. He asserts that the rule requires confidentiality when a lawyer has learned information from a prospective client, even when no client-lawyer relationship ensues.  *Id.* And the rule, Swift points out, has been adopted by the state bars in Washington, Texas, North Carolina, and the District of Columbia, of which Swift is a member.  *Id.*  Further, he avers that Maryland has also adopted Model Rule 1.18, where Simms is a member of the Bar.  And, he states that the provision is also incorporated by reference in the ethical rules of practice for the United States District Court for the District of Maryland. *Id.*[9]  Thus, Swift avers that "there is a good faith basis to assert that

---

[8] The Court expresses no opinion as to whether this "conflict" would disqualify all lawyers at CLCMA.

[9] Presumably, Swift is referring to Local Rule 704, in which this Court has adopted the Maryland Rules of Professional Conduct.

Mr. Simms's advice to Mr. Elshinawy erroneously dissuaded him from exercising his Sixth Amendment rights to secure counsel of his choice." *Id.* ¶ 13.[10]

Notably, by letter of March 3, 2016 (ECF 273-2 at 5-7), Simms informed Petitioner that he had been contacted by Swift, and that the two had spoken for about 20 minutes. *Id.* at 5. Simms indicated that Swift intended to schedule a meeting with defendant, and wanted Simms and Mr. Treem, the co-counsel, to attend. *Id.* However, Simms told defendant that they did not plan to do so, and he "urged [defendant] to support this decision and further recommend[ed] that [defendant] decline Mr. Swift's visit request." *Id.*

Simms stated that he was under the "impression" that Swift "was 'not seeking to be defense counsel of record.'" *Id.* at 6. Among many things, Simms said: "[Y]ou should understand that there will be no attorney-client privilege for any discussion with Mr. Swift or any representative of his organization. *Id.* And, he claimed that Mr. Swift could be subpoenaed as a witness at a motion hearing or trial. *Id.*

Simms provided several additional reasons as to why, in the view of defense counsel, working with Swift was not advisable. He said, *id.* at 5: "[T]here can only be one counsel in a legal matter such as this. Mr. Treem [who was co-counsel] and I do not need to be distracted by any attorney or organization we do not know and cannot manage." He added, *id.*: "This is a management issue. We need the time and energy to focus on your best interests and not the best interests of a non-profit which may have a different agenda." Further, Simms stated: "The organization's focus . . . [is] on important constitutional issues. Commenting on this case, [Swift] stated that this case does not appear to raise any significant constitutional issues." *Id.*

---

[10] "'[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them.'" *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006)).

Further, Simms noted that Swift's proposed assistance duplicates the "additional resources" that they were seeking. *Id.* at 6. In this regard, Simms noted that he and Treem were preparing a budget to "fund translators and a consultant . . . ." *Id.*

In addition, Simms wrote that "it would be a breach of attorney-client privilege for us to discuss" the case with Swift. *Id.* And, he reiterated, *id.* at 5-6: "[A]ny discussion that you have had or may have with Mr. Swift . . . is <u>not</u> privileged."

Moreover, Simms claimed that the discovery agreement with the government prohibited examination of any discovery materials by anyone other than the defense counsel of record. *Id.* at 6. In addition, he claimed that certain classified materials would only be available to defense counsel of record. *Id.* Simms indicated that time had already been "diverted" from Elshinawy's case to address the issue of additional counsel. However, he pointed out that Swift could still "voluntarily contribute" to aspects of the case. *Id.*

Notably, Simms concluded: "[S]hould you wish to ignore our advice and request change of counsel, you would need to make such a request to the Court." *Id.* In the several years that the case was pending, Mr. Elshinawy never made such a request.

Simms asked defendant to acknowledge receipt of the letter. Defendant signed the letter on March 3, 2016, acknowledging receipt of the letter. *Id.* at 7.

As mentioned, at the defendant's guilty plea proceeding, the Court asked the defendant, who was under oath: "Do you have any complaints whatsoever about any aspect of the representation provided to you by your lawyers?" ECF 262 at 6. Defendant answered, "No." The Court also asked defendant if he was "fully satisfied with the legal services provided to [him] by [his] lawyers in this case?" He answered, "Yes, Your Honor." *Id.*

ABA Rule 1.18 is titled "Duties to Prospective Client."  It states, in part:  "Even when no client—lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except . . . ."  Maryland Rule 19-301.18(b) is to the same effect.

I shall assume that defendant has successfully demonstrated that Simms misinformed him in stating that his discussions with Swift would not be protected by the attorney-client privilege. This would satisfy the performance prong under *Strickland*.  Even so, defendant's argument as to ineffective assistance necessarily fails, because defendant cannot satisfy the prejudice prong, *i.e.*, "a reasonable probability that, but for counsel's errors, [defendant] would not have pleaded guilty and would have insisted on going to trial." *Hooper*, 845 F.2d at 475 (quoting *Hill*, 474 U.S. at 59).

Of import here, Elshinawy does not allege that he would not have pleaded guilty, and would have gone to trial, rather than plead guilty, if he been represented by Swift. *See* ECF 273 at 4. Nor is it clear that CLCMA would have represented Elshinawy. As noted, Swift had to submit a recommendation for representation to the Board of Directors of his organization, which could have rejected Swift's request. ECF 273-2, ¶ 3.

To add to the calculus, the evidence in support of defendant's guilt was very strong.  This suggests that another lawyer, such as Swift, would not have advised Elshinawy to proceed to trial. *See* ECF 139 (Government Sentencing Memo); ECF 190; 191; 232; 259; 260 (Sentencing Transcripts).

For example, in the government's lengthy sentencing memorandum and supporting exhibits, the government summarized numerous chats between Elshinawy, his brother, and Individual # 1, obtained from social media accounts. ECF 139. In those chats, Petitioner demonstrated his understanding of ISIS's goals as well as an interest in carrying out those goals.

26

*Id.* To illustrate, in a conversation with Individual # 1, Elshinawy expressed a desire for "victory over the infidels" and stated that he would "behead the Arab and foreign tyrants." *Id.* at 21. He also discussed his aspiration to join Individual # 1 in the Islamic State. *Id.* at 20-27. In his conversations with his brother, Petitioner stated: "Nothing is left but pride and martyrdom[,]" and "[k]illing the apostates is allowed." *Id.* at 36.

In addition to these conversations, forensic analysis of defendant's computer revealed significant evidence that petitioner frequently sought out ISIS and terror-related materials online. *Id.* at 52-56. For example, Petitioner had a screenshot of a video of an ISIS beheading, where an ISIS fighter said: "Here we are, burying the first American crusader in Dabiq, eagerly waiting for the remainder of your armies to arrive." *Id.* at 53. Moreover, there was significant evidence of monetary transfers from ISIS-affiliated entities to Petitioner's bank accounts. *Id.* at 60.

*United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010), provides guidance. In that case, the defendant pleaded guilty to various conspiracy charges arising from the terrorist attacks on September 11, 2001. The defendant waived his right to counsel, but the Court required "standby" counsel. *Id.* at 268. The defendant wanted a Muslim attorney who had agreed to assist him, *pro bono*. *Id.* For various reasons, that request was denied. Among the defendant's many challenges on appeal, he complained that the trial court violated his Fifth and Sixth Amendment rights to obtain counsel of his choice. *Id.* at 279.

The Fourth Circuit disagreed. It said, *id.*: "'When a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea.'" (Citation omitted). Instead, a defendant who pleads guilty is limited to a challenge to the adequacy of the plea. *United States v. Bundy*, 392 F.3d 641, 644 (4th Cir. 2004).

To be sure, the issue in *Moussaoui* arose in a post-plea effort to withdraw a guilty plea. And, some courts have determined that an ineffective assistance claim implicates a defendant's decision to plead guilty.  *See United States v. Glover*, 8 F.4th 239, 245 (4th Cir. 2021) (citing *United States v. Smith*, 618 F.3d 657 (7th Cir. 2010); *United States v. Sanchez Guerrero*, 546 F.3d 328 (5th Cir. 2008)).  But, there is no basis to conclude that Simms's advice had such an effect here.  Significantly, Simms did not bar defendant from seeking a new lawyer.  ECF 273-2 at 5-7. To the contrary, he told defendant he could make such a request to the Court.  *Id.* at 6.  Defendant never did so.

In sum, Elshinawy has not shown that, but for his attorney's alleged error, there is a reasonable probability that he would not have pleaded guilty and would have gone to trial, rather than plead guilty. Indeed, Elshinawy does not allege he would have done anything different, even if he had worked with Swift as his counsel.

## C.  Ground Two

Elshinawy next alleges that his attorney provided ineffective assistance of counsel because he had a financial conflict of interest that incentivized him to dissuade Petitioner from obtaining other counsel. ECF 273 at 5. This conflict of interest, according to Elshinawy, "prevented him from seeking out counsel of [his] choosing under the Sixth Amendment." *Id.*

A conflict of interest claim adheres to a structure similar to that of *Strickland,* 466 U.S. at 687. The mere "possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see United States v. Nicholson*, 475 F.3d 241, 249 (4th Cir. 2007). And, "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348. Such "[a]dverse effect cannot be presumed from the mere existence of a conflict of interest." *Rubin v. Gee*, 292

F.3d 396, 401 (4th Cir. 2002). In other words, Petitioner must demonstrate both deficient performance, in the form of conflict of interest, and prejudice, in the form of adverse effect.

The allegations here do not support the finding that Simms had an actual conflict of interest or that any conflict had an adverse effect on his legal performance. First, the notion that counsel had a financial incentive to remain in the case so that he could collect fees is nothing more than normal legal practice, as the government points out in its response. ECF 283 at 16. As the Court said in *United States v. Sabbagh*, 98 F. Supp. 2d 680, 689 (D. Md. 2000), the collection of legal fees for services "is without more insufficient to raise an inference that [counsel] failed to withdraw as counsel because of his own pecuniary interest . . . ." Indeed, this is not the kind of "'fee rich case'" described in *Sabbagh*; Elshinawy's attorneys were appointed for him under the Criminal Justice Act ("CJA"). Thus, petitioner has failed to demonstrate an actual conflict of interest based on CJA fees.

Elshinawy has also failed to establish any adverse effect on his case resulting from this alleged conflict. As discussed, it is not entirely clear that CLCMA would have represented him. ECF 273-2 at 2.  And, as noted, Simms never prevented Elshinawy from seeking new counsel. *Id.* at 5-7.  In fact, Simms explicitly told Elshinawy what he had to do to obtain new counsel, demonstrating that any alleged financial conflict did not affect his performance. *Id.* at 6.

This case is altogether unlike *Glover*.  There, the defendant sought to withdraw his guilty plea and his lawyer argued against the motion.  8 F.4th at 247, 248.  The Fourth Circuit said, *id.* at 248:  "By effectively 'testifying against his client,' Glover's counsel 'acted as both counselor and witness' for the prosecution.  These roles are inherently inconsistent.'"  (Citation omitted).

Elshinawy has failed to demonstrate a colorable conflict of interest claim.

### D.  Ground Three

Elshinawy maintains that his "statements/agreements/consent to procedures" were involuntary as a result of his fear of law enforcement and his own attorneys. ECF 273 at 7, 13-16.

Specifically, Petitioner claims that he met with FBI agents "out of fear," which stemmed from a visit to his home by three FBI agents in July 2015. *Id.* at 13. According to Elshinawy, the FBI agents interviewed him with "threatening language" and had their guns "un-concealed . . . ." *Id.* This frightened him because he "lived most of his life and grew up in Egypt" where, he explains, law enforcement agents are "known to be brutal . . . ." *Id.* at 7.

To support his claim of fear of law enforcement, defendant points to a "death threat" that is "on record" in a letter written by his wife, Rachel Rowe.  ECF 273-3 at 2-6. The letter was sent to the Court on January 20, 2018, prior to the sentencing.  It states: "[FBI agent] Dave told Ron [the stepfather of defendant's wife] that when Mohamed gets to prison an inmate will shenk him and kill him."  ECF 273-3 at 3. He also points to his own request that law enforcement meet with him in public. ECF 273 at 14.

As evidence of the intimidation of defendant by his lawyers, defendant highlights email correspondence on September 16, 2016, to Simms from Joshua Treem, another CJA defense attorney. ECF 273-3 at 6. The email stated, in part: "The wife's complaints are nonsense and we should not pander to her or her husband. If the client's [sic] doesn't like how we are defending this case *then he can ask for new counsel*. If he does not have the balls to do that then he needs to shut his mouth and let us do our jobs. We are all he has between freedom on one end and 20+ years in jail on the other end." *Id.* (emphasis added).  Notably, defendant's wife was copied on the email. *Id.*

The email from Treem to Simms was prompted by a complaint sent that day to Simms from defendant's wife, Rachel Rowe. ECF 273-3 at 5. She wrote, *id.*: "Mohamed is tired of you answering all his questions with maybe, perhaps or not sure. Mohamed asked you to bring certain documents last time and you didn't. Please do next time. Mohamed said he can now guess all the answers to his questions he has for you. It's time to change this strategy . . . . If you would just answer his questions. Mohamed said he can't take it anymore . . . . He said you and the other lawyers need to change the way you deal with him."

Simms responded to Rowe two hours later. *Id.* at 5-6. He said, in part, *id.* at 6: "We share our client's frustration . . . let me repeat . . . . The fact that we are not explicit in e-mails does not necessarily mean that we are not devoting time to the defense of this case. This case has been and remains a priority."

This claim must be evaluated in light of the defendant's guilty plea. In determining whether a confession is voluntary, the Fourth Circuit has said: "The mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997); *see also United States v. Khoa Dang Hoang*, 737 F. App'x 136, 139 (4th Cir. 2018); *United States v. Giddins,* 858 F.3d 870, 881 (4th Cir. 2017). Indeed, the test for voluntariness is "whether the defendant's will has been overborne or his capacity for self-determination is critically impaired." *Giddins*, 858 F.3d at 881. The court must "consider 'the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and details of the interrogation.'" *United States v. Parks*, 849 F. App'x 400, 402 (4th Cir. 2021) (quoting *United States v. Holmes*, 670 F.3d 586, 592 (4th Cir. 2012)); *see Walton v. Angelone*, 321 F.3d 442, 462 (4th Cir. 2003) (recognizing that court looks to the totality of the circumstances to evaluate the constitutionality

of a guilty plea, with a presumption of truthfulness as to a defendant's "solemn declaration of guilt . . . .").

The cases in which a court has found that a defendant's will was overborne are altogether unlike this case.  In *Davis v. North Carolina*, 384 U.S. 737 (1966), for example, the defendant was held in detention for sixteen days and interrogated daily under coercive circumstances. In another case, *Spano v. New York*, 360 U.S. 315 (1959), police officers questioned an uneducated defendant with "emotional instability" until 3:00 a.m. at the police station, ignored the defendant's requests to contact an attorney, and leveraged a personal relationship the defendant had with a policeman in order to extract a confession.

As a threshold matter, the government argues that this claim must fail because defendant did not raise a claim of coercion or involuntary plea on direct appeal. ECF 283 at 18 (citing *Bousley*, 523 U.S. at 620); *see also Pettiford*, 612 F.3d at 280 (citing *Mikalajunas*, 186 F.3d at 492-93). Thus, according to the government, it is now procedurally defaulted unless Elshinawy can show cause for the waiver of the claim on direct appeal and actual prejudice from the allegedly coerced confession or plea. ECF 283 at 18 (citing *Murray*, 477 U.S. at 485). Elshinawy claims that he did not raise this issue on appeal because he feared law enforcement retaliation. ECF 273 at 7. However, it is not clear why he would feel any more comfortable now than he did at the time of his appeal. He has failed to allege cause for the waiver.

Even if Elshinawy could show cause, his claims regarding his fear of law enforcement and his own counsel do not amount to coercion such that his will was "overborne" or his capacity for self-determination was impaired.  In consideration of the "totality of the circumstances," *Parks*, 849 F. App'x at 402 (quoting *Holmes*, 670 F.3d at 592) (internal quotations omitted) (citation omitted), petitioner's ties to ISIS may have contributed to his fear, but he does not allege any facts

that would indicate coercive activity by law enforcement or his counsel. *See* ECF 273. Further, although defendant alleged that "threatening language" was used during his initial FBI interview, he does not point to any specific statements. *Id.* at 13. The "threat" described in Rowe's letter is uncorroborated and also more likely to induce one to plead *not guilty* because the alleged threat is with respect to what might happen in prison. ECF 273-3 at 3.

Regarding Elshinawy's counsel, the email correspondence certainly demonstrates that counsel spoke indelicately about petitioner's case, seemingly due to frustration.  But, it is not so extreme as to amount to coercion. *Id.* at 6. In fact, barring the offensive language, this correspondence demonstrates a consistent theme throughout this case: Elshinawy was told he could request new counsel. *Id.*

Having established that there was no coercion by law enforcement or his counsel, Elshinawy's remaining claim that his guilty plea was involuntary depends on whether he had "real notice of the true nature of the charge against him." *Henderson*, 426 U.S. at 645. As mentioned, the Supreme Court has permitted a reviewing court to conclude that "defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice." *Marshall*, 459 U.S. at 436. And, Elshinawy explicitly stated on the record that he had discussed the Plea Agreement with counsel, that he understood the terms, and that he consented to the Agreement. ECF 262 at 7. The Fourth Circuit has explained that "courts must be able to rely on the defendant's statements made under oath during a properly conducted Rule 11 plea colloquy." *Lemaster*, 403 F.3d at 222.

In sum, there is no basis upon which to conclude that Petitioner was coerced to plead guilty, either by law enforcement or his counsel, so as to render his plea involuntary.

### E.   Ground Four

Elshinawy complains that his counsel erroneously advised him to waive his right to a preliminary hearing. ECF 273 at 8. He argues, among other things, that "he was asserting innocence to his counsel at the time," and that a rational person would not have waived the hearing. *Id.* at 17. This claim lacks merit.

As noted previously, in order to prevail on a claim of ineffective assistance of counsel, petitioner must demonstrate both a deficient performance as well as prejudice to his defense. *Strickland*, 466 U.S. at 687. In the context of a plea bargain, Petitioner must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hooper,* 835 F.2d at 475 (quoting *Hill*, 474 U.S. at 59) (internal quotations omitted). Elshinawy's claim fails both prongs.

Courts in the Fourth Circuit have consistently found that waiver of a preliminary hearing does not establish ineffective assistance of counsel when it is a sound trial strategy or the defendant proceeds to enter a voluntary guilty plea. *See Scott v. Wheeler*, 705CV00057, 2005 WL 1388912, at *3 (W.D. Va. June 10, 2005) (holding that waiver of preliminary hearing was not ineffective assistance when defendant entered into voluntary and knowing guilty plea); *Straws v. Stevenson*, 5:13-3484-BHH-KDW, 2014 WL 8433190, at *4 (D.S.C. Dec. 17, 2014) (holding that "counsel articulated valid strategic reasons for waiving the preliminary hearing"); *Tekle v. Clark*, 3:18CV694, 2020 WL 2108725, at *7 (E.D. Va. May 1, 2020) (holding that petitioner failed to "demonstrate that counsel's advice to waive the preliminary hearing was unreasonable in light of the Commonwealth's ability and intent to bring additional charges.").

"The exclusive purpose of a preliminary hearing is to permit a determination of probable cause." *United States v. Smith*, 22 F. App'x 137, 138 (4th Cir. 2001) (per curiam). And, the

issuance of an indictment obviates the need for a preliminary hearing. It is well settled that "an indictment, 'fair upon its face,' returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause." *Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012); *see Gerstein v. Pugh*, 420 U.S. 103, 123 (1975) (concluding that "[t]here is no single preferred pretrial procedure[]" for determining probable cause for detaining an arrested person pending further proceedings); *Jaben v. United States*, 381 U.S. 214, 220 (1964) (stating that a preliminary hearing is not required if "the grand jury supersedes the complaint procedure by returning an indictment"); *United States v. Anderson*, 481 F.2d 685, 691 (4th Cir. 1973) (stating that a preliminary hearing is not a "discovery mechanism for the defendant" and a defendant may not "demand a preliminary hearing after indictment").

Perhaps most telling here is that petitioner voluntarily and knowingly pled guilty on all counts, which renders baseless his claim of ineffective assistance of counsel claim based on the waiver of preliminary hearing. *See* ECF 120; ECF 262. *See Scott*, 2005 WL 1388912, at *3. Moreover, the government notes that the facts establishing probable cause were clearly outlined in the criminal complaint, suggesting that it was reasonable for counsel to waive the preliminary hearing. ECF 283 at 22; *see* ECF 1 (Complaint). Thus, Elshinawy has failed to allege deficient performance.

And, following waiver of Elshinawy's preliminary hearing, his case proceeded to indictment, which is sufficient to establish probable cause, signifying that he has also failed to demonstrate prejudice. *See* ECF 19; *see also Durham*, 690 F.3d at 189. Given the strength of the evidence against Elshinawy, it is difficult to envision how a preliminary hearing could have changed the outcome of this case. *See* ECF 139; ECF 190; 191; 232; 259; 260.  Waiver of the preliminary hearing was not ineffective assistance of counsel.

### F.  Ground Five

In Petitioner's fifth contention, he broadly states that his counsel rendered ineffective assistance when he did not "adhere to the defendant's choice about the proper way to protect his own liberty." ECF 273 at 18. In particular, Elshinawy argues that his attorney, who he does not reference by name, failed to challenge the element of intent with regard to the charges under 28 U.S.C. §§ 2339B and 2339C. *Id.* He also complains that he instructed his attorney to seek out additional Facebook transcripts, which counsel failed to do. *Id.* The other transcripts, Elshinawy explains, would have shown that he had been acting "negligently" and that his chats were "nothing more than an illusory world." ECF 285 at 31-32. He claims he was addicted to online chats and never had the intent to act on anything he discussed. *Id.*  Accordingly, he claims that he would have gone to trial if counsel had litigated the case in the manner that he wanted. ECF 273 at 8.

Notably, in connection with defendant's plea of guilty, he admitted to facts that established the required intent for the crimes with which he was charged. ECF 120. Thus, the performance prong of defendant's ineffective assistance of counsel claim faces the "strong presumption" that his attorney's actions fell within the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

To be clear, counsel for Elshinawy introduced several Facebook transcripts in connection with the sentencing. *See* ECF 138-2 (Facebook transcripts). These transcripts demonstrate, among other things, that Individual # 1 reached out to defendant via Facebook, offering him money and assistance to travel to Syria multiple times, which Elshinawy did not pursue. ECF 138 (Elshinawy Sentencing Memorandum) at 9. Furthermore, the Facebook records "demonstrate that Mr. Elshinawy 'blocked' [Individual # 1] at some point and later deleted the records of his conversations with [Individual # 1]." *Id.* But, if there were additional relevant transcripts, it was

within the range of "reasonable professional assistance" that counsel did not seek out these transcripts in order to challenge intent, given the otherwise overwhelming evidence of Elshinawy's guilt. *Strickland*, 466 U.S. at 689. *See* ECF 139; ECF 190; 191; 232; 259; 260.

Even if these transcripts would have shown that defendant was acting "negligently" within an "illusory world" of chat groups, this would not undermine the clear evidence, to which defendant stipulated, of money transfers or conversations with his brother, who presumably was not a part of his online "illusory world." ECF 120; ECF 273 at 18. Put differently, challenging defendant's intent would not have produced a reasonable probability of proceeding to trial, rather than pleading guilty. Defendant's claim then, without more, fails both the performance and prejudice prong of ineffective assistance of counsel.

Additionally, in his reply, Elshinawy argues that counsel's failure to litigate his case in the manner he wished was a "structural error" that is "not subject to harmless-error review." ECF 285 at 27. However, petitioner relies on cases that address the right to proceed pro se. *Id.*

In conclusion, there is no colorable Sixth Amendment claim with respect to failure to challenge the Petitioner's intent.

## G.  Ground Six

In ground six, Elshinawy asserts that his attorney rendered ineffective assistance of counsel by failing to allege that the government had breached his Plea Agreement. ECF 273 at 20; ECF 120. According to Elshinawy, "the government [brought] 'misrepresented' proffer information" at sentencing, which he alleges was in violation of the Plea Agreement. *Id.* Furthermore, he mentions in passing that the "government presented to the court a video of defendant and his wife which has nothing to do with the defendant's accusations . . . ." *Id.* Consequently, Elshinawy claims that, if

his attorney had "announced the government to be in breach of [the] plea agreement, the court would [have] made a determination . . . ." *Id.* at 20-21.

The same two-prong standard for ineffective assistance of counsel applies at sentencing. *Strickland*, 466 U.S. at 695. In particular, the *Strickland* Court held: "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.; see also United States v. Freeman*, 992 F.3d 268, 275 (4th Cir. 2021) ("'An attorney's failure to object to an error in the court's guidelines calculation that results in a longer sentence for the defendant can demonstrate constitutionally ineffective performance.'"). Here, Elshinawy would have to demonstrate both deficient performance and probability of a more lenient sentence. He fails to satisfy either prong.

To be clear, there was substantial litigation here about breach of the proffer agreement. *See* ECF 234 (Memo. Opinion of March 28, 2018). At sentencing, the government asserted that it was entitled to introduce portions of the defendant's proffer that were materially different from the defendant's statements in his sentencing memoranda. *Id.* at 4. The defense vigorously disputed the claim of breach. *Id.* In my Opinion of March 28, 2018, however, I found that defendant breached the proffer agreement. *Id.* at 74.

The Plea Agreement specified that the government and petitioner "agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute." ECF 120 at 5-6. However, both parties reserved the right to present information relevant to the sentencing factors under 18 U.S.C § 3553. *Id.* And, the parties reserved the right to "bring to the Court's attention at the time of sentencing, and the Court

will be entitled to consider, all relevant information concerning the Defendant's background, character, and conduct." *Id.* at 6. At sentencing, the government introduced evidence to argue sentencing factors, including the terrorism enhancement, that were left open and unresolved in the Plea Agreement. *Id.*; *see* ECF 234 (Memo. Opinion of March 28, 2018).  Thus, there was no material breach of the Plea Agreement and Elshinawy's counsel did not fail to make a claim for breach.

Even if Elshinawy were able to satisfy the performance prong of ineffective assistance of counsel with respect to failure to allege breach of the Plea Agreement, he failed to allege any "reasonable probability" that his sentencing would have been different, but for counsel's error. *Strickland*, 466 U.S. at 694. In fact, as indicated, the Plea Agreement left open the question of whether Elshinawy was subject to the twelve-level terrorism enhancement under U.S.S.G. § 3A1.4 for Counts One, Two, and Three, which would increase his offense level from 28 to 40. ECF 120 at 4-5. At the sentencing hearing of March 30, 2018, the parties disputed introduction of evidence from the proffer, which Elshinawy now contends should not have been admitted. ECF 260. But, the Court said: "I found the terrorism enhancement applicable without consideration of anything in the proffer." *Id.* at 29. Therefore, even if Elshinawy's counsel had claimed breach of the Plea Agreement, his sentence would not have changed.

Of import, the Guidelines called for a sentence of 360 to 816 months.  ECF 245 at 1.  The government recommended a sentence of 300 months (25 years).  ECF 260 at 48.  The court imposed a sentence of 240 months (20 years), which was well below the government's recommendation and far below the Guidelines.  ECF 244.

Under this ground, petitioner also claims, in passing, that the government introduced a video, which was "private" and "had nothing to do with the defendant's accusations." ECF 273 at

20. However, this video was used to provide "relevant information concerning the Defendant's background, character and conduct." ECF 120 at 6. Specifically, the government asked the Court "to understand that this defendant is not the protector of [his wife,] Rachel Rowe." ECF 260 at 42. The government also explained that Elshinawy had "molded her into submission." *Id.* Thus, the introduction of this video was not improper. And yet again, even if this had been deficient performance on the part of counsel for the defense, it did not prejudice the defendant in light of the other evidence of his guilt. *See* ECF 139; ECF 190; 191; 232; 259; 260.

Accordingly, there is no Sixth Amendment claim with respect to breach of the Plea Agreement or based on the video.

## H.  Ground Seven

Petitioner next asserts that his attorney erroneously failed to impeach his own expert, Dr. Marc Sageman. ECF 273 at 22. He argues that Sageman provided a "conflicting and contradicting report," which resulted in "an admission of guilt regarding the defendant's intent . . . ." *Id.* Elshinawy cites several sections of the expert report, including where the expert stated, "Mr. Elshinawy is not dangerous in the criminal sense, nor is he likely to conduct any significant terrorist operations in the United States." *Id.* at 23. Petitioner contends that this exemplifies the contradictory and inculpatory nature of the report because it implies that he would be willing to conduct an "insignificant" terrorist attack. *Id.* Elshinawy also claims that his attorney should have highlighted these contradictory aspects of the report at sentencing because "the government relied heavily on this Expert Report . . . [to justify] a long sentence." *Id.* at 25.

Again, Elshinawy must satisfy the two-prong standard for ineffective assistance of counsel at sentencing. *See Henry,* 336 F. App'x at 310. Rather than being contradictory, the expert report attempts to draw a distinction between Elshinawy's intent prior to his interviews with the FBI and

after the interviews. ECF 190 at 48-49. Specifically, Sageman claimed that, "[b]y the time that the FBI came to the interview," petitioner already had given up his plans "to travel to Syria, join the Islamic State, and carry out a terrorist operation in the United States." *Id.* at 61. This was an effort to provide an explanation as to why defendant "lied to the government about his past plan to join the Islamic State and his past plan to carry out a terrorist attack on its behalf." *Id.* As the government puts it, this is "an attempt to convince the Court that an individual who pled guilty to providing material support to ISIS was no longer dangerous." ECF 283 at 26.

In my view, it was reasonable to present the report to the Court at sentencing to the extent that it suggests that the Court should not view defendant as dangerous going forward. Thus, there is no evidence that Elshinawy's attorney was deficient for failing to impeach his own expert.

Furthermore, there was evidence of petitioner's intent, as discussed previously, beyond the Expert Report. *See* ECF 120 at 9-11; 139; 190; 191; 232; 259; 260. Although Elshinawy argues that his attorney should have highlighted certain discrepancies in the report, the full report was submitted to the Court. ECF 138-4 (Expert Report). And, I indicated that I understood the purpose of Sageman's distinction. ECF 234 at 37. Thus, failure to impeach the expert would not constitute prejudice even in the unlikely event it constituted deficient performance.

## I.   Ground Eight

In his eighth and final ground, petitioner alleges that religion was used as evidence of his bad character, which is a violation of his constitutional rights. ECF 273 at 25. He argues that the government should not have been permitted to introduce evidence that he watched a video of Islamic religious sites in Saudi Arabia and that he listened to the online recitation of the Quran. *Id.* at 26. He also complains that evidence that he viewed pictures of government buildings should not have been used at his sentencing because he was merely researching the facilities for his wife's

medical treatments. *Id.* at 26-27. Further, he argues that a photo introduced by the government of his vehicle filled with newspapers was a "mockery," given that he had previously worked as a newspaper deliveryman. *Id.* at 27.

Elshinawy has not alleged ineffective assistance of counsel on this ground. Therefore, petitioner's challenge to the admission of this evidence could have been raised on direct appeal and is now procedurally defaulted.  *See Bousley*, 523 U.S. at 620; *see also Pettiford*, 612 F.3d at 280 (citing *Mikalajunas*, 186 F.3d at 492-93). Thus, to succeed on this claim, petitioner must show both cause for the waiver of the claim on direct appeal and actual prejudice from the allegedly inadmissible evidence. *Id.* Elshinawy has established neither.

As a preliminary matter, petitioner has not alleged any cause for the waiver of these claims on direct appeal. Moreover, petitioner has not actually alleged any instances where his religion was used as evidence of his bad character. To be sure, at the sentencing hearing on March 30, 2018, the government described petitioner's online activity, including "accessing a lot of Islamic sort of religious information" and "all sorts of prayer sites." ECF 260 at 39. However, the government used this as evidence not of Elshinawy's bad character but of "whether or not the tide was turning in his mind as to whether it was safe to do something . . . ." *Id.*

And, his claim regarding the photograph of newspapers in his car is taken out of context. The record from direct examination of Johnathan Cobo, an FBI Staff Operations Specialist, demonstrates as much. *See* ECF 191. Cobo was questioned about newspapers found in petitioner's home, which were opened to articles on recent terrorist attacks, including the Paris terrorist attack, the San Bernadino terrorist attack, and others that occurred in the United States and overseas. *Id.* at 40. After describing the newspapers strewn about in petitioner's home, Cobo agreed that the photo of Elshinawy's car showed newspapers that "were stacked for delivery." *Id.* at 41. In other

words, Cobo acknowledged that the newspapers in Elshinawy's vehicle were from his job as a newspaper deliveryman, as petitioner contends.

Further, Elshinawy argues his research on various federal buildings should not have been admitted as evidence because he was looking at those buildings to take his wife to the hospital. ECF 273 at 26-27. However, even if there is truth to his claim, it does not render the evidence inadmissible. Pursuant to Federal Rule of Evidence 104(b) and *Huddleston v. United States*, 485 U.S. 681, 690 (1988), conditionally relevant evidence is admissible if any rational trier of fact could conclude by a preponderance of the evidence that the condition rendering the evidence relevant is true. In this case, the conditional relevance question is whether defendant was viewing the buildings for purposes of taking his wife to the hospital or to plan an attack. Fed. R. Evid. 104(b). Given the leniency of this standard, there is no admissibility problem.

Petitioner also alleges that he would have gone to trial if he knew that he would be exposed to a sentence of sixty-eight years in the Plea Agreement. ECF 273 at 25; ECF 120. There is no merit to this claim, as the Plea Agreement explicitly outlines the maximum sentence available. ECF 120 at 2. Furthermore, petitioner explicitly acknowledged on the record that he had read and understood the Agreement. ECF 262 at 7. And, the Supreme Court has explained that a reviewing court may presume that competent counsel explained a plea and its consequences to a defendant. *Marshall*, 459 U.S. at 436 (quoting *Henderson*, 426 U.S. at 647).

Thus, Petitioner's final ground is also without merit.

### IV. Summary

Elshinawy has presented many arguments in his submissions. To the extent that the Court has not expressly addressed all of his contentions, they have nonetheless been considered and are hereby rejected.

## V.  Certificate of Appealability

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the Court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding..5 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see Buck*, 137 S.Ct. at 773.  Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find the court's assessment of the constitutional claims debatable or wrong. *See Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003).

Petitioner has not made a substantial showing of the denial of his constitutional rights. Therefore, I decline to issue a COA.[11]

An Order follows, consistent with this Memorandum Opinion.


Date: October 14, 2021                                      _____/s/_____

                                                           Ellen L. Hollander
                                                           United States District Judge

---

[11] Where the district court denies a COA, this does not preclude a petitioner from seeking a COA from the appellate court.